**FILED**
U. S. DISTRICT COURT
**EASTERN DISTRICT ARKANSAS**

United States District Court Eastern District of Arkansas   SEP 2 3 2019
Western Division

**JAMES W. McCORMACK, CLERK**
By:_____
**DEP CLERK**

4:19-cv-655-BSM

Janice Hargrove Warren                                      Plaintiff

v.

Charles McNulty,                                          Defendants
in his official capacity as Superintendent of the
Pulaski County Special School District;

Mike Kemp,
in his official capacity as a Member of the Board of the
Pulaski County Special School District and in his individual capacity;

Tina Ward,
in her official capacity as a Member of the Board of the
Pulaski County Special School District and in her individual capacity;

Linda Remele,
in her official capacity as a Member of the Board of the
Pulaski County Special School District and in her individual capacity;

Shelby Thomas,
in his official capacity as a Member of the Board of the
Pulaski County Special School District and in his individual capacity;

Alicia Gillen,
in her official capacity as a Member of the Board of the
Pulaski County Special School District and in her individual capacity;

Eli Keller,
in his official capacity as a Member of the Board of the
Pulaski County Special School District and in his individual capacity;

Brian Maune,
in his official capacity as a Member of the Board of the
Pulaski County Special School District and in his individual capacity;

The Pulaski County Special School District ("PCSSD").

This case assigned to District Judge Miller
and to Magistrate Judge Kearney

1

## COMPLAINT

### Parties

1.      The Plaintiff, Janice Hargrove Warren ("Dr. Warren"), is a natural person who resides in Maumelle, Arkansas, during the times relevant to this cause of action. Dr. Warren is a black female; at all times relevant to this cause of action, she was over the age of forty.

2.      Separate Defendant Charles McNulty ("Dr. McNulty") is a natural person and is currently the Superintendent of the Pulaski County Special School District. Dr. McNulty is named in his official capacity as Superintendent of the Pulaski County Special School District.

3.      Separate Defendant Mike Kemp ("Mr. Kemp") is a natural person and currently represents Zone 1 on the Board of the Pulaski County Special School District. Mr. Kemp is named in his official capacity as a member of the Board of the Pulaski County Special School District and in his individual capacity.

4.      Separate Defendant Tina Ward ("Ms. Ward") is a natural person and currently represents Zone 2 on the Board of the Pulaski County Special School District. Ms. Ward is named in her official capacity as a member of the Board of the Pulaski County Special School District and in her individual capacity.

5.      Separate Defendant Linda Remele ("Dr. Remele") is a natural person and currently represents Zone 3 on the Board of the Pulaski County Special School District. Dr. Remele is named in her official capacity as a member of the Board of the Pulaski County Special School District and in her individual capacity.

6.      Separate Defendant Shelby Thomas ("Mr. Thomas") is a natural person and currently represents Zone 4 on the Board of the Pulaski County Special School District. Mr. Thomas is

named in his official capacity as a member of the Board of the Pulaski County Special School District and in his individual capacity.

7.      Separate Defendant Alicia Gillen ("Ms. Gillen") is a natural person and currently represents Zone 5 on the Board of the Pulaski County Special School District. Ms. Gillen is named in her official capacity as a member of the Board of the Pulaski County Special School District and in her individual capacity.

8.      Separate Defendant Eli Keller ("Mr. Keller") is a natural person and currently represents Zone 6 on the Board of the Pulaski County Special School District. Mr. Keller is named in his official capacity as a member of the Board of the Pulaski County Special School District and in his individual capacity.

9.      Separate Defendant Brian Maune ("Mr. Maune") is a natural person and currently represents Zone 7 on the Board of the Pulaski County Special School District. Mr. Maune is named in his official capacity as a member of the Board of the Pulaski County Special School District and in his individual capacity.

10.     Separate Defendant Pulaski County Special School District ("PCSSD") is a public school district with its central office located in Sweet Home, Arkansas. It is a corporate body with the power to sue and be sued. Ark. Code Ann. § 6-13-102; Ozarks Unlimited Res. Coop., Inc. v. Daniels, 333 Ark. 214, 223, 969 S.W.2d 169, 173 (1998), F.E. Compton & Co. v. Greenwood Sch. Distr. No. 25, 203 Ark. 935, 159 S.W.2d 721 (1942), Clarke v. School Distr. No. 16, 84 Ark. 516, 106 S.W. 677 (1907)(a school district is a corporate body with the power to sue and be sued).

## Subject Matter Jurisdiction

11.     This Court has subject matter jurisdiction over this cause of action under 28 U.S.C. §

1331 because it is a civil action arising under the laws of the United States, specifically 42

U.S.C. §§ 1981, 1983, 2000e-2(a)(1), 2000e-2(a)(2), 2000e-3(a), and 2000e-5(f)(1).

## Personal Jurisdiction

12.     This Court has personal jurisdiction over Mr. Kemp, Ms. Ward, Dr. Remele, Mr.

Thomas, Ms. Gillen, Mr. Keller, Mr. Maune, and PCSSD because at all times relevant to this

cause of action, each of the foregoing had continuous and systematic contacts with the State of

Arkansas that are sufficient to justify the State's exercise of judicial power with respect to all

claims Dr. Warren may have against each of them. Int'l Shoe Co. v. Washington, 316 U.S. 310,

317 (1945) (citations omitted).  This Court has personal jurisdiction over Dr. McNulty because

he is the executive officer of the PCSSD Board of Education ("PCSSD Board" or "Board")

directing the affairs of the PCSSD. Ark. Code § 6-13-109 (2018).

## Venue

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of

the events or omissions giving rise to Dr. Warren's claims against Mr. Kemp, Ms. Ward, Dr.

Remele, Mr. Thomas, Ms. Gillen, Mr. Keller, Mr. Maune, PCSSD, and Dr. McNulty occurred in

the Eastern District of Arkansas.

## Factual Basis of Dr. Warren's Claims

14.     Dr. Warren is an experienced agent of change in the public education arena, advancing

the educational opportunities for students, staff, and other stakeholders. She began her career in

educational leadership as an Elementary School Principal (K-5) for Crossett School District,

Crossett, AR ("Crossett School District") (1988-1991). She, then, supervised four elementary

schools PK-5 as an Administrative Assistant of Crossett School District (1992-1995). She

continued her ascension in leadership to the position of Assistant Superintendent for the Crossett

School District (1996–2001) as the elementary supervisor and elementary curriculum

coordinator. Finally, Dr. Warren was appointed Superintendent of Crossett School District in

July of 2001 and served as Executive over the District for ten years.

15.     During her ten-year service as Superintendent, Crossett School District had a student

enrollment that ranged from 3500 to 2500, with a racial composition of 60% white, 40% black to

56% white, 42% black, 2% other. When Dr. Warren began serving as Superintendent on July 1,

2001, the high school and middle school were in academic distress. At the same time, Crossett

suffered from a decline in the timber industry and many families relocated to find jobs

elsewhere. The Crossett School District suffered a substantial loss in student population.

Consequently, eight months after Dr. Warren was appointed Superintendent, the Crossett School

District was declared fiscally distressed. Under Dr. Warren's leadership, two years later, both

schools were released, and Crossett School District was declared fiscally sound. Based on

improvements in student achievement during Dr. Warren's tenure as Superintendent, the middle

school was named a "National Blue Ribbon" school, one that has attained a high level of student

achievement or made *significant* improvements in closing the achievement gap among student

5

subgroups. This stellar achievement occurred during economic hard times and attested to Dr.

Warren's proven leadership.

16.     In July of 2012, Dr. Warren was appointed Director of Elementary Education of PCSSD.

Her responsibilities were later enlarged with her dual appointment as Assistant Superintendent of

Equity and Pupil Services in May of 2013.  Coordinating and implementing PCSSD's

desegregation plan; directing the administration of the Division of Equity and Pupil Services;

serving as the liaison between the PCSSD and the Federal Court and its monitors; and

supervising, directing, and evaluating the performance and effectiveness of 24 elementary

schools (the pre-kindergarten to 5th grade), their principals, and their instructional programs

were her primary responsibilities among her many assigned duties.

17.     On July 18, 2017, the PCSSD Board terminated Dr. Jerry Guess, PCSSD Superintendent

who had served from July 1, 2011.  (Deposition of Dr. Linda Remele, Beasley v. Dr. Charles

McNulty, No.4:18-cv-508-DPM, page 37, line 20, through page 38, line 9) This testimony is

attached as Exhibit A.  Dr. Warren was appointed Interim Superintendent of PCSSD. The student

population of PCSSD was 12,000, with an annual budget of $244,859,652.85 million and a per

pupil allocation of $12,189.58, and a racial composition of 42.2% Black, 57.8% non-Black.

18.     Dr. Warren is the only woman to serve as PCSSD's Superintendent in the past 34 years.

Between 1984 and 2018, the PCSSD hired six White males and three Black males to serve as

Superintendent.  Two of the Black males were Interim Superintendent when promoted to

Superintendent.  PCSSD hired Dr. Warren as Interim Superintendent on July 18, 2017.

19.     Between August 2017 and September 5, 2017, thirty to sixty days after her appointment

as Interim Superintendent, Dr. Warren, as Interim Superintendent, reported to the PCSSD Board

and the PCSSD attorney that the PCSSD had violated the Federal Court's directive regarding

District facilities and had engaged in discriminatory practices in Derrick Scott's development of the District facilities in predominately White versus predominately Black communities. PCSSD's attorney reported the discriminatory practices in a status report on September 5, 2017, to the Federal Judge under whose jurisdiction PCSSD is subject. On September 8, 2017, the Federal Court requested the Court Expert, Margie L. Powell to report on whether the sports facility constructed at Mills *High* School was equal to the sports facility constructed at Robinson *Middle* School.

20.    The Arkansas Democrat-Gazette published an article addressing PCSSD's discriminatory conduct on September 9, 2017. This article is attached as Exhibit B with enlargements. The article may be viewed at:

https://www.arkansasonline.com/news/2017/sep/09/judge-requests-report-on-parity-of-2-sc/#.XYg0a2Idork.gmail.

21.    PCSSD's Board President, Dr. Remele, communicated to Dr. Warren, "We do not air our dirty laundry in public."

22.    In her November 9, 2017, report, the Court Expert identified substantial inequities between the sports facilities at Mills High School and the Robinson Middle School. This report is attached as Exhibit C. At its November 14, 2017, meeting, the Board received its first presentation by a third-party provider of its superintendent search services. These Minutes are attached as Exhibit D. On November 29, 2017, Ray and Associates of Cedar Rapids, Iowa, made its presentation to the PCSSD Board. The Board voted to hire Ray and Associates at its December 12, 2017. (PCSSD Board Minutes dated December 12, 2017 (attached as Exhibit E); Deposition of Dr. Linda Remele, Beasley v. Dr. Charles McNulty, No.4:18-cv-508-DPM, page 50, lines 18-19 (Exhibit A)) ("We hired a consulting firm to look for new Superintendents [sic].

And I believe that was in November.") Thus, the PCSSD Board decided to fire Dr. Warren and to hire a new superintendent before November 14, 2017.  Deciding to hire a superintendent is an official duty of the Board (Board Policy 1.7P) and requires the convening of a meeting (Board Policy 1.1).  The decision to hire a superintendent and to invite presentations by search firms had to be a part of the Board's agenda or the decision was made in an Executive Session before the November 14th. The minutes of the September 12, 2017, meeting held seven (7) days after the District's attorney notified the Federal Court of the inequities between the construction projects for Robinson Middle School and Mills High School include an hour and 30-minute Executive Session on personnel (see Exhibit F); the September 25, 2017, meeting did not include an Executive Session; the October 10, 2017, meeting had a 2-minute Executive Session. None of the Board Agenda between September 12 and November 14 included an agenda item on the need to hire a Superintendent.  As an official action, the Board's decision had to occur no later than its September 12, 2017, meeting, seven (7) days after the PCSSD attorney notified the Federal Court of the District's discriminatory conduct in Derek Scott's, PCSSD's Executive Director of Operations, supervision of the Mills High School and Robinson Middle School construction projects.

23.     The PCSSD Board did not give Dr. Warren an evaluation of her performance as Interim Superintendent before the Board hired Ray and Associates.

24.     Ray and Associates posted the Superintendent opening with PCSSD online at https://www.pcssd.org/superintendent-search (See Exhibit G).  The application deadline was March 12, 2018.  Dr. Warren applied for the position of PCSSD Superintendent in early 2018. Ray and Associates included Dr. Warren in the pool of eleven applicants recommended to the PCSSD Board for interviews.

25.     The PCSSD Board did not give Dr. Warren an evaluation of her performance as Interim Superintendent after she applied for the position of Superintendent in early 2018.

26.     PCSSD's Personnel Policies for Certified Staff 2017-2018 mandate the hiring of qualified internal candidates over the hiring of *similarly* qualified external candidates. (PCSSD Personnel Policies for Certified Staff 2017-2018, page 101; available at

https://pcssd.s3.amazonaws.com/ppc-certified/2019-personnel-policy-certified.pdf ). Likewise, the policy must be interpreted as mandating that a qualified internal candidate has a preference over lesser qualified external candidates.

27.     PCSSD Superintendent Candidate Comparison Table (Attached as Exhibit H).

28.     On March 27, 2018, the PCSSD Board selected three males, two Black and one White, for final interviews. The Board did not invite Dr. Warren to interview. The PCSSD Board Minutes dated March 27, 2018, are attached as Exhibit I. The PCSSD Board did not give Dr. Warren a reason for not including her as a finalist, and the Board did not provide her with an evaluation of her performance as Interim Superintendent.

29.     The PCSSD Board selected Dr. Charles McNulty, Mr. James Harris, and Dr. Erick Pruitt for final interviews.

30.     Dr. Warren's qualifications were superior to those of the three male candidates selected. (See PCSSD Superintendent Candidate Comparison Table, Exhibit H). Her eleven years of experience as a superintendent for student populations of 2500 to 12,101 exceeded Dr. McNulty's *three* years of experience as Superintendent over a meager student population that averaged 436 students during his tenure as Superintendent and James Harris' ("Harris") *two and a half* years as Superintendent over 3700 students. Harris withdrew his application on the day of his interview. Although Erick Pruitt ("Pruitt") had oversight responsibilities for 23,000 students,

9

he was an Area Superintendent with only *15 months'* experience in that role.  None of the three

males dealt, in their leadership capacity, with overhanging federal court supervision in a

desegregation case.  Neither male managed an educational program for an approximately 50%

racial distribution between Whites and non-Whites and the accompanying disparities in

educational preparation and exposure, severe dissimilarity of socioeconomic status, and adverse

family and discipline variables such as truancy and failure to graduate that the PCSSD student

demographics reflect.  Dr. McNulty's student population was homogeneous, 98.5% White.  Only

seven non-White students were enrolled in the schools he supervised as Superintendent.

Likewise, Harris' student population was nearly homogeneous, 89% White and 11% non-White.

Neither was prepared for the problems inherent in PCSSD's pupil enrollment and community

composition.  Pruitt's student population was the inverse of McNulty and Harris.  The 2017-18

demographics of the Houston Independent School District were 8.7% White and 91.3% non-

White with a 61.3% Hispanic/Latino student population,[1] substantially different from PCSSD.

Neither man was qualified to address the substantive non-financial issues facing the students,

teachers, staff, administration, and communities of PCSSD.

31.     As PCSSD Interim Superintendent, Dr. Warren had budgetary oversight of

$244,895,652.58 with a per pupil allocation of $12189.58.  Neither McNulty nor Harris, as

Superintendents, had budgetary oversight that reached $60 million much less $244 million, but

both enjoyed during their limited experience as Superintendents per student allocations that

exceeded that of PCSSD by approximately $2000 to $3000 per student!  As an Area

Superintendent, Pruitt managed a budget equivalent to that of PCSSD $264,546,000 out of the

total Houston ISD budget of $2,096,294,796, with a $658 per student allocation less than PCSSD

---

[1] Houston Independent School District ("Houston ISD"), 2017-2018 Facts & Figures
(https://www.houstonisd.org/site/handlers/filedownload.ashx?moduleinstanceid=48525&dataid=217137&FileName
=2017-18_FactsFigures.pdf)

but for only 15 months. Dr. Warren's credentials and experience were superior to the three men selected as finalists for the position of PCSSD Superintendent. Furthermore, only Dr. Warren qualified for the PCSSD hiring preference as an internal candidate.

32.     In addition to her eleven years' experience as a superintendent, Dr. Warren had 15 years of central office experience, three years as a principal, and completed her terminal degree in Education ten years before she applied for the position of PCSSD Superintendent. Her qualifications were superior to the men selected for final interviews.

33.     The qualifications of the two Black males were substantially less than the one White male in the pool of finalists. Among the male finalists, Dr. McNulty had the longest tenure of three years as a superintendent, 12 years' experience as a central office administrator, seven years of service as a principal, and he held a terminal degree in Education for seven years. Harris had not served as a principal and had not completed a terminal degree in Education. Harris had, however, seven years of central office administrator experience. Harris withdrew from consideration on the day of his interview. Pruitt did not have *any* central office experience but served as a principal for six years. He had completed a terminal degree in Education four years before he applied for the position. Of the three males selected as finalists, Dr. McNulty, the sole White male in the pool of finalist, was the most qualified and was the first to interview.

34.     Why were Harris and Pruitt, the substantially less qualified Black males, included in the tiny pool of finalists? Their presence served as a pretext for creating a racially diverse pool, nothing more! The PCSSD Board assumed that no one could complain about the pool's diversity because the majority of finalists in the pool were Black males. Neither had the experience of Dr. Warren nor Dr. McNulty.

35.     McNulty, the first finalist to interview, interviewed on April 3, 2018. Shortly after that interview concluded, the Board offered Dr. McNulty the position of PCSSD Superintendent. (Deposition of Charles McNulty, Beasley v. Dr. Charles McNulty, No.4:18-cv-508-DPM, page 11, lines 19-25 through page 12, lines 1-4 (attached as Exhibit J). The April 3, 2017, Board Minutes are attached as Exhibit K. The substantially different qualifications among the Black males and the sole White male in the pool assured Dr. McNulty's selection as PCSSD Superintendent.

36.     The Board knew it had a legal duty to provide Dr. Warren with an evaluation. Contrary to its obligation, the PCSSD Board did not give Dr. Warren an evaluation of her performance as Interim Superintendent before or after it appointed Dr. McNulty as Superintendent on April 5, 2018. Deposition of Dr. Linda Remele, Beasley v. Dr. Charles McNulty, No.4:18-cv-508-DPM, page 39, line 8, through page 40, line 9, Exhibit A.

37.     Dr. Remele, PCSSD Board President, does not dispute that Dr. Warren was qualified for the position of Superintendent and does not dispute that Dr. Warren did not become less qualified for the position of Superintendent between the time Dr. Warren was appointed Interim Superintendent and when Dr. Warren applied for the position of Superintendent.  (Dr. Linda Remele, Beasley v. Dr. Charles McNulty, No.4:18-cv-508-DPM, page 40, Exhibit A.)  Neither Dr. Remele nor other members of the Board sought to include Dr. Warren among the finalists and did not grant Dr. Warren an interview.

38.     Dr. Warren filed a formal charge of sex and race discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") on October 1, 2018. A copy of that charge is attached as Exhibit L. PCSSD submitted its Response on October 25, 2018. A copy of PCSSD's Response is attached as Exhibit M.

39.     PCSSD's Response to Dr. Warren's Charge does not include an evaluation of Dr.

Warren's services as Interim Superintendent; the Response does not state a reason for the Board's

failure to include Dr. Warren among the finalists selected to interview for the position of

Superintendent; and the Response does not provide a rationale for hiring Dr. McNulty, an

external candidate, despite the District's policy preference for qualified internal candidates and

Dr. Warren's superior qualifications.

40.     Dr. Warren received her Right to Sue letter from the EEOC dated June 26, 2019. A copy

of her letter is attached as Exhibit N and this action is filed within 90 days of the dispatch of that

letter.

## Claims For Relief

### I.     Title VII Sex Discrimination Claims

41.     When the PCSSD Board failed to include Dr. Warren, a more qualified applicant, among

the finalists for the position of PCSSD Superintendent, that act was an adverse employment

action of discrimination taken against her because of her sex and was a continuation of the

Board's 34-year pattern of discrimination based on sex. In 2018, approximately sixty-five

percent of PCSSD Certified Secondary Staff, Teachers and Administrators, who create a pool of

individuals qualified for consideration as Superintendent were female. (PCSSD 2017-2018

Annual Personnel Hiring and Deployment Report, June 1, 2018, Appendix VIII, page 11;

Attached as Exhibit O). The pool of finalists selected by the PCSSD Board included 0%

females. Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307, 97 S.Ct. 2736 (1977);

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973).

42.     When the PCSSD Board failed to include Dr. Warren among the finalists for the position

of PCSSD Superintendent despite her superior qualifications for the job, the PCSSD Board

refused to hire her. This failure was an adverse employment action and discriminated against Dr. Warren because of her sex and violated Dr. Warren's statutory right not to be discriminated against with respect to her employment because of her sex. 42 U.S.C. § 2000e-2(a)(1); Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775 (1989) (applicant's sex an impermissible factor).

43.     This adverse employment action deprived Dr. Warren of her statutory right not to be limited, segregated, or classified by the PCSSD Board in a way that deprived her of an employment opportunity because of her sex. 42 U.S.C. § 2000e-2(a)(2); Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775 (1989) (applicant's sex an impermissible factor).

44.     When the PCSSD Board hired Dr. McNulty, a lesser qualified external applicant, PCSSD discriminated against Dr. Warren. This was an adverse employment action, violating her statutory right to privileges of employment because of her sex. 42 U.S.C. § 2000e-2(a)(1).

45.     The PCSSD Board's hiring of Dr. McNulty, a lesser qualified male applicant, was an adverse employment action that discriminated against Dr. Warren and violated her statutory right not to be limited or deprived as an applicant or employee of employment opportunities because of her sex. 42 U.S.C. § 2000e-2(a)(2).

46.     The PCSSD is liable for its Board's discriminatory actions based on sex. 42 U.S.C. § 1981a(a)(1); 42 U.S.C. § 1981a(b)(3); 42 U.S.C. § 2000e-5(g)(1).

## II.     Title VII Race Discrimination Claims

47.     When the PCSSD Board hired a lesser qualified White male as Superintendent, the Board engaged in an adverse employment action against Dr. Warren for racially discriminatory reasons. Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888 (11th Cir.

