IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

---------------------------------------------------------

JANICE HARGROVE WARREN,

PLAINTIFF,

VS.          NO. 4:19-cv-655-BSM

DR. CHARLES MCNULTY, et al.,

DEFENDANTS.

---------------------------------------------------------

---o---

DEPOSITION

OF

JANICE HARGROVE WARREN

---o---

MONDAY, JUNE 22, 2020

---o---

**EXHIBIT A**

1   Q     It is fair to say you and Doctor Guess were

2   friends outside of school?

3   A     We were professionals.

4   Q     Okay.

5   A     So, I had never been to, as you say it, a social

6   event outside of school, even with him at the time I

7   was here.

8   Q     Okay.  What about Paul Brewer?

9   A     No, no.

10  Q     Okay.  So, we fast forwarded to your -- you

11  taking the Interim appointment on July 18th.

12  A     Yes.

13  Q     And I have asked if you had any interactions,

14  outside of Board meetings, excluding Remele and her

15  time as your supervisor?

16  A     Okay.

17  Q     Have you ever had any interactions with these

18  Board members outside of Board meetings, and your

19  answer was "no"?

20  A     No.

21  Q     Your interactions at Board meetings, were they

22  limited to pleasantries and then maybe questions they

23  may have had for you when they presented?

24  A     My interactions were simply making a

25  presentation to the Board, I was often on the agenda

1   A      Yes, I did.

2   Q      Okay.  Let's move to the facility discussion;

3   okay?  My notes indicate, and based on what I have

4   heard in the depositions, that August 28th, 2017, you

5   received some type of communication from a parent?

6   A      It was maybe the week before that.  Seemed like

7   August 28th is when I started setting up meetings with

8   Board members.

9   Q      Okay.  Do you have the exact date that you had a

10  parent call?

11  A      No, I don't have the exact date that a parent

12  called.

13  Q      Or contacted you?

14  A      But I can tell you, the parent either called on

15  -- it was August 23rd, 24th, 25th.  And I'm thinking

16  it was the 24th, because it was afternoon.  I had a

17  meeting that night that I couldn't go.  So, I sent

18  Will Reid, director of IT.  I remember calling him.

19  So, it had to be Thursday, the 24th, saying, "Will, I

20  have had this call.  Will you go get me some footage?"

21  Friday, the 25th, is when he -- when we actually

22  viewed it together, or it might have been that night

23  of the 24th.  But we viewed it together, and I

24  immediately started on that Friday trying to set up

25  meetings with all of the Board members to come view it

1   constructed?

2   A     Well, I didn't -- well, I said, I didn't know

3   what it was.

4   Q     Okay.

5   A     It didn't look like an athletic facility.  "What

6   is this?"  So, any time I had questions about

7   Facilities, I either went to Derek Scott, who was in

8   charge of Facilities, and then I always went to his

9   immediate supervisor, who was Doctor Guess.

10  Q     So, in this time of -- in this period where we

11  are doing the construction at Mills and Robinson,

12  which is a year period or so in 2016 to the phone call

13  in August.  Okay?  Stick with me on that time period.

14  A     Okay.

15  Q     As the Equity officer, what did you see your

16  role as in terms of Facilities, particularly the

17  facilities being built that were approved by the

18  Board?

19  A     The position of Assistant Superintendent of

20  Equity and Pupil Services, there is a process in

21  monitoring all phases of Plan 2000 that had been

22  established and approved by a Court prior to me

23  getting there.  Now, part of the process, because it

24  was before I became this position, I had to report at

25  Cabinet, as every person did, about their area that

1   was not unitary.  So, we are having a weekly Cabinet

2   meeting.  And if your area is not unitary, you have to

3   report.  And Derek Scott was reporting to us in

4   Cabinet, "Facilities here, we are on target, we are on

5   budget, everything is, you know, going as expected."

6   Shawn Burgess reported on staffing.  Okay.  "This is

7   what we are doing as a recruitment tool", or whatever

8   it may be.  So, that was what we did.

9   Q    Were you gaining your knowledge of the

10  facilities from these Cabinet meetings?

11  A    Yes, the reports that were being made, as well

12  as the monthly reports that are being made to the

13  Board.  The Facilities Report is on the agenda every

14  month at the Board meeting.

