IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

---------------------------------------------------------

JENNIFER BEASLEY; DR. KIFFANY
PRIDE; LAURA SHIRLEY; and
NICOLE TOWNSEND,

                                        PLAINTIFFS,

VS.                   NO. 4:18-cv-508-DPM

DR. CHARLES MCNULTY, in his official
capacity as Superintendent of Schools
of the Pulaski County Special School
District; PULASKI COUNTY SPECIAL SCHOOL
DISTRICT BOARD OF DIRECTORS; and
PULASKI COUNTY SPECIAL SCHOOL DISTRICT,
a public body corporate,

                                        DEFENDANTS.

---------------------------------------------------------


---o---

DEPOSITION

OF

LINDA REMELE

---o---

TUESDAY, JUNE 4, 2019

---o---

A P P E A R A N C E S:


    ON BEHALF OF PLAINTIFFS:

        JOHN WALKER, ESQUIRE
        JOY SPRINGER, Administrative Assistant
            John Walker Law Firm
            1723 South Broadway Street
            Little Rock, Arkansas  72206


    ON BEHALF OF DEFENDANTS:

        W. CODY KEES, ESQUIRE
            Bequette and Billingsley
            425 West Capitol Avenue
            Suite 3200
            Little Rock, Arkansas  72201



    ALSO PRESENT:

        DR. KIFFANY PRIDE
        MS. LAURA SHIRLEY
        MS. NICOLE TOWNSEND


                ---o---

3

# I N D E X

WITNESS:                                                    PAGE:

LINDA REMELE
     Direct Examination............................    5
ADDENDUM WITH REGARD TO D'ABADIE...................   78
     Cross Examination............................   86
     Redirect Examination.........................   87

---o---

# E X H I B I T S

Exhibit One......................................   16

McNulty Exhibit 3a...............................   33

---o---

Reporter's Certificate...........................   93

---o---

1              The deposition of Linda Remele was

2     taken before me, Debbye L. Petre, Certified Court

3     Reporter and notary public within and for the County

4     of Pulaski, State of Arkansas, duly commissioned and

5     acting, on Tuesday, June 4, 2019, beginning at the

6     hour of 11:30 a.m., at the offices of Pulaski County

7     Special School District, Administration Building, 925

8     East Dixon Road, Little Rock, Pulaski County,

9     Arkansas.

10              Said deposition being taken in

11     accordance with the Rules of Federal Procedure and

12     pursuant to the provisions of the Arkansas Rules of

13     Civil Procedure at instance of counsel for the

14     Plaintiffs in the above-styled case in the United

15     States District Court, Eastern District of Arkansas,

16     Western Division.

17                          ---o---

18     THEREUPON, the following proceedings were had,

19     to-wit:

20                          ---o---

21

22

23

24

25

1                    P R O C E E D I N G S

2     WHEREUPON,

3                         LINDA REMELE,

4     having been called for examination, and having been

5     first duly sworn, was examined and testified as

6     follows:

7                         DIRECT EXAMINATION

8     BY MR. WALKER:

9     Q     State your name.

10    A     Linda Remele.

11    Q     Ms. Remele, were you the president of the

12    Pulaski County School Board in 2016 and '17?

13    A     Yes, I was.

14    Q     Who was your Superintendent in 2016?

15    A     Doctor Jerry Guess.

16    Q     And who was your Superintendent in 2017?

17    A     Doctor Jerry Guess.

18    Q     And who was your Superintendent in 2018?

19    A     Doctor Janice Warren.

20    Q     And in 2019?

21    A     Doctor Charles McNulty.

22    Q     Is it fair to say that you are a former

23    employee of the Pulaski County School District?

24    A     Absolutely.

25    Q     And that you served in an administrative

1   capacity for many years, at least seven?

2   A     Yes.

3   Q     And is it fair to say that you were well aware

4   in 2016, '17, '18, and now, of the policies --

5   personnel policies of the school district?

6   A     Yes.

7   Q     And those personnel policies that were in place

8   when you left remain basically the same personnel

9   policies for the present?

10  A     What do you mean when I left?

11  Q     You left the district about seven years ago?

12  A     I left the district in 2013.  No, they are not

13  the same policies.

14  Q     Have they been changed?

15  A     Yes.

16  Q     How have they been changed?

17  A     Doctor Yolaundra Williams rewrote the policy

18  book at the direction, I believe, of Doctor Guess,

19  and finished it under Doctor Warren to jibe with

20  Arkansas School Board Association policies.

21  Q     Did the policies with Reduction in Force ever

22  change?

23  A     I would have to look at the old policy and the

24  new policy.

25  Q     You have done that, haven't you?

1   A      No, I have not compared the two policies.

2   Q      All right.  Can you describe the present

3   Reduction in Force policy?

4   A      I have looked at it.

5   Q      That's fine.

6   A      You determine seniority and you -- if you are

7   doing a classroom teacher Reduction in Force, you

8   have a seniority list, and then you determine how

9   many people have to be cut, and then you give them

10  the bottom seniority, the senior-most teacher gets

11  the cut.  And they are allowed to come back by the

12  senior-most teacher that was cut when positions open

13  up.

14  Q      Is your RIF policy just limited to teachers?

15  A      No.  But that's where it is usually applied.

16  Q      Well, when you say "usually applied", for

17  something to be usual it has to happen more than

18  once, doesn't it?  Have you had any RIFs in the last

19  seven years, that you recall?

20  A      Well, I know that when we cut services that

21  they -- lately, that they called it a RIF.

22  Q      Who is the "they" who called it a RIF?

23  A      Probably Human Resources called it a RIF.

24  Q      I see.  Well, do you recall ever being a part

25  of a Board-mandated RIF?  As an employee, first?

1    A      As an employee?

2    Q      Yes.  Do you know that the Board ever did it

3    while you were an employee up through 2012 or '13?

4    A      The time I remember RIFs the best is when we

5    lost 14 schools to Little Rock and we RIFed all those

6    teachers.  That's when I remember RIFs and that's

7    really what my issue was going back to.

8    Q      When you lost those schools, that was in '89

9    and '90 and '91?

10   A      Yes.

11   Q      All right.  But that's a recollection.  You

12   didn't participate in that?

13   A      No, I did not -- I was not an administrator at

14   that time.

15   Q      At that time, you were not even an

16   administrator?

17   A      No.

18   Q      All right.  So, do you know of any Board RIF,

19   ever, before you left the district as an employee?

20   A      We -- they may have called it RIF, yeah.

21   Q      That's "yes" or "no".  Do you know of any?

22   That's "yes" or "no".

23   A      I guess "yes".

24   Q      Yes.  What year was it?

25   A      We cut people in the budget, it seems like,

1   every year since I have been the president.

2   Q      But a RIF is different than just cutting people

3   in the budget, isn't it?

4   A      Yes.  Because a RIF is insinuating that you are

5   going to call them back and not cut positions.

6   Q      No, a RIF is in writing.  Y'all had a Board

7   policy regarding RIF at all times, didn't you?

8   A      Yes.

9   Q      You are also aware that there has always been a

10  state -- not always.  But during your tenure, there

11  has been a state law regarding RIFs; is that right?

12  A      No, I'm really not aware of that.

13  Q      You have never read the state law regarding

14  RIFs?

15  A      No, I have not.

16  Q      Have you ever read the Board policy as

17  President of the Board on Reductions in Force?

18  A      I have read all the policies when we redid the

19  policies.

20  Q      I understand.  Do you recall it?

21  A      Not well enough to speak.

22  Q      Did you ever have a discussion as President of

23  the Board regarding Reduction in Force?

24  A      No.

25  Q      Did you ever vote for a Reduction in Force

```
 1   while you were a Board member?
 2   A    Not that I was aware of.
 3   Q    I see.  Did you ever mandate, as a Board, that
 4   a certain amount of money be cut from the budget?
 5   A    Yes.
 6   Q    Did you do that or did the Board do it?
 7   A    The Board did it.
 8   Q    Is there a Board minute that reflects that?
 9   A    The Board minutes --
10   Q    That's "yes" or "no".
11   A    No.
12   Q    There is not.  Now, how can the Board act
13   except officially and by recorded minutes?
14   A    The Board only acts officially when it sits.
15   Q    Was there any official Board minute to cut a
16   particular amount of money from a budget?
17   A    There was, if they took the -- if there is a
18   recorded conversation of the meeting, there is to be
19   official Board minutes.
20   Q    Well, official -- discussions are not actions.
21   There is a difference, isn't there?
22   A    (Indicated yes.)
23   Q    Yes?  You have to say "yes".
24   A    Yes.
25   Q    Was there any Board action at any time since
```

1   you have been president that there be a Reduction in

2   Force in an amount certain with respect to dollars?

3   A       There was no official action that was voted on

4   that would be recorded in the minutes.

5   Q       Was there unofficial action taken by the Board

6   with respect to a RIF?

7   A       There was only discussion about reduction -- or

8   there was only discussion about reducing the budget,

9   not Reduction in Force.

10   Q       Did you ever give Doctor Guess a direction to

11   engage in a RIF?

12   A       No.

13   Q       Did you ever give Doctor Warren a decision to

14   engage in a RIF?

15   A       Those specific words, no.

16   Q       Did you ever tell her to reduce the budget?

17   A       The Board told her to reduce the budget.

18   Q       Did the Board tell her how much to reduce the

19   budget by?

20   A       I believe so.

21   Q       What do you believe the amount to have been?

22   A       I believe we were told that we needed to reduce

23   it by $5 million.

24   Q       Who told you that?

25   A       Chief Financial Officer.

1    Q      And who was that?

2    A      Denise Palmer.

3    Q      Did she ever provide a document to that effect?

4    A      She provides the monthly updates.

5    Q      Did she ever provide a document to that effect?

6    A      I'm not positive.  I do not remember.

7    Q      Now, when was Ms. Palmer hired as the Chief

8    Financial Officer?

9    A      I don't know.

10   Q      She has only been Chief Financial Officer like

11   three years; isn't that true?

12   A      She was here when I came on the Board.

13   Q      She was not Chief Financial Officer, was she?

14   A      (No response.)

15   Q      Isn't it true that Mr. Bill Goff was the Chief

16   Financial Officer?

17   A      When I was retired -- when I retired, Bill Goff

18   was the Chief Financial Officer.

19   Q      Did he remain during the first years of Doctor

20   Guess' administration?

21   A      Yes, he was the Chief Financial Officer.

22   Q      And at that time, you were on the Board?

23   A      No, sir.

24   Q      When did you go onto the Board?

25   A      When we were -- when the state rehired -- or

1  allowed a School Board to come back and all seven of

2  us were elected.

3  Q     What year was that?

4  A     That was December 2016.

5  Q     All right.  Now, Ms. Palmer had never been a

6  CFO before, had she?

7  A     I do not know.

8  Q     Did you participate in the decision to hire

9  her?

10 A     No, sir.  She was already here when I came on

11 the Board.

12 Q     Now --

13 A     She came sometime between me retiring and me

14 coming on the Board.

15 Q     Now, let me go over a few things.  Did the

16 Board direct Doctor Jerry Guess to terminate his --

17 the Board's lawyer, Allen Roberts, at any time, by

18 discussion or otherwise?

19 A     By discussion.

20 Q     Okay.  Were you part of that discussion?

21 A     Yes.

22 Q     Did you speak those words?

23 A     Yes.

24 Q     Did you tell him that if he didn't fire Allen

25 Roberts, that he would be fired?

1   A     No.

2   Q     Did someone else tell him that?

3   A     I can't speak for anybody else.  I didn't hear

4   it.