1986) (Title VII prohibit all forms of employment discrimination based on race); McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973).

48.     When the PCSSD Board failed to include Dr. Warren, a qualified Black applicant, in the

pool of finalists because of her race, the Board engaged in an adverse employment action

against Dr. Warren for racially discriminatory reasons.  Parr v. Woodmen of the World Life

Ins. Co., 791 F.2d 888 (11th Cir. 1986) (Title VII prohibit all forms of employment

discrimination based on race); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

49.     These adverse employment acts violated Dr. Warren's statutory right not to be

discriminated against with respect to her compensation, terms, conditions, or privileges of

employment because of her race. 42 U.S.C. § 2000e-2(a)(1).

50.     These adverse employment acts violated Dr. Warren's statutory right not to be

limited, segregated, or classified in any way that would deprive or tend to deprive her of

employment opportunities or otherwise adversely affect her status as an employee because

of her race. 42 U.S.C. § 2000e-2(a)(2).

51.     The PCSSD is liable for its Board's racially discriminatory acts. 42 U.S.C. § 1981a

(a)(1); 42 U.S.C. § 1981a(b)(3); 42 U.S.C. § 2000e-5(g)(1).


### III.     Title VII Retaliation Claims

52.     Between August 2017 and September 5, 2017, Dr. Warren, as Interim Superintendent,

reported to the PCSSD Board and the PCSSD attorney that the PCSSD had violated its

desegregation plan, Plan 2000, and the Federal District Court's orders regarding the construction

of PCSSD facilities. Through Derrick Scott, PCSSD Executive Director of Operations, PCSSD

engaged in discriminatory practices in the development of its athletic facilities in predominately

White, Robinson, versus predominately Black, Mills, communities. PCSSD's attorney reported the deliberate discrepancies between the facilities and deviation from the Court's orders in a status report on September 5, 2017, to the Federal Judge who has jurisdiction over PCSSD.

53.     On September 8, 2017, the Federal Court requested the Court Expert, Margie L. Powell to report on whether the sports facility constructed at Mills *High* School was equal to the sports facility constructed at Robinson *Middle* School.

54.     The Arkansas Democrat-Gazette published an article addressing PCSSD's discriminatory conduct on September 9, 2017, (Exhibit B).

55.     Thereafter, PCSSD's Board President, Dr. Remele, communicated to Dr. Warren, "We do not air our dirty laundry in public."

56.     The Court Expert filed her report on the substantial inequities between the two properties on November 9, 2017, (Exhibit C).

57.     On December 12, 2017, approximately thirty days after the Court Expert filed her report, the PCSSD Board hired Ray and Associates, Inc. ("Ray and Associates"), of Cedar Rapids, Iowa, to search for a superintendent.  (Deposition of Dr. Linda Remele, Beasley v. Dr. Charles McNulty, No.4:18-cv-508-DPM, page 50, line 18-21 (Exhibit A).  To be in a position to engage a search firm, the PCSSD Board decided to terminate Dr. Warren at its September 12, 2017, meeting, seven (7) days after the District's attorney reported to the Federal Court the inequities in the construction supervised by Derrick Scott. In retaliation for notifying the PCSSD attorney of the inequities in the District's construction and deviation from Federal Court orders, Dr. Warren would be replaced.

58.     Ray and Associates posted the Superintendent opening with PCSSD online at https://www.pcssd.org/superintendent-search (Exhibit G).  The application deadline was March

12, 2018. Dr. Warren applied for the position of PCSSD Superintendent in early 2018. Ray and Associates included Dr. Warren in the pool of eleven candidates recommended to the PCSSD Board for interviews.

59.     In March of 2018, the PCSSD Board selected three males, two Black and one White, for final interviews. The Board did not invite Dr. Warren to interview.  The decision to exclude Dr. Warren from the final interviews was an adverse employment action by the PCSSD Board in retaliation for Dr. Warren's opposition to the unlawful conduct of District employees and her notifying the District's attorney of the District's deviation from Federal Court orders and the District's desegregation plan, Plan 2000.  As Interim Superintendent, Dr. Warren opposed the District's racial discrimination against Black students residing in the Mills community and sought to facilitate a resolution of the District's unlawful act by being proactive.

60.     The PCSSD Board selected Dr. Charles McNulty, Mr. James Harris, and Dr. Erick Pruitt for final interviews and offered the position of Superintendent to Dr. Charles McNulty.  Offering the position of Superintendent to Dr. McNulty was an adverse employment action by the PCSSD against Dr. Warren in retaliation of her lawful conduct in communicating to the District's attorney that the District had deviated from the Federal Court's orders and the District's desegregation plan, Plan 2000.  Dr. Warren's conduct opposed the unlawful conduct by District employees that constituted racial discrimination of Black students in the Mills community.

61.     The PCSSD Board's adverse employment action violated Dr. Warren's statutory right to challenge racially discriminatory practices by her employer and not be retaliated against for doing so. 42 U.S.C. § 2000e-3(a); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 799 (1973).

62.     PCSSD is liable for its Board's racially retaliatory acts. 42 U.S.C. § 1981a(a)(1); 42

U.S.C. § 1981a(b)(3); 42 U.S.C. § 2000e-5(g)(1).

### IV.     Race Discrimination Under 42 U.S.C. § 1981, § 1983

63.     When Mike Kemp, Tina Ward, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller,

and Brian Maune decided to terminate Dr. Warren as Interim Superintendent, excluded her

from the pool of finalists, and hired a lesser qualified White male as Superintendent, they

willfully engaged in adverse employment actions with malice or with reckless indifference

against Dr. Warren for racially discriminatory reasons.  42 U.S.C. 1981(a) (b) & (c).

64.     These adverse actions by Mike Kemp, Tina Ward, Linda Remele, Shelby Thomas,

Alicia Gillen, Eli Keller, and Brian Maune violated Dr. Warren's statutory right to make and

enforce employment contracts free from race discrimination.  They are personally liable for

these violations. 42 U.S.C. §§ 1981(a), (b), (c); 42 U.S.C. § 1983; General Building Contractors

Association, Inc v. Pennsylvania United Engineers Constructors, Inc., 458 U.S. 375, 102 S.Ct.

3141 (1982).

65.     Linda Remele, Board President, Shelby Thomas, Board Vice President, and Tina

Ward, Board Member, attended the January 22, 2018, Arkansas School Board Association

training that included a session conducted by the Board's legal counsel entitled:

"Employing a Superintendent:  From Dating to Divorce" that addressed discrimination in

the process of hiring a superintendent.  The Program handout attached as Exhibit P.  Linda

Remele, Board President, Shelby Thomas, Board Vice President, and Tina Ward, Board

Member, had actual knowledge that discrimination in employment is illegal and willfully

engaged in illegal, adverse employment acts with malice against Dr. Warren with regard to

her federally protected rights.  Therefore, Linda Remele, Board President, Shelby Thomas,

Board Vice President, and Tina Ward, Board Member, personally liable for compensatory and punitive damages. 42 U.S.C. § 1981 (a) (b) (c).

66.     It is common knowledge that race discrimination in employment is illegal under federal law.  Mike Kemp, Tina Ward, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller, and Brian Maune cannot claim ignorance of this fact.  When they took adverse actions against Dr. Warren on the basis of race, they did so with malice or with a reckless indifference to Dr. Warren's right to be free from race discrimination in employment. Therefore, they are personally liable for compersatory and punitive damages. 42 U.S.C. § 1981 (a)(b)(c).

67.     When Mike Kemp, Tina Ward, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller, and Brian Maune took adverse employment actions against Dr. Warren on the basis of race, they did so in their capacity as members of the PCSSD Board and as a final policymaker for the PCSSD.  Therefore, the PCSSD is liable for the wrongful acts of Mike Kemp, Tina Ward, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller, and Brian Maune. 42 U.S.C. § 1981, 42 U.S.C. § 1983; Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735 (1989).

## V.     Retaliation Claims under 42 U.S.C. §§ 1981, 1983

68.     Thirty-three days after Court Expert filed her report on the substantial deficiencies between two construction projects overseen by Derrick Scott in violation of the District's desegregation plan, the PCSSD Board hired Ray and Associates to commence a search for a new superintendent.  Review of the Board's minutes for September suggests that the members of the PCSSD Board made the decision to terminate Dr. Warren as Interim Superintendent at its September 12, 2017, (Exhibit F).  This Board meeting was held seven (7) days after the Federal Court was notified of the District's construction deviation.  The Board's decision was made in

retaliation for Dr. Warren's challenging the District's racially discriminatory practices in violation of its desegregation plan, Plan 2000, and Federal Court orders. The Board's decision was an adverse employment action that violated Dr. Warren's statutory right to challenge racially discriminatory practices by her employer and not be retaliated against for doing so. CBOCS West, Inc. v. Humphries, 553 U.S. 442, 445-457, 128 S.Ct. 1951 (2008) (42 U.S.C. § 1981 encompasses retaliation claims).

69.     Mike Kemp, Tina Ward, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller, and Brian Maune are personally liable for retaliating against Dr. Warren because she notified the District's attorney of racially discriminatory conduct by the District's employee, Derrick Scott. 42 U.S.C. §§ 1981(a), (b), (c); 42 U.S.C. § 1983; CBOCS West, Inc. v. Humphries, 553 U.S. 442, 445-457, 128 S.Ct. 1951 (2008).

70.     It is common knowledge that race discrimination in public education is illegal under federal law. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401 (1958); Little Rock School Dist. v. Pulaski County Special School Dist. No. 1, 921 F.2d 1371 (8th Cir. 1990).  Mike Kemp, Tina Ward, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller, and Brian Maune cannot claim ignorance of this fact. Thus, when they retaliated against Dr. Warren for notifying the District's attorney of racial discrimination in the construction of the District's facilities, they were aware of Dr. Warren's right to be free from race discrimination by her employer and acted intentionally not accidentally with malice or with a reckless indifference to Dr. Warren's right to be free from race discrimination by her employer. Consequently, they are personally liable for compensatory and punitive damages. 42 U.S.C. § 1981(a)(b)(c).

71.     When Mike Kemp, Tina Ward, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller, and Brian Maune, retaliated against Dr. Warren for notifying the District's Attorney of race

discrimination by the District, they did so in their capacity as the PCSSD Board and in their

capacity as a final policymaker for the PCSSD.  Therefore, the PCSSD is liable for their

wrongful acts. 42 U.S.C. §§ 1981 (a)(b)(c), 42 U.S.C. § 1983; Pembaur v. City of Cincinnati,

475 U.S. 469, 481-483 (1986) (plurality opinion).

### RELIEF REQUESTED

72.     Dr. Warren requests this Court to award her retroactive seniority and backpay from

July 1, 2018, until this Court's judgment with interest on backpay. 42 U.S.C. § 2000e-

5(g)(1).  Albemarle Paper Co. v. Moody, 422 U.S. 405, 421, 95 S.Ct. 2362 (1975); E.E.O.C. v.

Dial Corp., 469 F.3d 735 (8th Cir., 2006) (There is a strong presumption that an employee who

has suffered discrimination should receive backpay). The backpay award should include lost

wages, raises, overtime compensation, bonuses, sick pay, vacation pay, life and other

insurance benefits, annuities, and retirement benefits Dr. Warren would have received but

for the race and sex discrimination and retaliation that occurred when PCSSD hired its

Superintendent in 2018.

73.     Dr. Warren requests that the Court award her front pay until an opening for the

position of PCSSD Superintendent occurs and she is offered the position or until her earlier

retirement. Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 121 S.Ct. 1946, 150

L.Ed.2d 62 (2001) (front pay is a remedy that is not subject to the limitations of 1981a(b)(3));

Kramer v. Logan County School District No. R-1, 157 F.3d 620 (8th Cir. 1998) (front pay is an

equitable remedy excluded from the statutory limit on compensatory damages provided for in

section 1981a(b)(3)).

74.     Dr. Warren requests an award of compensatory damages against the PCSSD for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses. 42 U.S.C. §§ 1981a(a)(1), 1981a(b)(3).

75.     Dr. Warren requests an award of compensatory damages against Mike Kemp, Tina Ward, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller, and Brian Maune in their individual capacities for violating her right to make and enforce employment contracts free from race discrimination. 42 U.S.C. §§ 1981(a), (b), (c).

76.     Dr. Warren requests an award of punitive damages against Mike Kemp, Tina Ward, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller, and Brian Maune in their individual capacities because they willfully engaged in discriminatory practices with malice or with a reckless indifference to her federally protected rights. 42 U.S.C. §§ 1981 (a) (b)(c).

77.     Dr. Warren requests an award of compensatory and punitive damages against the PCSSD for acts of sex discrimination, race discrimination, and retaliation based on race by Mike Kemp, Tina Ward, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller, and Brian Maune. 42 U.S.C. 1981a (a)(1); 42 U.S.C. 1981a (b)(3); Kolstad v American Dental Ass'n, 527 U.S. 526, 119 S.Ct. 2118 (1999) (employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination is relevant for determining the availability of punitive damages under Title VII).

78.     Dr. Warren requests an award of pre-judgment interest and post-judgment interest at the maximum rate allowed by law. Loeffler v. Frank, 486 U.S. 549, 557-558 (1988) (Title VII authorizes complete compensation).

79.     Dr. Warren requests that she be awarded her costs of prosecuting this case, including attorneys' fees. 42 U.S.C. §§ 1988(b), 1988(c), 2000e-5(k).

80.  Dr. Warren requests this Court to award her any other equitable relief that the Court deems appropriate. 42 U.S.C. § 2000e-5(g)(1).

Jury Demand

81.  Dr. Warren demands a trial by jury. 42 U.S.C. § 1981a(c)(1).

Respectfully submitted,

Sarah Howard Jenkins, Esq.
Ark. Sup. Ct. Reg. No. 97046
Attorney for Plaintiff
Sarah Howard Jenkins, PLLC
P.O. Box 242694
Little Rock, AR 72223
Telephone: (501) 406-0905
Email address:  sarah@shjenkinslaw.com

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

--------------------------------------------------------

JENNIFER BEASLEY; DR. KIFFANY
PRIDE; LAURA SHIRLEY; and
NICOLE TOWNSEND,

                              PLAINTIFFS,

VS.            NO. 4:18-cv-508-DPM

DR. CHARLES MCNULTY, in his official
capacity as Superintendent of Schools
of the Pulaski County Special School
District; PULASKI COUNTY SPECIAL SCHOOL
DISTRICT BOARD OF DIRECTORS; and
PULASKI COUNTY SPECIAL SCHOOL DISTRICT,
a public body corporate,

                              DEFENDANTS.

--------------------------------------------------------

---o---

DEPOSITION

OF

LINDA REMELE

---o---

TUESDAY, JUNE 4, 2019

---o---



PETRE'S STENOGRAPH SERVICE
(501) 834-2352

A P P E A R A N C E S:

    ON BEHALF OF PLAINTIFFS:

        JOHN WALKER, ESQUIRE
        JOY SPRINGER, Administrative Assistant
            John Walker Law Firm
            1723 South Broadway Street
            Little Rock, Arkansas  72206

    ON BEHALF OF DEFENDANTS:

        W. CODY KEES, ESQUIRE
            Bequette and Billingsley
            425 West Capitol Avenue
            Suite 3200
            Little Rock, Arkansas  72201

    ALSO PRESENT:

        DR. KIFFANY PRIDE
        MS. LAURA SHIRLEY
        MS. NICOLE TOWNSEND

                ---o---

1          get testimony from her on D'Abadie?

2                MR. WALKER:  Well, I will in due course

3          if it's all right with you.

4                MR. KEES:  Well, I just don't want to

5          bring her back up here later.

6                MR. WALKER:  Well, that's fine.

7                MR. KEES:  It just came to mind when

8          you asked about --

9                MR. WALKER:  She is so pleasant, I

10          would probably like to depose her again.

11                THE WITNESS:  Thank you.

12                MR. KEES:  Well, D'Abadie should be

13          pretty short, so maybe at the end --

14                MR. WALKER:  Well, we will see.

15  BY MR. WALKER:

16  Q     Now, after you all were in a huff about Doctor

17  Guess and Allen Roberts --

18                MR. KEES:  Object to form.

19  BY MR. WALKER:

20  Q     -- and Doctor Guess resigned, you all made

21  Doctor --

22  A     He didn't resign.

23                MR. KEES:  He didn't resign, John.

24                THE WITNESS:  He didn't resign.  I wish

25          he would have resigned.

1 | BY MR. WALKER:

2 | Q     Oh.  Y'all terminated him?

3 | A     I wish he would have resigned.

4 | Q     You all asked him --

5 |             MR. KEES:  He was terminated.  You know

6 |         that.

7 | BY MR. WALKER:

8 | Q     You all fired him --

9 | A     Yes.

10 | Q     -- because he wouldn't fire Allen Roberts?

11 | A     Yes -- no.  Can I clarify why we fired him?

12 | Q     Well, first let me ask you this.  Let me go

13 | through my questions.  Did you all ever give him a

14 | job performance evaluation?

15 | A     No.

16 | Q     You knew you were required to under Arkansas

17 | law to do so?

18 | A     Yes.

19 | Q     Is there a reason you didn't give him a job

20 | evaluation?

21 | A     We came on in December, his job evaluation is

22 | due in January.  We didn't know him well enough to do

23 | that.

24 | Q     Well, that meant that you didn't know Allen

25 | Roberts well enough to do what you did with respect

1  to him, either, did you?

2  A     We didn't request that Allen Roberts be

3  released until July.  I think it was July 18th.

4  Q     All right.  Now, are you saying that if you

5  only have a short term with the Superintendent, you

6  don't give a written evaluation?

7  A     No.

8  Q     I see.  Did you ever give Doctor Warren a

9  written evaluation?

10  A     No.

11  Q     She was on for a whole year.

12  A     Correct.

13  Q     So, how do you jibe those two answers?

14  A     Superintendent evaluations --

15  Q     I want you to jibe them, compare them.  You say

16  you didn't have enough time, then you had more than a

17  year with Doctor Warren.  But the question was, did

18  you give her an evaluation, "yes" or "no".  The Board

19  didn't even take up an evaluation for her, did it?

20  A     No.

21  Q     That's right.  Nobody was concerned whether she

22  had one, as required by law; right?

23  A     Wrong.

24  Q     What is wrong with that?  It's not required by

25  law?

1    A     I was concerned.  I knew we had to do one, by

2    law.

3    Q     But you didn't bring it up as a Board agenda

4    item, did you?

5    A     No.

6    Q     All right.  So, whatever concern you had, you

7    kept to yourself and didn't put it in the public

8    domain?

9    A     Correct.

10   Q     Thank you.  Now, was she qualified for the

11   position?

12   A     Yes.

13   Q     Was she well qualified?

14   A     That's an objective question.

15   Q     Well, since you all didn't evaluate her, you

16   had no reason to believe she wasn't; isn't that

17   correct?

18   A     I believe she was well qualified.  On July

19   18th, I believe she was well qualified.

20   Q     I see.  Did she become less qualified between

21   July 18 of that year and July 1 of this past year?

22              MR. KEES:  Object to form.

23   BY MR. WALKER:

24   Q     Did she become less qualified during that time?

25   A     No.

1          MR. KEES:  Well, that's a compound

2          question.

3     BY MR. WALKER:

4     Q    Okay.  You hired the new Superintendent in

5     April, didn't you?

6     A    I believe so.

7     Q    All right.  Now, the month for you all to

8     address allocations is normally April or May, isn't

9     it?

10    A    April.

11    Q    All right.  So, Doctor Warren was on notice she

12    wouldn't be Superintendent the next year as of April

13    1st, wasn't she?

14    A    No.

15    Q    April 5th?

16    A    No.

17    Q    When was he hired?

18    A    We hired a consulting firm to look for new

19    Superintendents.  And I believe that was in November.

20    Q    Just a moment, Doctor.  Isn't it true that you

21    hired Doctor Remele on April 5th?

22              MS. SPRINGER:  McNulty.

23              THE WITNESS:  I'm Doctor Remele.

24    BY MR. WALKER:

25    Q    I mean, Doctor Warren -- no.  Doctor McNulty on

# ARKANSAS

Arkansas Democrat Gazette

**B**

Inside

## DRIVETIME MARKETING

### FRANCES LONE

## Stopped?
## It's hands
## on wheel

Dear Mahatma:
One coffee group had a long discussion about what a driver should do when pulled over on a traffic stop. Some in the group are outside in the driver's seat, hands on top of the steering wheel, even the wrist until the officer tells was what to do. Others questioned that it is safer for the officer if you exit the vehicle and stand facing the officer, which would show him you are unarmed. Please clarify.
— Coffee Drinkers



LR garden wins tiller

## Court urged to skip
## abortion law review

### 2015 measure sets rules for clinics' drugs

## Angling for catfish



## UAMS audit finds fund misuse

### $6,188 spent in unauthorized fuel card charges, report says

## Inmate
## sues over
## abuse at
## lockup

### Lawyer says filing
### spotlights truth.

## State official earned
## 2 salaries, audit says

## Food on the go

## Judge requests report
## on parity of 2 schools

## Governor declares programs' successes

PLAINTIFF'S
EXHIBIT

B

# Schools

● Continued from Page 1B

for black students known as the Joshua intervenors, will have until Oct. 24 to respond to the school district's report, and the court's independent expert in the case, Margie Powell, will then have until Nov. 8 to present her analysis of the building matters to the judge.

"I feel confident that the Court will have a sufficient picture in 60 days on which direction we need to go on the county's facilities issue — whether that is discovery and a trial date or just continued reporting [by the district] and monitoring by the court," Marshall told representatives of the parties at Friday's quarterly status conference in the long-running lawsuit.

The 12,000-student Pulaski County Special district remains under court supervision of its efforts to eliminate inequities in the condition of school buildings, student discipline practices and student achievement. The 4,000-student Jacksonville/North Pulaski School District is seeking unitary status in those areas plus its staffing practices.

Both districts have aging and inferior school structures in communities with high percentages of black students compared with Maumelle High and Chenal Elementary schools, which are in more affluent communities and serve higher percentages of white students.

Marshall started Friday's status conference by saying that he was "bumfuzzled" by the Pulaski County Special district's notice this week of plans to investigate for possible disparities in the funding and construction of Mills High on Dixon Road in the district's southeast section and Robinson Middle on Arkansas 10 in west Pulaski County. Robinson Elementary, Middle and High schools serve the district's Chenal Valley neighborhoods, a largely more affluent area than southeast Pulaski County.