15  Q    Did you do anything, outside of these reports,

16  to gain any knowledge about the facilities and the

17  progress?

18  A    Such as?

19  Q    Inquiring of Derek Scott in a meeting, a private

20  meeting?  Did you ever ask him to have a private

21  meeting with you, or a one-on-one meeting?

22  A    I don't recall having a one-on-one meeting with

23  Derek.  No, I don't, I don't recall.

24  Q    Could you have asked to have a meeting with him?

25  A    Yes.

1    Superintendent a copy, as well as the Office of Equity

2    and Pupil Services always got a copy of the Status

3    Report.

4    Q    Okay.  So, what do you recall Linda's

5    conversation with you was?

6    A    She called me, and Sam and I were -- I think

7    what he usually did, like an interview, interviewed

8    me, asked me questions, and from that he would do his

9    report.  And the morning that she called me, I told

10   her that Sam was working on a Status Report then.  And

11   she asked me could she come and help.  And I said,

12   "No.  You have been most helpful."  Because she, one

13   of the things Sam asked me that I had no clue, she

14   remembered exactly when Derek presented that -- I

15   don't know.  It's not called a Change Order.  That

16   document to the CAB about the $80 million.  And she

17   said to me, because I had called her, "Do you remember

18   when this would have come before you all?"  And she

19   said, "Yes, I remember exactly because it was in

20   March, my mother's birthday, and I missed that

21   meeting."  So, I was able to go to the Board book and

22   find that -- or Felicia was, the secretary, and find

23   that document that Sam needed.  So, you know, no, we

24   -- that's what we needed.  I didn't know where to find

25   it or when it happened.  I knew where to find it, but

1    A      No, I don't recall that.

2    Q      Okay.

3    A      I mean, they were already scheduled when she

4    came.

5    Q      I understand that.

6    A      Yeah.

7    Q      But that aside, you don't recall that request?

8    A      No, no.

9    Q      When she offered to help and you said, "You have

10   been most helpful," did she then ask, "Can I see the

11   Status Report before it's filed with the Court?"

12   A      No.

13   Q      You don't recall that?

14   A      No.

15   Q      Are you saying, no, she didn't, or, no, you

16   don't recall?

17   A      No, I don't recall.

18   Q      Who was involved in the crafting of the Status

19   Update, the September 5th filing?  And I know Sam

20   wrote it.

21   A      Yes.  And he would call and ask me questions.

22   Q      Okay.  Was your input more of lawyers asking you

23   details?

24   A      Yes.

25   Q      The Socratic method, they ask you questions, you

1   give answers?

2   A      And he write.

3   Q      And he writes it?

4   A      Yes.

5   Q      Okay.  Did Sam, you know, ever express to you

6   any trepidation about filing the report or any

7   concern?  Does that make sense, the question I'm

8   asking?

9   A      No.

10   Q      Well, we are about to update the Court --

11   A      Okay.

12   Q      -- that a previous report was in error.

13   A      Okay.

14   Q      Is that correct?

15   A      Yes.

16   Q      Did he ever express to you, as attorney for the

17   district, you know, "Well, I'm a little hesitant

18   about" -- not that he didn't want to do it, but did he

19   just express to you that, "This is a big deal"?  Does

20   that make sense?

21   A      On the contrary.  Because what he wanted to do

22   was to make sure that the Court knew anything before

23   the word got out.

24   Q      Sure.

25   A      That he -- and his statement was, wanted the

1   Court and John --

2   A      -- to hear it from us, not anyone else.

3   Q      Right.

4   A      No.  And I don't know -- I don't know that he

5   anticipated, or his behavior didn't anticipate that he

6   expected any kind of backlash.  His thinking was the

7   contrary, "We need to do this."

8   Q      Right.  No, no.  I understand Sam was wanting to

9   be transparent.

10  A      Yes.

11  Q      I'm asking you, did he ever indicate the

12  significance of the report?

13  A      No.  It was a regular Status Report.

14  Q      Okay.  That got it.  Did he tell you or indicate

15  to you, "Before we file this, the Board needs to see

16  it"?