5   Q     If he says that that's what you told him, would

6   you disagree with that?

7   A     Yes.

8   Q     What did you tell him if he didn't fire

9   Roberts?

10  A     I didn't tell him anything.

11  Q     What is the reason that you wanted him to fire

12  Roberts?

13  A     Because it came to our attention that Roberts

14  was making agreements with you and to the court that

15  we, as the Board of Directors, knew nothing about.

16  Q     Isn't it true that you all were just a new

17  Board at that time?

18  A     We were a -- we had been a Board for a year,

19  maybe half a year, six months.  Yes, we were a new

20  Board.

21  Q     Isn't it true that the decisions you were

22  complaining about preceded your appointment?

23  A     I don't know that.

24  Q     All right.  Nonetheless, you all directed that

25  he fire you because of lack of -- no.  Y'all directed

1   that he be fired because the Board and the then named

2   Joshua Plaintiffs were making agreements of which you

3   were not apprised?

4   A      Correct.

5              MR. KEES:  Object to the term "fire",

6           since they really don't hire attorneys, more

7           so just directed not to use the services.

8   BY MR. WALKER:

9   Q      By whatever name it is, it still arose.

10  Wouldn't you agree?

11  A      We did not want Allen Roberts' law firm

12  supporting us.

13  Q      And that's basically --

14  A      Speaking for us.

15  Q      That's basically because you thought he was too

16  close to John Walker, isn't it?

17  A      No.  It's because things were going on that we

18  didn't know.

19  Q      What went on that you didn't know?  Tell me one

20  thing that went on that you didn't know.

21  A      That there was a letter that had agreements of

22  things that would happen that the Board would do, and

23  we didn't know we were supposed to do those things.

24  Q      Well, isn't it true that that was a letter

25  wherein he indicated that they would make certain

```
 1    recommendations as counsel and the administration to
 2    the Board?  Isn't that what happened?
 3                    MR. KEES:  He is about to show you
 4          something.
 5                    THE WITNESS:  Yes.
 6                    MR. WALKER:  Do you have it here?
 7                    MR. KEES:  It's in your Complaint.  She
 8          needs a copy.
 9                    (WHEREUPON, Exhibit Number One was
10          marked for identification.)
11    BY MR. WALKER:
12    Q    I want you to look at that and see if you can
13    identify that letter as the source letter to which
14    you are referring.
15    A    That is.
16    Q    And you all came back to the Board in January
17    of 2016 or '17?
18    A    December 2016.
19    Q    December 2016.  And this is May 2017.  You were
20    aware that there had been ongoing -- at the time you
21    became a Board member and campaigned for office, you
22    were aware that the court had given Doctor Guess
23    carte blanche, as Superintendent, to make
24    recommendations and to engage in discussions leading
25    toward unitary status; isn't that correct?
```

1   A     I would not have used the word "carte blanche".

2   Q     He had the opportunity to run the district

3   pretty much as he saw fit, consistent with the

4   Decree, isn't that correct, because he was the

5   Superintendent and the Board, for all practical

6   purposes, reporting only to the Commissioner?

7   A     To the Commissioner.

8   Q     All right.

9   A     With the Commissioner's permission.

10  Q     All right.  Now, at that time, you were aware

11  that there were complaints about Derek Scott giving

12  favor to Robinson School and to the schools in your

13  district, meaning Sylvan Hills, that were being

14  lodged by the Joshua Intervenors.  You knew that,

15  didn't you?

16  A     No.

17  Q     You were unaware of the fact that -- you were

18  aware that you all had obligations to equalize the

19  facilities and at that time to build new facilities?

20  A     Yes.

21  Q     Were you not aware that Derek Scott had that

22  task as supervision person?

23  A     I was aware that Derek Scott was over the

24  construction of the new building.

25  Q     And were you not aware that Derek Scott had

1    allegedly usurped his authority and converted what
2    was represented to the court to installing Robinson
3    ahead of Mills?

4    A    No, I was not.

5    Q    Did you subsequently find that out?

6    A    I did.

7    Q    All right.  Now, when Mr. Roberts wrote,
8    "Doctor Guess has directed Whitney Moore and me to
9    make our first order of business the investigation of
10   certain allegations and complaints about Derek
11   Scott," did that upset you?

12   A    No.

13   Q    Did it upset you that he was going to recommend
14   Doctor Warren as Deputy Superintendent?

15   A    No.  I voted for her.

16   Q    Well, you may have.  But I'm asking you what
17   upset you.  You were aware that Paul Brewer intended
18   to retire at the end of the year, weren't you?

19   A    Not really.  I knew he was close to retirement.

20   Q    But you knew that Paul was Interim in the first
21   place, didn't you?

22   A    Correct.

23   Q    And you knew that he had been Interim for
24   years?

25   A    Yes.

1    Q    And you knew that he wasn't a part of your

2    regular budget, even though he was being paid?

3    A    No, that, I did not know.

4    Q    And then, he said that he would interview the

5    -- he would review the personnel files of certain

6    people to see if there was anything that might

7    justify a name-clearing hearing for them.

8    Name-clearing hearings.  What is inappropriate about

9    a name-clearing hearing?

10    A    Nothing.

11    Q    "Whitman and I will be able to negotiate in

12    good faith to resolve the complaints of four people."

13    Did you have any objection to that?

14    A    No.

15    Q    And then, on number seven, "Joshua may provide

16    information to PCSSD regarding potential applicants,

17    and the Human Resources Department shall consider

18    that information when filling future positions."  Did

19    you find anything wrong with that?

20    A    No.

21    Q    "All the administrators who are quartered

22    within the PCSSD Central Office will be required by

23    2018-'19 to hold the certification considered

24    necessary by ADE for the job held by that particular

25    employee."  So, you didn't find any objection to

1    that?

2    A     I found an objection to that in the fact that I

3    thought we all were.

4    Q     Well, you may have thought that.  But how did

5    that have to do with Mr. Roberts?  Obviously,

6    somebody had brought to -- you understood that Joshua

7    had the responsibility to bring things to the

8    attention?

9    A     (Indicated yes.)

10   Q     All right.  And this was something that we had

11   brought to their attention, and we had suggested

12   that, at least by last year, they all be certified.

13   What did you find wrong with him addressing that in

14   2017 in view of the fact that in 2017, May, all of

15   the hires -- all of the persons being hired for next

16   year had already been determined, except for new

17   hires?  The hires for 2018-'19 had already been hired

18   by May 1, hadn't they, of the current staff?

19   A     I don't know that.

20   Q     The current staff was going to be retained if

21   they did not receive notice by May 1; isn't that

22   right?

23   A     Correct.

24   Q     So, you knew that almost all of the staff had

25   not received Letters for Nonrenewal, so you knew they

1   were going to be rehired.  So, what in this letter

2   did you find offensive, other than he wrote it to me?

3   A     The fact that the letter existed and that the

4   Board knew nothing about it.

5   Q     Ms. Remele, how do lawyers negotiate other than

6   negotiating first and then reporting to the client

7   later?  They didn't make any agreement here.  Where

8   is the agreement?  You said this is an agreement.

9   Show me any agreement that was reached.

10              MR. KEES:  Object to form.

11  BY MR. WALKER:

12  Q     Show me one agreement that was reached.  Look

13  at the letter.

14  A     I have the letter in front of me.

15  Q     Thank you.  Now, what agreement was reached

16  there?

17  A     We were informed that this --

18  Q     No.  I'm only asking my question.  What

19  agreement was reached here by this letter?

20  A     The agreement that we thought --

21  Q     Doctor Remele --

22              MR. KEES:  You are not letting her

23         answer, John.

24              MR. WALKER:  Just a moment.  Just a

25         moment.

BY MR. WALKER:

Q    I'm asking you to look at this letter and tell
me what agreement in this letter was reached.

A    That these things would be done.

Q    There is nothing here that they said would be
done, other than a recommendation.  The Board's --
it's administration's role, isn't it, Doctor Remele,
to recommend to the Board personnel matters?  Is that
right?

A    Correct.

Q    And then, it's on the Board to act; isn't that
correct?

A    Correct.

Q    And you all weren't supposed to even be
involved in anything about recommendations until they
came to the Board; isn't that correct?

                 MR. KEES:  Object to form.

BY MR. WALKER:

Q    Isn't that correct?

A    Correct.

Q    All right.  Now, so, you got upset because they
didn't come and talk to you about discussions they
were having --

                 MR. KEES:  Object to form.

BY MR. WALKER:

1    Q     -- as a Board; is that right?

2    A     We were under the opinion that this had already

3    been an agreement and everything, that the Board had

4    to do this.

5    Q     Well, wait just a moment.  Who gave you that

6    opinion?  You said "we were".  So, that means you're

7    collectively speaking.

8    A     The Board.

9    Q     No.  Were you of that -- well, I'm going to ask

10   all the Board members.

11   A     Yes.

12   Q     Were you of that opinion?

13   A     I was of the opinion that this was an

14   agreement.

15   Q     All right.  And you now -- in reading this, you

16   were wrong?

17            MR. KEES:  Object to form.

18   BY MR. WALKER:

19   Q     You acknowledge you were wrong, don't you?

20   A     No.

21   Q     Well, tell me, then -- tell me one agreement

22   that was reached, other than to consider recommending

23   something to the Board, as required by law.

24   A     I think number two.

25   Q     All right.  Number two.  He directed her to

1    inquire into whether or not Derek Scott was abusing

2    his position?

3    A    I don't know what number four is.

4    Q    Number four.  All right.  Do you have the

5    letter?  And in number four, there is no -- it

6    couldn't be an agreement, is it?  If he says, "No,"

7    that is clearly no agreement; right?

8    A    I don't know what it was.

9              MR. KEES:  She doesn't know what the

10         question was.

11   BY MR. WALKER:

12   Q    Well, how could "no" ever be agreement?

13   A    Well, it could be he is agreeing with you on

14   something.  I don't know.

15   Q    How can "no" ever be an agreement?  If one says

16   something exists?

17   A    Depends on how the question is asked.

18   Q    No.  Doctor Remele, you are a smart lady, and

19   I'm not trying to be coy with you.  This is the

20   written response that I promised you reflected the

21   commitments.  And number four, whatever I -- it's

22   inferred to an intelligent person.  Whatever I had

23   said to him, he disagreed with.

24             MR. KEES:  Object to form.

25   BY MR. WALKER:

1   Q      It says "no", doesn't it?

2   A      It says "no", I will agree.

3   Q      All right.  Now, what other inference is to be

4   drawn other than that there was no agreement there?

5   What other agreement?

6   A      I don't know.

7   Q      What other inference?

8   A      I don't know.

9   Q      All right.  So, you used the fact that he wrote

10  this letter as the basis for telling Doctor Guess

11  that he had to terminate Mr. Roberts; is that right?

12                  MR. KEES:  Object to form.

13  BY MR. WALKER:

14  Q      That's "yes" or "no".

15  A      Part of the basis, yes.

16  Q      All right.  What was the other basis, Doctor

17  Remele?

18  A      We think that there -- I -- I think that there

19  were things going on that we were completely not

20  aware of.

21  Q      Well, first of all, you think that.  Do you

22  have any evidence that there were?