Sam Jones, the district's newly reinstated lead counsel in the lawsuit, referred to a supplemental status report he sent to the judge on Tuesday

that focused largely on athletics, which are being evaluated and further explored, that certain aspects of the facilities at Robinson may involve features that could be subjectively if not objectively regarded as superior to certain of those at Mills," Jones wrote in that report.

There are questions about the differences in the size of coaches' offices and weight rooms at the new Mills and Robinson schools as well as differences in lighting and windows and in the interior wall, floor and ceiling finishes, Jones said.

Also to be determined, he said, is why the new indoor athletic facilities are already being used at Robinson but not at Mills, although he suggested that an outcropping of granite rock at the Mills site may be a reason for a delay there.

"Thus far the questions that have arisen are limited to the athletic facilities at the two schools," Jones said. "Construction of the academic facilities has not yet progressed to the point where the district is unable to remedy any equitable issues that might be present in the construction plans."

The district has received assurances from architects for Mills that, if necessary, additional windows can be added to the indoor practice facility and that the lighting can be enhanced to bring it on par with that at Robinson, Jones said. Concrete columns at Mills can be wrapped in plasterboard.

Jones said the district is also looking at the broader issues of whether expenditures for the new Mills comport with the judge's Jan. 12, 2015, order approving the expenditure of about $50 million for Mills and $5 million for the conversion of Mills High to be a new Fuller Middle School. Also in question is whether the district is devoting $15,350,000 in state desegregation aid exclusively to the Mills projects, as had been planned.

"What has been spent to date at Mills? What has been spent to date at Robinson? What were the original

budgets for each project? Who changed, who proposed the changes and who approved the changes?" are among the inquiries being made, Jones wrote. "What can be done at this stage to equalize the projects if in fact they are not substantially equal in terms of expenditures overall?"

Jones said the district so far has determined that an application was submitted in June 2015 to the Arkansas Board of Education for authority to issue $56,265,000 in bonds for the purpose of equipping school facilities, construction a new Mills High and converting the existing Mills High to a middle school.

"It appears that on March 14, 2016, the architects for Mills were directed to work toward a $35 million construction budget for the new Mills High," Jones also wrote. "The district is inquiring further as to how that figure was derived and the authority for that directive."

"On March 15, 2016," Jones continued, "the superintendent and commissioner approved a recommendation to construct the Mills High replacement project and to convert the existing high school into a middle school and to demolish the existing Fuller Middle School and campus support facilities for the Robinson Middle School replacement project reflecting a cost for all projects of $80 million and describing the funding source as the building fund and second-lien bond proceeds."

Walker, on behalf of the Joshua intervenors, complained to Marshall on Friday that both the intervenors and the judge "had been sold a bill of goods" in regard to the Pulaski County Special district's building of a new Robinson Middle School. He called the status conference "a sad occasion because the district has admitted in effect complicity in circumventing" its desegregation plan commitments.

Walker argued to the judge Friday that one recently resigned Pulaski County Special district staff member "manipulated" the district's building program to advantage his own own neighbor-

hood.

"There is no inclination that kids in the Mills area matter less than kids in more affluent areas," he said.

Walker didn't specifically name an official, but Derek Scott, the district's executive director of operations, earlier this month submitted his letter of resignation, effective Sept. 15.

The Pulaski Special district is not the financially strapped system it has been depicted to be, Walker told Marshall. The district should be made to earmark some $20 million for improvements to College Station Elementary in the southeast part of the district and Harris Elementary in the northeast section.

He also proposed that the Pulaski County Special district transfer some money to the new Jacksonville/North Pulaski district for replacing its old schools. That district is in the midst of building a new elementary to open in 2018-19 and anew high school to open in 2019-20, with plans for other new elementaries in later years.

Just this week, Jacksonville/North Pulaski district leaders have raised the possibility of constructing a new middle school rather than spending almost the same amount to renovate its existing middle school campus, which is the former North Pulaski High School.

Friday's status conference between Marshall and the parties was the first since the Pulaski Special district's school board voted in July to fire six-year Superintendent Jerry Guess and the Allen P. Roberts law firm, which had taken the lead counsel role in representing the district in the ongoing lawsuit.

The seven-member School Board, elected in November 2016 after the district operated for five years in state control and without an elected board, immediately named Janice Warren as interim superintendent for this school year and reinstated Jones as lead counsel. Jones had held that role before the hiring of the Roberts firm.

The judge on Friday asked Jones to report later this year on the long-term leadership plans for the district.

# Judge requests report on parity of 2 schools

BY CYNTHIA HOWELL
ARKANSAS DEMOCRAT-GAZETTE

Possible disparities in the funding and construction of Mills High and Robinson Middle schools in the Pulaski County Special School District were at the forefront of talks Friday between the judge and parties in a 34-year-old federal school desegregation lawsuit.

U.S. District Judge D. Price Marshall Jr. directed leaders in the Pulaski Special district to send to him by Oct. 9 a report on whether the district has deviated from its commitment to provide students with equitable school facilities and, if so, what will be done about it.

John Walker, an attorney

See **SCHOOLS**, Page 7B

# Schools

• Continued from Page 1B

for black students known as the Joshua intervenors, will have until Oct. 24 to respond to the school district's report, and the court's independent expert in the case, Margie Powell, will then have until Nov. 8 to present her analysis of the building matters to the judge.

"I feel confident that the Court will have a sufficient picture in 60 days on which direction we need to go on the county's facilities issue — whether that is discovery and a trial date or just continued reporting [by the district] and monitoring by the court," Marshall told representatives of the parties at Friday's quarterly status conference in the long-running lawsuit.

The 12,000-student Pulaski County Special District remains under court supervision of its efforts to eliminate inequities in the condition of school buildings, student discipline practices and student achievement. The 4,000-student Jacksonville/North Pulaski School District is seeking unitary status in those areas plus its staffing practices.

Both districts have aging and inferior school structures in communities with high percentages of black students compared with Maumelle High and Chenal Elementary schools, which are in more affluent communities and serve higher percentages of white students.

Marshall started Friday's status conference by saying that he was "bumfuzzled" by the Pulaski County Special district's notice this week of plans to investigate for possible disparities in the funding and construction of Mills High on Dixon Road in the district's southeast section and Robinson Middle on Arkansas 10 in west Pulaski County. Robinson Elementary, Middle and High schools serve the district's Chenal Valley neighborhoods, a largely more affluent area than southeast Pulaski County.

Sam Jones, the district's newly reinstated lead counsel in the lawsuit, referred to a supplemental status report he sent to the judge on Tuesday that focused largely on athletic facilities at the two schools.

"There are indications, which are being evaluated and further explored, that certain aspects of the facilities at Robinson may involve features that could be subjectively if not objectively regarded as superior to certain of those at Mills," Jones wrote in that report.

There are questions about the differences in the size of coaches' offices and weight rooms at the new Mills and Robinson schools as well as differences in lighting and windows and in the interior wall, floor and ceiling finishes, Jones said.

Also to be determined, he said, is why the new indoor athletic facilities are already being used at Robinson but not at Mills, although he suggested that an outcropping of granite rock at the Mills site may be a reason for a delay there.

"Thus far the questions that have arisen are limited to the athletic facilities at the two schools," Jones said. "Construction of the academic facilities has not yet progressed to the point where the district is unable to remedy any equitable issues that might be present in the construction plans."

The district has received assurances from architects for Mills that, if necessary, additional windows can be added to the indoor practice facility and that the lighting can be enhanced to bring it on par with that at Robinson, Jones said. Concrete columns at Mills can be wrapped in plasterboard.

Jones said the district is also looking at the broader issues of whether expenditures for the new Mills comport with the judge's Jan. 12, 2015, order approving the expenditure of about $50 million for Mills and $5 million for the conversion of Mills High to be a new Fuller Middle School. Also in question is whether the district is devoting $15,350,000 in state desegregation aid exclusively to the Mills projects, as had been planned.

"What has been spent to date at Mills? What has been spent to date at Robinson? What were the original budgets for each project? Have the respective budgets changed, who proposed the changes and who approved the changes?" are among the inquiries being made, Jones wrote. "What can be done at this stage to equalize the projects if in fact they are not substantially equal in terms of expenditures overall?"

Jones said the district so far has determined that an application was submitted in June 2015 to the Arkansas Board of Education for authority to issue $56,265,000 in bonds for the purpose of equipping school facilities, construction a new Mills High and converting the existing Mills High to a middle school.

"It appears that on March 14, 2016, the architects for Mills were directed to work toward a $35 million construction budget for the new Mills High," Jones also wrote. "The district is inquiring further as to how that figure was derived and the authority for that directive."

"On March 15, 2016," Jones continued, "the superintendent and commissioner approved a recommendation to construct the Mills High replacement project and to convert the existing high school into a middle school and to demolish the existing Fuller Middle School and campus support facilities for the Robinson Middle School replacement project reflecting a cost for all projects of $80 million and describing the funding source as the building fund and second-lien bond proceeds."

Walker, on behalf of the Joshua intervenors, complained to Marshall on Friday that both the intervenors and the judge "had been sold a bill of goods" in regard to the Pulaski County Special district's building of a new Robinson Middle School. He called the status conference "a sad occasion because the district has admitted in effect complicity in circumventing" its desegregation plan commitments.

Walker argued to the judge Friday that one recently resigned Pulaski County Special district staff member "manipulated" the district's building program to advantage his own own neighborhood.

"This reinforces the notion that kids in the Mills area matter less than kids in more affluent areas," he said.

Walker didn't specifically name an official, but Derek Scott, the district's executive director of operations, earlier this month submitted his letter of resignation, effective Sept. 15.

The Pulaski Special district is not the financially strapped system it has been depicted to be, Walker told Marshall. The district should be made to earmark some $20 million for improvements to College Station Elementary in the southeast part of the district and Harris Elementary in the northeast section.

He also proposed that the Pulaski County Special district transfer some money to the new Jacksonville/North Pulaski district for replacing its old schools. That district is in the midst of building a new elementary to open in 2018-19 and a new high school to open in 2019-20, with plans for other new elementaries in later years.

Just this week, Jacksonville/North Pulaski district leaders have raised the possibility of constructing a new middle school rather than spending almost the same amount to renovate its existing middle school campus, which is the former North Pulaski High School.

Friday's status conference between Marshall and the parties was the first since the Pulaski Special district's school board voted in July to fire six-year Superintendent Jerry Guess and the Allen P. Roberts law firm, which had taken the lead counsel role in representing the district in the ongoing lawsuit.

The seven-member School Board, elected in November 2016 after the district operated for five years in state control and without an elected board, immediately named Janice Warren as interim superintendent for this school year and reinstated Jones as lead counsel. Jones had held that role before the hiring of the Roberts firm.

The judge on Friday asked Jones to report later this year on the long-term leadership plans for the district.

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

LITTLE ROCK SCHOOL DISTRICT, *et al.*                    PLAINTIFFS

v.                           No. 4:82-cv-866-DPM

PULASKI COUNTY SPECIAL
SCHOOL DISTRICT, *et al.*                                DEFENDANTS

LORENE JOSHUA, *et al.*                                  INTERVENORS

## ORDER

Ms. Powell has delivered her report on the Robinson/Mills sports complexes to the Court.  It is attached.  And it is appreciated.

So Ordered.

_____
D.P. Marshall Jr.
United States District Judge



## COMPARISON OF SPORTS COMPLEX AT MILLS AND AT ROBINSON HIGH SCHOOLS

On September 8, 2017, the Court directed the Court Expert to report on whether the sports complex at Mills High School is equal to the one located on the site of the Robinson Middle School campus.

## NARRATIVE

In December, 2012, the PCSSD and Joshua Intervenors filed a motion to "Supplement Plan 2000 As It Pertains to Facilities". The parties moved to change and replace a portion of the plan, Section H (School Facilities). Among other things, the new language committed to constructing two new high schools for "circa $50,000,000.00 each, to replace existing Mills High School and Robinson High School. The new Mills and Robinson will be constructed in that order (i.e., first Mills, then Robinson) if for any reason they cannot be constructed simultaneously." Pg. 2: 4-A That plan was contingent upon the passage of a millage increase, which did not pass.

The proposal included a section that became known as "Plan B", whereby the district committed to "the circa $50,000,000.00 new Mills High School........regardless of the success of the millage." Pg. 3: 4-B

Note: The plan also included language whereby the district would spend $5000,000 on both the Mills and Robinson campuses to convert the existing high schools to middle schools.

In 2016, the district's superintendent, Dr. Jerry Guess and the Commissioner of Education, Mr. Johnny Key, approved a recommendation to set the project costs for both campuses at a combined total of $80,000,000. It is unclear if or how the budgets changed and whether or not the district is in compliance with the Court's order of January 12, 2015 approving the district's proposal to spend "circa $50,000,000 for the new Mills High School" and "circa $5,000,000 for the middle school conversion to a high school."

At the October 27th monthly status meeting of the parties, John Walker, attorney for the Joshua Intervenors, shared some aspects of a conversation he recently had with Dr. Guess concerning the current controversy surrounding the Mills/Robinson construction projects. According to Mr. Walker, Dr. Guess accepted the blame for the shortcomings of the Mills project. He stated that Dr. Guess felt that current demographic trends warranted downsizing the Mills project and speeding up the Robinson project. Dr. Guess explained that he was trying to save enough money in a "rainy day account" in order to enable the district to build two elementary schools (although that was not in his immediate plans).

On November 2nd I spoke with Dr. Guess and he emphasized that his focus was always on the kids in the southeast quadrant of the county and that he wanted to make sure there was a quality

school in that area. When the district embarked on redeveloping the Mills and Robinson campuses, he gave oversight authority to the then Executive Director of Operations, Derek Scott. The two of them had a good track record working on various projects together. Dr. Guess indicated that he was adamant that Mr Scott was to make sure that the Mills campus would be equal to that of the Robinson campus and comparable to the campus at Maumelle High School. In addition, he made it clear to district personnel that the Mills High School and middle school projects were the district's priority.

Dr. Guess insists there is enough money available to complete both campus projects. He asserts that a lack of funds was not an issue in the decision making process with respect to either campus. In addition, he assured me that the district will spend at least $55,000,000 on the Mills project. Nevertheless, Dr. Guess acknowledges that as the district's chief executive officer, the "buck stopped with him." In that context, he accepts some of the responsibility for the present state of affairs.

## FINDINGS

On September 19th[th] and October 25th I visited the Robinson sports complex center, toured the facility and grounds, and interviewed the athletic director (AD), as well as some of his staff. I made the same type of visits to Mills on September 26th and on October 24th. The bulleted points below reflect my findings on the status of the construction projects as of October 25th.

- The first thing of note on my initial visit to the Robinson complex is that it was up and running; fully functional, and the landscaping was almost complete. Mills' was not operational and the land preparation was no where near completion. According to the AD, no work had been done on the site in three weeks. On my follow up visit to Mills on October 24th the field house was in operation, but the landscape looked much the same.

- Based on PCSSD's status report (document 5337, dated October 10, 2017), it is clear that the two facilities were inherently unequal from the start of construction. The field house at Robinson is 19130 SF larger than the one at Mills. Part of the reason is that the field house at Robinson has a 15,047 SF second storey. Even if the second storey's square footage was removed from the equation, Robinson's field house would still be over 4000 SF larger than the one at Mills. It should also be noted that the field house at Mills was originally designed to be a two storey building.

- The second floor at Robinson provides additional space for academics, feeding, and other activities. Mills has no unassigned space in the field house.

- At Robinson, the indoor field is at least 1147 SF larger than at Mills. Robinson has 3 roll-up doors leading from the indoor field into the field house. Mills has one roll-up door.

- The weight room at Robinson is over 2700 SF larger than at Mills. While not of the same magnitude, every room in the Robinson field house is larger than its counterpart at Mills.

- The floor in the team room at Robinson slants up theater-styled; has padded chairs with a built-in desk top feature; a large flat screen TV that is wall mounted and, has internet access. The team room at Mills has a flat classroom styled floor plan; a desk top TV, and what can best be described as "glorified folding chairs."

- Robinson's AD has a separate office, that includes a restroom.  The AD at Mills does not have an office.

- According to the AD at Mills, despite the PCSSD's claim, there is no women-only locker room at the new complex. The women's locker room will be shared with male athletes. According the Robinson's AD, during football season, the middle school males will use the women's locker room, because most of the women's sports seasons begin after the football season. After that time the locker room converts to "women only."

- At Robinson, referees will use the auxiliary locker room in the sports complex. Visiting teams will use the middle school gym as the locker room. Unlike Robinson, the facility at Mills lacks visitor/referee locker space.

- Robinson has separate restrooms for males and females on the practice field.  After using a Port a Potty for over seven years, Mills got a trailer that serves as a unisex restroom, with each gender having 2 stalls.

- Season ticket holder seats are numbered at Robinson, were not at Mills.

- The AD at Mills indicated that the school would have half the parking space than at the old facility and that the new parking area is located significantly further from the field. On the other hand, the AD at Robinson revealed that once the middle school is complete, they would have access to additional parking. In addition, the existing parking lot has been completely resurfaced and is a short distance from the field.

- The Mills facility lacks some of the interior finishes found at Robinson, i.e.,door and wall wraps. In addition, there are noticeable differences between the two complexes with respect to lighting and window treatments. The district has pledged to address those issues and to make changes where possible. (See document 5322,p.2, filed 09/05/17)

- Some of the figures reported on Doc. 5337-1,filed 10/09/17 - (Multipurpose Fieldhouse Information) could be misleading. Under the column "Usage by Students", figures for Mills do not include middle school students, whereas they are included in the Robinson column. This gives the appearance that every student at Robinson is participating in a sport.

## UPDATE-CONCLUSIONS

I spoke at length with the AD's at Mills and Robinson's campuses and was very disappointed to learn that while the AD at Robinson was invited (at least twice) to provide input on what he felt was important with respect to design and specific attributes of his school's complex, the AD at Mills was not allowed the same privilege. Even more troubling is that Mills' AD reported that when he asked Mr. Scott to allow him to provide input with respect to the sports complex, he says that he was told not to worry because "the district had good people on the project making the decisions."

On October 31st I spoke again with the AD at Mills and he indicated that since my last visit to the site, the TV has been mounted and the season ticket holder seats have numbers. On the other hand, the unisex restroom facility has been removed and students are back to using the Port a Potty. He revealed that on October 30th he had finally been asked to meet with the construction project managers and district officials to discuss some of the issues mentioned earlier in this report. He was also taken on a tour of the new gym and afforded an opportunity for input (even though the facility was well under construction by then). He pointed out to the construction team that there were no restrooms in the locker rooms and no office space for the AD. He also explained to them that one has to walk approximately a quarter of a mile through overgrown brush and rough terrain to get from the main gym to the practice field.

The construction leader indicated that they could build a sidewalk from the gym to the Mills field house. Also, they could run a line to add a restroom in each locker room in the gym. In addition, the contractor pointed out that they could add additional windows to increase the natural light in the field house. However, he pointed out that because construction of the building has already been completed, the new additions might look like a "patch job."

The AD at Robinson indicated that he had not yet seen his school's gym. As a result, he could not comment on any shortcomings or other issues related to that facility.

Former district personnel have been quick to point out that the Mills and Robinson projects had different architects, which is true, but district personnel approved the designs. There is some debate on when and how changes in designs were made and by whom. Nevertheless, the bottom line is that the two schools are not equal and someone should have stepped in to correct the glaring inequities between the two projects. It is inconceivable that the AD at Robinson was consulted during the design and construction of the sports complex, while Mills' AD was not given the same privilege. It seems certain that his input may have prevented some of the current problems with that project.

Finally, while the impetus behind the changes in design and the downsizing of the Mills project may never be known, it is clear that there was an amazing lack of sensitivity to the people of the southeast quadrant. They were promised a campus with facilities equal to that at Robinson and they have not gotten that. While district officials may not have meant to signal that the Mills facilities did not warrant all of the features included at Robinson campus, perception is reality. The PCSSD should make every effort to make things right and, based on my conversations with

officials, they will try to do so.

## COMMENTARY

Perhaps in an effort to attract even more students, it seems that some district personnel may have felt that it was a good idea to increase the design enhancements on the Robinson High School project and to cut corners at Mills. It is true that Mills High School has been experiencing a decline in it's student population over the past few years. However, the past and current administration may be unaware that it was not too long ago that Mills was cited as a Top 100 High School in Newsweek Magazine. The school had a thriving "University Studies" magnet component; a top rated gifted and talented program and; highly rated services for special needs students, among other things. There is no reason to believe that the school cannot achieve those distinctions again.

Respectfully Submitted:

*Margie L. Powell*

Margie L. Powell
Court Expert

5

# Board of Education Meeting Minutes:
## November 14, 2017

**In Attendance:** Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward

**Absent:** (None)

## 1. Call to Order

- Dr. Remele called the meeting to order at 6:00 p.m.

## 2. Roll Call

- All members present.

## 3. Pledge of Allegiance

- Brian Maune introduced Davis Wofford, Robinson High School guest Board Student, who led the Pledge of Allegiance.

## 4. Public Comments

- There were no Public Comments.

## 5. Recognitions

- Maumelle High School 5A Cross Country State Championship Team Ms. Gillen introduced Maumelle High School Cross Country coaches, Coach Tyler and Coach Henry. Ms. Gillen congratulated the coaches and team on their recent 5A State Championship. Coach Tyler and Coach Henry introduced each team member.

## 6. Certified P.P.C. Presentation

- Ms. Fitzgiven presented a proposal to the Board for a one time bonus of $2,500 for full time certified staff and one-time bonus of $1,250 fo[r] [...] in the month of December.

PLAINTIFF'S
EXHIBIT
D

7. Classified P.P.C. Presentation

- Mr. Chesterfield presented a proposal for a one-time bonus for all Classified staff for $2,500 to be paid in the month of December.
- Both Ms. Fitzgiven and Mr. Chesterfield presented rationals for the proposed bonuses and figures on the cost to the District for the different bonus scenarios.
- After hearing both presentations the Board scheduled a Special Board Meeting for Wednesday, November 29 to render their decision regarding the bonuses.