17  A      No.

18  Q      Or, "That the Board needs to be notified that we

19  are filing it"?

20  A      No.

21  Q      When you met with the Board on the 28th and the

22  29th and Maune was the 31st --

23  A      Yes.

24  Q      Which was?

25  A      Thursday.

1    Q    Yes.  Which was the week before that filing.

2  Did you tell them that, "We are going to be updating

3  the Court"?

4    A    No, I don't recall.  I don't recall.

5    Q    Okay.

6    A    Keep in mind, the Board, to my knowledge, didn't

7  know we even filed -- that the district filed Status

8  Reports.

9    Q    Sure.

10   A    They had never been on a Status Report the

11  entire prior year.  And as of now, they don't get a

12  copy or know that the quarterly Status Report is still

13  being filed.

14   Q    And you don't recall Sam advising you to update

15  the Board on the actual Status Report?

16   A    No.

17                 (WHEREUPON, Exhibit Number Two was

18            marked for identification.)

19  BY MR. KEES:

20   Q    Let me show you some e-mails.  Go to the third

21  page, Doctor Warren.

22   A    (Witness complies.)

23   Q    And this is him writing to you on September the

24  5th.  "Janice:  Attached is my rewrite representing

25  the second draft of the proposed Amended Status Report

Page 86

1    to the Court.  And you will see that I added a great

2    deal more detail.  Share your thoughts and concerns.

3    I would like to be able to show it to John Walker at

4    our 2:00 meeting.  And I do feel like it needs to be

5    shared with the Board before filing.  I do not want

6    either of us to be second-guessed for filing something

7    of which the Board was not completely aware."

8    A     Okay.

9    Q     Do you recall that e-mail?

10   A     No.  But -- and it's addressed to me.  However,

11   if I had received this e-mail, and I'm not saying I

12   didn't, my thought was that he was sharing it with the

13   Board, "needs to be shared with the Board."  "I do

14   feel it needs to be shared with the Board."

15   Q     How would Sam have known -- how would Sam have

16   been able to share it with the Board?

17   A     He e-mailed them.  He was e-mailing me, he

18   e-mailed the Board.

19   Q     Okay.

20   A     Yes.

21   Q     You were on e-mails with Sam to the Board?

22   A     If I e-mailed Sam, I could copy the Board.

23   Q     Okay.  But, I mean, Sam, did he have access to

24   the Board at that time?

25   A     Their e-mails, yes.

1    Q    Okay.

2    A    Yes.

3    Q    And then, on the next page Bates stamped 1452,

4    he writes to you, "About to file.  Is the Board fully

5    informed?  Thanks, Sam."  And you write back, "Yes."

6    Do you see that?

7    A    Yes.

8    Q    But you just testified the Board wasn't aware of

9    the filing for the draft.

10   A    I don't know when I sent them or Sam sent them a

11   copy.  Okay.  Yes, I do.  Yes, I do.  Because when I

12   sent it -- when I forwarded what Sam had sent me to

13   them, I remember Alicia Gillen making the comment it

14   was too late for us to make any changes when I sent it

15   to them.  So, yes, I do recall forwarding what Sam had

16   sent me to the Board, yes.

17   Q    And was that on that same day?

18   A    Don't ask me about the date now.  I don't know.

19   Q    Okay.

20   A    But it was all during this same time frame, I

21   remember forwarding it to them.

22   Q    So, your testimony is, and I will just go look,

23   but is that you forwarded Sam's e-mail with a proposed

24   draft to the Board?

25   A    Yes, yes.

1   A      It's like 12:15 a.m.

2   Q      Where are we talking?  Are we talking about --

3   A      We're at the November Board meeting.

4   Q      November Board meeting?

5   A      Uh-huh.  We are at a Board meeting, and Doctor

6   Remele calls and asks me would I step back in

7   Executive Session.  "Yes."  So, when I go back in

8   Executive Session, Doctor Remele and Ms. Gillen are

9   sitting here at the head of the table, the two of

10  them, the other Board members are on each side.  Well,

11  when I walk in, of course, it's the next morning, you

12  can tell there is tension in the room.  Of course, I

13  can --

14  Q      Is this a personnel hearing that went into the

15  next morning?