23  A      No.

24  Q      So, it's a gut reaction?

25  A      I would say that.

1    Q     Okay.  Now, you have a Ph.D. degree?

2    A     I have an Ed.D.

3    Q     Same, pretty much, aren't they?

4    A     Well, not if you have a Ph.D., probably.

5    Q     Well, you understand that gut reactions are not

6    something that are respected in the educational

7    community?  That gut is not something that is valid,

8    objectively and in decision-making; isn't that

9    correct?

10   A     No.

11   Q     That's not correct?

12   A     No.

13   Q     All right, that's fine.  So, it's your position

14   that gut reactions form the basis for personnel

15   policies?

16   A     No.

17   Q     Well, at least in personnel actions by an

18   administrator?

19               MR. KEES:  Object to form, this wasn't

20          "personnel".

21               THE WITNESS:  You asked about a

22          different request -- different question.

23   BY MR. WALKER:

24   Q     No.  I'm going to go from here.

25               MR. KEES:  This wasn't personnel,

1          John.

2    BY MR. WALKER:

3    Q     At that time, weren't you lobbying to have

4    material enhancements to Sylvan Hills High School?

5    A     No.

6    Q     Right after this happened, didn't you all

7    submit to the voters a plan for substantial

8    enhancements, if not building a new Sylvan Hills

9    School, after then?  "Yes" or "no"?

10   A     Yes.

11   Q     All right.

12   A     Because of data that was presented.

13   Q     Now, isn't it true that you knew at the time,

14   at the time you made that later recommendation, that

15   Derek Scott had tried to subordinate the plan that

16   had been submitted to the court for construction of

17   schools?

18            MR. KEES:  Don't answer, because it's

19        totally unclear what recommendation you are

20        talking about.

21            MR. WALKER:  She knows.

22            THE WITNESS:  No, I don't.

23            MR. KEES:  The record doesn't know.

24   BY MR. WALKER:

25   Q     You were aware that you all were obliged to

1   replace Mills -- not only Mills, but College Station

2   and Harris, weren't you?

3   A      No, not College Station and Harris.   Replace

4   Mills.

5   Q      You were never known -- didn't the plans say

6   that you had to replace those inferior, unacceptable

7   schools?

8   A      The plan said we had to replace Mills.

9   Q      And the plan doesn't specify.   It says -- it

10  says the schools that are deficient.   It was a court

11  order, by the way.   It was a court order.   Were you

12  aware there was a court order to do that?

13  A      A court order to replace Mills.

14  Q      So, that's your understanding.   Now, let me go

15  on.   So, for some reason you directed that Roberts be

16  terminated?

17                MR. KEES:   Object to form.

18  BY MR. WALKER:

19  Q      Did every Board member concur with you?

20                MR. KEES:   Object to form.

21                THE WITNESS:   No.

22  BY MR. WALKER:

23  Q      Which ones didn't?

24  A      Mike Kemp.

25  Q      Mike Kemp?

1   A      Mayor Kemp.

2   Q      What reason did he say?

3   A      I didn't ask.

4   Q      Did anybody explain his or her reason for --

5   did the others explain their reasons for wanting

6   Roberts gone?

7   A      This was done in an open forum.

8   Q      No.  I'm asking, did they express their reasons

9   in that meeting?

10  A      In the open forum, no.

11  Q      All right.  Now, you all also had a private

12  meeting called executive session on it, didn't you?

13  A      We had -- not over Allen.

14  Q      But it was over Doctor Guess?

15  A      It was over having a --

16  Q      And Doctor Guess, in that meeting, was

17  instructed to fire Roberts, wasn't he?

18  A      We had already --

19  Q      "Yes" or "no"?

20  A      No.

21  Q      Did you, in an open session, vote to direct

22  Doctor Guess to fire Roberts?

23  A      Yes.

24  Q      Did you ever ask Roberts to explain, by letter

25  or anything else?

1   A      No.

2   Q      All right.

3   A      I do not remember having a conversation with

4   Roberts over that.

5   Q      That's fine.  Now, this is the context in which

6   we find this.  Doctor Guess had put in place an

7   educational plan, hadn't he, to try to address the

8   educational requirements of the court with respect to

9   alleviating the achievement gap between black and

10  white students?

11  A      Yes.

12  Q      And that included these Program Administrators,

13  didn't it, among other things?

14  A      I put in place the Program Administrators, not

15  Doctor Guess.

16  Q      Well, you were with Doctor Guess at the time,

17  weren't you?

18  A      Yes.

19  Q      You worked for him?

20  A      Yes.  That was part --

21  Q      That was --

22  A      So, that was the plan.

23  Q      That was part of the plan -- that was part of

24  the equity plan to address student achievement and

25  remediation of achievement disparities, wasn't it?

```
 1    A     Yes.
 2    Q     All right.
 3    A     I agree with you the way you asked that
 4    question.
 5    Q     All right.  But I mean, if you put it in, you
 6    don't get the credit because you are not the
 7    Superintendent?
 8    A     Right.
 9    Q     So, the person who gets the credit is the
10    Superintendent.  And when I say Doctor Guess did it,
11    obviously Guess didn't do much of anything other than
12    direct people, of whom you were one; is that correct?
13    A     Correct.
14              MR. KEES:  Object to form.
15    BY MR. WALKER:
16    Q     All right.  And you put it in place.  Which
17    means, then, that you knew Ms. Pride, didn't you?
18    A     I did.
19    Q     You knew Ms. Beasley, didn't you?
20    A     I did.
21    Q     You knew Ms. -- did you know Ms. Townsend?
22    A     No.
23    Q     You came to know Ms. Townsend?
24    A     No.
25    Q     You never did?
```

1   A      I wouldn't recognize her.

2   Q      And you also knew Ms. Shirley, didn't you?

3   A      Yes.

4   Q      All right.  And at the time these Program

5   Administrators were hired, they either worked with or

6   for you; right?

7   A      Correct.

8   Q      Was their work performance satisfactory?

9   A      The ones that I hired, yes.

10  Q      All right.  In other words, you never gave

11  either one of these persons a negative evaluation,

12  did you?

13  A      No.

14  Q      What year did you leave the administration?

15  A      June 30th, 2013.

16              MR. WALKER:  Let me see the exhibits.

17          Let me have the court reporter's exhibits

18          and we will use them both places.  I will

19          try to keep the same numbers.

20  BY MR. WALKER:

21  Q      I show you what has been marked as Exhibit 3a

22  in the McNulty deposition, a document.  Can you

23  describe that document?

24  A      (Witness reviews document.)  This is the job

25  posting for the Program Administrators.

1   Q     Did you help create that document?

2   A     I believe so.

3   Q     That's right.

4   A     I just helped.

5   Q     All right.

6              MR. WALKER:  Move that as the first

7         exhibit for this deposition.

8              COURT REPORTER:  You already have a

9         One.

10             MR. WALKER:  I understand.  But I'm

11        just trying to make sure -- I'm just trying

12        to make sure that they are in both places.

13        It's still 3a, because I'm just going to

14        have them used both places.

15             (WHEREUPON, Exhibit Number 3a was

16        marked for identification.)

17  BY MR. WALKER:

18  Q     All right.  Now, tell me why you created this

19  position and what did you intend by it?

20  A      In order to raise student achievement,

21  curriculum content area was what we were using.  And

22  what we really needed was pedagogy.  We needed just

23  good teaching techniques.  Didn't matter whether you

24  taught science or social studies, English, writing,

25  you needed good pedagogy.  And so, what we were

1   looking for was Program Administrators that would go

2   in and do job-embedded PD with the teachers and not

3   "sit and get", which is what we call one time and

4   then you are gone and then who knows whether anything

5   is really going to change in the classroom.  So, what

6   we wanted were people who could actually work with

7   administrators so that they knew what they were

8   looking for in the classroom, teachers, and then go

9   back and do followup to make sure that the new

10  programs that we were bringing in place were actually

11  making changes for children.  And working with media

12  specialists, coaches and others.  But it was

13  job-embedded PD.  And I didn't need somebody who

14  taught science and was strong in science curriculum,

15  I needed somebody who was strong in pedagogy.

16  Q     That's right.  That's why you hired these -- at

17  least these three people?

18  A     Well, I didn't hire --

19  Q     Two of these -- two of these people?

20  A     Two of those people.

21  Q     All right.  And we are referring to Ms. Beasley

22  and Doctor Pride?

23  A     Correct.

24  Q     All right.  Now, the district was deficient in

25  student achievement with respect to plan 2000 under

1   your administration, wasn't it?

2   A    We were working on improving it.

3   Q    I understand.  But you were still deficient,

4   you had not been relieved?

5   A    Correct.

6   Q    And it remains deficient, doesn't it?

7   A    We are still working on improving it.

8   Q    I understand.

9   A    But we have not been relieved.

10  Q    But the point is, that when you start

11  something, it has to have time to work in order to

12  achieve the intended objectives; isn't that correct?

13  A    Correct.

14  Q    All right.  So, you don't get in the middle of

15  the stream and start changing unless and until it has

16  been demonstrated that the path you are taking or the

17  plan you are using has failed; isn't that correct?

18  A    It would be so nice if that was true.

19  Q    Well, you change things in the middle of the

20  stream all the time, is that what you are saying?

21  A    (No response.)

22  Q    Yes?

23  A    (Indicated yes.)

24  Q    All right.  You have to put it on the record.

25            MR. KEES:  You have to say "yes".

 1               THE WITNESS:  Yes.  Yes.

 2   BY MR. WALKER:

 3   Q     All right.  Now, do you know why we are here?

 4   A     I have read the case.

 5   Q     Did you have a chance to talk with Doctor

 6   McNulty this morning?

 7   A     Yes.

 8   Q     Did he tell you about his testimony?

 9   A     Not in the brief -- I mean, we only talked for

10   two minutes.

11   Q     What did he tell you?

12   A     I believe he said you were very polite and

13   cordial.

14   Q     All right.  He didn't say anything nasty about

15   me?

16   A     No, sir.

17   Q     All right.  Now --

18               MR. KEES:  And we've stipulated that

19          this is for both cases, have we not?

20               MR. WALKER:  Which is the both?

21               MR. KEES:  Beasley, et al., and

22          D'Abadie.

23               MR. WALKER:  Well, I can make it that

24          way.  But we can so stipulate.

25               MR. KEES:  Well, I mean, do you want to

1          get testimony from her on D'Abadie?

2                MR. WALKER:  Well, I will in due course

3          if it's all right with you.

4                MR. KEES:  Well, I just don't want to

5          bring her back up here later.

6                MR. WALKER:  Well, that's fine.

7                MR. KEES:  It just came to mind when

8          you asked about --

9                MR. WALKER:  She is so pleasant, I

10         would probably like to depose her again.