8. Reports

1. McPherson & Jacobson, LCC Dr. Keith Williams, McPherson & Jacobson, LCC, made a presentation to the Board outlining the services they provide to Districts with regards to the hiring of Superintendents.
2. Mills High School Enhancements Mr. Roy Horsey, Baldwin & Shell, presented change orders to be added to the contract for Mills High School enhancements. Mr. Michael Hansberry, project manager, gave an update on the construction progress and reported that the new Mills High School is now at 55% completion.
   - Vote to approve change orders to Mills High School
     Motion by Mike Kemp
     Seconded by Alicia Gillen
     In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
     Opposed: (None)
   - Vote to suspend Roberts Rules of Order to consider S.H.H.S. price proposal
     Motion by Mike Kemp
     Seconded by Eli Keller
     In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
     Opposed: (None)
   - Vote to approve price proposal to add $27,000,000 to contract to begin work on classrooms at S.H.H.S.
     Motion by Mike Kemp
     Seconded by Alicia Gillen
     In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
     Opposed: (None)
3. Construction Update - Robinson Middle School
   - Eldon Bock and Russ Fason, W.E.R. Architects, presented a slide presentation to the Board of the inside renderings for Robinson Middle School.
   - Patrick Schroeder, Baldwin & Shell, presented a construction update for the school.
4. Presentation of the 2017-2018 Annual Report to the Public
   - Dr. Williams presented the 2017-2018 Report to the Public.
5. Bond Investment/Financial Report
   - Denise Palmer presented a Financial update and Bond Investment report.

9. Action Items - Old Business

1. Board Policy Section B- School Governance and Operations- Second Reading
2. Board Policy Section C- General School Administration- Second Reading
3. Board Policy Section D- Fiscal Management- Second Reading
4. Board Policy Section F- Facilities Planning and Development- Second Reading

- o Vote to Approve 2nd readings of Board Policy Sections B, C, D, and F.
  Motion by Mike Kemp
  Seconded by Tina Ward
  In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
  Opposed: (None)

## 10. Action Items - New Business

1. Board Policy Section I- Curriculum and Instruction-
   - First Reading Dr. Williams also advised the Board that she would be adding Board Policy 4.6 - Homeschooling- to the December Agenda for 1st and 2nd readings.
   - Vote to approve 1st reading of Board Policy Section I - Curriculum and Instruction
     Motion by Mike Kemp
     Seconded by Shelby Thomas
     In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
     Opposed: (None)

2. Moncrief One Team Literacy Coaching
   - Vote to approve Moncrief One Team Literacy Coaching P.D.
     Motion by Alicia Gillen
     Seconded by Eli Keller
     In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
     Opposed: (None)

3. Accelerated Math - Renaissance Learning, Inc.
   - Vote to approve Accelerated Math -Renaissance Learning, Inc.
     Motion by Alicia Gillen
     Seconded by Tina Ward
     In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
     Opposed: (None)

4. Generation Ready Reading and Writing Support
   - Vote to approve Generation Ready Reading and Writing Support P.D.
     Motion by Eli Keller
     Seconded by Tina Ward
     In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
     Opposed: (None)

5. BloomBoard Premium Services
   - Vote to approve BloomBoard Premium Services
     Motion by Shelby Thomas
     Seconded by Alicia Gillen
     In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
     Opposed: (None)

## 11. Comments from the Board

1. Dr. Remele reported that the three feeder pattern vision/mission meetings have been very successful and reminded everyone the next meeting is at Robinson High School on December 4th, 6:30 p.m. She also reminded them that the Board will meet with Mr. Horace Smith again on December 7th, 6:00 p.m. at A.S.B.A.

2. Ms. Ward inquired about board terms and board reorganization. Dr. Remele verified the board terms and reminded everyone that the board will once again elect officers at the December meeting.

## 12. Superintendent's Comments

1. Dr. Warren informed the Board that the District has received notice from Mr. Johnnie Key that P.C.S.S.D. is one of the 17 districts that have been approved for A.M.I. (Alternative Method of Instruction). This will allow the District up to 5 inclement weather days to be made up by on-line instruction.

## 13. Consent Agenda

1. University of Memphis Research Foundation through the Center for Research in Education Policy (CREP) Agreement
2. Pfeifer Kiwanis Camp Contract Agreement with PCSSD
3. Certified Personnel
4. Support Staff Personnel
5. Financial Reports /Bank Reconciliations
6. October 2017 Board Financials and AP check register
7. Consent Agenda - Student Expulsion
8. Consent Agenda - Student Expulsion
9. Consent Agenda - Student Expulsion
10. Minutes from 10-10-17 Board Meeting

- Vote to suspend Roberts Rules of Order to conduct personnel hearings prior to the Consent Agenda
  Motion by Eli Keller
  Seconded by Alicia Gillen
  In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
  Opposed: (None)

- Vote to go into Executive Session to discuss personnel
  Motion by Brian Maune
  Seconded by Tina Ward
  In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
  Opposed: (None)

- Vote to approve Consent Agenda
  Motion by Alicia Gillen
  Seconded by Shelby Thomas
  In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
  Opposed: (None)

## 14. Student Hearings

## 15. Employee Hearings

1. Hearing I
   - Vote to grant waiver for Diane Lindsey
     Motion by Mike Kemp
     Seconded by Shelby Thomas
     In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
     Opposed: (None)
2. Hearing II After all testimonies and debate, the Board entered into Executive Session at 11:02 p.m. The Board reconvened into Regular Session at 11:04 p.m.

- ▪ Vote to accept Superintendent's recommendation for termination of employment contract for Elizabeth Robinson
  Motion by Alicia Gillen
  Seconded by Mike Kemp
  In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
  Opposed: (None)

3. Hearing III The Employee, Yolanda Thompson was a no-show for the hearing. After hearing remarks from Jay Bequette, district attorney, the board was asked to consider Reasons #1, #2, #3, #4, #5 as true and to uphold the Superintendent's recommendation for termination of the employee's contract.

  - ▪ Vote to accept Reason #1 to be true
    Motion by Shelby Thomas
    Seconded by Alicia Gillen
    In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
    Opposed: (None)
  - ▪ Vote to accept Reason #2 to be true
    Motion by Alicia Gillen
    Seconded by Brian Maune
    In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
    Opposed: (None)
  - ▪ Vote to accept Reason #3 to be true
    Motion by Shelby Thomas
    Seconded by Alicia Gillen
    In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
    Opposed: (None)
  - ▪ Vote to accept Reason #4 to be true
    Motion by Tina Ward
    Seconded by Brian Maune
    In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
    Opposed: (None)
  - ▪ Vote to accept Reason #5 to be true
    Motion by Tina Ward
    Seconded by Shelby Thomas
    In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
    Opposed: (None)
  - ▪ Vote to uphold the Superintendent's recommendation for termination of the employee's contract
    Motion by Shelby Thomas
    Seconded by Brian Maune
    In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
    Opposed: (None)

4. Hearing IV After hearing testimonies and debate the Board entered into Executive Session at 11:59 p.m. and reconvened into Regular Session at 12:04 a.m.

  - ▪ Following all personnel hearings, the Board convened into Executive Session at 12:06 a.m. to discuss personnel. The Board reconvened into Regular Session at 1:35 a.m.
  - ▪ Vote to reject the Superintendent's recommendation for termination of Mr. Phillip Zaffarano's contract and to reinstate the employee with probabation for the 2017-2018 school year with the

Case 4:19-cv-00655-BSM   Document 1   Filed 09/23/19   Page 46 of 119

stipulations that employee repeat entry level security training and enroll in deescalation and anger management training, additionally, the employee to be suspended without pay for three days

Motion by Brian Maune

Seconded by Shelby Thomas

In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward

Opposed: (None)

## 16. Adjournment

- Mr. Keller made a motion to adjourn at 1:37 a.m.

### **Our Leadership (/#)**

Annual Report to the Public (https://www.pcssd.org/annual-report-to-the-public-2018-2019)

Board of Education (http://pcssd.org/board-of-education)

Board Policies (/board-policies)

Board Meeting Information (http://www.pcssd.org/board-meeting-information)

Board Meeting Agendas (https://www.pcssd.org/board-meeting-agendas)

PCSSD Board Meeting Minutes (/board-meeting-minutes)

Board Zoning Map (/board-zones)

Legal Transfer Form (https://pcssd.s3.amazonaws.com/equity/legal-transfer-form.pdf)

Personnel Policy Committee (Classified) (/classified-personnel-policy-committee)

Personnel Policy Committee (Certified) (/certified-personnel-policy-committee)

Meet our Superintendent (/meet-our-superintendent)

# Board of Education Meeting Minutes: December 12, 2017

**In Attendance:** Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward

**Absent:** (None)

1. ## Call to Order
   - Dr. Remele called the meeting to order at 6:00 p.m.

2. ## Roll Call
   - All members present.

3. ## Pledge of Allegiance
   - Dr. Remele introduced guest board student, Alana Canady from Sylvan Hills High School and led everyone in the Pledge of Allegiance.

4. ## Election of Officers
   1. Vote - Dr. Remele- President
      Motion by Mike Kemp
      Seconded by Alicia Gillen
      In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
      Opposed: (None)
   2. Vote for nominations to cease for President
      Motion by Mike Kemp
      Seconded by Brian Maune
      In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
      Opposed: (None)



PLAINTIFF'S EXHIBIT

E

   3. Vote - Vice President - Shelby Thomas
   Motion by Mike Kemp
   Seconded by Brian Maune
   In Favor: Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas
   Opposed: Alicia Gillen, Tina Ward
4. Vote - Vice President - Tina Ward
   Motion by Tina Ward
   Seconded by Alicia Gillen
   In Favor: Alicia Gillen, Tina Ward
   Opposed: Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas
5. Vote - Secretary - Alicia Gillen
   Motion by Shelby Thomas
   Seconded by Mike Kemp
   In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
   Opposed: (None)
6. Vote - Disbursing Officer - Tina Ward
   Motion by Brian Maune
   Seconded by Alicia Gillen
   In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
   Opposed: (None)

## 5. Public Comments

1. Mr. James Long, Long Sales Agency, addressed the Board regarding his position on the importance of the District asking for multi-name specifications in regards to receiving competitive bids.

2. Mr. Robert Bolin, General Manager for Staley Electric, spoke defending his position on bid processes.

## 6. Certified P.P.C. Presentation

1. Request for Waiver for uniform dates for beginning and end of school year
   - Melissa Morgan representing the Certified P.P.C., asked the Board to vote to request a Waiver from the Department of Education for uniform dates for beginning and end of school year.
   - Vote to seek Waiver for uniform dates for beginning and end of school year
     Motion by Alicia Gillen
     Seconded by Shelby Thomas
     In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
     Opposed:(None

## 7. Classified P.P.C. Presentation

- Mr. Chesterfield was not present.

8. # Reports

1. Construction Updates/Change Orders
   1. Sylvan Hills High School (Change Order #002)
      - Vote to approve Change Order #002
        Motion by Alicia Gillen
        Seconded by Eli Keller
        In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
        Opposed: (None)

   2. Robinson Middle School (Change Order #003)
      - Vote to approve Change Order #003
        Motion by Alicia Gillen
        Seconded by Shelby Thomas
        In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
        Opposed: (None)
   3. Mills High School (Change Order #005)|
      - Vote to approve Change Order #005
        Motion by Shelby Thomas
        Seconded by Mike Kemp
        In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
        Opposed: (None)
2. Sylvan Hills High School Construction Update
   - Mr. Russell Fason, and Mr. Eldon Bock, W.E.R. Architects, presented proposed floor plans, construction phases, and interior renderings of the Sylvan Hills High School expansion project.
3. Financial Report
   - Monica Bryant, in Denise Palmer's absence, presented the Financial Update.
4. Media Specialist Report
   - Melinda Holman presented an overview of the issues facing Media Specialists in regards to testing responsibilities they have been assigned.
   - Vote to ask A.D.E. for waiver to be excluded from the 3rd Interim Assessment for the 2017-2018 school year
     Motion by Alicia Gillen
     Seconded by Mike Kemp
     In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
     Opposed: (None)

9. # Action Items - Old Business

1. Consideration of School Choice
   - Vote to paraticipate in School Choice for the 2018-2019 school year
     Motion by Mike Kemp
     Seconded by Eli Keller
     In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
     Opposed: (None)

2. Board Policy Section I- Curriculum and Instruction- Second Reading
    - Vote to approve Second Reading and adopt Board Policy Section I - Curriculum and Instruction
      Motion by Mike Kemp
      Seconded by Shelby Thomas
      In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
      Opposed: (None)
3. Consideration of Superintendent Search Consultants
    - Vote to hire Ray & Associates, Inc., to assist in Superintendent Search
      Motion by Shelby Thomas
      Seconded by Mike Kemp
      In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
      Opposed: (None)

## 10. Action Items - New Business

1. 4.59 Academic Course Attendance by Private School and Home School Students- First Reading
    - Vote to suspend Roberts Rules of Order so both 1st and 2nd readings can be voted on tonight
      Motion by Alicia Gillen
      Seconded by Shelby Thomas
      In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
      Opposed: (None)
    - Vote to approve 1st Reading of Board Policy 4.59 - Acadmic Course Attendance by Private School and Home School Students
      Motion by Alicia Gillen
      Seconded by Shelby Thomas
      In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
      Opposed: (None)
    - Vote to approve 2nd Reading of 4.59 - Academic Course Attendance by Private School and Home School Students
      Motion by Alicia Gillen
      Seconded by Shelby Thomas
      In Favor: bAlicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
      Opposed: (None)
2. 4.6 Homeschooling- First Reading
    - Vote to approve 1st Reading of Board Policy 4.6 - Homeschooling
      Motion by Alicia Gillen
      Seconded by Shelby Thomas
      In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
      Opposed: (None)
    - Vote to approve 2nd Reading of Board Policy 4.6 - Homeschooling
      Motion by Shelby Thomas
      Seconded by Alicia Gillen

In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
Opposed: (None)

3. Security Cameras, Mills
   - Vote to approve Secruity Cameras for Mills High School
   Motion by Tina Ward
   Seconded by Eli Keller
   In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
   Opposed: (None)

4. Instructional Technology
   - Vote to approve Smart Panels for Special Education
   Motion by Tina Ward
   Seconded by Eli Keller
   In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
   Opposed: (None)

5. ChromeBooks for ESL Program
   - Vote to approve ChromeBooks for ESL Program
   Motion by Alicia Gillen
   Seconded by Tina Ward
   In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
   Opposed: (None)

6. Vision, Mission, and Core Beliefs
   - Dr. Warren reported that all four Community Feeder Group Meetings had been wonderful. They are continuing to develop the Vision, Mission, and Core Beliefs for the District based on the feedback they have received.

## 11. Comments from the Board

   ○ Dr. Remele reported on the A.S.B.A. conference she attended.

## 12. Superintendent's Comments

   ○ Dr. Warren announced that the District had received approval from the A.D.E. for the A.M.I. plan. She presented each member with a copy of the District's A.M.I. plan.

## 13. Legal Transfer Requests

1. Vote to approve Legal Transfer for Joseph Rhee
   Motion by Shelby Thomas
   Seconded by Alicia Gillen
   In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
   Opposed: (None)

2. Vote to approve Legal Transfer for Hameed Zandi
   Motion by Alicia Gillen
   Seconded by Shelby Thomas

In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
Opposed: (None)

3. Vote to approve Legal Transfer for Karely Cavazos
   Motion by Mike Kemp
   Seconded by Tina Ward
   In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
   Opposed: (None)

4. Vote to approve Legal Transfer for Henry Cavazos
   Motion by Mike Kemp
   Seconded by Shelby Thomas
   In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
   Opposed: (None)

5. Vote to approve Legal Transfer for Daniel Cavazos
   Motion by Mike Kemp
   Seconded by Alicia Gillen
   In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
   Opposed: (None)

6. Vote to approve Legal Transfer for Jerry Doughty
   Motion by Mike Kemp
   Seconded by Tina Ward
   In Favor: Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
   Opposed: Alicia Gillen

## 14. Consent Agenda

1. Certified Personnel
2. Support Staff Personnel
3. Student Expulsion for Consent Agenda
4. Student Expulsion for Consent Agenda
5. Student Expulsion for Consent Agenda
6. Minutes from 11-14-17 Board Meeting
7. Minutes from 11-29-17 Board Meeting
8. November 2017 Board Financials and Accounts Payable Check Register
9. The Board entered into Executive Session at 8:15 p.m. and reconvened into Regular Session at 8:35 p.m. The Board took no action while in Executive Session.

○ Vote to enter into Executive Session to discuss Support Staff personnel
  Motion by Eli Keller
  No second required

○ Vote to approve Consent Agenda
  Motion by Alicia Gillen
  Seconded by Eli Keller
  In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
  Opposed: (None)

## 15. Adjournment

- o The meeting was adjourned at 8:40 p.m.
  Vote to adjourn
  Motion by Alicia Gillen

  No second required

### Our Leadership (/#)

Annual Report to the Public (https://www.pcssd.org/annual-report-to-the-public-2018-2019)

Board of Education (http://pcssd.org/board-of-education)

Board Policies (/board-policies)

Board Meeting Information (http://www.pcssd.org/board-meeting-information)

Board Meeting Agendas (https://www.pcssd.org/board-meeting-agendas)

PCSSD Board Meeting Minutes (/board-meeting-minutes)

Board Zoning Map (/board-zones)

Legal Transfer Form (https://pcssd.s3.amazonaws.com/equity/legal-transfer-form.pdf)

Personnel Policy Committee (Classified) (/classified-personnel-policy-committee)

Personnel Policy Committee (Certified) (/certified-personnel-policy-committee)

Meet our Superintendent (/meet-our-superintendent)

### STAFF LINKS

Webmail Login (https://portal.pcssd.org)

AMI Assignment Portal
(https://docs.pcssd.org/inclementweather)

Maintenance
(http://www.myschoolbuilding.com/myschoolbuilding/mygateway.asp?
acctnum=143100274)

IT Helpdesk (http://www.pcssd.org/it-helpdesk)

eSchool Plus Login (http://eschool40.esp.k12.ar.us)

### PARENT LINKS

Adult Education Center – GED
(http://www.gedwage.com)

AMI Assignment Portal
(https://docs.pcssd.org/inclementweather)

Apply for a career with PCSSD
(https://www.pcssd.org/careers)

Register Online (https://www.pcssd.org/register)

2018 Summer School (https://www.pcssd.org/sumer-
school-2018)

eSchool Teacher Access Center (http://tac40.esp.k12.ar.us)

FileBound (https://pcssd.filebound.com/LogOn.aspx)

Single Sign-On Portal (https://portal.pcssd.org/_auth/login.aspx?ru=====)

State Required Information (http://www.pcssd.org/legal-center/)

SEAS Access for Teachers (https://www.seasweb.net/arpcssd)

ESC Works Shoebox (http://www.escweb.net/ar_esc/)

Training Network Online (http://trainingnetworkonline.com/login?co=3705&v=75899)

Download the Online Registration Manual (https://pcssdpublicfiles.s3.amazonaws.com/docs/equity/registration-manual.pdf)

Apply for Free or Reduced Meals (https://frapps.horizonsolana.com/PULC01)

DRIVEN School of Opportunity (https://driven.pcssd.org)

Request Transcripts or Records (https://forms.pcssd.org/transcriptrequest)

Home Access Center (https://www.pcssd.org/home-access-center-hac)

Download the HAC Manual (https://pcssd.s3.amazonaws.com/technology/hac-manual.pdf)

MyPayments Plus (https://www01.mypaymentsplus.com/Default.aspx)

PCSSD Libraries Online (https://atriuum.pcssd.org)

School Improvement Plans (https://www.pcssd.org/school-improvement-plan)

## PULASKI COUNTY SPECIAL SCHOOL DISTRICT



925 East Dixon Road
Little Rock, AR 72206

Dr. Charles McNulty, Superintendent
501.234.2000

Select Language ▼     Select Language ▼



# Board of Education Meeting Minutes: September 12, 2017

Board of Education Meeting Minutes Tuesday, September 12, 2017 6 p.m.

**In Attendance:** Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward

**Absent:** (None)

## 1. Call to Order

Dr. Remele called the meeting to order at 6:00 p.m.

## 2. Roll Call

All members present.

## 3. Pledge of Allegiance

Ms. Tina Ward introduced our September Board Student, Jaden Turner from Mills University High School. Jaden led the Pledge of Allegiance.

## 4. Public Comments

No Public Comments

## 5. Certified P.P.C. Presentation

Ms. Fitzgiven was not present.



# 6. Classified P.P.C. Presentation

Mr. Chesterfield was not present.

# 7. Reports

1. Financial Update FY16/17
   Denise Palmer presented the Financial Update.
2. Comparison of 2016 and 2017 12th Day Enrollment Count
   Dr. Yolanda Williams presented the Comparison of the 2016-2017 12th Day
   Enrollment Count.

# 8. Action Items - Old Business

1. IJJ, IJJ-E, and IJJ-R Textbook Selection and Adoption- Second Reading with revisions
   Vote to adopt Board Policies IJJ, IJJ-E, and IJJ-R pending recommended changes by
   Dr. Remele

   - Motion by: Alicia Gillen
   - Seconded by: Mike Kemp
   - In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele,
     Shelby Thomas, Tina Ward
   - Opposed: (None)

2. 5.6 Challenge to Instructional- Supplemental Materials & Form 5.6F (New Policy) -
   Second Reading
   Vote to adopt Board policy 5.6

   - Motion by: Alicia Gillen
   - Seconded by: Mike Kemp
   - In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele,
     Shelby Thomas, Tina Ward
   - Opposed: (None)

# 9. Action Items - New Business

1. Board Policy Section A- Foundations and Basic Commitments- First Reading
   (Delete)
   Vote to delete Board Policy Section A

   - Motion by: Shelby Thomas
   - Seconded by: Brian Maune
   - In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele,
     Shelby Thomas, Tina Ward
   - Opposed: (None)

2. Board Policy Section C- General School Administration- First Reading (Delete)
   The Board will send any concerns regarding this section to Dr. Warren and Dr.
   Williams before the October Board Meeting.
   Table Board Policy Section C until October Board Meeting

■ Motion by: Alicia Gillen
■ Seconded by: Shelby Thomas
■ In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
■ Opposed: (None)

3. Board Policy Section E- Support Services- First Reading (Delete)

Vote to delete Board Policy Section E

■ Motion by: Eli Keller
■ Seconded by: Alicia Gillen
■ In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
■ Opposed: (None)

4. Board Policy Section K- School-Community- Home Relations- First Reading

Vote to adopt Board Policy Section K

■ Motion by: Shelby Thomas
■ Seconded by: Alicia Gillen
■ In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
■ Opposed: (None)

5. Biomedical Computer Lab

Vote to approve Biomedical Computer Lab for Sylvan Hills High School

■ Motion by: Alicia Gillen
■ Seconded by: Shelby Thomas
■ In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
■ Opposed: (None)

6. Pre-Engineering Computer Lab (Pam Black)

Vote to approve Pre-Engineering Computer Lab at Mills University High School

■ Motion by: Alicia Gillen
■ Seconded by: Brian Maune
■ In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
■ Opposed: (None)

# 10. Comments from the Board

Dr. Remele stated that she attended Court on Friday and the Arkansas Gazette did a good job accurately reporting what happened in the hearing.