16  A      Yes, yes.

17  Q      Okay.

18  A      We had had some employee hearings or something.

19  And then, at the end they asked the Superintendent to

20  come in Executive Session.  So, I can tell a little

21  tension in the room.  So, I sit down at that end of

22  the table, and Doctor Remele has a yellow legal pad,

23  just like you have there.  (Indicating.)  And she

24  starts off, legal pad by saying, "Doctor Warren, it's

25  our understanding that you have purchased umbrellas"

1  -- "imprinted umbrellas for all of the employees in

2  the building." "Yes, ma'am." "You can't do that.

3  That would be an audit finding," blah, blah, blah, she

4  goes on and on and on in that respect. And I finally

5  respond, "Well, I visited with the auditors on what I

6  can do, how I can do." "Well, no, you can't do that."

7  Goes to the next item. There are about eight or ten

8  items on this legal pad. They were things that she

9  had concerns about.

10      Maybe the next thing on the list, I remember one

11  in particular she got to, "And I told you not to hire

12  Cherrie Johnson in this district." "I don't do hiring

13  in the district, Doctor Remele. That's HR." "Well, I

14  don't want her" -- "She is a sub in the district. I

15  don't want her subbing." I said, "Is there a reason

16  that we can give the lady? She is a certified sub, is

17  my understanding." And at that time, I didn't even

18  know who Cherrie Johnson was. She was a former

19  retired administrator in the district that HR was

20  using. And so, she said, "She is a thief." So, all

21  the Board members look at me, and I look at her, and I

22  say, "Ma'am?" She said, "We brought charges against

23  her, and she was fired from the district, and we don't

24  want that kind of person working in our district." I

25  said, "Well, I'm not aware of any of that." "Well, I

1    whatever reason, she didn't want them, as a

2    cost-saving, is what she said, we didn't need to have

3    a sub in those positions.

4    Q    When she was going through this list -- and you

5    say it was November 14, 2017?

6    A    Yes.

7    Q    Were any other Board members speaking up --

8    A    No.

9    Q    -- to disagree with her?

10   A    No.  They didn't speak to disagree or agree.

11   They just sat there.  Like I said, every now and then

12   Ms. Gillen would chime in and say something, you know,

13   "Because we got to save money," she would make a

14   comment.  But the rest of the Board members, no.  Now,

15   on the issue about the umbrellas, I remember Mayor

16   Kemp making a statement about, "Yeah, that could be an

17   audit finding."  But, you know, what I think is the

18   odd thing about that conversation, nobody ever asked,

19   "How are you going to pay for them?"  And to this day,

20   I don't even know if they know I paid for those

21   umbrellas out of my pocket.  The morale in Central

22   Office was so bad that when I started as the Interim

23   Superintendent, in January -- not January.  In August,

24   we had a popcorn/Coke reception, 3:00 o'clock, I

25   called all staff to the Boardroom.  We had popcorn and

1   Q      And do you recall how much you paid for the

2   umbrellas?

3   A      $2,200.00.  $2,200.00 something.

4   Q      Out of your pocket?

5   A      I did, personal check.

6   Q      Is that something you can provide your counsel

7   to provide to me?

8   A      I will look.  I have looked for it.  So, maybe

9   my bank can go back and get me something from 2017.

10  Because I have tried to look through some of my old

11  bank statements.

12  Q      Who did you purchase them from?

13  A      Oh, don't ask me that.  I don't know the name of

14  the company, the imprint company.

15  Q      But you will go back and look for that --

16  A      I will check.

17  Q      -- and check?

18  A      Yes.

19              MR. KEES:  And I will send you a letter,

20         Sarah.

21  BY MR. KEES:

22  Q      Did you explain that to Remele and the Board on

23  November 14th, 2017?

24  A      They never asked me anything.  She went down her

25  list telling me, "Don't do this," "Don't do this,"

1   Q     And are any of them piping in?

2   A     I can't remember a lot about the first meeting,

3   the September meeting.  I remember more about the

4   November Board meeting.

5   Q     Okay.

6   A     And I don't remember -- generally, the men on

7   the Board never said anything -- much, if anything.