11               THE WITNESS:  Thank you.

12               MR. KEES:  Well, D'Abadie should be

13         pretty short, so maybe at the end --

14               MR. WALKER:  Well, we will see.

15   BY MR. WALKER:

16   Q    Now, after you all were in a huff about Doctor

17   Guess and Allen Roberts --

18               MR. KEES:  Object to form.

19   BY MR. WALKER:

20   Q    -- and Doctor Guess resigned, you all made

21   Doctor --

22   A    He didn't resign.

23               MR. KEES:  He didn't resign, John.

24               THE WITNESS:  He didn't resign.  I wish

25         he would have resigned.

```
 1   BY MR. WALKER:
 2   Q     Oh.  Y'all terminated him?
 3   A     I wish he would have resigned.
 4   Q     You all asked him --
 5              MR. KEES:  He was terminated.  You know
 6          that.
 7   BY MR. WALKER:
 8   Q     You all fired him --
 9   A     Yes.
10   Q     -- because he wouldn't fire Allen Roberts?
11   A     Yes -- no.  Can I clarify why we fired him?
12   Q     Well, first let me ask you this.  Let me go
13   through my questions.  Did you all ever give him a
14   job performance evaluation?
15   A     No.
16   Q     You knew you were required to under Arkansas
17   law to do so?
18   A     Yes.
19   Q     Is there a reason you didn't give him a job
20   evaluation?
21   A     We came on in December, his job evaluation is
22   due in January.  We didn't know him well enough to do
23   that.
24   Q     Well, that meant that you didn't know Allen
25   Roberts well enough to do what you did with respect
```

1   to him, either, did you?

2   A     We didn't request that Allen Roberts be

3   released until July.  I think it was July 18th.

4   Q     All right.  Now, are you saying that if you

5   only have a short term with the Superintendent, you

6   don't give a written evaluation?

7   A     No.

8   Q     I see.  Did you ever give Doctor Warren a

9   written evaluation?

10  A     No.

11  Q     She was on for a whole year.

12  A     Correct.

13  Q     So, how do you jibe those two answers?

14  A     Superintendent evaluations --

15  Q     I want you to jibe them, compare them.  You say

16  you didn't have enough time, then you had more than a

17  year with Doctor Warren.  But the question was, did

18  you give her an evaluation, "yes" or "no".  The Board

19  didn't even take up an evaluation for her, did it?

20  A     No.

21  Q     That's right.  Nobody was concerned whether she

22  had one, as required by law; right?

23  A     Wrong.

24  Q     What is wrong with that?  It's not required by

25  law?

1    A     I was concerned.  I knew we had to do one, by

2    law.

3    Q     But you didn't bring it up as a Board agenda

4    item, did you?

5    A     No.

6    Q     All right.  So, whatever concern you had, you

7    kept to yourself and didn't put it in the public

8    domain?

9    A     Correct.

10   Q     Thank you.  Now, was she qualified for the

11   position?

12   A     Yes.

13   Q     Was she well qualified?

14   A     That's an objective question.

15   Q     Well, since you all didn't evaluate her, you

16   had no reason to believe she wasn't; isn't that

17   correct?

18   A     I believe she was well qualified.  On July

19   18th, I believe she was well qualified.

20   Q     I see.  Did she become less qualified between

21   July 18 of that year and July 1 of this past year?

22              MR. KEES:  Object to form.

23   BY MR. WALKER:

24   Q     Did she become less qualified during that time?

25   A     No.

```
 1   Q     All right.

 2   A     Hard to become less qualified.

 3   Q     Now --

 4              MR. KEES:  John, are you meshing all

 5           this together?  I give a lot of flexibility,

 6           but discovery has to be reasonably

 7           calculated to lead to discovery for this

 8           case.

 9              MR. WALKER:  Well, I tell you what --

10              MR. KEES:  And I know there is some

11           flexibility here.

12              MR. WALKER:  I don't mind explaining to

13           you.  They have a process of doing

14           evaluations and they also have a process of

15           being a Board.  The Board doesn't get into

16           administration.  The Board doesn't direct

17           administration.  And I'm showing otherwise,

18           little by little.

19              MR. KEES:  Okay.

20              MR. WALKER:  Okay.

21   BY MR. WALKER:

22   Q     Now, do you agree that the Board was not to be

23   involved in school administration?

24   A     Yes.

25   Q     Isn't it true, though, that under both Doctor
```

1    Guess and Doctor Warren you often came over to the

2    office and went to the schools and participated in

3    various things in those places during your tenure as

4    a Board member?

5    A      I participate in Read Across America.

6    Q      No, no.  Now, you participated in some things.

7    Now, didn't you also make suggestions about

8    administration?

9    A      No.

10   Q      Didn't you make suggestions about personnel?

11   A      No.

12   Q      Did any Board members make suggestions about

13   personnel?

14   A      I can't speak for the other Board members.

15   Q      Now, you understood that it was not your role

16   to determine or even to make suggestions about whom

17   to hire or to fire?

18   A      Correct.

19   Q      All right.  Now, did you ever have any Board

20   meetings in 2017 before Doctor Guess left where Ms.

21   Palmer was called on to discuss the budget with you

22   all?

23   A      Yes.

24   Q      Did she ever present a budget reduction plan in

25   writing?

1    A     I don't remember.

2    Q     Did you all vote upon a budget reduction plan

3    in writing during Doctor Guess' tenure or Doctor

4    Warren's tenure?

5    A     I don't remember.

6    Q     Now, when you say you don't remember, is it

7    that you don't have a good memory because some of

8    this is recent, or is it that it's not significant

9    sufficiently for you to remember and, therefore,

10   something could refresh your memory?

11   A     I don't like the way you phrased the question.

12   Q     And I will change it.  I apologize.

13   A     Because things are significant.

14   Q     Is it possible that -- is it possible to

15   refresh your memory?

16   A     Yes.

17   Q     All right.  Now, were you ever given any

18   warning signals about the necessity for budget

19   reduction by your administrators?

20   A     By Doctor Guess and by Ms. Palmer.

21   Q     All right.  Was it verbal or in writing?

22   A     I would say it was in writing -- I mean,

23   verbal, in my memory.  When she would make her

24   reports to the Board, it was the fact that we are

25   losing -- we are losing deseg money, we are losing

1    children to Jacksonville.  I mean, we were constantly
2    losing enrollment.
3    Q    Let me go back.  You understood, before you got
4    there, that Jacksonville was being detached, and you
5    understood that you had a plan for detachment, not
6    only of students, but of finances.  You knew that,
7    didn't you?
8    A    Yes.
9    Q    All right.  And you also knew that you had a
10   plan for reduction of staff which was one by
11   attrition.  You knew that, too, didn't you?
12   A    For Jacksonville?
13   Q    No.  For your district, for Pulaski County?
14   A    Well, it's confusing when you bring in
15   Jacksonville with that, because --
16   Q    Well, let me just deal with --
17   A    -- there was a problem with how we were going
18   to decide who worked for Jacksonville and who worked
19   for PCSSD.
20   Q    I understand.  But that was abated within the
21   time -- within six months of the time you became a
22   Board member; isn't that correct?
23   A    It was what?
24   Q    Abated.
25   A    I would have to remember.  I don't remember

1   when Jacksonville actually split off.

2   Q    Well, Jacksonville was split by the time you

3   all fired Doctor Guess.

4   A    Okay.

5   Q    You all had been on -- been a Board at that

6   time six months.  So, that separation had already

7   occurred, Ms. Remele.  So, in terms of your budget

8   reductions, that had already taken place.  You were

9   aware of that, weren't you, "yes" or "no"?

10  A    I would need my memory refreshed.  I would need

11  to go back and look at a time line.

12  Q    Well, let me ask you this.  You know that when

13  Doctor Guess was terminated, Jacksonville was

14  detached?

15  A    That's what I'm trying to remember back.

16  Q    Let me refresh your memory.  Do you remember

17  coming to court and the court saying in 2015 and in

18  '16 that it was approving the detachment?  You were

19  there almost every time?

20  A    Yes, yes.

21  Q    Do you remember Doctor Guess presenting a

22  detachment plan and Scott Richardson saying that this

23  is our plan, and someone from Jacksonville being

24  there?  Do you remember that?

25  A    I remember that.  I just -- because I was there

1   all the time, I don't remember exactly what year,

2   what meeting.

3   Q      But you do know that at the time of -- at the

4   time that Doctor Guess was fired, that Jacksonville

5   was a separate operating district?

6   A      Yes.

7   Q      All right.

8   A      Yes.

9   Q      So, in terms --

10  A      It takes me a minute to get back to where those

11  were, because it has been two years.

12  Q      All right.  Now, in July of 2018, did you have

13  any plan for budget reduction in writing?  Did the

14  Board have a plan for budget reduction that had been

15  reduced to writing?

16  A      Only allocations.

17  Q      Only allocations.  Now, that means where people

18  -- that's money and placements; right?

19  A      Correct.

20  Q      So, you had no reduction plan; isn't that

21  correct?

22  A      That I remember.

23  Q      That's fine.  Now, under Doctor Warren, did you

24  have a budget -- a written budget reduction plan?

25  A      That would have been --

1   Q     That's "yes" or "no".

2   A     -- under Doctor Warren.

3   Q     All right.  So, you had none under Doctor

4   Warren?

5   A     Other than allocations.

6   Q     All right.  Now, did Doctor Warren present to

7   you all a manner of addressing the decline in student

8   enrollment and the revenue that would be reduced by

9   it?

10  A     She informed the Board --

11  Q     Yes.

12  A     -- verbally.

13  Q     She did.  And she indicated, did she not, that

14  with the loss of enrollment from -- within PCSSD that

15  was independent of the separation of Jacksonville,

16  that there would be some loss of enrollment and the

17  loss of state funding, didn't she?

18  A     Correct.

19  Q     And she told you that that loss could be made

20  up by attrition of staff, didn't she?

21  A     Correct.

22  Q     All right.  Did any Board member disapprove of

23  her manner of addressing that?

24  A     The Board, as a whole, disapproved of that

25  manner.

1    Q      Did they vote to disapprove of it?

2    A      They voted -- or they refused to vote on

3    allocations because that was the budget.

4    Q      They refused to vote on allocations?

5    A      (Indicated yes.)

6    Q      So, how do you refuse to vote?

7    A      Nobody makes a motion.

8    Q      Well, that doesn't mean you refuse to vote.

9    A      Well --

10   Q      That means, simply, that there was no motion

11   made, doesn't it?

12   A      Correct.

13   Q      All right.  So, the Board didn't refuse to vote

14   on it, the Board -- no Board member raised the issue.

15   Isn't that more properly the way to present it?

16              MR. KEES:  Object to form.

17              THE WITNESS:  No.

18   BY MR. WALKER:

19   Q      Well, no Board member presented it, did they,

20   for approval?

21   A      Doctor Warren presented it for approval and we

22   didn't take action on it.

23   Q      Was it an action item on your Board agenda?  We

24   have the action items on your agenda.  Do you all

25   have action items?  Old business and new business,

1   don't you?

2   A     Yes.

3   Q     Was it ever an action item?

4   A     Yes, it should have been an action item.

5   Q     Well, it should have been.  You are the Board

6   president.  Did you ever make it an action item?  You

7   set the agenda, don't you?

8   A     Yes.

9   Q     Did you ever make it an action item?

10  A     I'm sure it was an action item.  Allocations

11  are always an action item.

12  Q     Well, just a moment.  How often are allocations

13  made during the course of the year?

14  A     They come up one time in a year, in the spring.

15  Q     I see.  In the spring?  All right.  Well, did

16  it come up before or after you all had decided to

17  post the position of Superintendent?

18  A     Came up after.

19  Q     After you decided.  All right.  So, let me

20  understand this.  You all had decided to fire Doctor

21  Warren.  So, that would have been in March or April.

22  And I say that because you posted the position.  And

23  at that time, you had not considered allocations.

24  So, since you hired Doctor -- the new Superintendent

25  in April -- you did hire him in April, didn't you?