# 11. Superintendent's Comments

1. Dr. Warren recognized new Cabinet members Linda Goodwin, Interim Director of Elementary Education, and Sherman Whitfield, Interim Director of Equity and Pupil Services.

2. Dr. Warrend advised the Board that the insurance change (ASBA vs CARMA) is on hold and will be brought before the Board again at the beginning of next year.

Case 4:19-cv-00655-BSM    Document 1    Filed 09/23/19    Page 58 of 119

2. Dr. Warrend advised the Board that the insurance change (ASBA vs CARMA) is on hold and will be brought before the Board again at the beginning of next year.

3. D. Warren reminded the Board of the upcoming September 25th Special Board Meeting for budget training and the October 3rd training with A.S.B.A.

## 12. Petitions for Legal Transfers

Vote to approve Legal Transfer Request for Judge Dylan Hoof

- ○ Motion by: Alicia Gillen
- ○ Seconded by: Tina Ward
- ○ In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- ○ Opposed: (None)

Vote to approve Legal Transfer Request for Carlos Maciel

- ○ Motion by Brian Maune
- ○ Seconded by Eli Keller
- ○ In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- ○ Opposed: (None)

Vote to approve Legal Transfer Request for Angel Gomez

- ○ Motion by Shelby Thomas
- ○ Seconded by Tina Ward
- ○ In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- ○ Opposed: (None)

Vote to deny Legal Transfer Request for Darrell Hughes

- ○ Motion by Alicia Gillen
- ○ Seconded by Tina Ward
- ○ In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- ○ Opposed: (None)

Vote to deny Legal Transfer Request for Aaliyah McBride

- ○ Motion by Tina Ward
- ○ Seconded by Alicia Gillen
- ○ In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- ○ Opposed: (None)

Vote to deny Legal Transfer Request for Lakiah Henry

- ○ Motion by Alicia Gillen
- ○ Seconded by Tina Ward
- ○ In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- ○ Opposed: (None)

Vote to deny Legal Transfer Request for Kimora Miller

- Motion by Shelby Thomas
- Seconded by Alicia Gillen

- In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- Opposed: (None)

Vote to deny Legal Transfer Request for Ma'Kayla Miller

- Motion by Alicia Gillen
- Seconded by Shelby Thomas
- In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- Opposed: (None)

Vote to approve Legal Transfer Request for Chance West

- Motion by Shelby Thomas
- Seconded by Mike Kemp
- In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- Opposed: (None)

Vote to approve Legal Transfer Request for Aiden Peloquin

- Motion by Shelby Thomas
- Seconded by Alicia Gillen
- In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- Opposed: (None)

Vote to approve Legal Transfer Request for Dana Perez

- Motion by Mike Kemp
- Seconded by Tina Ward
- In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- Opposed: (None)

## 13. Consent Agenda

Alicia Gillen made a motion to move into Executive Session for the purpose of discussing Personnel. The Board entered into Executive Session at 7:00 p.m.

The Board reconvened into Regular Session at 8:30 p.m.
Vote to pull Personnel from the Consent Agenda

- Motion by Alicia Gillen
- Seconded by Mike Kemp
- In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- Opposed: (None)

Vote to approve Superintendent's recommendations for Personnel

- Motion by Alicia Gillen

- Seconded by Mike Kemp
- In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- Opposed: (None)

Vote to approve remainder of Consent Agenda

- Motion by Mike Kemp
- Seconded by Tina Ward
- In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- Opposed: (None)

1. Board Financials and AP Check Register
2. Support Staff Personnel
3. Certified Staff Personnel
4. Minutes from 8-08-17 Board Meeting
5. Approval of the ACSIP process for the district and the schools, and the ACSIP Statement of Assurances.
6. Legislative Audit 06-30-16

## 14. Student Hearings

There were no student hearings.

## 15. Employee Hearings

Vote to grant employee waiver

- Motion by Eli Keller
- Seconded by Mike Kemp
- In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward
- Opposed: (None)

## 16. Adjournment

Eli Keller made a motion to adjourn, the meeting was adjourned at 8:43 p.m.

### Our Leadership (/#)

Annual Report to the Public (https://www.pcssd.org/annual-report-to-the-public-2018-2019)

Board of Education (http://pcssd.org/board-of-education)

Board Meeting Information (http://www.pcssd.org/board-meeting-information)

Board Meeting Agendas (https://www.pcssd.org/board-meeting-agendas)

PCSSD Board Meeting Minutes (/board-meeting-minutes)

Board Zoning Map (/board-zones)

📄 Legal Transfer Form (https://pcssd.s3.amazonaws.com/equity/legal-transfer-form.pdf)

Personnel Policy Committee (Classified) (/classified-personnel-policy-committee)

Personnel Policy Committee (Certified) (/certified-personnel-policy-committee)

Meet our Superintendent (/meet-our-superintendent)

# PULASKI COUNTY SPECIAL SCHOOL DISTRICT



925 East Dixon Road
Little Rock, AR 72206

Dr. Charles McNulty, Superintendent
501.234.2000

Select Language   ▼      Select Language   ▼

# PCSSD seeks new superintendent



## About Pulaski County Special School District:

The Pulaski County Special School District (PCSSD) is one of four public school districts in Pulaski County, Arkansas. The others are the Little Rock School District, the North Little Rock School District and the Jacksonville-North Pulaski School District. PCSSD has its headquarters in Sweet Home, an unincorporated area near Little Rock. The current PCSSD was established July 21, 1927, by referendum pursuant to Act 152 of the 1927 Arkansas Acts by the Arkansas legislature joining 38 independent school districts into a "special" school district. One of the largest school districts in the state (by student population), PCSSD is among the 500 largest in the United States. Geographically, PCSSD is the state's sixth-largest district, encompassing a total 640 square miles and including all areas of the county—incorporated and unincorporated.

## Seeking a Superintendent who:

- Possesses excellent people skills, presents a positive image of the district and will listen to input and make a decision when necessary.
- Possesses the leadership skills required to respond to the opportunities and challenges presented by an ethnically and culturally diverse community.
- Inspires trust, has high levels of self-confidence and optimism, and models high standards of integrity and personal performance.
- Is a strong communicator; speaking, listening and writing.
- Has experience recruiting and maintaining exceptional staff for the district and schools.
- Is able to delegate authority appropriately while maintaining accountability.

PLAINTIFF'S EXHIBIT
G

- Has knowledge of and successful experience in sound fiscal practices and management of district resources, including appropriate participation of others in planning and decision-making.
- Is strongly committed to a "student first" philosophy in all decisions.
- Possesses the ability to enhance student performance, especially in
- identifying and closing or narrowing the gaps in student achievement.
- Promotes a positive and professional environment for district employees and Board.
- Is comfortable leading innovation and reform efforts.

## Shared Vision:

The Pulaski County Special School District is committed to creating a nationally recognized school district which assures that all students achieve at their maximum potential through the collaborative, supportive and continuous efforts of all stakeholders (teachers, administrators, support staff, families, students, communities and businesses).

## Deadline and Selection:

All materials submitted as part of the superintendent application will remain confidential to the fullest extent allowed by law, which includes board review in a closed session of the Board of Education. After all applications have been reviewed and preliminary interviews conducted by the consulting firm, the names of the finalists will be presented to the PCSSD Board for its consideration. Selection of candidates for interviews is the sole responsibility of the Board. Candidates selected for interviews should expect that their names and resumes will become public information. Persons wishing to be considered for the position should submit an application file online including:

- A letter of application stating personal qualifications, experiences and reasons for interest in the position.
- The online application form and a resume.
- Four current letters of recommendation.

## Salary and Benefits:

The salary will be in the range of  $215,000 plus an excellent and comprehensive benefit package. The final salary for the successful candidate will be negotiated and determined based upon proven experience, qualifications and meeting Board criteria.

## Requirements:

The candidate must have superintendent credentials. More information about Arkansas' superintendent accreditation process is available at the Department of Education website (http://www.arkansased.gov).

## About Central Arkansas:

- Central Arkansas has earned a reputation among history buffs, foodies and art lovers as an exciting place to live.
- America's No. 1 "Great Place to Live" – Small to Midsize Cities (*Kiplinger*)
- Little Rock name one of five secret foodie cities (*Forbes Travel Guide*)
- Consistently ranked among the nation's top 10 in housing and jobs, the region boasts unparalleled amenities for a market its size.
- *Outside* magazine named Little Rock one of its overall best towns in America.
- As a premier city in the Natural State, Little Rock boasts a network of biking and hiking trails unmatched anywhere.

## Apply online at:

www.rayassoc.com (http://rayassoc.com/job-details.php?ID=416)

Questions should be directed to:

Ray & Associates, Inc.
4403 First Avenue SE, Suite 407
Cedar Rapids, IA 52402

**Phone:** 319-393-3115

**Fax:** 319-393-4931

**Email:** glr@rayassoc.com (mailto:glr@rayassoc.com?subject=PCSSD%20Superintendent%20Search)

Please do not contact the Board of Education or District directly.

Deadline to apply is March 12, 2018

Download this information (https://drive.google.com/file/d/11UaJEfcBQG3BC8vstwMHxVx95ZPyj_tH/view?
usp=sharing)

<< Previous Post (/spec-ed-records-destruction)                 Next Post >> (/parent-conf-2-19-18)

## Latest Headlines

Football Friday: September 14, 2018 (/football-friday-2018-09-14)

Celebrate National Arts in Education Week (/2018-arts-iin-ed-week)

Robinson Middle School opens new campus (/rms-opens-thv)

Crystal Hill Elementary set to start new teaching method (/ches-new-ways)

Teachers, schools appreciate classroom investments (/thv11-classroom-investments)

PCSSD rolling out self-paced learning initiative guiding students toward career path (/driven-katv)

Football Friday: September 7, 2018 (/football-friday-2018-09-07)

Board Meeting Agenda: September 10 and 11, 2018 (/board-agenda-2018-09-10)

District closed Monday in observance of Labor Day (/no-school-2018-09-03)

Football Friday: August 31, 2018 (/football-friday-2018-08-31)



## PULASKI COUNTY SPECIAL SCHOOL DISTRICT

925 East Dixon Road
Little Rock, AR 72206

Dr. Charles McNulty, Superintendent
501.234.2000

Select Language  ▼

## PCSSD SUPERINTENDENT CANDIDATE COMPARISON

| Category | Warren | McNulty | Harris | Pruitt |
|---|---|---|---|---|
| Age | 61 | 55 | 49 | 46 |
| Gender | Female | Male | Male | Male |
| Race | Black/African-American | White/Caucasian | Black/African-American | Black/African-American |
| Superintendent Experience | 11 years | 3 years | 2.5 years | 0 years[1] |
| District Student Size Racial Composition | 2,500 (Crossett) 12,101 (PCSSD) 56% White 44% non-White | 436 98.5% White[2] 1.5% non-White | 3700 89% White 11% non-White | |
| Superintendent Annual Budget Oversight | $244,859,652.89 | $6,171,334.22[3] | $56,000,000.00 | |
| Per Pupil Allocation | $12,189.58 | $14,424.00[4] | $15,135.00[5] | |
| Central Office Admin | 15 years | 12 years | 7 years | |
| Service As Principal | 3 years | 7 years | 0 years | 6 years |
| Terminal Education | Ed. D. (2008) | PhD (2011) | MBA (2005) | Ed. D. (2014) |
| Desegregation Case Experience | 5 years | | | |



PLAINTIFF'S EXHIBIT
H

# PCSSD SUPERINTENDENT CANDIDATE COMPARISON

| PCSSD Internal Candidate Preference | Yes | No | No | No |
|---|---|---|---|---|

---

[1] Erick Pruitt served as Area Superintendent of the South Area Schools in the Houston Independent School District, Houston, Texas, for one (1) year and three (3) months at the time of his application.  The racial composition of the Houston Independent School District for 2017-18 was 8.7% White and 91.3% non-White.  Mr. Pruitt's total budget oversight for his area was $264,546,000, $11,502 per student allocation for 23,000 students.

[2] Wisconsin Department of Public Instruction, Public Enrollment Data, 2008-2011, average enrollment included at most seven (7) non-white children from 2008 through 2011 (https://dpi.wi.gov/cst/data-collections/student/ises/published-data/excel).

[3] Wisconsin Department of Public Instruction, Comparative Revenue Per Member, One-District Comparative Revenue Pie & Data Charts (https://dpi.wi.gov/sfs/statistical/cost-revenue/comparative-revenue-member#Item%201b).

[4] Average "per member"/ per pupil of total revenue for 2008, 2009, 2010.  (https://apps2.dpi.wi.gov/sdpr/district-report).

[5] 2015-2016 per pupil of total revenue:  $15854 (https://nces.ed.gov/ccd/districtsearch/district_detail.asp?ID2=4207290).

# Board Meeting Minutes: March 27, 2018

This regular meeting of the Pulaski County Special School District was held on Tuesday, March 27, 2018, in the Board Room of the PCSSD Administrative Building (925 East Dixon Rd.).

**In Attendance:**  Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward

**Absent:** (None)

## 1. Call to Order

- Dr. Remele called the meeting to order at 6:00 p.m.

## 2. Roll Call

- All Members Present

## 3. Pledge of Allegiance

- Dr. Remele led the Pledge of Allegiance.

## 4. Ray & Associates, Superintendent Search Firm

- Vote to go into Executive Session
  Motion by Alicia Gillen
  Seconded by Tina Ward
  In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward Opposed:
- Vote to interview the following candidates for the position of Superintendent: James Harris, Charles McNulty, Erick Pruitt

PLAINTIFF'S EXHIBIT
I

Motion by Alicia Gillen
Seconded by Shelby Thomas
In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward Opposed:

## 5. Adjournment

- ○ Vote to adjourn
  Motion by Eli Keller
  Seconded by
  In Favor: Opposed:

## **Our Leadership (/#)**

Annual Report to the Public (https://www.pcssd.org/annual-report-to-the-public-2018-2019)

Board of Education (http://pcssd.org/board-of-education)

Board Policies (/board-policies)

Board Meeting Information (http://www.pcssd.org/board-meeting-information)

Board Meeting Agendas (https://www.pcssd.org/board-meeting-agendas)

PCSSD Board Meeting Minutes (/board-meeting-minutes)

Board Zoning Map (/board-zones)

🄰 Legal Transfer Form (https://pcssd.s3.amazonaws.com/equity/legal-transfer-form.pdf)

Personnel Policy Committee (Classified) (/classified-personnel-policy-committee)

Personnel Policy Committee (Certified) (/certified-personnel-policy-committee)

Meet our Superintendent (/meet-our-superintendent)

## **STAFF LINKS**

Webmail Login (https://portal.pcssd.org)

AMI Assignment Portal
(https://docs.pcssd.org/inclementweather)

Maintenance

## **PARENT LINKS**

Adult Education Center – GED
(http://www.gedwage.com)

AMI Assignment Portal
(https://docs.pcssd.org/inclementweather)

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JENNIFER BEASLEY; DR. KIFFANY
PRIDE; LAURA SHIRLEY; and
NICOLE TOWNSEND,

                                        PLAINTIFFS,

VS.                     NO. 4:18-cv-508-DPM

DR. CHARLES MCNULTY, in his official
capacity as Superintendent of Schools
of the Pulaski County Special School
District; PULASKI COUNTY SPECIAL SCHOOL
DISTRICT BOARD OF DIRECTORS; and
PULASKI COUNTY SPECIAL SCHOOL DISTRICT,
a public body corporate,

                                        DEFENDANTS.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

---o---

DEPOSITION

OF

CHARLES McNULTY

---o---

TUESDAY, JUNE 4, 2019

---o---



**PETRE'S STENOGRAPH SERVICE**
(501) 834-2352

A P P E A R A N C E S:

    ON BEHALF OF PLAINTIFFS:

        JOHN WALKER, ESQUIRE
        JOY SPRINGER, Administrative Assistant
            John Walker Law Firm
            1723 South Broadway Street
            Little Rock, Arkansas   72206

    ON BEHALF OF DEFENDANTS:

        W. CODY KEES, ESQUIRE
            Bequette and Billingsley
            425 West Capitol Avenue
            Suite 3200
            Little Rock, Arkansas   72201

    ALSO PRESENT:

        DR. KIFFANY PRIDE
        MS. LAURA SHIRLEY
        MS. NICOLE TOWNSEND

                ---o---

3

# I N D E X

WITNESS:                                                              PAGE:

CHARLES McNULTY

        Direct Examination............................      5

        Cross Examination............................     64

        Redirect Examination.........................     65

---o---

# E X H I B I T S

Exhibit One......................................     40

Exhibit Two......................................     42

Exhibit Three....................................     50

Exhibit 3a.......................................     56

Exhibit 3b.......................................     56

---o---

Reporter's Certificate...........................     73

---o---

1       The deposition of Charles McNulty was

2   taken before me, Debbye L. Petre, Certified Court

3   Reporter and notary public within and for the County

4   of Pulaski, State of Arkansas, duly commissioned and

5   acting, on Tuesday, June 4, 2019, beginning at the

6   hour of 10:00 p.m., at the offices of Pulaski County

7   Special School District, Administration Building, 945

8   East Dixon Road, Little Rock, Pulaski County,

9   Arkansas.

10      Said deposition being taken in

11  accordance with the Rules of Federal Procedure and

12  pursuant to the provisions of the Arkansas Rules of

13  Civil Procedure at instance of counsel for the

14  Plaintiffs in the above-styled case in the United

15  States District Court, Eastern District of Arkansas,

16  Western Division.

17                  ---o---

18  THEREUPON, the following proceedings were had,

19  to-wit:

20                  ---o---

21

22

23

24

25

1  hired?

2  A     Actually, it was -- they asked if I was

3  interested in the position as we were driving home

4  that day.

5  Q     So, interviewed and were offered the position

6  the same day?

7  A     Yes, sir.

8          MR. KEES:  Where is Waterloo?

9          THE WITNESS:  It's nine hours north.

10          MR. KEES:  That's a long drive.

11          THE WITNESS:  It was a long drive.

12  BY MR. WALKER:

13  Q     No, no.  I'm talking about Pulaski now.

14          MR. KEES:  That he was driving back.  I

15          just wanted to know long the drive was.

16          Nine hours.  My wife would never want to be

17          in the car with me that long.

18  BY MR. WALKER:

19  Q     So, the day of your interview, you were hired?

20  A     I was offered the position, correct.

21  Q     On behalf of the Board, who extended the offer?

22  A     Doctor Remele.

23  Q     Did she do so in writing or by phone?

24  A     By phone.

25  Q     What time of day was it?

1    A    3:00, 4:00 o'clock.

2    Q    What time did you end your interview?

3    A    I feel like it was like noon or 1:00.  I may be

4    wrong about that.  But I felt like we just got right

5    into the car and started driving.

6    Q    Was there a School Board meeting that day?

7    A    I believe there was.

8    Q    Was it an emergency meeting?

9    A    I don't know.

10   Q    Did you, after that date on April 5th, begin to

11   have conversations with any School Board member or

12   members?

13   A    It was about the contract.

14   Q    What was the next date that you recall?

15   A    Later that week.  I don't recall.

16   Q    With whom did you speak?

17   A    Doctor Remele.

18   Q    How long was your conversation?

19   A    Ten or 15 minutes, maybe.  Maybe.

20   Q    What was the next contact with Doctor Remele?

21   A    Was, I think, the same week, still talking

22   about the contract.

23   Q    And so, that would be the week of the 5th?

24   A    The best I can recall, sir, yes.

25   Q    Did you finalize your contract?

# Board Meeting Minutes: April 3, 2018

This regular meeting of the Pulaski County Special School District was held on Tuesday, April 3, 2018, in the Board Room of the PCSSD Administrative Building (925 East Dixon Rd.).

**In Attendance:** Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward

**Absent:** (None)

1. ## Call to Order
   - Dr. Remele called the meeting to order at 10:10 a.m.

2. ## Roll Call
   - All members present

3. ## Pledge of Allegiance
   - Dr. Remele led the Pledge of Allegiance.