8   They didn't.

9   Q     Okay.  So, you got appointed in July --

10  A     Yes.

11  Q     -- 18th meeting?

12  A     Yes.

13  Q     And you knew, admittedly, it was for an Interim

14  appointment?

15  A     Yeah.  The minutes said, "Hire for Interim

16  Superintendent."

17  Q     And your contract was an Interim --

18  A     Yes.

19  Q     -- Superintendent --

20  A     That's correct.

21  Q     -- for one year, correct?

22  A     Correct, yes.

23  Q     So, at what point -- and there is a phone

24  buzzing.  I don't care who is ringing, I just want to

25  make sure y'all know.

1  A    I don't recall.  I don't know which meeting it

2  was that the tension when I walked in.

3  Q    Was it September 12th when Doctor Remele brought

4  up issues with the paneling and the painting of the

5  paneling?

6  A    Was that September or November?  One of the

7  meetings, she did.  I'm not certain if it was the

8  September or the November.

9  Q    Okay.

10  A    It was September --

11  Q    I'm sure you have seen her list.

12  A    Yeah, I have.  What number are you referring to?

13  Q    Well, she says on July 19th, "I hear about the

14  paneling."

15  A    Well, I don't know how she heard about it on

16  July 19th, number two, because on July 19th I'm

17  meeting with Doctor Guess in his office still.

18              (WHEREUPON, Exhibit Number Three was

19          marked for identification.)

20  BY MR. KEES:

21  Q    So, what exactly did you have done to the office

22  that was different than what Guess had?

23  A    The walls were painted a white.

24  Q    You painted them white -- or you had them

25  painted a white?

1    A      No.  The Maintenance office.

2    Q      That's what I'm saying.  You caused them to be

3    painted white?

4    A      Yes.  The Maintenance office had them painted

5    white.  The desk -- replaced the desk that was on two

6    bricks.  And the chairs -- there were six -- four, six

7    chairs around the conference table that was replaced.

8    Not the table, but the chairs around the table were

9    replaced.

10   Q      Did you have the paneling removed or painted?

11   A      I think they removed it, the maintenance men.

12   When they came in, they had started painting, and I

13   don't know what they said, but I do think it was

14   removed.  But I wouldn't have told them to remove it.

15   I left that job up to them.

16   Q      Did you authorize Maintenance, and whoever else,

17   is it Facilities that would have done the purchasing

18   of the desk and chairs?  Who would have done that, if

19   you know?

20   A      Who would have --

21   Q      Yes, I know Maintenance did the painting.  Who

22   would have --

23   A      Ordered the furniture?

24   Q      -- ordered the furniture?

25   A      It's just a Purchase Order that we would have

1    done through one of our furniture vendors.

2    Q     And is that a Purchase Order that you executed?

3    A     Yes.  I would have told the business office or

4    whomever.

5    Q     So, you executed the Purchase Order for the desk

6    and the chairs?

7    A     Yes, yes.

8    Q     And then, you sent in some type of document to

9    Maintenance for the in-house maintenance staff?

10   A     No.

11   Q     Explain what you would have done about the

12   painting.

13   A     And it might have been on the 19th, but I don't

14   think so, that Derek walked in the Superintendent's

15   office, and Doctor Guess and I were in there, and he

16   said that they had planned to paint the office.  And I

17   remember asking him, "How are you going to pay for

18   that?"  He said, "It's part of SRM."  I said, "Oh,

19   okay."  So, that's how it started, with the walls.

20   Q     Okay.  So, you are saying that -- are you

21   testifying that Derek Scott told you that that was

22   already in motion?

23   A     It was already in the budget, yes.

24   Q     Okay.

25   A     That that was part of the plan for that

1   Q     She is the only one that expressed it?

2   A     Okay.

3   Q     Is that right?  She is the only one that

4   expressed it?

5   A     Yes.

6   Q     And then, who else do you know that can testify

7   to this desk being on bricks?

8   A     Guess.

9   Q     Presumably, Doctor Guess?

10  A     Yes, Doctor Guess.

11  Q     And did you -- and you approved the Purchase

12  Order for the desk and the chairs?

13  A     Yes.

14  Q     Okay.  Did you think that that would cause any

15  consternation on the part of the Board members that

16  you were buying new furniture?