 1              MR. KEES:  Well, that's a compound
 2         question.
 3    BY MR. WALKER:
 4    Q      Okay.  You hired the new Superintendent in
 5    April, didn't you?
 6    A      I believe so.
 7    Q      All right.  Now, the month for you all to
 8    address allocations is normally April or May, isn't
 9    it?
10    A      April.
11    Q      All right.  So, Doctor Warren was on notice she
12    wouldn't be Superintendent the next year as of April
13    1st, wasn't she?
14    A      No.
15    Q      April 5th?
16    A      No.
17    Q      When was he hired?
18    A      We hired a consulting firm to look for new
19    Superintendents.  And I believe that was in November.
20    Q      Just a moment, Doctor.  Isn't it true that you
21    hired Doctor Remele on April 5th?
22              MS. SPRINGER:  McNulty.
23              THE WITNESS:  I'm Doctor Remele.
24    BY MR. WALKER:
25    Q      I mean, Doctor Warren -- no.  Doctor McNulty on

1   April 5th?  That's "yes" or "no".

2   A     I would have to look at the date.

3   Q     All right.

4   A     But, yes, that sounds close to right.

5   Q     And isn't it normal that you would deal with

6   your budget or what you call allocations in either

7   the April or the May meeting?

8   A     Correct.

9   Q     All right.  But Doctor Warren didn't get a

10  chance to present any allocations, did she?

11  A     No.  That's wrong.  That's wrong.

12  Q     She did?

13  A     She did.  She presented allocations in April.

14  Q     She presented the allocations in April?

15  A     In April.

16  Q     And you all -- did y'all take the position at

17  that time you wouldn't act on them until you got a

18  new Superintendent?

19  A     No.

20  Q     But nobody moved to approve or disapprove those

21  allocations; right?

22  A     Correct.

23  Q     All right.  Now, at that time, were Ms. Beasley

24  and Ms. Pride performing satisfactorily?

25  A     I wasn't their supervisor.  I don't know.

1   Q      Were you informed by anyone that they were not?

2   A      No.  I was not informed about anything about

3   anybody.

4   Q      Have you ever been informed that they were not

5   performing their work satisfactorily?

6   A      No.

7   Q      Now, let me fast-forward.  Do you remember

8   interviewing Doctor McNulty on or about April 5th?

9   A      Yes.

10  Q      Do you remember the Board considering several

11  applicants?

12  A      Yes.

13  Q      After all of the interviews were completed, did

14  you all have a Board meeting to compare the

15  applicants?

16  A      In executive session.

17  Q      How long did that meeting last?

18  A      It was an all-day meeting.

19  Q      How long?

20  A      I don't remember.  A couple of hours.

21  Q      Couple of hours?

22  A      I mean, the interviews and then the meeting

23  afterwards was a couple of hours.

24  Q      Now, what date did you -- how much time passed

25  between the date of the last interview and the date

1   you offered employment to someone?

2   A    It was the same day.

3   Q    Same day.  And right after Doctor McNulty's

4   interview, you offered him employment within an hour?

5   A    I don't believe so.

6   Q    If he says so, would you agree or disagree?

7   A    I would disagree.

8   Q    Oh, I see.  What is your recollection -- now,

9   you all were in executive session; right?

10   A    Correct.

11   Q    Did you all make a comparison of all the

12   applicants in terms of Superintendent experience, in

13   terms of education, in terms of objective criteria?

14   A    Yes.

15   Q    In writing?

16   A    Yes.

17   Q    Where are those writings?

18   A    I would assume the HR Department has it.  We

19   collected everything.

20   Q    Was the HR Department present then?

21   A    No.

22   Q    Well, where is your objective determination

23   that you all -- your comparison, your scores and all?

24   Did you all have scores?

25   A    We had scores.

1   Q      Where are those scores kept?

2   A      HR.  We turned everything over to HR.

3   Q      I see.  Which of the two, McNulty or Doctor

4   Warren, had the greater experience as a

5   Superintendent in a large district?

6   A      Warren.

7   Q      Which of the two had the greater tenure in

8   education?

9   A      "Tenure" meaning years?

10   Q      Yes.

11   A      Warren.

12   Q      Which had a degree for the longest period of

13   time?

14   A      I don't know.

15   Q      Which one had experience in dealing with a

16   bi-racial population?

17   A      Both.

18   Q      Doctor Warren had it continuously, he had it

19   for four years; isn't that correct?

20   A      I would have to go look.

21   Q      Did he tell you that the school from which he

22   came had failing schools?

23   A      No.

24   Q      Did he tell you that the black schools in his

25   town of Waterloo were the deficient ones?

1    A       No.

2    Q       He didn't tell you that?

3    A       No.

4    Q       Y'all didn't ask him?  Did y'all ask him?

5    A       I do not remember that question.

6    Q       That's fine.  That's fine.  Now, let me go to

7    what happened thereafter.  Were you the one to

8    communicate the fact of his hiring to him?

9    A       Yes.

10   Q       All right.  Were you the one to negotiate his

11   hiring package?

12   A       Yes.

13   Q       Did you do so with Doctor Warren?

14   A       Yes.

15   Q       You were the one to do that?

16   A       Yes.

17   Q       Were you the one to communicate to Doctor Guess

18   that he was fired?

19   A       That happened in an open Board meeting.

20   Q       Were you the one that communicated to him?  Was

21   he at that Board meeting?

22   A       Yes, sir.

23   Q       I see.  All right.  Now, after he was hired,

24   did you give him any instructions with respect to

25   allocations?

1    A     No.

2    Q     Did anyone on the Board give him directions

3    with respect to allocations?

4    A     I can't speak for that.  I don't know anyone at

5    the Board talked to him.

6    Q     Did the Board pass any -- just a second.  Did

7    the Board pass any motions to address budget cuts?

8    A     The Board did not pass any motions.  The Board

9    had discussion.

10   Q     Only discussions.  Now, do discussions have the

11   force of Board action?

12   A     No.

13   Q     Did you give him any instructions with respect

14   to cutting the budget?

15   A     I did not give McNulty directions to cut the

16   budget.

17   Q     Did you give him suggestions about cutting the

18   budget?

19   A     Absolutely not.

20   Q     What did you tell him about budget cuts?

21   A     I didn't talk to Doctor McNulty about budget

22   cuts.

23   Q     You had no conversation with him about budget

24   cuts?

25   A     Not that I remember.

1   Q      Did you authorize Paul Brewer to talk to him,

2   "yes" or "no"?

3   A      The Board -- yes.

4   Q      The Board did that in a motion?

5   A      No.  The Board did that.

6   Q      Wait a minute.  I only asked about motion.  So,

7   did the Board say in motion that Paul Brewer would be

8   the one to communicate with Doctor McNulty?

9   A      Not in a motion.

10  Q      Not in a motion.  Who was the one to suggest

11  that Paul Brewer be the one to talk to McNulty?

12  A      I don't remember who specifically said it.  I

13  would have said that multiple Board members said --

14  Q      But nobody took the step to have a motion

15  passed; right?

16  A      Nobody made a motion.

17  Q      In that meeting, was Doctor Warren present?

18  A      Yes.

19  Q      Why would you instruct Mr. Brewer to have the

20  conversation with Mr. McNulty when Doctor Warren was

21  present?

22  A      It was not to not do it with Doctor Warren.  We

23  just said, "Consult the incoming Superintendent about

24  changes."

25  Q      Who did you tell to do that?

1   A      Paul Brewer.

2   Q      You told Paul Brewer?

3   A      (Indicated yes.)

4   Q      So, you circumvented Doctor Warren.  Can you

5   explain why?

6   A      Because Paul Brewer was the one that was on the

7   stand presenting allocations.

8   Q      So, he was the one to present the allocations?

9   A      Paul Brewer was the one that presented the

10  allocations.  It was his report.

11  Q      So, what you all said was that since he

12  presented the allocations, he should be the one to

13  talk to the Superintendent.  Is it your testimony you

14  never talked to him about anything?

15                  MR. KEES:  Who is "him"?

16                  THE WITNESS:  I talked to Doctor

17         McNulty about his --

18  BY MR. WALKER:

19  Q      Other than his contract?

20  A      -- contract, when he was moving here.

21  Q      Did you tell him who should be cut?

22  A      No.

23  Q      Did you tell him what department should be cut?

24  A      No.

25  Q      Did you tell anybody that the Program

1    Administrators should be cut?

2    A      No.

3    Q      Did Paul Brewer tell you that the Program

4    Administrators should be cut?

5    A      Paul Brewer brought a packet of who was to be

6    cut.

7    Q      Was that in the allocations?

8    A      In the allocations the second time.

9    Q      No.  The first time.  I'm talking about the

10   first time.  The first time, in the allocations did

11   he present a package that involved cutting of

12   anybody?

13   A      No, he did not.

14   Q      Did you all direct him to redo the allocations?

15   A      Yes.

16   Q      Was that by Board motion?

17   A      No.

18   Q      All right.  So, somebody said, "Go back, Paul,

19   and redo this"?

20   A      Correct.

21   Q      Well, why didn't you tell Doctor Warren to go

22   back and redo it?

23   A      Because Paul Brewer was presenting the

24   allocations.

25   Q      Wasn't he subordinate to Doctor Warren?

1   A     Yes.

2   Q     Wouldn't ordinarily Doctor Guess be the one to

3   present the allocations --

4   A     No.

5   Q     -- in previous years?

6   A     HR.  It's an HR.

7   Q     Had Paul presented these allocations for the

8   past five or six years?

9   A     HR has always presented the allocations.

10  Q     HR.  Now, let me ask you, Doctor, did you talk

11  to Ms. Alicia Gillen regarding budget cuts?

12  A     No.

13  Q     Did you talk to any Board member regarding

14  budget cuts?

15  A     No.

16  Q     Did you ever talk to a Board member away from

17  the office on any subject?

18  A     Yes.

19  Q     Was that a frequent thing or an occasional

20  thing?

21  A     No.

22  Q     I see.  What would be the subjects y'all talked

23  about?

24  A     Shelby Thomas and I?

25  Q     Anybody?  I'm just interested in you bringing

 1   up Shelby Thomas.

 2   A     Shelby Thomas and I are friends, and I know he

 3   just adopted his granddaughter.

 4   Q     Well, my question is, since you all had these

 5   Board meetings, you had meetings away from the Board

 6   with -- we have pictures, of you and Ms. Alicia

 7   Gillen at a school.  Do you remember being there at a

 8   school with her?

 9   A     Now, we often show up at functions together.

10   Q     Do you all discuss Board business at those

11   times?

12   A     No, it's against the law.

13   Q     Well, I understand it's against the law.  Now,

14   were you aware that Ms. Alicia Gillen was on

15   Facebook?

16   A     Yes.

17   Q     Were you aware that she was discussing Board

18   matters on Facebook -- executive committee matters

19   and Board matters on Facebook?

20   A     Not executive committee matters.

21   Q     Well, Board matters?

22   A     Board matters.

23                  MR. WALKER:  Let me see that.

24   BY MR. WALKER:

25   Q     Do you remember Ms. Gillen, in effect, saying

1    that there were going to be budget cuts next year,

2    doing this in February of 2017 -- February of 2018, I

3    guess, and at that time she made suggestions about

4    cuts?

5    A    I am not aware of her making suggestions about

6    who should be cut.

7    Q    Well, some --

8    A    Or positions that should be cut.

9    Q    Well, did someone tell Doctor McNulty, to your

10   knowledge, that he should cut the Program

11   Administrators?

12   A    No.

13   Q    Did Paul Brewer say that -- did he ever tell

14   y'all in the first meeting that the Program

15   Administrators should be cut?

16   A    In the first meeting when he stood before the

17   Board and presented the allocations, he did not make

18   any recommendations of positions that should be cut,

19   to my recollection.