4. ## Action Items - New Business
   1. Interview Candidates for Superintendent
      - Vote to enter into Executive Session for the purpose of interviewing Dr. McNulty
        Motion by Alicia Gillen
        Seconded by Eli Keller
        In Favor: Opposed:
      - Vote to break for lunch
        Motion by Shelby Thomas
        Seconded by Eli Keller
        In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby

Motion by Eli Keller
Seconded by Brian Maune
In Favor: Opposed:

- Vote to break for dinner and reconvene at 5:30 p.m.
  Motion by Mike Kemp
  Seconded by Eli Keller
  In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas, Tina Ward Opposed:
- Vote to select Dr. McNulty as Superintendent
  Motion by Mike Kemp
  Seconded by Alicia Gillen
  In Favor: Alicia Gillen, Eli Keller, Mike Kemp, Brian Maune, Linda Remele, Shelby Thomas Opposed: Tina Ward

# 5. Adjournment

- The meeting was adjourned at 5:39 p.m.
- Vote to adjourn
  Motion by Alicia Gillen
  Seconded by Shelby Thomas
  In Favor: Opposed:

## **Our Leadership (/#)**

Annual Report to the Public (https://www.pcssd.org/annual-report-to-the-public-2018-2019)

Board of Education (http://pcssd.org/board-of-education)

Board Policies (/board-policies)

Board Meeting Information (http://www.pcssd.org/board-meeting-information)

Board Meeting Agendas (https://www.pcssd.org/board-meeting-agendas)

PCSSD Board Meeting Minutes (/board-meeting-minutes)

Board Zoning Map (/board-zones)

Legal Transfer Form (https://pcssd.s3.amazonaws.com/equity/legal-transfer-form.pdf)

Personnel Policy Committee (Classified) (/classified-personnel-policy-committee)

Personnel Policy Committee (Certified) (/certified-personnel-policy-committee)

## STAFF LINKS

Webmail Login (https://portal.pcssd.org)

AMI Assignment Portal
(https://docs.pcssd.org/inclementweather)

Maintenance
(http://www.myschoolbuilding.com/myschoolbuilding/mygatewayaspx?
acctnum=143100274)

IT Helpdesk (http://www.pcssd.org/it-helpdesk)

eSchool Plus Login
(http://eschool40.esp.k12.ar.us)

eSchool Teacher Access Center
(http://tac40.esp.k12.ar.us)

FileBound
(https://pcssd.filebound.com/LogOn.aspx)

Single Sign-On Portal
(https://portal.pcssd.org/_auth/login.aspx?
ru=====)

State Required Information
(http://www.pcssd.org/legal-center/)

SEAS Access for Teachers
(https://www.seasweb.net/arpcssd)

ESC Works Shoebox
(http://www.escweb.net/ar_esc/)

Training Network Online
(http://trainingnetworkonline.com/login?
co=3705&v=75899)

## PARENT LINKS

Adult Education Center – GED
(http://www.gedwage.com)

AMI Assignment Portal
(https://docs.pcssd.org/inclementweather)

Apply for a career with PCSSD
(https://www.pcssd.org/careers)

Register Online
(https://www.pcssd.org/register)

2018 Summer School
(https://www.pcssd.org/sumer-school-2018)

Download the Online Registration Manual
(https://pcssdpublicfiles.s3.amazonaws.com/docs/e
registration-manual.pdf)

Apply for Free or Reduced Meals
(https://frapps.horizonsolana.com/PULC01)

DRIVEN School of Opportunity
(https://driven.pcssd.org)

Request Transcripts or Records
(https://forms.pcssd.org/transcriptrequest)

Home Access Center
(https://www.pcssd.org/home-access-center-
hac)

Download the HAC Manual
(https://pcssd.s3.amazonaws.com/technology/hac-
manual.pdf)

MyPayments Plus
(https://www01.mypaymentsplus.com/Default.aspx

PCSSD Libraries Online
(https://atriuum.pcssd.org)



# PULASKI COUNTY SPECIAL SCHOOL DISTRICT

925 East Dixon Road
Little Rock, AR 72206

Dr. Charles McNulty, Superintendent
501.234.2000

Copyright 2019 PCSSD - All rights reserved.

Select Language  ▼      Select Language  ▼



EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

*[Agency stamp: EQUAL EMPLOYMENT OPPORTUNITY COMM. OCT 01 2018 LITTLE ROCK, AR]*

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 493-2018-02090 |
| | and EEOC |

State or local Agency, if any

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Janice H. Warren** | **(870) 500-7704** | 1956 |

| Street Address | City, State and ZIP Code |
|---|---|
| **8917 B Northwood Creek Drive, N Little Rock, AR 72113** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **PULASKI COUNTY SPECIAL SCHOOL DISTRICT** | **500 or More** | **(501) 234-2000** |

| Street Address | City, State and ZIP Code |
|---|---|
| **925 East Dixon Road,  Little Rock, AR 72206** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☒ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **01-01-2018** | **04-03-2018** |

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I was hired on or about June 1, 2012.  I am currently employed as an Assistant Superintendent for Equity and Pupil Services. On or about July 18, 2017 I accepted the Interim Superintendent position.  Between August 2017 and October 2017, I made reports regarding the discriminatory practices in district facilities. In early 2018, I applied for the permanent superintendent position.  On or about March 29, 2018 I learned I was not selected for an interview and on or about April 3, 2018 I learned I was not selected for the permanent superintendent position.

Three lesser qualified, younger, male applicants were selected for interviews.  A lesser qualified, younger, white male applicant was selected for the position.

I believe that I was denied the opportunity to interview for the superintendent position and not promoted because of my race, Black, sex, Female, and in retaliation for reporting discrimination practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, and due to my age, 61, in violation of the Age Discrimination in Employment Act of 1967, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 10-1-18 _____ *Janice H. Warren* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| Date          Charging Party Signature | |

PLAINTIFF'S EXHIBIT L

*The Law Firm of*

# BEQUETTE, BILLINGSLEY & KEES

*A Professional Association*

GEORGE J. BEQUETTE, JR.
KEITH I. BILLINGSLEY
W. CODY KEES

Simmons Bank Tower
425 West Capitol Avenue, Suite 3200
Little Rock, Arkansas 72201-3469
www.bbpalaw.com

Telephone
(501) 374-1107

———

Telecopier
(501) 374-5092

October 25, 2018

<u>CONFIDENTIAL</u>
<u>FOR EEOC PURPOSES ONLY</u>

Ms. Virginia Pollard
U.S. Equal Employment Opportunity Commission
Little Rock Area Office
820 Louisiana Street, Suite 200
Little Rock, AR 72201
virginia.pollard@eeoc.gov

  Re: EEOC Charge No.: 493-2018-02090
     Charging Party: Janice H. Warren
     Respondent: Pulaski County Special School District

Dear Ms. Pollard:

  The Respondent, Pulaski County Special School District ("PCSSD" or the "District"), hereby submits this Position Statement in response to the above-referenced charge. It is the District's expectation that this Position Statement and attached exhibits contain extremely private and sensitive personal information about employees of the District and therefore will be kept confidential by the Commission. The Commission is not authorized to disclose this information to any third party without the express written permission of the District. Additionally, the District reserves the right to amend or supplement this statement, if necessary, particularly if additional information bearing on the charge is discovered or the issues become more focused.

## I.

## POSITION STATEMENT

  The District is an equal employment opportunity employer and denies that it has engaged in any unlawful discriminatory practice with respect to the charging party, Janice Warren ("Dr. Warren" or "Charging Party"). The District's anti-discrimination policies are available on their website: https://www.pcssd.org/board-policies. In essence, the charge alleges that Dr. Warren was not hired for a position with the District due to retaliation for reporting disparate treatment in violation of Title VII of the Civil Rights Act of 1964, as amended, and on account of her race, sex, and age.



PLAINTIFF'S
EXHIBIT
M

Equal Employment Opportunity Commission
October 25, 2018
Page 2

Contrary to the allegations of the charge, the District did not discriminate against the Charging Party in retaliation for reporting differential treatment. The uncontroverted facts prove that the Charging Party's allegations are groundless, frivolous, and should be dismissed by the EEOC with a no reasonable cause determination.

## II.

## RESPONSE TO CHARGING PARTY'S SPECIFIC ALLEGATIONS

### CHARGING PARTY'S ALLEGATIONS:

**1.     I was hired on or about June 1, 2012.**

RESPONDENT'S REPLY:

The District admits that the Charging Party was hired on or about June 1, 2012.

**2.     I am currently employed as an Assistant Superintendent for Equity and Pupil Services.**

RESPONDENT'S REPLY:

The District admits that the Charging Party is currently employed as an Assistant Superintendent for Equity and Pupil Services.

**3.     On or about July 18, 2017 I accepted the Interim Superintendent position.**

RESPONDENT'S REPLY:

The District admits that on or about July 18, 2017, the Charging Party accepted the Interim Superintendent position.

**4.     Between August 2017 and October 2017, I made reports regarding the discriminatory practices in district facilities.**

RESPONDENT'S REPLY:

The District denies that between August 2017 and October 2017 the Charging Party made reports regarding discriminatory practices in District facilities.

Equal Employment Opportunity Commission
October 25, 2018
Page 3

_____

5.      **In early 2018, I applied for the permanent superintendent position.**

RESPONDENT'S REPLY:

The District admits that the Charging Party applied for the permanent superintendent position.

6.      **On or about March 29, 2018, I learned I was not selected for an interview and on or about April 3, 2018 I learned I was not selected for the permanent superintendent position.**

RESPONDENT'S REPLY:

The District admits that the Charging Party was not selected for an interview and was not selected for the permanent superintendent position.

7.      **Three lesser qualified, younger, male applicants were selected for interviews.**

RESPONDENT'S REPLY:

The District denies that three lesser qualified, younger, male applicants were selected for interviews.

8.      **A lesser qualified, younger, white male applicant was selected for the position.**

RESPONDENT'S REPLY:

The District denies that a lesser qualified, younger, white male applicant was selected for the position.

9.      **I believe that I was denied the opportunity to interview for the superintendent position and not promoted because of my race, Black, sex, Female, and in retaliation for reporting discrimination practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, and due to my age, 61, in violation of the Age Discrimination in Employment Act of 1967, as amended.**

Equal Employment Opportunity Commission
October 25, 2018
Page 4

_____

RESPONDENT'S REPLY:

The District adamantly denies that the Charging Party was retaliated against or discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act of 1967, as amended.

## III.

## CONCLUSION

The District did not retaliate against the Charging Party in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act of 1967, as amended. The District acted in good faith, consistent with sound management, and in a completely non-discriminatory fashion. Accordingly, Dr. Warren's claims of retaliation are without merit, and the District requests that the EEOC issue a no reasonable cause determination.

If you have any questions, or if you need any additional information, please do not hesitate to contact the undersigned.

Very truly yours,

BEQUETTE, BILLINGSLEY & KEES, P.A.

By: _____
     Jay Bequette
     W. Cody Kees

Attorneys for Pulaski County Special School District

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Little Rock Area Office**

820 Louisiana St., Suite 200
Little Rock, AR 72201
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
FAX (501) 324-5991
Website: www.eeoc.gov

Janice Warren
8917 B Northwood Creek Drive
North Little Rock, AR 72113

Re: Janice Warren vs. Pulaski County Special School District
    EEOC Charge 493-2018-02090

Dear Ms. Warren:

The enclosed Notice terminates the processing of your charge and gives notice of your right to sue within 90 days. On November 3, 2018 you downloaded a copy of the Respondent's position statement from the EEOC portal. You were given an opportunity to provide a response to the Respondent's position statement but failed to do so. All evidence collected during the investigation was thoroughly reviewed. The investigation revealed the following facts:

You alleged you were not allowed to interview and denied promotion to Superintendent due to your race, Black, sex, Female, and in retaliation for reporting discriminatory practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, and due to your age, 61, in violation of the Age Discrimination in Employment Act of 1967, as amended.

The investigation revealed the type of retaliation you alleged is outside of EEOC's jurisdiction. Respondent used a third-party company to advertise and identify potential candidates for the Superintendent position. At the time the application process began you were Interim Superintendent and had held that job for several months. The third-party company collected 35 applications and identified 9 individuals who were given a video interview. You were one of the 9 selected for a video interview. Three of those 9 were selected for in-person interviews: 2 Black Males and 1 White Male. One of the Black Males selected withdrew his name from consideration. The other Black Male, Dr. Eric Pruitt is within the protected age category and has 1 ½ years of experience as a Superintendent. Dr. Charles McNulty, White Male and within the protected age category, was selected for the position because he was the most qualified applicant: he had been an Associate Superintendent for approximately 4 years and a Superintendent for 7 years.

No further action will be taken by this office regarding your charge of discrimination. The Director's determination in this matter is enclosed. This determination concludes the processing of the charge by the EEOC, but does not affect your right to sue on your own behalf. You may pursue the matter by filing in Federal District Court as explained in the Dismissal and Notice of Rights.

Sincerely,

Matilda Louvring                    JUN 2 6 2019
Investigator                        Date

Enclosure



EEOC Form 161 (11/16)                    U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Janice H. Warren<br>8917 B Northwood Creek Drive<br>N Little Rock, AR 72113 | From: Little Rock Area Office<br>820 Louisiana<br>Suite 200<br>Little Rock, AR 72201 |
|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |  |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 493-2018-02090 | Matilda S. Louvring,<br>Investigator | (501) 324-5535 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*William a. Cash, Jr./lll*                    **JUN 2 6 2019**

Enclosures(s)                    **William A. Cash, Jr.,**                    (Date Mailed)
                                 **Area Office Director**

cc:    **Jay Bequette**
       **Bequette Billingsley & Kees**
       **425 West Capitol Avenue, Suite 3200**
       **Little Rock, AR 72201**

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS  --  Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Courts often require that a copy of your charge must be attached to the complaint you file in court.  If so, you should remove your birth date from the charge.  Some courts will not accept your complaint where the charge includes a date of birth.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS  --  Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION  --  Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE  --  All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

### 2017-2018
### ANNUAL PERSONNEL HIRING
### AND DEPLOYMENT REPORT
### June 1, 2018



Submitted by Human Resources Division

**PAUL BREWER**
**CHIEF EXECUTIVE OFFICER/HUMAN RESOURCES**

DIRECT                CES



PLAINTIFF'S
EXHIBIT

0

I. <u>GOALS FOR TEACHERS</u>

1.  **GOAL:** To continue on-campus recruiting efforts in colleges and universities where a larger number of African American graduates may be expected and to continue recruiting efforts with agencies and organizations where African American teacher applicants may be found.

    **RESPONSIBILITY:** Director of Human Resources

    **TARGET DATE:** Continuous

    **PROGRESS:** Of the thirty-six (36) new African American teachers employed for the 2017-2018 school year, many of these teachers were employed as a direct result of the District's Career Fair and on-campus recruitment efforts.

2.  **GOAL:** To assure that African Americans continue to be adequately represented in the census by employing African American certified personnel in proportion to their availability in the relevant labor market. The court approved Desegregation Plan states "Pulaski County Special School District will work with the North Little Rock School District, Little Rock School District, State Department of Education and other parties to the desegregation litigation to develop information regarding availability and the relevant labor market." To the extent possible, the ratio will be maintained in each school.

    **RESPONSIBILITY:** Director of Human Resources
    Deputy Superintendent – Learning Services
    Principals

    **TARGET DATE:** Continuous

    **PROGRESS:** The District maintained 26.12% African American teachers for the 2017-2018 school year.   One hundred forty-eight (148) teachers were employed for the 2017-2018 school year. Of this number, thirty-six (36) African-American teachers were employed which represents 24.3% African American teacher employment   for the 2017-2018 school year. (See Appendix I, IV, V, VI, VII, VIII)  Regular meetings are scheduled with the Human Resource Departments of Pulaski County Special School District, Little Rock School District and North Little Rock School District.

3.  **GOAL:** To offer career counseling to teachers who seek it.

    **RESPONSIBILITY:** Assistant Superintendents
    Director of Human Resources

    **TARGET DATE:** Continuous

    **PROGRESS:** The District continues to offer career counseling to African American teachers.  The District encourages African American teachers to participate in graduate courses resulting in salary increases for these efforts.  Additionally, African American teachers are encouraged to apply for promotional positions in the District as evidenced by the continuing growth of the number of African American administrators.

4.  **GOAL:** To provide every teacher with access to the Equal Employment Opportunity/Affirmative Action Informational Brochure.

    **RESPONSIBILITY:** Chief Executive Officer/Human Resources
    Director of Human Resources

    **TARGET DATE:** Continuous

**1**

PROGRESS: New employees to the District are provided access to the Equal Employment Opportunity/Affirmative Action informational brochure. This brochure was revised in 2003 and is posted on all employee bulletin boards in the District.

5. GOAL: To continue to make special efforts to employ African American coaches, counselors, media specialists, math, science, and gifted and talented teachers.

RESPONSIBILITY: Principals
Director of Human Resources
Director of Counseling Services
Director of Talented/Gifted Programs
Coordinator of Information Technologies
Assistant Superintendents

TARGET DATE: Continuous

PROGRESS: The District continues to recruit and employ African Americans in key role model teacher positions. (See Appendix II) The following new black personnel were assigned in an effort to achieve this goal:

| | |
|---|---|
| Assessment Specialist | R. Ward, Learning Services |
| Graduation Coach | G. Thurmond, Mills University Studies High |
| Counseling | L. Goins, Mills University Studies High |
| | K. Peterson, Fuller/Sylvan Hills Middle |
| Ellementary | S. Armstrong, Chenal Elementary |
| | P. Brooks, College Station Elementary |
| | J. Burns, Bates Elementary |
| | K. Hinter, Harris Elementary |
| | B. Larry, Landmark Elementary |
| | S. McKenzie, Baker Elementary |
| | T. Thomas, Bates Elementary |
| | R. White, College Station |
| English | D. Evans, Sylvan Hills High Freshman Campus |
| ESL | A. Johnson, Learning Services |
| | K. Robinson, Learning Services |
| Family and Consumer Science | M. Williams, Sylvan Hills Middle |
| Kindergarten | J. Siler, Crystal Hill Elementary |
| Mathematics | J. Johnson, Maumelle High |
| Middle School | C. Halton, Fuller Middle |
| | L. Hardiman, Robinson Middle |
| | C. Haynes, Maumelle Middle |
| | C. Johnson, Robinson Middle |
| | E. Ware, Fuller Middle |
| Physical Education | D. Harris, Chenal Elementary |
| Pre-K | S. Davis, Lawson Elementary |

**2**

| | |
|---|---|
| Special Education | L. Bailey, Mills University Studies High |
| | R. Carroll, Sylvan Hills High |
| | M. Cook, Fuller Middle |
| | M. Dorhan, Sylvan Hills High Freshman Campus |
| | B. Green, Fuller Middle |
| | L. Moss, Mills University Studies High |
| | C. Wade, Mills University Studies High |
| Title I Feeder Reading | M. Norwood, Mills University Studies High |
| Vocal Music | R. Thompson, Jr., Harris Elementary |
| Vocational | C. Dare, Mills University Studies High |
| | S. Hubbard, Mills University Studies High |

## II.   GOALS FOR ADMINISTRATIVE PERSONNEL

1.   **GOAL:**

To attain a ratio of African American administrators in the Pulaski County Special School District in proportion to the ratio of African American certified personnel in the district in the preceding year.  The District continues to recruit, employ and promote African Americans  in administrative positions.

**RESPONSIBILITY:**

Directors
Assistant Superintendents
Deputy Superintendents
Superintendent

**TARGET DATE:**   Continuous

**PROGRESS:**   The District continues to meet this goal (see Appendix III for additional information).

2.   **GOAL:**   To employ a minimum of one African American administrator in each secondary school.

**RESPONSIBILITY:**

Superintendent
Deputy Superintendent for Learning Services
Chief Executive Officer/Human Resources
Director of Elementary Education

**TARGET DATE:**   Continuous

**PROGRESS:**

The District continues to achieve this goal.  The District continues to recruit, employ and promote African Americans in administrative positions. The following African American personnel were hired or promoted in an effort to achieve this goal:

Y. Harris, Elementary Principal, Chenal Elementary
R. Jones, Facilitator for the Hearing Impaired
N. Townsend, Program Administrator
R. Wilson, Middle School Assistant Principal

3.   **GOAL:**   To provide continuing professional development for current and prospective administrators.

**RESPONSIBILITY:**

Director of Professional Development
Director of Human Resources

**3**

TARGET DATE: Continuous

PROGRESS: Administrative professional development is offered and taught to current African American teachers and administrators.

4. GOAL: To extend opportunities for African American teachers to become aware of the qualifications and hiring procedures for supervisory and administrative positions.

 RESPONSIBILITY: Director of Human Resources

 TARGET DATE: Continuous

 PROGRESS: All administrative and supervisory vacancies are posted in all District departmental units. These postings include Position Title, Qualifications, Supervisor, Job Goal, Performance Responsibilities, Terms of Employment, and Evaluation Information.  All job descriptions are reviewed and approved by the Office of Equity and Pupil Services.

5. GOAL: To offer career counseling to administrators who seek it.

 RESPONSIBILITY: Chief Executive Officer/Human Resources
 Assistant Superintendents
 Deputy Superintendents
 Director of Elementary Education
 Director of Human Resources

 TARGET DATE: Continuous

 PROGRESS: Career counseling is available upon request.  Pulaski County Special School District also hosts Phase I and Phase II Aspiring Black Principals Workshops in which current minority district employees are invited to participate.

6. GOAL: To provide every administrative employee access to the Equal Opportunity/Affirmative Action Informational brochure.

 RESPONSIBILITY: Chief Executive Officer/Human Resources
 Director of Human Resources

 TARGET DATE: Continuous

 PROGRESS: All administrators are provided access to the Equal Employment Opportunity /Affirmative Action Informational Brochure.

## III.  GOALS FOR SUPPORT STAFF PERSONNEL

1. GOAL: To increase recruiting efforts with agencies where minority applicants may be located.

 RESPONSIBILITY: Chief Executive Officer/ Human Resources
 Director of Human Resources
 Department Heads
 Principals

**4**

TARGET DATE:    Continuous

PROGRESS:    The following agencies were contacted during the 2017-2018 school year:

Command Center
Easter Seals of Arkansas
Employment Security Division (Jacksonville and Little Rock)
Goodwill
Philander Smith College
Remington College
Shorter College
University of Arkansas at Little Rock
University of Arkansas at Pine Bluff
University of Central Arkansas

2.  GOAL:    To increase the percentage of African American support staff personnel representation in the district to the degree that it reflects the percentage of the African American civilian labor force sixteen (16) years of age and older in Pulaski County.

Utilizing the 2010 Census Data, the percentage of the African American civilian labor force sixteen (16) years of age and older is 28.3%. To the extent possible, the 28.3% ratio will be maintained in each administrative unit.

RESPONSIBILITY:    Chief Executive Officer/ Human Resources
Director of Human Resources
Department Heads
Principals

TARGET DATE:    Continuous

PROGRESS:    The 2017-2018 African American support staff personnel employment percentage is 54.9% which is 26.6% above the present goal. (See appendix X)

3.  GOAL:    To encourage support staff personnel to pursue career promotions.

RESPONSIBILITY:    Chief Executive Officer/Human Resources
Assistant Superintendents
Director of Human Resources

TARGET DATE:    Continuous

PROGRESS:    Thirty (30) promotions were granted to support staff personnel. Seventeen (17) of the promotions were granted to African American employees which represents a 56.7% African American promotion rate.