17  A     No.

18  Q     Why is that?

19  A     Board members typically aren't involved in the

20  purchase of furniture, or painting, or materials, or

21  supplies.

22  Q     Do you know when the furniture -- strike that.

23        The painting was done in July, because you said

24  you had to wait to come into the office.

25  A     Yes.

1    tone.  But my point was, did he scold the district or

2    anything?

3    A     No.  As a matter of fact, he applauded the

4    district, he thanked Sam for providing the

5    information.

6    Q     Yes.  He is always very gentleman-like in Court.

7    But I just wanted to know if you recalled --

8    A     No.

9    Q     -- that?

10   A     No.

11   Q     You are still kind of interrupting me a little

12   bit, Doctor Warren.  And I'm not scolding you, I just

13   want it to be clear on the record.

14   A     I'm sorry.

15   Q     Do you recall Doctor Remele having a

16   conversation with you that you needed to take the

17   furniture back?

18   A     She called me and she said something about, "I

19   understand you are getting" -- number eight.

20   "September 22nd, I hear you have purchased and

21   installed new furniture in your offices.  I call you

22   and tell you as a friend that the Board as a whole

23   will not be happy with this.  And you said you didn't

24   think you could."

25         Yes, I do remember her calling me and asking me

1  has furniture -- yes.  And, "You need to return it,"

2  is what she said.  And I said, "It has been purchased.

3  We can't return it."  I mean, what kind of business is

4  that, that you have ordered something and then going

5  to return it?  Yes.

6  Q     And did the conversation end there with her?

7  A     She said something about the Board was going to

8  be unhappy.

9  Q     She says here, "I called you as a friend."  Did

10  you consider her a friend?

11  A     No.

12  Q     She testified that she supported you for the

13  position of Interim.  I want your reaction to that.

14  A     Interim --

15  Q     Interim Superintendent, at the July meeting,

16  July 18th.

17  A     All of them did, is my understanding.  When she

18  came to ask me to be Interim?

19  Q     Right.

20  A     Yes, the entire Board.

21  Q     Do you know whether she supported you like

22  vocally amongst the Board?

23  A     No, no.

24  Q     Okay.

25  A     I don't know.

1    A     Yes, I think we would.

2    Q     I'm just saying, he has been off the Board for a

3    while.  Besides the expressions that you discussed

4    with Brian Maune, anything that -- any personal things

5    that he said or did that you take issue with?

6    A     No.  I don't recall anything personal, no.

7    Q     Okay.  Same question as it applies to Eli

8    Keller?

9    A     No.

10   Q     Same as it applies to Shelby Thomas?

11   A     I can't recall anything personal.

12   Q     Okay.  Then, going to the females, what about

13   Tina, anything that she has personally said to you or

14   said in a meeting that caused -- anything personal

15   towards you?

16   A     No, I don't recall anything personal toward me.

17   Q     Okay.  Did the Board, at any time in the

18   discussions with you and your performance, say it had

19   anything to do with race?

20   A     They wouldn't have ever said that.

21   Q     Okay.  Did they ever say it had anything to do

22   with your gender?

23   A     They didn't say anything.

24   Q     Okay.  They didn't say anything?

25   A     No.  You asked me in my position, did they say

1    anything about race.  No.  Anything -- no, they didn't

2    say anything.

3    Q    Okay.  You have alleged gender discrimination as

4    part of your lawsuit?

5    A    Uh-huh.  (Indicated yes.)

6    Q    Correct?

7    A    Correct.

8    Q    What is the basis for that claim?

9    A    The basis is that you have a female -- black

10   female African-American Superintendent with the

11   qualifications, the certifications, yet you chose to

12   interview three male candidates who were less

13   qualified.  One of the male candidates, Mr. Harris,

14   that was selected, could not be a Superintendent in

15   Arkansas, because he couldn't get Arkansas

16   certification.  The other candidate, Mr. Harris --

17   Q    Mr. Pruitt.

18   A    Mr. Pruitt, thank you.  Mr. Pruitt, had never

19   been a Superintendent before, or had Superintendent

20   experience.  He was an Area Superintendent.  Doctor

21   McNulty had been a Superintendent three years, four

22   years, maybe, in a district with less than 500

23   students.  That's why.  You chose three males, and you

24   had a female candidate.