20   Q    Did you all tell him who to be cut?

21   A    Absolutely not.

22   Q    Now, you understood that these minutes, these

23   -- your administrative data show that the cuts were

24   first called RIFs.  Were you aware of that?

25   A    I was not at the time.  I am now.

1    Q     I will show you a document that is titled

2    "Reduction in Force".  Have you seen that before?

3    A     (Witness reviews document.)  I believe that's

4    part of the policy, Reduction in Force policy.

5    Q     I see.

6    A     Yes, I have seen it before.

7    Q     What is your recollection of the use of the

8    RIF, Reduction in Force process, to get rid of the

9    Program Administrators?  What is your recollection of

10   how that came about?

11   A     My recollection was that it was not a Reduction

12   in Force.

13   Q     But you understand that it was called that?

14   A     I do now.  But that was not how that was --

15   HR's way of doing it.  But what we were doing was

16   looking at cutting the budget.

17   Q     Just a moment.  It was first presented by Paul

18   Brewer to you all as a Reduction in Force, wasn't it?

19   That's "yes" or "no".

20   A     When you say "first presented".

21   Q     Yes, ma'am.  First time --

22   A     Paul Brewer, the first time he came, he didn't

23   reduce anybody.

24   Q     No, I didn't say he reduced.  He didn't have

25   the power.  Only y'all had the power.

1    A    Right.  But he didn't recommend any reductions.

2    The first time allocations came, he didn't recommend.

3    Q    And at the second meeting, did he recommend it?

4    A    I wasn't at the second meeting.

5    Q    There was never a second meeting?

6    A    I was not at the second meeting.  There was a

7    second meeting.

8    Q    What is your understanding about his

9    recommendation at the second meeting?

10    A    I was not in attendance the second meeting, so

11    everything I would --

12    Q    You have been at Board hearings regarding these

13    people.  Is it your recollection, based upon all the

14    testimony and evidence and documents, that Paul

15    Brewer recommended a Reduction in Force or not?

16    A    I was not at a hearing for these people.

17    Q    Oh, you weren't?  So, you never -- all right.

18            MR. KEES:  I think you were with your

19      mom; right?

20            THE WITNESS:  I was with my mom.

21    BY MR. WALKER:

22    Q    Now, how do you decide whether a Reduction in

23    Force takes place?

24    A    Follow the recommendations of the

25    Superintendent.

1   Q     Well, let me ask you about this Reduction in

2   Force.  Do you know whether the Superintendent ever

3   recommended that these people be terminated and that

4   Ms. Shirley be reduced?

5   A     I was not at that meeting.

6   Q     No.  I'm asking, do you know?

7   A     I believe her signature is on the form.

8   Q     Whose signature?

9   A     Doctor Warren's.

10  Q     Now, isn't it true that at the hearing, Doctor

11  Warren said that these were not her recommendations?

12  A     I wasn't at the hearing.

13  Q     All right.  Did you read the transcripts?

14  A     No.

15  Q     Are you now informed that she said that she did

16  not recommend that these people be terminated?

17  A     If you are telling me that.

18  Q     Are you not aware that the Board expressly said

19  that, "We directed that this be done"?

20  A     I have understood that the Board directed her

21  to recommend that.

22  Q     Would you, based on your experience and

23  training, would you not agree that that is Board

24  interfering with the administration?

25  A     No.

1                    MR. KEES:  Object to form.

2    BY MR. WALKER:

3    Q     Tell me why not.

4    A     Because the Board is responsible for being

5    fiscally sound.

6    Q     It may be.  But in terms of being fiscally

7    sound, y'all can only act on recommendations; isn't

8    that correct?

9    A     Correct.  But we have to --

10   Q     Now, if the Board directs a recommendation,

11   isn't that the same as the Board making a

12   recommendation?

13                   MR. KEES:  Object to form.

14                   THE WITNESS:  We didn't recommend who

15          to be cut.  We just recommended a slimmer

16          budget.

17   BY MR. WALKER:

18   Q     Well, you understood -- while you were absent,

19   you were still talking back here to people.  Do you

20   recall I called you during that time and you recall

21   telling me that you were -- do you recall that

22   conversation?

23   A     No.  I absolutely believe you, Mr. Walker, but

24   I don't remember having a conversation with you when

25   my mother was dying.

```
 1   Q     That's fine.  I won't --
 2   A     You would think I would, because that's a
 3   significant conversation.  But I don't remember that.
 4              MR. KEES:  Well, you had family things
 5         on your mind.
 6              THE WITNESS:  Pardon?
 7              MR. KEES:  You had family things on
 8         your mind.
 9              THE WITNESS:  I don't remember.  I
10         can't believe I wouldn't remember it, but I
11         don't remember having a conversation with
12         you.
13   BY MR. WALKER:
14   Q     Are you aware of this item on the budget for
15   2018 and '19 allocations?  And I'm going to just let
16   you read it on the cell phone.
17   A     On the screen?
18   Q     On the screen.
19   A     (Witness reviews document.)  Yes, I'm aware of
20   that.
21   Q     So, that means that the Board became the
22   administrator and the Board at the same time, doesn't
23   it?
24              MR. KEES:  Object to form.
25              THE WITNESS:  The Board was looking at
```

1          staying fiscally sound.

2     BY MR. WALKER:

3     Q     Well, you weren't there.  But I'm only asking

4     you a question.  You don't know what the Board was

5     looking at because you weren't there.  My point,

6     though, is when the Board directs administrative

7     action, it's usurping the role of the administration,

8     isn't it?

9     A     No.

10    Q     Have you all ever, in any other occasion,

11    directed the Superintendent to do a particular thing

12    and have the Superintendent disagree with you and

13    then you all went ahead and overruled him?  Not only

14    overruled him, told him he had to do it, or she?

15    A     I would say the Roberts Law Firm was probably

16    the same situation.

17    Q     Oh.  So, you all -- there are no minutes to

18    reflect that?

19    A     No.

20    Q     No minute.

21    A     But Doctor Guess told us that he wouldn't work

22    without Allen Roberts.

23    Q     And this is something more specific --

24    A     And I did talk to Doctor Guess to try to

25    convince him.

1    Q      To get rid of Roberts?

2    A      No -- well, to get rid of Roberts and to stay

3    on as Superintendent.

4    Q      I see.  Even though there was no basis for

5    getting rid of Roberts?

6                     MR. KEES:  Object to form.

7    BY MR. WALKER:

8    Q      You had no basis for getting rid of Roberts?

9                     MR. KEES:  Object to form.

10   BY MR. WALKER:

11   Q      I have gone through the letter.

12                    MR. KEES:  Asked and answered.

13   BY MR. WALKER:

14   Q      You had no basis for that, did you?

15   A      I disagree.

16   Q      All right.  Succinctly, tell me what the reason

17   that you had for getting rid of Roberts.

18                    MR. KEES:  Object to form.

19                    THE WITNESS:  There were communications

20              going on behind our back that we weren't

21              even informed of, and we no longer had

22              trust.

23   BY MR. WALKER:

24   Q      Just a moment.  You understand that when people

25   act in an administrative capacity, they are not to

1   act until they have some action, and they don't --
2   they are not obliged to tell you of their
3   negotiations, are they?
4                MR. KEES:   Object to form.
5   BY MR. WALKER:
6   Q     Are they, Doctor?
7   A     When it becomes final, I think there is.
8   Q     Well, when it becomes final.   There was no
9   finality there, was it?
10  A     I disagree.   We thought there was.
11  Q     Tell me what is final there.
12  Q     I thought there was.
13  Q     Tell me what is final there.   Whatever you
14  think is not relevant.   Tell me, right now, objective
15  -- what, objectively, what was final there?
16               MR. KEES:   I'm sure what she thinks is
17           relevant.
18  BY MR. WALKER:
19  Q     One thing that was final?   And read it for the
20  record.
21               MR. KEES:   She testified the whole
22           letter, John.
23               MR. WALKER:   You are helping your
24           witness?
25               MR. KEES:   You are just being

1              argumentative at this point.

2                   MR. WALKER:  I'm not argumentative.

3                   MR. KEES:  Yes, you are.

4                   MR. WALKER:  I'm asking her to specify

5              now, because she keeps coming back to it and

6              relying on --

7                   MR. KEES:  It was the fact that he was

8              even engaged in negotiations without their

9              information or belief, and she has testified

10             to that.

11                  MR. WALKER:  Well, that's fine.  That

12             will be fine for me.  But the court directed

13             that those things happen, explicitly

14             directed that we negotiate, explicitly, and

15             there is a court order to that effect.

16                  MR. KEES:  And she has testified that

17             this Board was not made aware of the

18             negotiations.

19                  MR. WALKER:  Well, the court gave an

20             order.

21                  MR. KEES:  Well, you can disagree with

22             it, John, but she has already testified to

23             this.  So, you have testified to that.

24                  THE WITNESS:  Yes.  Okay.

25                  MR. WALKER:  No, wait a minute.  Are

1          you instructing her not to answer?

2               MR. KEES:  What is your question?  She

3          has answered this in detail.

4    BY MR. WALKER:

5    Q    No, no.  You said that he acted -- Mr. Roberts

6    acted without Board permission; right?

7               MR. KEES:  No.

8               THE WITNESS:  No, I did not ever say

9          "Board permission".

10   BY MR. WALKER:

11   Q    Without letting you know what he was doing?  He

12   took action without informing the Board; is that

13   right?

14   A    Of final things.

15   Q    Of final things.  And I'm just asking you to

16   identify any one thing, Doctor.

17   A    We felt that the letter was a final -- we felt

18   the letter was -- I felt the letter was final action.

19   Q    All right.

20               MR. KEES:  Will you please send that to

21          somebody to print, Joy, so we can make it an

22          exhibit?

23               MR. WALKER:  We will do that.  Well,

24          let's just tell you what it is.

25               MS. SPRINGER:  Let me see if I can do a

1          screen shot and then I'll see if I can send

2          it to you.

3   BY MR. WALKER:

4   Q      All right.  Now, Doctor Remele --

5                  MR. KEES:  What is it, for the record?

6          It's the Board minutes of when?

7                  MS. SPRINGER:  Yes, that's all it is.

8                  MR. KEES:  Will you send it to me?

9                  MS. SPRINGER:  I don't even know your

10         phone number.

11                 MR. KEES:  Well, you can do it on

12         e-mail.

13  BY MR. WALKER:

14  Q      Did the Board have any objective -- did the

15  Board have any objective reasons, as far as you know,

16  of focusing in upon the Program Administrators and

17  Ms. Shirley?

18  A      Absolutely not.

19  Q      You don't know or they didn't have?

20  A      We did not have.  We were not focusing in on

21  any specific people.

22  Q      Well, aren't you aware that Paul Brewer came up

23  with this list of people?  That these are the Board

24  -- this is Exhibit One in the other.  That these are

25  the Board directed reductions?

1   A      (Witness reviews document.)  I have not seen

2   that until --

3   Q      Let me stop you.

4   A      -- today.

5   Q      No.  You were -- that's right.  You weren't

6   present at the hearing.  That's fine.  But you and

7   Paul are friends, aren't you?

8   A      Yes.

9   Q      You all are social friends, as well as friends,

10  professionally?