A. Bass, General Custodian, Range 1, Maumelle High – promoted to Lead Custodian, Range 2, Robinson Elementary
D. Blevens, 5 hr. Cafeteria Worker, Range 1 – promoted to 6 hr. Cafeteria Worker, Range 1, Clinton Elementary
J. Coleman, Operation Specialist II, Range 10 (hourly) – promoted to Route Supervisor, Range 1 (daily), Transportation
J. Croon, Special Education Secretary, Range 5 (hourly) – promoted to IT Help Desk Manager/ Network Security, Range 4 (daily), Information Technology
K. Dunhoo, Bus Driver-Permanent Sub, Range 9 – promoted to Bus Driver, Range 12, Transportation
D. Grayson, In-School Suspension Intercessor, Range 3 – promoted to ALC Para Facilitator,

5

Range 7, Sylvan Hills High Freshman Campus
D. Harris, ALE Para-Educator, Range 3 – promoted to ALC Para Facilitator, Sylvan Hills Middle
C. Hill, 4 hr. General Custodian, Range 1, Sylvan Hills High Freshman Campus – promoted to 8 hr. General Custodian, Range 1, College Station
D. Kendrick, 5 hr. Cafeteria Worker, Range 1 – promoted to 6 hr. Cafeteria Worker, Range 1, Mills University Studies High
V. Mabry, Bus Driver-Permanent Sub, Range 9 – promoted to Bus Driver, Range 12, Transportation
E. Mason, .6 FTE Registered Nurse, Landmark Elementary – promoted to 1.0 FTE Registered Nurse, Range 4 (daily), Fuller Middle
W. Nettles, 6 hr. General Secretary - promoted to 8 hr. General Secretary, Range 3, Oakbrooke Elementary
A. Tate, Assistant Cafeteria Manager, Range 3, Student Nutrition – promoted to Secondary Cafeteria Manager Non-Certified, Range 5, Robinson Middle
K. Traylor, 4 hr. General Custodian, Range 1, Robinson Elementary – promoted to 8 hr. General Custodian, Range 1, Robinson Elementary/Robinson Middle
W. Washington, 9 mos. General Custodian, Range 1 – promoted to 11 mos. General Custodian, Sylvan Hills High School
B. Whitehead, 11 mos. General Custodian, Range 1, Mills University Studies High School – promoted to Lead Custodian, Range 2, Bates Elementary
W. Williams, Cafeteria Worker, Range 1, Landmark Elementary – promoted to Assistant Cafeteria Manager, Range 3, Student Nutrition

4.  **GOAL:**          To provide counseling and training opportunities so that support staff personnel may increase their skills in order to qualify for promotional opportunities

    **RESPONSIBILITY:**   Chief Executive Officer/ Human Resources
                                    Director of Human Resources

    **TARGET DATE:**   Continuous

    **PROGRESS:**    African American para-educators/instructional assistants and other support staff employees have been provided teacher certification counseling by the Director of Human Resources. The Director of Human Resources provides counseling to any individual who is interested in seeking financial assistance through the Minority Scholarship Program offered by the Arkansas Department of Education, as well as, the TRIO Program offered through the University of Arkansas at Little Rock. Several PRAXIS coaching sessions have been were held for support staff employees who desire to become certified teachers.

5.  **GOAL:**          To assure that every support staff employee has access to the Equal Employment Opportunity/ Affirmative Action Informational Brochure.

    **RESPONSIBILITY:**   Chief Executive Officer/ Human Resources

    **TARGET DATE:**   Continuous

    **PROGRESS:**    All support staff are provided access to the EEO brochure.

**6**

# APPENDIX I

| 2017-18 ANALYSIS OF TEACHERS BY RACE & GENDER BY FTE | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Black | | White | | Total | PERCENT | PERCENT |
| DISTRICT-WIDE | M | F | M | F | | BLACK | + OR - |
| STUDENT POPULATION (10-1-17) | 2671 | 2430 | 3635 | 3365 | 12101 | 42.15% | 0.14% |
| ELEMENTARY TEACHERS | 4.00 | 113.26 | 23.50 | 318.05 | 458.81 | 25.56% | 0.71% |
| SECONDARY TEACHERS | 30.00 | 89.74 | 123.16 | 205.74 | 448.64 | 26.69% | 2.45% |
| TOTAL TEACHERS | 34.00 | 203.00 | 146.66 | 523.79 | 907.45 | 26.12% | 1.57% |
| PERCENT | 3.75% | 22.37% | 16.16% | 57.72% | 100.00% | | |

# APPENDIX II

| 2017-18 ANALYSIS OF SPECIAL NEEDS AREAS BY RACE & GENDER BY FTE | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Black | | White | | Total | PERCENT | PERCENT |
| DISTRICT-WIDE | M | F | M | F | | BLACK | + OR - |
| STUDENT POPULATION (10-1-17) | 2671 | 2430 | 3635 | 3365 | 12101 | 42.15% | 0.14% |
| COACHES | 2.75 | 0.45 | 5.70 | 0.35 | 9.25 | 34.59% | 17.38% |
| COUNSELORS | 0.00 | 12.00 | 1.00 | 20.00 | 33.00 | 36.36% | 4.01% |
| MEDIA SPECIALISTS | 0.00 | 4.00 | 0.00 | 21.00 | 25.00 | 16.00% | 0.00% |
| SECONDARY MATH TEACHERS | 2.23 | 7.00 | 16.61 | 23.16 | 49.00 | 18.84% | -0.81% |
| SECONDARY SCIENCE TEACHERS | 1.86 | 6.32 | 16.17 | 22.62 | 46.97 | 17.42% | -2.37% |
| TALENTED AND GIFTED | 0.00 | 2.00 | 0.00 | 12.00 | 14.00 | 14.29% | -5.43% |
| TOTAL TEACHERS | 6.84 | 31.77 | 39.48 | 99.13 | 177.22 | 21.79% | 0.33% |
| PERCENT | 3.86% | 17.93% | 22.28% | 55.94% | 100.00% | | |

# APPENDIX III

| 2017-18 ANALYSIS OF CERTIFIED ADMINISTRATORS BY RACE & GENDER BY FTE | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Black | | White | | Total | PERCENT | PERCENT |
| DISTRICT-WIDE | M | F | M | F | | BLACK | + OR - |
| STUDENT POPULATION (10-1-17) | 2671 | 2430 | 3635 | 3365 | 12101 | 42.15% | 0.14% |
| ELEMENTARY PRINCIPALS | 1.00 | 10.00 | 2.00 | 3.00 | 16.00 | 68.75% | 4.04% |
| ELEMENTARY ASST. PRINCIPALS | 0.00 | 5.00 | 1.00 | 4.00 | 10.00 | 50.00% | 4.55% |
| SECONDARY PRINCIPALS | 3.00 | 1.00 | 4.00 | 1.00 | 9.00 | 44.44% | 0.00% |
| SECONDARY ASST. PRINCIPALS | 4.00 | 7.00 | 4.00 | 2.00 | 17.00 | 64.71% | -7.51% |
| CENTRAL OFFICE OTHER* | 1.00 | 14.00 | 4.00 | 20.00 | 39.00 | 38.46% | 5.13% |
| ASSISTANT SUPERINTENDENTS | 0.00 | 1.00 | 1.00 | 0.00 | 2.00 | 50.00% | 16.67% |
| DEPUTY SUPERINTENDENTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% | 0.00% |
| CHIEF FINANCIAL OFFICER | 0.00 | 0.00 | 0.00 | 1.00 | 1.00 | 0.00% | 0.00% |
| SUPERINTENDENT | 0.00 | 0.00 | 1.00 | 0.00 | 1.00 | 0.00% | 0.00% |
| TOTAL ADMINISTRATORS | 9.00 | 38.00 | 17.00 | 31.00 | 95.00 | 49.47% | 1.55% |
| PERCENT | 9.47% | 40.00% | 17.89% | 32.63% | 100.00% | | |

*Includes Administrators at Adult Educatiion/WAGE

## APPENDIX IV

| 2017-18 ANALYSIS OF CERTIFIED ELEMENTARY STAFF BY RACE & GENDER BY FTE (INCLUDES TEACHERS AND ADMINISTRATORS) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Black | | White | | Total | PERCENT | PERCENT |
| DISTRICT-WIDE | M | F | M | F | | BLACK | + OR - |
| STUDENT POPULATION (10-1-17) | 2671 | 2430 | 3635 | 3365 | 12101 | 42.15% | 0.14% |
| BAKER | 0.00 | 6.80 | 1.00 | 20.25 | 28.05 | 24.24% | -0.54% |
| BATES | 2.50 | 10.39 | 0.70 | 28.00 | 41.59 | 30.99% | 2.50% |
| CATO | 0.00 | 5.00 | 1.00 | 19.64 | 25.64 | 19.50% | -4.10% |
| CHENAL | 1.00 | 11.81 | 2.00 | 24.59 | 39.40 | 32.51% | 4.81% |
| CLINTON | 0.00 | 18.98 | 2.00 | 27.96 | 48.94 | 38.78% | 0.95% |
| COLLEGE STATION | 0.50 | 6.61 | 0.63 | 9.70 | 17.44 | 40.77% | -4.69% |
| CRYSTAL HILL | 0.00 | 12.15 | 2.00 | 31.90 | 46.05 | 26.38% | 8.77% |
| HARRIS | 1.00 | 8.00 | 1.21 | 11.80 | 22.01 | 40.89% | -2.03% |
| LANDMARK | 0.00 | 9.00 | 1.00 | 13.20 | 23.20 | 38.79% | 5.44% |
| LAWSON | 0.00 | 2.00 | 3.62 | 17.39 | 23.01 | 8.69% | -3.05% |
| OAKBROOKE | 0.00 | 8.52 | 1.34 | 25.00 | 34.86 | 24.44% | 0.26% |
| OAK GROVE | 0.00 | 5.00 | 1.00 | 14.69 | 20.69 | 24.17% | -5.43% |
| PINE FOREST | 0.00 | 8.00 | 2.00 | 26.40 | 36.40 | 21.98% | 1.11% |
| ROBINSON | 0.00 | 4.00 | 1.00 | 14.71 | 19.71 | 20.29% | -8.60% |
| SHERWOOD | 0.00 | 5.00 | 3.00 | 17.19 | 25.19 | 19.85% | -1.10% |
| SYLVAN HILLS | 0.00 | 7.00 | 3.00 | 22.63 | 32.63 | 21.45% | 0.44% |
| TOTALS | 5.00 | 128.26 | 26.50 | 325.05 | 484.81 | 27.49% | 0.85% |
| PERCENT | 1.03% | 26.46% | 5.47% | 67.05% | 100.00% | | |

## APPENDIX V

| 2017-18 ANALYSIS OF CERTIFIED MIDDLE SCHOOL STAFF BY RACE & GENDER BY FTE (INCLUDES TEACHERS AND ADMINISTRATORS) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Black | | White | | Total | PERCENT | PERCENT |
| DISTRICT-WIDE | M | F | M | F | | BLACK | + OR - |
| STUDENT POPULATION (10-1-17) | 2671 | 2430 | 3635 | 3365 | 12101 | 42.15% | 0.14% |
| FULLER MIDDLE | 6.00 | 10.60 | 4.58 | 16.14 | 37.32 | 44.48% | -7.73% |
| MAUMELLE MIDDLE | 6.68 | 11.04 | 9.00 | 22.10 | 48.82 | 36.30% | 2.73% |
| ROBINSON MIDDLE | 0.00 | 8.39 | 9.72 | 17.51 | 35.62 | 23.55% | 1.65% |
| SYLVAN HILLS MIDDLE | 2.00 | 17.73 | 17.24 | 37.45 | 74.42 | 26.51% | 3.16% |
| SUB-TOTAL | 14.68 | 47.76 | 40.54 | 93.20 | 196.18 | 31.83% | 0.88% |
| PERCENT | 7.48% | 24.34% | 20.66% | 47.51% | 100.00% | | |

## APPENDIX VI

| 2017-18 ANALYSIS OF CERTIFIED SENIOR HIGH STAFF BY RACE & GENDER BY FTE (INCLUDES TEACHERS AND ADMINISTRATORS) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Black | | White | | Total | PERCENT | PERCENT |
| DISTRICT-WIDE | M | F | M | F | | BLACK | + OR - |
| STUDENT POPULATION (10-1-17) | 2671 | 2430 | 3635 | 3365 | 12101 | 42.15% | 0.14% |
| MAUMELLE SENIOR HIGH | 4.32 | 12.85 | 25.66 | 34.29 | 77.12 | 22.26% | -0.66% |
| MILLS SENIOR HIGH | 8.00 | 15.00 | 18.88 | 13.07 | 54.95 | 41.86% | 8.12% |
| ROBINSON SENIOR HIGH | 3.00 | 4.80 | 12.08 | 23.33 | 43.21 | 18.05% | 3.29% |
| SYLVAN HILLS SENIOR HIGH | 7.00 | 16.33 | 34.00 | 44.85 | 102.18 | 22.83% | 2.72% |
| SUB-TOTAL | 22.32 | 48.98 | 90.62 | 115.54 | 277.46 | 25.70% | 2.85% |
| PERCENT | 8.04% | 17.65% | 32.66% | 41.64% | 100.00% | | |

# APPENDIX VII

| 2017-18 ANALYSIS OF OTHER CERTIFIED SECONDARY STAFF BY RACE & GENDER BY FTE (INCLUDES TEACHERS AND ADMINISTRATORS) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Black | | White | | Total | PERCENT | PERCENT |
| DISTRICT-WIDE | M | F | M | F | | BLACK | + OR - |
| STUDENT POPULATION (10-1-17) | 2671 | 2430 | 3635 | 3365 | 12101 | 42.15% | 0.14% |
| ADULT EDUCATION | 0.00 | 1.00 | 1.00 | 1.00 | 3.00 | 33.33% | 0.00% |
| SUB-TOTAL | 0.00 | 1.00 | 1.00 | 1.00 | 3.00 | 33.33% | 0.00% |
| PERCENT | 0.00% | 33.33% | 33.33% | 33.33% | 100.00% | | |

# APPENDIX VIII

| 2017-18 ANALYSIS OF CERTIFIED SECONDARY STAFF BY RACE & GENDER BY FTE (INCLUDES TEACHERS AND ADMINISTRATORS) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Black | | White | | Total | PERCENT | PERCENT |
| DISTRICT-WIDE | M | F | M | F | | BLACK | + OR - |
| STUDENT POPULATION (10-1-17) | 2671 | 2430 | 3635 | 3365 | 12101 | 42.15% | 0.14% |
| MIDDLE SCHOOL SUB-TOTAL | 14.68 | 47.76 | 40.54 | 93.20 | 196.18 | 31.83% | 0.88% |
| SENIOR HIGH SUB-TOTAL | 22.32 | 48.98 | 90.62 | 115.54 | 277.46 | 25.70% | 2.85% |
| OTHER SECONDARY SUB-TOTAL | 0.00 | 1.00 | 1.00 | 1.00 | 3.00 | 33.33% | 0.00% |
| SUB-TOTAL | 37.00 | 97.74 | 132.16 | 209.74 | 476.64 | 28.27% | 2.03% |
| PERCENT | 7.76% | 20.51% | 27.73% | 44.00% | 100.00% | | |

# APPENDIX IX

| SUMMARY OF CERTIFIED EMPLOYMENT FROM 1984 TO PRESENT | | | | | | |
|---|---|---|---|---|---|---|
| | BLACK STUDENTS | | BLACK TEACHERS | | BLACK ADMINISTRATORS | |
| REPORTING YEAR | NUMBER | PER CENT | NUMBER | PERCENT | NUMBER | PERCENT |
| 1984-85 | 7046 | 23.6% | 348 | 21.7% | 29 | 27.3% |
| 1985-86 | 7357 | 24.6% | 367 | 22.6% | 30 | 24.7% |
| 1986-87 | 7866 | 25.7% | 398 | 23.4% | 37 | 27.6% |
| 1987-88 | 5749 | 25.7% | 271 | 19.4% | 31 | 27.7% |
| 1988-89 | 5587 | 25.8% | 262 | 19.7% | 34 | 27.7% |
| 1989-90 | 5581 | 26.0% | 262 | 19.4% | 33 | 29.5% |
| 1990-91 | 5716 | 26.8% | 267 | 19.6% | 32 | 29.4% |
| 1991-92 | 5751 | 27.3% | 253 | 18.4% | 39 | 27.7% |
| 1992-93 | 6150 | 28.4% | 271 | 19.3% | 40 | 27.2% |
| 1993-94 | 6100 | 29.7% | 276 | 19.8% | 41 | 27.9% |
| 1994-95 | 6422 | 31.5% | 283 | 20.2% | 43 | 29.1% |
| 1995-96 | 6630 | 32.3% | 269 | 20.1% | 44 | 29.5% |
| 1996-97 | 6630 | 32.7% | 283 | 20.7% | 44 | 28.8% |
| 1997-98 | 6571 | 32.8% | 276 | 20.7% | 47 | 30.9% |
| 1998-99 | 6646 | 34.2% | 264 | 19.4% | 46 | 29.9% |
| 1999-00 | 6520 | 34.0% | 278 | 20.1% | 46 | 31.3% |
| 2000-01 | 6443 | 34.4% | 251 | 18.9% | 44 | 30.8% |
| 2001-02 | 6726 | 36.1% | 248 | 18.9% | 44 | 29.5% |
| 2002-03 | 6843 | 37.7% | 260 | 19.2% | 46 | 32.9% |
| 2003-04 | 7192 | 39.5% | 248 | 18.8% | 46 | 34.9% |
| 2004-05 | 7358 | 41.0% | 256 | 19.5% | 49 | 37.7% |
| 2005-06 | 7540 | 42.0% | 261 | 20.0% | 49 | 40.2% |
| 2006-07 | 7646 | 43.1% | 264 | 20.2% | 46 | 37.4% |
| 2007-08 | 7641 | 43.9% | 280 | 20.7% | 45 | 37.2% |
| 2008-09 | 7698 | 44.2% | 268 | 19.9% | 51 | 39.5% |
| 2009-10 | 7810 | 44.0% | 293 | 21.1% | 44 | 33.6% |
| 2010-11 | 7559 | 43.2% | 274 | 20.3% | 55 | 38.7% |
| 2011-12 | 7671 | 43.4% | 312 | 20.8% | 52 | 39.7% |
| 2012-13 | 7708 | 43.0% | 285 | 22.2% | 55 | 44.2% |
| 2013-14 | 7693 | 43.3% | 317 | 24.4% | 53.5 | 44.4% |
| 2014-15 | 8164 | 46.4% | 306 | 24.1% | 54.5 | 46.8% |
| 2015-16 | 8001 | 46.2% | 286 | 23.7% | 55 | 46.0% |
| 2016-17 | 5125 | 42.0% | 232 | 24.6% | 46 | 47.9% |
| 2017-18 | 5101 | 42.2% | 237 | 26.1% | 47 | 49.5% |

## APPENDIX XII

| SUMMARY OF SUPPORT STAFF EMPLOYMENT FROM 1985 TO PRESENT | | | | | |
|---|---|---|---|---|---|
| | BLACK STUDENTS | | BLACK SUPPORT STAFF | | % BLACK CENSUS |
| REPORTING YEAR | NUMBER | PERCENT | NUMBER | PERCENT | PERCENT |
| 1985-86 | 7357 | 24.6% | 277 | 19.0% | 19.9% |
| 1986-87 | 7866 | 25.7% | 252 | 19.7% | 19.9% |
| 1987-88 | 5749 | 25.7% | 220 | 20.1% | 19.9% |
| 1988-89 | 5587 | 25.8% | 222 | 23.9% | 19.9% |
| 1989-90 | 5581 | 26.0% | 215 | 22.5% | 19.9% |
| 1990-91 | 5716 | 26.8% | 283 | 26.3% | 19.9% |
| 1991-92 | 5751 | 27.3% | 325 | 27.3% | 19.9% |
| 1992-93 | 6150 | 28.4% | 316 | 26.7% | 19.9% |
| 1993-94 | 6100 | 29.7% | 357 | 29.0% | 22.7% |
| 1994-95 | 6422 | 31.5% | 371 | 30.4% | 22.7% |
| 1995-96 | 6630 | 32.3% | 326 | 29.1% | 22.7% |
| 1996-97 | 6630 | 32.7% | 392 | 31.7% | 22.7% |
| 1997-98 | 6571 | 32.8% | 387 | 31.6% | 22.7% |
| 1998-99 | 6646 | 34.2% | 388 | 32.4% | 22.7% |
| 1999-00 | 6520 | 34.0% | 392 | 33.8% | 22.7% |
| 2000-01 | 6443 | 34.4% | 394 | 34.4% | 22.6% |
| 2001-02 | 6726 | 36.1% | 426 | 36.2% | 22.6% |
| 2002-03 | 6843 | 37.7% | 435 | 36.1% | 22.6% |
| 2003-04 | 7192 | 39.5% | 414 | 36.5% | 22.6% |
| 2004-05 | 7358 | 41.0% | 433 | 38.8% | 22.6% |
| 2005-06 | 7540 | 42.0% | 489 | 40.7% | 22.6% |
| 2006-07 | 7646 | 43.1% | 474 | 40.0% | 22.6% |
| 2007-08 | 7641 | 43.9% | 515 | 41.2% | 22.6% |
| 2008-09 | 7698 | 44.2% | 519 | 41.9% | 22.6% |
| 2009-10 | 7810 | 44.0% | 541 | 42.5% | 22.6% |
| 2010-11 | 7559 | 43.2% | 533 | 43.7% | 28.3% |
| 2011-12 | 7671 | 43.4% | 611 | 44.8% | 28.3% |
| 2012-13 | 7708 | 43.0% | 613 | 47.0% | 28.3% |
| 2013-14 | 7693 | 43.3% | 611 | 48.5% | 28.3% |
| 2014-15 | 8164 | 46.4% | 604 | 49.7% | 28.3% |
| 2015-16 | 8001 | 46.2% | 593 | 49.7% | 28.3% |
| 2016-17 | 5125 | 42.0% | 516 | 53.6% | 28.3% |
| 2017-18 | 5101 | 42.2% | 513 | 54.9% | 28.3% |

# MINORITY TEACHER AND ADMINISTRATOR RECRUITMENT REPORT
# 2017

## PULASKI COUNTY SPECIAL SCHOOL DISTRICT

**MR. PAUL BREWER**
**EXECUTIVE DIRECTOR**
**FOR HUMAN RESOURCES**

**MRS. SHAWN BURGESS**
**DIRECTOR OF HUMAN RESOURCES**

**October 1, 2017**

# MINORITY TEACHER AND ADMINISTRATOR RECRUITMENT REPORT

During the 2016-2017 school year, the Human Resource Division coordinated its efforts to increase the number of minority teachers employed by the Pulaski County Special School District.  The members serving on the district's teacher recruitment team were as follows:

Shawn Burgess, Director of Human Resources (B-F)
Paul Brewer, Executive Director for Human Resources (W-M)
Kim White, Personnel Specialist II (W-F)
Chanda Watson, Personnel/Recruiting Specialist I (B-F)
Sherman Whitfield, Director of Equity Pupil Services (B-M)
Kristy Manees, Personnel Specialist II (W-F)
Building Level Administrator Representatives
Central Office Administrator Representatives

The Office of Desegregation is included in the development of the District's recruitment plans and strategies.