25   Q    And that is the basis for your claim of gender

1   PCSSD April 29th, 30th, May 1st, three days right

2   there.  Well, I got to spend those three days with

3   him.  And I had asked him, when he was arranging when

4   he was coming, would he make sure he was here May 1st,

5   because that was the day of the next administrators'

6   meeting at Clinton Center and I wanted to introduce

7   him to all the administrators.  So, we had ridden

8   around for two days, carrying him to schools and in

9   conversation.  At that meeting, I said to the building

10  administrators, "This is Doctor McNulty.  I have been

11  with him the last two days.  I think he is a person of

12  integrity.  I do believe that he can be trusted.  I'm

13  going to support him in making sure that PCSSD becomes

14  unitary, and I would like for you all to do the same

15  thing."

16  Q    And has that changed --

17  A    No.

18  Q    -- since that --

19  A    No.

20  Q    -- date?

21  A    No, no.  Sorry, I cut you off again.

22  Q    Do you think he was qualified for the position

23  of Superintendent of PCSSD?

24  A    I think I was as qualified or more.

25  Q    So, can you answer my question, though, as to

1   Doctor McNulty?  Do you think he was?  I guess the

2   inference is "yes"?

3   A     Right.

4   Q     But you think you were more qualified?

5   A     Yes.

6   Q     Okay.  I'm wrapping up here, I think, but I hate

7   to say that.

8   A     Okay.

9   A     Why do you think you are not the -- why do you

10  think you were not selected to be the permanent

11  Superintendent in April of -- well, March and April of

12  2018?

13  A     January 22nd, 2018.

14  Q     January 22nd?

15  A     2018, the presentation that Bequette and Kees

16  did, the comment was made, "If you do not select the

17  person already within the district as a candidate for

18  interview, make sure you have a conversation with that

19  person, an explanation as to why not."  I'm still

20  waiting on that conversation.

21  Q     If we had that conversation, would it resolve

22  this lawsuit?

23  A     No.

24  Q     Okay.  Well, let me ask you a question, though,

25  Doctor Warren, because you side-stepped that one.  Why

1    A    I take that back.  I have spoken to someone at

2    Ray and Associates.  There have been -- since the

3    PCSSD search, Ray and Associates have contacted me on

4    three different occasions about entering my name in

5    their pool of Superintendent candidates --

6    Q    Okay.

7    A    -- out of state somewhere.

8    Q    Oh, sure.  And I'm assuming you didn't have an

9    interest?

10   A    No, I do not.

11   Q    And I only said that because of the way that you

12   made that gesture.  Okay.  For the Deputy position,

13   the Interview Committee was Sonya Whitfield; is that

14   correct?

15   A    I don't remember that one, now.  I don't

16   remember who was on that committee.  I don't know.

17   Q    Did you request your rubric for that interview

18   or anything?

19   A    No.

20   Q    Why did you not take an interest in trying to

21   discover more or learn more why you weren't given that

22   position?

23   A    I was already, like I said, in the midst of the

24   EEOC claim on this.

25   Q    Okay.  Do you have any evidence, information,

1    other instances with any of the other six?

2    A    I don't recall any right off.

3    Q    Okay.  Well, I usually would say recall is okay,

4    but you can't get on the witness stand and start

5    saying that, you know, one of these Board members made

6    a racial slur or something.  I'm talking out loud.

7    But, essentially, I just need to know in preparation

8    for the trial, are there other instances, aside from

9    Doctor Remele, that you remember any of the five

10   acting in a way in which you felt it was

11   discriminatory?

12   A    I cannot think of any time.

13   Q    Okay.  And then, Doctor Remele, you talked about

14   her time as the Deputy in that one year that you

15   served as Elementary Education Director.  Is that what

16   you are referring to?

17   A    She was Deputy two years when I was -- my first

18   year as --

19   Q    Yes.  But one year -- the second year you were

20   Assistant Superintendent, you told me you reported --

21   A    And Director.  Okay.

22   Q    -- you reported directly to Guess; right?

23   A    Yes.

24   Q    So, am I safe to assume that second year it

25   stopped you reporting to Remele?