11  A      I think that's a determination of social.

12  Q      Well, you all interact away from work?

13  A      He lives two blocks away from me.

14  Q      You all go to -- you visit each other from time

15  to time?

16  A      I have never been in his house.

17  Q      But he has been to yours?

18  A      One time.

19  Q      That's fine.  But you all are social friends,

20  aren't you?  You have been out to eat with him?

21  A      Maybe once.

22  Q      That's fine.  Now, look at that list.  Are

23  those the people that were scheduled to be

24  terminated, according to Mr. Brewer?

25  A      I don't know names.  I don't know who Beckham

1    is, I don't know who Ms. Ray is.

2    Q    You know Doctor Tackett?

3    A    I know who Doctor Tackett is.  I believe that

4    is a list of the people that were going to be

5    terminated.  I believe it is.

6    Q    Thank you.  Okay.  But you are saying that, as

7    far as you know, the Board did not direct that the

8    Program Administrators be terminated and that Ms.

9    Shirley be reduced in status, in pay?

10   A    I am very confident in saying I know of no

11   direction.

12   Q    Would there have been -- is there any objective

13   reason for focusing upon the very people you put in

14   place to address student achievement?

15   A    No.

16   Q    Okay.

17   A    The only reason I know was, we were looking at

18   budget cuts and we wanted them as far away from the

19   classroom as possible.

20   Q    Well, you all did not have in mind terminating

21   Paul Brewer, who had really never been hired on a

22   full-time basis, did you?  That's as far away from

23   the classroom as possible.  You cut nobody in

24   Personnel.  Now, that's far away from the classroom.

25   A    We weren't making the cuts.  We told Paul

1    Brewer to --

2    Q     It was up to Paul?

3    A     -- recommend, to bring us back better

4    allocations with cuts in it.

5    Q     So, you didn't tell Doctor Warren to do that?

6    A     No.

7    Q     That's fine.

8             MR. WALKER:  Let me have a few minutes.

9         Let us step out just a moment.

10            MR. KEES:  Y'all can have the room.

11        There are more of y'all.

12            (WHEREUPON, a break was taken.)

13   BY MR. WALKER:

14   Q     Thank you, Doctor Remele.  When you set up this

15   program for the Program Administrators, did you

16   contemplate that they would be working directly with

17   the schools?

18   A     Yes.

19   Q     Did they do so?

20   A     I was only here a year.

21   Q     Well, during that time --

22   A     That time.

23   Q     -- did they do so?

24   A     Yes.

25   Q     All right.  Is there anything else you want to

1    tell me about your discriminatory practices?

2              MR. KEES:  Object to form.  Don't

3         answer.

4              MR. WALKER:  No, you don't have to put

5         that question in.  I don't have any more

6         questions, Doctor Remele.

7              MR. KEES:  Do you want to ask her

8         anything about --

9              MR. WALKER:  If you want me to, I'll do

10        it.

11             MR. KEES:  Well, I don't want to do

12        another hour, but --

13             MR. WALKER:  Well, I don't mind doing

14        D'Abadie.  We can go on and do a second

15        deposition, or we can just make it an

16        addendum to this and we just stipulate that

17        it will be used for that.

18             MR. KEES:  Let's just do that.

19                    ---o---

20

21

22

23

24

25

```
 1    (ADDENDUM IN REGARD TO D'ABADIE:)

 2    (HERE AND UNDER SEPARATE COVER.)

 3

 4    WHEREUPON,

 5                        LINDA REMELE,

 6    having been called for examination, and having been

 7    first duly sworn, was examined and testified as

 8    follows:

 9                     DIRECT EXAMINATION

10    BY MR. WALKER:

11    Q     Would you state your name?

12    A     Linda Remele.

13    Q     Do you know a lady named Ms. D'Abadie?

14    A     I know who she is.  I wouldn't recognize her,

15    but I know that she has been to a hearing before us.

16    But it has been a while.

17    Q     Have you ever had a conversation with Derek

18    Scott?

19    A     Yes, I have had lots of conversations with

20    Derek Scott.

21    Q     Did you hold him in high regard?

22    A     No.

23    Q     When did you come to not hold him in high

24    regard?

25    A     I believe I was hired June 20th, 2011.  Maybe
```

```
 1   July 1st, 2011.
 2   Q     All right.
 3                MR. KEES:  Wait.  I thought he asked
 4        you about high regard for --
 5                THE WITNESS:  For Derek Scott.
 6                MR. KEES:  Yes.  Did you just answer
 7        when you were hired?
 8                THE WITNESS:  Yes.
 9                MR. KEES:  I'm sorry.
10   BY MR. WALKER:
11   Q     When did you begin to not hold him in high
12   regard?
13   A     Pardon?
14   Q     When did you begin to understand that he was an
15   unsavory character?
16   A     Fairly shortly after I was hired, was what I
17   was trying to state.
18                MR. KEES:  Oh, I'm sorry.
19   BY MR. WALKER:
20   Q     What were your experiences with him that led to
21   that conclusion on your part?
22   A     The way he talked to people, his interactions.
23   Q     Did you have any unpleasant encounters with him
24   personally?
25   A     No.  I would like to say I hold my own.
```

1    Q    Well, I understand.  Did you all have any
2    adversities?
3    A    We did not always agree on things.  But if you
4    ask me to list a specific thing right now that we did
5    not agree on, I could not do that.
6    Q    When did you become aware that he had
7    responsibility for helping participate in addressing
8    facility improvement or changes?
9    A    Well, his job title would have always been that
10   he was over construction of new facilities, updates.
11   I mean, you know, painting buildings, putting in new
12   flooring.  He has always had that in that job.
13   Q    Did you ever observe any traits that you
14   considered to be racial on his part?
15   A    Once again, you are going to ask me specifics,
16   and I can't give specifics.
17   Q    Just give me a general answer first.
18   A    But if I give you that general gut level
19   feeling --
20   Q    All right.
21   A    -- yes.
22   Q    All right.
23   A    And I realize gut level doesn't mean anything
24   to you, but this is where I think gut level does mean
25   something.  You just get that feeling.

1  Q     Well, you know, I guess the problem I have with

2  gut is that I can look at my man there and tell that

3  he is awfully intelligent, or I can tell that he is

4  awfully dumb.  I have had a Superintendent tell me

5  something like that in Watson Chapel, "I can look at

6  a person and tell they are smart."  I don't know how

7  you can look at someone.  But he said that was based

8  on his gut.  And that's my concern, it's so

9  subjective and incapable of being objectified.

10        Now, when did you all develop the plans for

11  Sylvan Hills to be materially enhanced as a high

12  school?

13  A     After the second lien bonds passed.  And I

14  believe that was in June 2017.

15  Q     That's after you all had been to court to say

16  that you were going to make great strides to equalize

17  and build a new facility at Mills, at least; right?

18  A     That came before we were on the Board.  That

19  was back in 2015.

20  Q     But you all -- after you all got on the Board,

21  Doctor Guess -- Doctor Guess had a plan to address

22  facilities, didn't he?

23  A     Doctor Guess had a plan to address facilities,

24  yes.

25  Q     And you were aware at some point that we

1    objected, didn't you, to Mr. Derek Scott's

2    participation in that?

3    A     No, I was not aware of that at the time.

4    Q     Were you aware that Mr. Guess used racial terms

5    in treating students and people in the College

6    Station community?

7    A     Mr. Guess?

8    Q     Not Guess.

9    A     Never.

10   Q     Mr. Derek Scott used those terms?

11   A     I heard it.  I was not -- I never heard it out

12   of his mouth.  I heard accusations.

13   Q     Did you ever see the report that was prepared

14   by Doctor Warren and Mr. Sam Jones regarding his

15   elevation of Robinson School ahead of Mills?

16   A     After it was filed with the court, I saw it.

17   Q     Did the Board take any action regarding that?

18   A     I consider we have taken a lot of action

19   regarding that.

20   Q     Here is my concern.  You spent 40 plus million

21   dollars for a middle school and $40 million for a

22   high school.  How can the high school be equal to the

23   middle school under those circumstances?  You

24   understand that middle schools are always less

25   expensive than high schools; is that right?

1  A     It depends upon the size of the building and

2  the student population.

3  Q     Well, you understood, though, that you all

4  determined the size of the building and the student

5  population by the boundary lines you draw.  You all

6  re-drew those boundary lines to make Mills of lower

7  population than it had been; isn't that correct?

8  A     If you are asking if -- when you say the word

9  "you all", you mean the Board?

10  Q     The Board, yes.

11  A     No, the Board did not do that.  That was done

12  before we had a Board.

13  Q     Oh.  So, that was done by Doctor Guess?

14  A     It was actually done by Doctor Warren, re-drew

15  the boundary lines, I understand.

16  Q     You understood that at one time Mills and

17  Sylvan Hills were the same size, if not Mills was

18  larger.  You understood that, didn't you?

19  A     Many years ago.

20  Q     Well, you also understood that College Station

21  and Harris were larger than one or two of the

22  elementary schools in West Little Rock in terms of

23  enrollment, didn't you?

24  A     I worked at Harris --

25  Q     You understood they had a larger --

1    A       -- in 1970 when we had 1,100 children there.

2    Q       All right.  Now, y'all built a new school to

3    replace a couple of the schools in what I call the

4    white community, Chenal and one or two others, that

5    their enrollment was 200 or less.  Do you remember

6    that?

7    A       I was not here at that time when Chenal was

8    built.

9    Q       You were not here.  Now, were you aware -- you

10   don't have any knowledge about D'Abadie, do you?

11   A       I sat in on the hearing.  I remember very

12   little about the hearing.  But I did sit -- I was in

13   the hearing at that time.

14   Q       Did you ever get a complaint regarding her

15   treatment from Ms. D'Abadie?  She said she sent you

16   an e-mail.

17   A       Yes.

18   Q       Did you look into the matter at that time?

19   A       I referred it to the Superintendent, which is

20   my job as a Board member.

21   Q       Other than that, did you look into it?

22   A       No.

23   Q       Now, I'm trying to understand this.  You all

24   looked at some other matters and had discussion about

25   them, but you -- but you referred this to the

1  Superintendent?

2  A     Employee complaints?  I don't remember ever

3  looking into an employee complaint.

4  Q     Well, you didn't have any complaints from these

5  people, these Program Administrators and Ms. Shirley,

6  that they were not being fairly treated?

7  A     I don't remember Ms. Shirley sending me an

8  e-mail, or Ms. Pride or Ms. Beasley sending me an

9  e-mail.  But if they did, I would have done the same

10  thing, I would have turned it over to the

11  Superintendent.

12  Q     Tell me, why was it necessary to reduce Ms.

13  Shirley's pay?

14  A     I wasn't in on that meeting when this --

15  Q     That's fine.

16  A     -- Paul Brewer turned that.

17  Q     You don't know why it was necessary?

18  A     So, there was no justification given --

19  Q     I see.

20  A     -- that I -- I mean, I wasn't there to hear a

21  justification given.

22  Q     You would have to really be stretching if you

23  cut $10,000.00 from a person's pay and then you try

24  to equalize it by then cutting $10,000.00 from

25  another person's pay, meaning Mr. Danny Ebbs.  When

1   you are talking about $5 million, that's pretty

2   minuscule, isn't it?

3   A     $10,000.00 is minuscule, I will agree, between

4   $5 million.  It takes a lot of $10,000.00 to get up

5   to $5 million.