The team continued the following practices with regard to the implementation of these recruitment strategies.  A recruitment card by areas of certification is kept on each student /applicant contacted.   On the recruitment card is each student's/applicant's name, address(es), telephone number(s) (school/permanent), e-mail address, possible  licensure areas, and race.   The recruitment brochure for all prospective applicants is updated annually and used extensively in the recruitment efforts.   The recruitment brochure contains pertinent information about the District and each school, benefits information, a current salary schedule, on-line application information for employment, district calendar highlighting the specialty dates of our district.  Follow-ups with applicants are conducted through screening interviews, letters, emails, and phone calls. Also, interviews may be conducted on the local college campuses to make it more advantageous for the graduates, as well as presentations made to the student teachers during the campus seminar sessions.  Many recruits were assisted in the licensure process whether it was standard, non-traditional, or provisional and reciprocity.

The team continued its recruitment efforts at ten in-state education/career fairs. The time table and number of contacts made for each of these visits is listed below.

| Recruitment Visits | Dates | Black | White | Total |
|---|---|---|---|---|
| UAPB | 10/5/2016 | 27 | 0 | 27 |
| UAPB | 3/8/2017 | 14 | 0 | 14 |
| Arkansas Tech University | 2/21/2017 | 0 | 12 | 12 |
| Henderson State University | 4/12/2017 | 2 | 24 | 26 |
| UCA | 2/24/2017 | 9 | 103 | 112 |
| Arkansas Department of Education | 422/2017 | 11 | 32 | 43 |
| Southern Arkansas Magnolia | 3/14/2017 | 0 | 3 | 3 |
| Philander Smith | 4/5/2017 | 4 | 0 | 4 |
| Pulaski County School District | 5/12/2017 | 10 | 14 | 24 |
| UALR | 10/21//2015 | 4 | 9 | 13 |
| St. Mark Baptist Church | 1/29/2017 | 70 | 5 | 75 |
| Total Visits - 11 | | | | |
| Total | | 151 | 202 | 353 |
| % of In-State Recruits | | 43% | 57% | |

The District continued to visit predominately black, in-state College/university fairs and local community venues. The decline in students electing to major in education and the obvious teacher shortage are still at hand.

Career Planning and Placement Centers for state colleges and universities have continued to be very cooperative in the recruitment of minority teachers. The District has not proven successful in hiring out-of-state graduates due to the significant differences in salary and lack of signing bonuses, and the local needs within their home state. The District's recruiters have experience, and often have a connection with the out-of-state and in-state colleges/universities where they have attended/recruited.

Inter-district cooperation prevailed among Little Rock School District, North Little Rock School District and Pulaski County Special School District, as they participated in several joint ventures. The district has also worked with the Office of Education Lead Planning and Desegregation Monitoring at the Arkansas Department of Education on the recommendation and issuance of minority scholarships for student teachers and substitute teachers. PCSSD also partners with the Arkansas Partnerships, and other state colleges in order to promote support staff employees and substitutes to pursue a career in education.

Additionally, the district participates in an Orientation to Teaching classes. This class is to educate students about the attributes of a teaching profession during their middle level/high school years, thus steering them toward the necessary college curriculum during high school.

Several initiatives were continued by the Human Resource Division for PCSSD to increase the number of minority teachers for the district:

1) Black applicants were interviewed and offered binders at the college/university job fairs. References were obtained from the university personnel during the fairs. (Only white applicants certified in high needs areas may be offered such binders at fairs.).

2) The district has worked with the Arkansas Department of Education in regard to minority graduates from the various colleges and universities.

3) The district has communicated with the local deans of the Colleges of Education to increase the number of African-American interns in the district.

4) Teaching positions may be temporary until minority candidates could be recruited in schools where the minority representation was not adequate.

5) PCSSD has held interest meetings for non-licensed employees with four-year degrees interested in becoming licensed teachers. This is a way for PCSSD is grow new teachers in high need areas.

PCSSD continues to offer Orientation to Teaching courses as elective courses at two high schools in order to encourage students to pursue the teaching profession. Students are routinely exposed to the activities that are offered through our high school sponsors. This is a very important part of our curriculum and the growth of our students personally and professionally.

Attachments are as follows:

Racial Composition of the present student bodies and teachers/administrators of Pulaski County Special School District
Responses to numbers 1-8
2016-2017 Annual Personnel Hiring And Deployment Report  ( Response to #8)
        Supporting documentation to #1-7

# Employing a Superintendent: From Dating to Divorce

Arkansas School Boards Association
Legal Seminar 2018

Jay Bequette

Cody Kees

Bequette & Billingsley, P.A.



PLAINTIFF'S EXHIBIT
P

## Employing a Superintendent

- **Dating**:  The search process
  - To advertise or not
  - Interview questions
  - Interview rubric
  - Veteran preference
- **Marriage**:  Making the Offer
  - Model contract
  - Annual evaluation
- **Divorce**:  Terminating the Contract
  - Buy-out
  - Separation agreement
  - Freedom of Information Act!!

2

## Dating

### The search process and job offer

3

## Search Process

- Determine if you are going to stay in-house or open to any qualified superintendent candidate

  - You do NOT have to advertise or even interview if you have an in-house candidate in mind
    - CAUTION:  Staying in-house could lead to a claim of preferential treatment or discrimination if you have more than one "qualified" candidate in the district

4

## Search Process

- What does a discrimination claim look like?

  - The Unsuccessful Candidate Was Not Selected Even Though He/She Was Better Qualified On Account of His/Her Race/Sex/Age/Disability/ National Origin/Etc.

  - Board/District Has to Articulate the Legitimate, Non-Discriminatory Reason(s) Why It Selected the Successful Candidate

  - If the Reason(s) Are Truly Legitimate, Unsuccessful Candidate Has to Show That The Supposed Legitimate Reason(s) Were A Pretext for Actual Discrimination

5

## Search Process

- You want to stay in-house and have two administrators with a superintendent certificate; your assistant supt for finance/HR (male) and your federal programs director (female).

- The board prefers the asst supt for finance/HR because it wants someone with a strong finance background, but the female federal programs director has more years in education and in administration.  What do you do?

- Thoughts?

6

## Search Process

- Best Practice Options:

- 1.  Interview both candidates using a unique rubric that places greater weight on financial strength.  Presumably this would favor your preferred candidate.

- 2.  Hire your preferred candidate but have a conversation with the federal programs director explaining your reasoning.  Be able to articulate a legitimate, non-discriminatory reason for your hire.
  - Try and make good with the federal programs director. Possibly placing her in an assist supt role with more responsibility/ more pay.  BUT REMEMBER, only the new supt can make this recommendation to the board.

7

2

## Advertising

· List position on the ASBA and AAEA website

· Hire a search firm
  · Additional cost, but...
  · The firm will recruit applicants
  · The firm vets candidates for you, can learn information about the candidate you cannot ask a candidate in interviews
  · More likely to find qualified candidates on a regional and national level
  · Streamlines the process for the board

· Would hiring a search firm keep the initial applicant pool confidential?

8

## Confidentiality

· There is no expectation of privacy with your applicants.
  · At a minimum, the public would have a right to know the applicant. The applicants entire application packet could be subject to disclosure.
  · Never promise confidentiality to an applicant.

9

## The Rubric

· No standard rubric, you can create a specialized rubric for the position.

· Advantages:
  · Professional
  · Streamlines board deliberation
  · Highly defensible in court
  · Can be created with the perfect applicant in mind
    · i.e. If you need a candidate with strong financial background, you can weight the rubric favoring such a candidate.

10

3

## The Rubric

SELECTING A SON-IN-LAW RUBRIC

| Criteria | Matthew | Mark | Luke |
|---|---|---|---|
| Cares of your daughter | X | X | X |
| Good family | | X | X |
| Handsome | X | | |
| Well educated | | X | X |
| Good Job | X | X | |
| TOTAL | 3 | 4 | 3 |

Mark wins. No debate.

11

---

## The Rubric

· If finance is your preference, but construction background is not

| Experience as District-Level Admin | Finance Background | Instructional Background | Construction Background | People Skills |
|---|---|---|---|---|
| 1-10 | 1-20 | 1-10 | 1-5 | 1-10 |

· This rubric weighs in favor of the strengths you are seeking.

12

---

## Veteran Preference

· Veterans receive a preference when:
  · Selecting applicants to interview; and
  · Selecting the applicant to hire

· "Veteran"
  · Been honorably discharged from a tour of active duty, other than active duty for training only, with the armed forces of the United States; or
  · Served honorably in the National Guard or reserve forces of the United States for a period of at least six (6) years, whether or not the person has retired or been discharged.

13

## Veteran Preference

· Which "veterans" receive preference?

· Fall under one of the "veteran" categories;

· Be a citizen of Arkansas;

· Indicate the appropriate veteran status on the application; and

· Attach all appropriate supporting documentation.
  · Districts are under no obligation to beg for documents
  · Burden is on applicant to disclose status and include appropriate and necessary document copies

14

## Veteran Preference

· For your rubric

· Simply designate a bonus number for a qualified veteran indicating preference was given to that candidate.

15

## Interviews

· Board interviews with candidates can be done in executive session
  · ONLY the board should be present. Not the mayor, leadership team or even the current superintendent
    · Lawfully, the current superintendent, as the top administrative officer, could be present, but not good optics
    · Board needs to take full responsibility for its hire

· Public presentation by the candidate, open to all

· Meetings with leadership team

· Meetings with community leaders

· FOIA: The press would only be invited it it were a public event or a board meeting where candidates were being discussed in open session

16

## Interviews

· **Interview Questions**
  · Create a set of questions before and do not veer off course.
  · Experience
  · Philosophy of education
  · Experience with curriculum
  · Experience with construction
  · Experience with finance
  · Leadership style
  · Vision for your District
  · Background questions: education, professional organizations, military experience, government service

· Determine what is important to your District and create a set of questions that allows the applicant freedom to talk openly so you can learn as much as you can

17

## Interviews

· **Questions To Avoid**

1. **Do you have children under the age of 18?**
· This question is usually viewed as discriminatory when asked only of women.

2. **Will you have to make arrangements for child care?**
· Again, this is a question usually asked of women, but the prohibition is to asking this question of anyone prior to employment.

3. **Do you have a credit record?**
· Rejecting applicants because of a poor credit rating tends to have a disproportionately greater effect on minority and female applicants. (Many married women have no independent credit history). Such questions are unlawful unless there is a business necessity for the question.

4. **Are you pregnant? Or, do you have children?**
· Discrimination based on pregnancy is unlawful under Title VII. (Obviously, primarily a concern for female applicants).

5. **Have you ever been arrested or convicted of a crime?**
· The Equal Employment Opportunity Commission has stated that members of some minority groups are arrested disproportionately more often than whites, so making a personnel decision based on arrest records could have a disparate effect on those groups. (Depending on the position, the employer could have a legitimate interest in excluding such applicants, but the screening process for certification in Arkansas probably would take care of any such concerns).

18

## Interviews

· **Questions To Avoid**

6. **What is your date of birth?**
· Questions which reveal an applicant's age could indicate unlawful age discrimination.

7. **When did you graduate from high school or college?**
· Same as No. 6, above. However, questions about an applicant's educational qualifications are appropriate. Simply look at their resume.

8. **Are you available to work on weekends?**
· This innocent-sounding question could be used to screen for applicants whose religion would prohibit working on Fridays, Saturdays or Sundays. Best practice is to ask if the applicant would be available 24/7 in case of deadlines or emergencies.

9. **What is the lowest salary you would accept?**
· This question could discriminate against women and, perhaps, minorities who might have been paid less in the past.

10. **Have you ever filed a workers' compensation claim?**
· This question could reveal an applicant's disabilities.

19

6

## Interviews

### · Questions To Avoid

**11. Do you have a disability?  Or, What is the nature of your disability?**

· The Americans with Disabilities Act prohibits a prospective employer from making any inquiry about an applicant's disability *prior to making an offer of employment.*

**12. Do you own your home?**

· Again, this question could indicate discrimination based on income.

**13. What is your religion?  Or, where do you go to church?**

· Discrimination on the basis of religion is prohibited, and asking such questions could indicate that the employer is either screening against certain religions or screening out those who are not religious.

**14. Are you a member of a union?**

· For a prospective superintendent, this seems unlikely.  Nevertheless, it should not be asked.  (There are a few superintendents who are members of the AEA).

**15. Do you have any relatives working for the District?**

· This question could be interpreted to mean that the employer gives a preference to those who have relatives employed in the District.  However, the Board needs to know any conflicts of interest.

20

---

# The Marriage

### Extending an offer, signing a contract, evaluations

21

---

## The Offer

· Board president:  determine the consensus of the board and material terms.
  · salary ceiling, contract length, will you require Supt to live in the District?
    · This is still in executive session, you have NOT taken action at this point
· Contact applicant, make the offer, get any "necessary terms" from the applicant.
  · My spouse will need a district position
  · I need a moving allowance
  · I must have a 3-year contract
  · My current District provides a car, I need the same

22

## The Offer

· No Rogue Board Members!

· The board needs one member communicating with the applicants and the candidate

· If a rogue board member is making contact with applicants in an effort to get his first choice over the consensus, it could lead to multiple offers being extended

· Do not discuss this process with media.  No official action has been taken at this point.  Presently, media would only know the candidates interviewed

23

## The Contract

· Model contracts provided by ASBA.

· If the board wants special provisions, consult with district counsel.

· Ideally, the contract needs to be presented to the applicant before board approval, but this can be done after board approval if all parties are agreeable to the material terms

· CAUTION:  emails between board and applicant and the board and counsel regarding the contract are subject to FOIA

24

## The Contract

SUPERINTENDENT'S CONTRACT

School District

July 1, 2018 to June 30, 2021

Employment.  The Board agrees to employ the Superintendent as Superintendent of the School District ("District") for the period July 1, 2018 ("Effective Date") to June 30, 2021 ("Termination Date"), who shall serve as the District's chief administrative officer, and perform all duties and possess all powers granted by applicable Arkansas law, rules or regulations, and Board policy, until such time as this Agreement expires or is terminated, as provided in paragraph 12.  The Superintendent agrees to accept the employment and faithfully discharge the duties incident to it.  During the term of this Agreement, the Superintendent agrees to devote his full attention to the performance of these duties, and will perform no other gainful employment or profession.

Compensation.  The salary to be paid to the Superintendent effective July 1, 2018 shall be at the annual rate of $_____, payable in twelve (12) equal monthly installments.

Duties.  The Superintendent shall serve as the chief executive officer of the District, and shall have the powers necessary to perform this duty.  All District staff are subject to the direction of the Superintendent and shall be recommended for hire, rehire, termination or nonrenewal by the Superintendent.  The Superintendent shall tender an official transcript of all post-secondary course work, a copy of his teaching license, proof of age and any other documents necessary to comply with state or federal law.

25

8

## The Contract

### SUPERINTENDENT'S CONTRACT

**Fitness for Duty.** The Superintendent represents that he is fully qualified to serve as Superintendent, and is fit and able to perform all physical and intellectual duties of the office.

**Professional Development and Activities.** The Superintendent is encouraged and expected to participate in professional activities that will tend to enhance his professional competence and keep him abreast of developments in education and educational administration and has reasonable expenses incident to such activities, subject to Board approval, including meetings, workshops, seminars, and other such programs. The District will pay the dues for the Superintendent to be a member of two state or national organizations that enable the Superintendent to obtain high quality professional development and further the interest of the District. The Superintendent may choose between membership in the Arkansas Association of Educational Administrators, the American Association of School Administrators, the National Association of School Superintendents, and the Arkansas Rural Education Association.

26

## The Contract

### SUPERINTENDENT'S CONTRACT

**Physical and Professional Conditions.** The parties hereto agree that there shall be filed in the records of the District an official transcript of the Superintendent's post-secondary course work; proof of his date of birth; a current, valid teaching license of the highest grade attainable with college credit; an Arkansas superintendent license; and any other documents necessary to comply with state and federal law. The Superintendent shall be responsible for maintaining his license in good standing for the duration of this Agreement. Any disciplinary suspension of the Superintendent's license by the Professional Licensing Standards Board shall constitute a material breach of this Agreement.

**Related Employees.** The Superintendent represents to the Board that he is not related to any member of the Board within the degrees prohibited by the laws of the State of Arkansas.

27

## The Contract

### SUPERINTENDENT'S CONTRACT

**Vacation, Sick Leave, Employment Benefits and Travel Reimbursement.** The Superintendent shall have the same fringe benefits as other contracted full year employees, including but not limited to insurance, vacation and personal days, and shall follow all personnel policies concerning these benefits. The Superintendent may transfer in his leave days from another Arkansas school district as provided by law. Upon separation from the District, the Superintendent shall be paid for any unused annual sick or vacation leave at his then prevailing daily rate of pay. The Board shall provide the Superintendent with a housing allowance of $800.00 per month, as he is required to maintain a residence within the boundaries of the District. The Board shall reimburse the Superintendent for business related use of the Superintendent's own vehicle at the rate established pursuant to Board policy. The Board will also permit the Superintendent to submit receipts for reimbursement for approved travel to conferences and meetings, in accordance with District policy.

**Equipment.** The Superintendent shall use school owned and provided technology for school and business-related purposes, as well as for personal use; however, this use shall not conflict with any school district policy concerning technology or internet use.

28

9

## The Contract

**SUPERINTENDENT'S CONTRACT**

**Moving and Relocation Expenses.** The Superintendent agrees to relocate and continuously reside within the school district as a term and condition of his employment by the Board. The Superintendent may submit paid receipts for moving and relocation expenses, including expenses incurred while searching for an appropriate dwelling, expenses for packing materials, movers, rental of moving vans or equipment, and up to $500.00 in personal and family hotel and restaurant expenses, not to exceed $1,000.00. In the event the Superintendent does not relocate within the first six months of employment, and continuously reside within the school district, it shall constitute a material breach of this Agreement and grounds for termination of this Agreement.

**Disability.** In the event the Superintendent shall be disabled and unable to perform his duties under this Agreement by reason of sickness, accident, or other cause beyond his control and such disability continues for more than thirty (30) days, the Board may terminate this Agreement. In the event of termination due to disability, the Superintendent shall continue to receive the salary provided for under paragraph 2 of this Agreement for a period of six (6) months from the date the Superintendent becomes disabled and has exhausted any sick leave available to him under paragraph 8 hereof. The Board's decision and determination as to the disability of the Superintendent shall be final

29

## The Contract

**SUPERINTENDENT'S CONTRACT**

**Moving and Relocation Expenses.** The Superintendent agrees to relocate and continuously reside within the school district as a term and condition of his employment by the Board. The Superintendent may submit paid receipts for moving and relocation expenses, including expenses incurred while searching for an appropriate dwelling, expenses for packing materials, movers, rental of moving vans or equipment, and up to $500.00 in personal and family hotel and restaurant expenses, not to exceed $1,000.00. In the event the Superintendent does not relocate within the first six months of employment, and continuously reside within the school district, it shall constitute a material breach of this Agreement and grounds for termination of this Agreement.

**Disability.** In the event the Superintendent shall be disabled and unable to perform his duties under this Agreement by reason of sickness, accident, or other cause beyond his control and such disability continues for more than thirty (30) days, the Board may terminate this Agreement. In the event of termination due to disability, the Superintendent shall continue to receive the salary provided for under paragraph 2 of this Agreement for a period of six (6) months from the date the Superintendent becomes disabled and has exhausted any sick leave available to him under paragraph 8 hereof. The Board's decision and determination as to the disability of the Superintendent shall be final

30

## The Divorce

### Terminating for cause or buying out the contract

31

10

## Termination

SUPERINTENDENT'S CONTRACT

- Evaluation and Termination for Cause. The Board shall evaluate the Superintendent at least annually, using the last adopted evaluation instrument for the Superintendent, or the evaluation instrument required by law, if one exists. If the Board does not use an evaluation instrument, but votes to extend the Agreement of the Superintendent, that vote shall constitute an evaluation of the Superintendent's job performance. The failure of the Board to evaluate the Superintendent or to extend the Agreement of the Superintendent into the future as an evaluation of the Superintendent shall not constitute a material breach of this Agreement.

- The Board shall have the right to terminate this Agreement for good cause. In the event the Board exercises such right, the Board shall follow the procedures provided by ARK. CODE ANN. §§ 6-17-1601, et seq., and any supplementary or amending act of the General Assembly of the State of Arkansas in effect at such time. While the parties to this Agreement agree that the Arkansas Teacher Fair Dismissal Act is neither relevant nor controlling as it relates to the termination of a superintendent, notice to the Superintendent shall be provided, and an opportunity to a hearing modeled after the hearing provisions in the Arkansas Teacher Fair Dismissal Act shall be provided in the event that a majority of the Board votes to initiate termination proceedings against the Superintendent for material breach of this Agreement, or other just cause. The decision of the Board shall be final. In the event of termination hereunder, the salary and benefits of the Superintendent shall terminate immediately.

32

## Evaluations

- Should be done annually.  Will be difficult to terminate a supt. with cause if you have not evaluated.

- Areas to address:
  - Relationship with board
  - Management skills and abilities
  - Relationship with community
  - Fiscal management
  - Person and professional attitude
  - Public relations
  - Relationship with staff

- ASBA has a new supt evaluation system- see Dr. Anne Butcher

33

## Buyout

- Board is obligated to pay remainder of supt's contract.
  - 2 year remaining, $100,000/ yr = $200,000
  - This is a negotiation.  How much will the supt take to resign, understanding he/she can then gain other employment?

  - Buyout options
    - (1) Pay a lump sum for the Supt's immediate resignation
      - Payment must be a payroll item, with standard deductions
      - NO TAX FREE BUYOUTS
    - (2)  Allow supt to work out remainder of current year, then a lump sum buyout for anything remaining
    - (3) Immediate resignation of supt and pay out remainder of contract or negotiated amount as a monthly paycheck

34

11

## Buyout

· Considerations

- · If you are wanting an immediate resignation, will you continue to pay the supt's health benefits?
- · Do you make an ARTRS contribution?  No longer required by law (Act 136 of 2017), but it is 14% of the buyout amount
- · Need to follow District polices regarding buy-back of sick/vacation days
- · If District provides a District home, need to make arrangements to vacate or have supt pay fair market value till he/she can vacate

35

·THE END

36

12