6   Q     Yes, that's right.  All right.  Since you don't

7   know anything about Ms. D'Abadie, I won't have any

8   other questions.

9   A     No, I don't really remember.

10                  MR. KEES:  Just briefly.

11                  CROSS EXAMINATION

12  BY MR. KEES:

13  Q     You remember getting an e-mail from Ms.

14  D'Abadie?

15  A     Now that you tell me, I do.  I mean, I do

16  remember getting an e-mail.

17  Q     Do you remember the substance of the complaint

18  -- of the e-mail?

19  A     I believe it was Derek Scott, the substance of

20  the e-mail was Derek Scott.

21  Q     Did you take any action besides forwarding that

22  to the Superintendent?

23  A     No.

24  Q     And then, at her hearing -- did you get the

25  e-mail before her hearing on the nonrenewal of her

1   position?

2   A      Yes, yes.

3   Q      Okay.  Did the fact that she reported some

4   activity to you in an e-mail, did it have any bearing

5   or consequence on your decision?

6   A      No.

7   Q      Did you rely on the evidence that was presented

8   at the hearing?

9   A      At the hearing.

10  Q      And as we sit here, all you can remember from

11  the e-mail is that it was a complaint and it involved

12  Derek Scott?

13  A      It involved Derek Scott.

14  Q      If she had complained about Derek Scott, would

15  you have any reason to have held that against her?

16  A      No.

17                 MR. KEES:  Thank you.

18                 THE WITNESS:  I have already testified

19          that I did not hold Derek Scott in high

20          esteem.

21                 REDIRECT EXAMINATION

22  BY MR. WALKER:

23  Q      All right.  Now, let me ask you, since he has

24  asked those questions, isn't it true that there was

25  no Reduction in Force the year before?

1    A      I would have to go back and look at records.

2    No Reduction in Force, but we may have cut the

3    budget.

4    Q      You may have cut budget.  But you understand

5    when you cut budget, it has got to be objective,

6    don't you?  You can't just go in and say, "Well, I'm

7    going to cut this person and that person."  It has to

8    be objective; right?  Isn't it true that the Board

9    had not issued a cut the budget directive the year

10   before or during that year with respect to the plant

11   maintenance staff and the other nonclassified people?

12   A      Doctor Guess -- the year before, Doctor Guess

13   had issued a cut the budget.

14   Q      All right.  But it was a Reduction in Force,

15   wasn't it?

16   A      I don't know if it was a Reduction in Force or

17   if it was cut the budget.  To me, it was a cut the

18   budget.

19   Q      Well, now, he didn't have the discretion to

20   just cut the budget without following policy, did he?

21   A      No.

22   Q      You have to follow the policy.  That's right.

23               MR. WALKER:  I don't have any more

24         questions.

25               MR. KEES:  Thank you, Doctor Remele.

1          (WHEREUPON, at 1:15 p.m., the taking of

2     the above-entitled deposition was

3     concluded.)

4                    ---o---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Exhibit One.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

# ALLEN P. ROBERTS, P.A.
## ATTORNEYS AT LAW

Allen P. Roberts
allen@aprobertslaw.com
Nate Roberts
nate@aprobertslaw.com
Camden Office
325 Jefferson St. /P.O. Box 280
Camden, AR 71701

Telephone:  (870) 836-5310
Facsimile:  (870) 836-9662

Whitney F. Moore
whitney@aprobertslaw.com
Little Rock Office
1818 N. Taylor St., Ste. B
PMB 356
Little Rock, AR 72227

May 12, 2017

## PERSONAL AND CONFIDENTIAL COMMUNICATION

*Via Electronic Mail Only*
johnwalkeratty@aol.com
John W. Walker
John W. Walker, P.A.
1723 Broadway
Little Rock, Arkansas  72206

EXHIBIT
1
*Remele*

    Re:   PCSSD Stipulation

Dear John:

    John, I believe the following accurately reflects my comments during our phone conversation on Monday, 8 May 2017, following my receipt of your CONFIDENTIAL COMMUNICATION email received by me at 1:26 p.m. on that date.  This is the written response I promised you reflected those comments.

    1. Dr. Warren will be recommended by Dr. Guess as Deputy Superintendent with full authority of a Deputy at the meeting of PCSSD school board in June, 2017.

    2. Dr. Guess has directed Whitney Moore and me to make our first order of business the investigation of certain allegations and complaints against Derek Scott.

    3. I represent to you in good faith it is my belief that Mr. Paul Brewer intends to retire at the end of this year or next year.

    4. No.

    5. I will review the personnel files of Donald Booth, Tony Adams, and Dr. Veronica Perkins to identify anything therein that might justify a name-clearing for any of them.

    6. Whitney and I will be able to negotiate in good faith to resolve the complaints of:

     a. Mr. Kenneth Moore
     b. Mr. Danny Bryan
     c. Ms. Cindy D'Abadie
     d. Ms. Marion Carter

    7. Joshua may provide information to PCSSD regarding potential applicants, and the Human Resources department shall consider that information when filling future positions, in accordance with current PCSSD policies.

    8. All administrators who are quartered within the PCSSD central office will be required by 2018-19 to hold the certification considered necessary by ADE for the job held by that particular employee.

    Thank you very much.

                          Sincerely,

                          */s/ Allen P. Roberts*

                          Allen P. Roberts

1    McNulty Exhibit 3a.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROGRAM ADMINISTRATOR

Pulaski County Special School District

Category:          Administrative Job Postings

Employment Type:          Full Time

Building:          LEARNING SERVICES

Location:          ARKANSAS



Summary

POSITION TITLE:  PROGRAM ADMINISTRATOR

QUALIFICATIONS:  Master's Degree in English or Math
Valid K-12 Arkansas Teaching License, Elementary K-6/1-6
Curriculum/Program Administrator or Building Level Administrator Licensure
A minimum of five years experience as a teacher

REPORTS TO:   Deputy Superintendent for Learning Services

JOB GOAL:   To provide leadership and professional development in the implementation of Arkansas State Standards for K-12.

Qualification

PERFORMANCE RESPONSIBILITIES:

1.    Develop, plan, and provide job-embedded quality professional development to assist administrators, instructional coaches, media specialists, and classroom teachers in the implementation of Arkansas State Standards.  This will include twenty-first century researched-based best practices, sound pedagogy, higher-order thinking skills and effective integration of instructional technology.
2.    Coordinate the process of formative assessments for all schools in the district
3.    Disaggregate, analyze, and interpret formative and interim assessment data to help the school and the district develop a plan for school improvement
4.    Evaluate the effectiveness of instructional practices and devise plans for systemic improvement
5.    Monitor the district curriculum to ensure it is aligned with State Standards in English, Math , Science and Social Studies
6.    Possess a working knowledge of principles of supervision, curriculum mapping, researched-based best practices, and student-centered coaching models
7.    Possess good oral and written communication skills and relationship skills with all people
8.    Oversee the district curriculum committee to review and revise the curriculum on an annual basis
9.    Stay abreast of new ideas and innovations concerning classroom instruction, curriculum, and current research and be able to implement these ideas into the district's overall plan and vision
10.    Direct the textbook adoption process as outlined in board policy
11.    Research the options of electronic textbooks and other resources and make recommendations to the Deputy Superintendent
12.    Assist the Director of Counseling with the process of course approval /revisions
13.    Assist in the process of course catalog/description revision
14.    Identify and request needed resources
15.    Assist with PLC's and building job-embedded professional development
16.    Assist in the recommendation of hiring instructional coaches, media specialists, and other classroom teachers  as requested by the administrator
17.    Work collaboratively with the other members of Learning Services to ensure continuity of program delivery throughout the district and increase student achievement in all schools
18.    Work with the media specialists and instructional technology to infuse the utilization of instructional media  and appropriate technology resources by teachers and students

19. Provide leadership in the recommendation of policies related to instruction and media
20. Promote the role of media services and informational technologies in the school and community
21. Support and assist the district in meeting the goals of the Desegregation Plan 2000
22. Perform other duties as assigned by the Deputy Superintendent

Program Administrator cont.

TERMS OF EMPLOYMENT:

Salary Range:      Teacher Salary Schedule  x Certified Administrative Index
Length of Contract:   244 contract days

EVALUATION:

Performance of this job will be evaluated in accordance with the provisions of the Board's policy of Evaluation of Professional Personnel.

APPLICATION PROCEDURE:

Interested and qualified applicants should submit an online application at www.pcssd.org.  Personnel currently employed by the district who meet the necessary qualifications may apply by submitting an online District application.

APPLICATION DEADLINE:   May 3, 3017 (or until filled)

IT IS THE POLICY OF THE PULASKI COUNTY SPECIAL SCHOOL DISTRICT TO PROVIDE EQUAL OPPORTUNITIES WITHOUT REGARD TO RACE, COLOR, NATIONAL ORIGIN, RELIGION, SEX, AGE, QUALIFIED DISABILITY, OR VETERAN IN ITS EDUCATIONAL PROGRAMS AND ACTIVITIES, EDUCATION SERVICES, FINANCIAL AID, AND EMPLOYMENT.  THE DISTRICT WILL MAKE SPECIAL EFFORTS TO EMPLOY AND ADVANCE WOMEN, BLACKS AND DISABLED PERSONS.  EQUITY CONCERNS MAY BE ADDRESSED TO THE ASSISTANT SUPERINTENDENT FOR EQUITY AND PUPIL SERVICES.

Qualification Details
**A:** Has any of the following endorsement(s):
- CURR PROG ADM CURR
- CURR SPEC K-12
- Curr/Prog Admin/ Curriculum 7-12
- PROG/CURR ADMIN 7-12
- PROG/CURR ADMIN P-8

**B:** Has one of the following degree(s) or above:
- Master's Degree

Posting Schedule
The posting is open for internal applicants
Open Date: At the start of 5/8/2017
Close Date: Open until filled

The posting is open for external applicants

Open Date: At the start of 5/8/2017

Close Date: Open until filled

1                     C E R T I F I C A T E

2

3   STATE OF ARKANSAS    )

4                        )  ss.:

5   COUNTY OF PULASKI    )

6

7            I, DEBBYE L. PETRE, Certified Court Reporter

8   and notary public in and for the County of Pulaski,

9   State of Arkansas, duly commissioned and acting, do

10  hereby certify that the witness herein was by me

11  first duly sworn to testify the whole truth and

12  nothing but the truth prior to taking down in

13  Stenotype the questions, answers, and proceedings

14  during said deposition, and from such recordation was

15  thereafter reduced to print by means of computer-

16  assisted transcription, and the same fully, truly,

17  and correctly reflects the proceedings had.

18            I FURTHER CERTIFY that the above deposition

19  was given by the witness and taken at the times and

20  in the place hereinabove set forth.

21            I FURTHER CERTIFY that I am not attorney or

22  counsel of any of the parties, nor am I relative or

23  employee of any attorney or counsel or party

24  connected with the action, and have no interest in

25  the outcome or results of this litigation.

93

1   WHEREFORE, I have subscribed my signature

2 and affixed my notarial seal as such notary public at

3 the City of Little Rock, County of Pulaski, State of

4 Arkansas, this the 10th day of June, 2019.

5

6

7       _____

8       DEBBYE L. PETRE, CCR

9       NOTARY PUBLIC IN AND FOR

10      PULASKI COUNTY, ARKANSAS

11

12

13

14 My Commission Expires:

15

16 August 4, 2020.

17

18       ---o---

19