Response to Dr. Remele's Malicious Criticism and Unsubstantiated Allegations
Issues Leading to a Lack of Confidence in Dr. Warren

1. Hired on July 18 (Tues) [July 18, 2017]

   Plaintiff's Response:   To my surprise, Dr. Remele asked me to join the Board in Executive Session.  I entered the room, and all seven board members sat around the table.  Dr. Remele initiated the conversation by stating, "We would like for you to fill the Interim Superintendent position for PCSSD."  I responded, "That's odd; you rejected the Superintendent's recommendation last month (June 2017) for me to be Deputy Superintendent."  Gillen immediately responded, "No, no, that had nothing to do with you."  The other Board members agreed.

   I accepted the Board's recommendation but told them, "I am a person of integrity, and I will not do anything illegal or immoral because I answer to a higher being, and I didn't look good in orange."  They laughed and we returned to open session where the recommendation was made public.

2. On July 19, I hear she is having paneling in Superintendent's office-later find out it was removed

   Plaintiff's Response:  On July 19, I spent most of the day meeting with the outgoing Superintendent, Dr. Jerry Guess, in his office and helping him pack boxes.  I am not sure what day that week the Executive Director of Operations, Derek Scott, approached me about painting the office to lighten it up because of the dark walls.  He said that was in his 3-yr SRM budget.  He stated, "CO was the last phase of the plan."  I requested that the old couch that Dr. Guess had in there be removed.  Dr. Guess had gotten it from Goodwill so he could sleep there on nights of late board meetings, so he didn't have to drive to Camden.

3. August 28 attend a meeting with Dr. Warren and Will Reid to preview pictures of Mills and Robinson athletic facilities.  I already have an appointment to go see Robinson that afternoon since I would not be there to attend the grand opening on the 31st. I go to meals immediately after the meeting. I asked dr. Warren to hold off notifying the rest of the board until I can see the issue for myself. She disregards me request and immediately called the rest of the board to come in to see slides.

   Plaintiff's Response:  On or about the 28th of August, I received a phone call from an irate Mills High parent concerning the fieldhouse at Mills and the one at Robinson High.  The parent alleged that PCSSD built one facility for black kids and one for white kids.  I called Will Reid, Executive Director of IT, and him to get video footage of each facility and bring it back to me. I could not leave due to a scheduled meeting.  He reported back to me that we were in trouble because it was crystal clear we had major discrepancies.  He and I viewed the video together.  I immediately started calling Board members and scheduled them separately to visit my office to

PLAINTIFF EXHIBIT 65

view the video.  All came over the next few days, except for board member, Eli Keller, who had viewed the video in Will Reid's office at Maumelle High.  I also notified the District's attorney, Sam Jones, to view the footage.

4. Email of supplemental report to court sent to board on September 5th. This was filed without board input and Dr. Warren represented it numerous times to Sam Jones that the board supported this document. The majority of the board was unaware of the creation of this document.

    Plaintiff's Response:  I never represented anything to Sam about the Board supporting a document.  The District started filing these Status Reports in 2015, right after the Jacksonville detachment.  To my knowledge, the Board never received a copy of these reports.  It was and still is filed quarterly by the attorney and the only persons receiving a copy are the Superintendent and Assistant Superintendent for Equity and Pupil Services.  When the September 5, 2017 Status Report was filed, Dr. Remele instructed Sam Jones to blind copy her on anything he sent to me.

5. We were never forwarded the original court document filed a week earlier by Sam Jones

    Plaintiff's Response:  To my knowledge, status reports had not been forwarded to the Board by the previous Superintendent or legal counsel.  In my previous role as Assistant Superintendent for Equity and Pupil Services, I received a copy for our desegregation filings but I was not aware of the Board reviewing it.  It never occurred to me to send them a copy of the previously filed August 25, 2017, Status Report and no one asked me for a copy.

6. Email dated September 6th indicates Sam got it to you right before it was filed but you had been working on several draft of the document for at least four days prior to sending it to us. I called you on the morning of September 5th and you said you were meeting with Sam right then to draft a response. I specifically asked if I could help and you quickly said NO. That I had helped enough when I told you the date the CAB heard the first report on Robinson. You chose not to include anyone on the board in the writing of the report. You also met with John Walker at 2 p.m. to let him see the report prior to sending it out to the board later on September 5th.

    Plaintiff's Response:  On September 5, I had a meeting with WD&D, the architect for Mills, and Sam Jones attended.  The architect shared information regarding meetings with the former Director of Operations and how we got to where we were in the design and construction.  Sam used this data for the Sept. 8 status conference with Judge Marshall and others.  I met with Dr. Remele at 10 a.m. on Sept. 7 to get her approval of the Board agenda, and I apprised her of all the findings stated in the September 5th Status Report.  Also, I did not meet with Mr. Walker on Sept. 5 to let him see the report.  Sam Jones said he would provide Mr. Walker with the report because he did not want Mr. Walker to read about it in the newspaper or hear about it from anyone else.

7. September 12 in executive session the board reminds you that you are interim and just to keep the ship afloat. Not make major changes and not remodel offices. You respond by telling us how we won't find a better superintendent than you.

   Plaintiff's Response:  My response regarding my lengthy experience and expertise as a Superintendent was my way of assuring the Board that although "interim" was in my title, I was not a gatekeeper and would fulfill the duties of Superintendent in all sincerity.  Dr. Remele, echoed by Mrs. Gillen on occasion, were the only members who reminded me that my title was "interim."  However, Dr. Remele usually followed the response with "but we want you to apply for the permanent position."

8. Sept 22 I hear you have purchased and installed new furniture in your offices. I call you and tell you as a friend that the board as a whole would not be happy with this as we told you not to remodel and I suggested you send the furniture back. You said you didn't think you could and I assured you the company would take it back as they do a huge volume of business with us and want to continue outfitting three new schools.

   Plaintiff's Response:  The office desk was on bricks. I had the desk replaced along with the credenza and six chairs for the conference table.  Dr. Remele called and told me she heard I had new furniture and to box it up and return it because the Board would be upset. I told her I would not ask the vendor to take it back.  On the night of the board meeting before the meeting started, I asked board members present, I don't recall if Kemp or Maune were present at the time to stop in my office to view the furniture.  All had a perplexed look as to what I was talking about.  This was a budget item from Mr. Scott's Sustainability Restoration and Modernization (SRM) budget.

9. Sept 25 you invite several of the board members into your office to see the new furniture and explain that it was the superintendent's office turn to be remodeled. This was not true. The office had already had new carpet put down and been updated. The new furniture was  an unnecessary expense and even if Derek Scott suggested it in trying to win your favor you should have been a wise Steward of the district's money and declined any new purchases as an interim supt.

   Plaintiff's Response:  I stated to Dr. Remele that the Superintendent's office was the final stage of three phases (3 years) of renovations at the central office.  In year 1, the central office's hallway flooring was redone and some floors received new furniture.  In year 2, flooring was redone in all office areas and new furniture.  The office area of Equity and Pupil Services was part of phase 2. This was a part of the District's Sustainability Restoration and Modernization (SRM) budget that was allocated years prior to me moving into the Superintendent's office.

10.  During preservice days in August it became apparent that you were moving all testing responsibilities to the media specialists. I talked to you about this and you said you would check on it. This resulted in the LaJuana Green agreeing to the counselors accepting responsibility for the summative assessments only.  Media specialist still would do the majority of the testing.

    When I suggested closing the media centers for training and testing was an unacceptable idea you said we would hire subs for the media specialist. This unnecessarily increases the cost of our substitute and our budget for Subs. We do not hire subs for counselors. In past times counselors dealt with many mental health issues of students but currently all schools have a mental health provider and most cases are referred to them. The counselors have the time to deal with testing. Media specialist are already the technology person in the school and with the one-on-one initiative that takes a lot of additional time without the added burden of all the testing. I have personally spoken to you on several occasions about my concern on this issue but have received no satisfaction as you are not going to return the counselors being responsible for testing.

    <u>Plaintiff's Response</u>:  Once again, Dr. Remele inserted herself in a matter that was not a policy issue or question for the Board.  It was a personal issue to her; one of the media specialists was her best friend.  The Director of Counseling and Assessment, LaJuana Green, had always been in charge of the District's testing plan.  Each school submitted their plan and testing committee, a minimum of three persons to her.  Those three included the counselor, media specialist, instructional coach and sometimes the AP.  That particular year, the Director of Federal Programs notified us that Instructional Coaches could no longer assist or administer the summative assessment because it was State required and State category fund were used for payment.  Therefore, we assigned interim/formative assessments to coaches and summative assessments to media specialists. Because the volume of the work and time spent preparing, testing was overwhelming for everyone.  Dr. Remele's friend complained to her.

11. You said the 4 high schools would continue to hire a testing coordinator. As of the meeting on Nov 2 I believe all 4 high schools have a testing coordinator but that has not relieved the media specialist at those 4 high schools of the testing responsibility. The newly hired coordinators are on contract and working but have been told to only take over a helping role and the media specialist is still the responsible person for testing up until the summative testing and then they will be in charge of the testing. This is another COST item. We are paying for 4 testing coordinators who are not coordinating testing until April.

    <u>Plaintiff's Response</u>:  Once a Testing Coordinator was hired for a high school, the Media Specialist assisted the Coordinator in transitioning testing responsibilities.  I am not certain how long this process took because it took the Human Resources Department several months (Spring) before each school had a coordinator.

12. You were hired in 2012-13 school year as the Elem Dir. At the end of that year you assume the additional role of assistant superintendent for desegregation. That means you are beginning your 6 year as an employee of pcssd. On Oct 31 you refer to yourself as an outsider in a construction meeting. 6 years is no longer an outsider. You have been in a position of authority as assist supt for deseg for 4 years. You are partially responsible for any disparity in the building of Mills.  This was your job to see the district followed Plan 2000.  On Nov 1 you had a principals meeting where you tell them that they have not been following Plan 2000. If that is true then it is your fault as that was your job. You cannot blame other people for PCSSD being out of compliance with plan 2000 for the past four years.

<u>Plaintiff's Response</u>:  Certainly, part of my job as Assistant Superintendent for Equity and Pupil Services is oversight of Plan 2000.  However, each section of the Plan has a person directly responsible for that area.  I take no responsibility for the inequities created in the facilities projects at Mills and Robinson.  Changes in the Plan were submitted to the Court and public were under the direction of Superintendent Guess, my supervisor, and the Executive Director of Operations, Derek Scott.  At most Principals' meetings, I make a reference to Plan 2000 and the District not being unitary yet.  I constantly reminded everyone that PCSSD has been subject to 38 years of Federal Court supervision because we have not met our obligations.

I also take part in leading the process to implement strategies and systems that lead to student success.  I have been and will continue to be a support to principals.  Dr. Remele's "blame game" theory needs to be redirected.

Additionally, after seven years with PCSSD, I still sometimes reference myself as an outsider.  Until now, most administration and other staff have 20+ years-experience with PCSSD.  Until the new administration came on board last year, I was "the new kid on the block." That statement brought laughter from the group and still does.  This is light humor and an easy method of establishing rapport with my audience.

13. At summer administrator meetings you tell the principles it was unacceptable that we did not have higher academic achievement. Once again, you have been the Elementary Director for 5 years and you bear the burden of raising student achievement.

    <u>Plaintiff's Response</u>:  I still tell those who are C and D schools it's unacceptable.  We continue to work together to increase one letter grade.  Dr. Remele's attempt to hold me solely responsible is part of her malicious criticism.  If the office holder is solely responsible, the she bears responsibility for not ending the achievement gap during her tenure as Director of Elementary Education (2002-2004), Deputy Superintendent of Academic Accountability (2011-2012), and Deputy Superintendent of Learning Services (2012-2013).

14. On Wed Oct 25 a potentially dangerous situation occurred at SH Freshman Academy. The board was not notified of this and had to hear it from the community later that night. I called you about it on Thursday to see why we were not notified and why Freshman Academy and Cato were not placed on lockdown. You indicated you had just heard the details that morning. That it is not true and should not be true. Your staff should keep you aware of any potential threat to students and staff and I know they did. You did not choose to inform the Board and did not question why the schools were not placed on lockdown once it was determined a threat have been made against a school.

    <u>Plaintiff's Response</u>: I do not recall an incident at Sylvan Hills Freshman campus. Sylvan Hills and Cato shared Officer Turner, the SRO placed there by the Sherwood Police Department.  If either campus needed to be on lockdown because of a threat, Officer Turner would have put them on lockdown and notified me later.  Neither Mr. West, Principal at Sylvan Hills Freshman

Campus, nor Mrs. Lee, the Principal at Cato, recall the incident that Dr. Remele alleges occurred.

Numbers 15-19: These were part of the interrogation conducted by Dr. Remele in Executive Session during the November 14, 2017, meeting. Dr. Remele stepped out of the Executive Session and asked me to join them. As I entered the room, I sensed tension. Board member Tina Ward sat to herself, at the end of the table, with a very angry look on her face. Board member Keller slid over toward her apparently to console her. When I sat down, Dr. Remele and Board member Gillen were near the head of the table. Remele started questioning me:

15. 11/14/17 ordered a hundred and fifty imprinted umbrellas for central office staff to give as Christmas gifts. Cost of $2,436.84 was told it would be an audit finding as you can't do that with taxpayer dollars. Dr. Warren said she was told it was not an audit finding. I know she was told exact opposite.

    Plaintiff's Response:  Dr. Remele said: "We understand you purchased umbrellas for gifts for the central office."  I replied "Correct. I spoke to the auditor on how I could do it."  Remele and Gillen kept going back and forth about this being illegal and the District would be cited.  This was about ten minutes of lecture from Remele and Gillen.  I do believe Board member, Kemp, interjected a comment at some point.  I listened without objection because I already planned to pay for the umbrellas myself.  Each month, I planned an event for the Central Office personnel so that the Central Office team could develop positive, productive working relationships.  In December, I hand delivered each person an imprinted umbrella and thanked them for their continued dedication and service to the District.

16. 11/14/17 Told to stop hiring subs for an administrator when there is another administrator in the building. She said this was past practice. I reminded her it was not practice when we were both in the district.

    Plaintiff's Response: Next, Dr. Remele stated, "We use too many substitutes for administrators. When I was in the District, we didn't get "subs" for administrators." Dr. Remele continued:  "Be mindful, it is the responsibility of administrators to work with Human Resources to acquire certified subs.  They made me aware when they were out."

    I did not implement the acquiring of subs as Interim Superintendent.  By this time in Executive Session, I realize this is Dr. Remele's "show" to tell me what to do and an attempt to create in the minds of the other members of the Board questions about my suitability for the position of Superintendent.  So, I stopped explaining and began writing. I asked if there was anything else. November 14, 2017, was also the date of the first presentation by a superintendent search company. McPherson & Jacobson, LCC, made its presentation to the Board about its services.

17. 11 / 14 / 17 Questioned about trip to Kansas City. She said ADE told them to visit and those going where Tackett, Reid, Altschul, Burgess and Whitfield. She failed to tell us that she and Clayton were also going. Also pretty sure ADE did not have them on a list to

visit. We explained the perception of all these trips when we have no money.

Plaintiff's Response:  In November 2017, the District was not aware of its financial deficit.  According to the CFO, we were on budget at that time.  The KC trip was a part of our School of Innovation initiative.  The KC school was one that the ADE highly recommended and they sent the AR School of Innovation representative on the trip as well.  Those attending from PCSSD were myself, Will Reid (Director of Instructional Technology), Sam Altschul (Director of PD/Federal Programs), John Tackett (Director of Secondary Education), the two principals whose schools we selected for implementing the program -- Jeff Senn (Maumelle High) and Duane Clayton (Mills High).  This trip was essential training for those who were responsible for implementing and ensuring success.  I don't recall Burgess being included among those participating. Dr. Remele stated, "We were going too much."

18. 11 / 14 / 17 told her to stop hiring Cherrie Johnson.

    Plaintiff's Response:  Dr. Remele's next statement, "I told you to stop using Cherrie Johnson." Other board members didn't know who Mrs. Johnson was, so I shared that she was a retired PCSSD administrator that the District often used.  Human Resources (HR) regularly called her because she was a licensed evaluator, TESS, and could step in long term when an administrator was out.  Dr. Remele interrupts and asserts, "She's a thief! I don't want anyone working for our district who stole money from us."  The other board members and I are looking at her wide-eyed and I said, "What are you talking about?"  Dr. Remele responded, "We don't want her in our District, but don't associate my name with it."  I asked, "What does that mean?" She stated, "Don't tell her I'm the reason she can't work."  Red flag! I guess Dr. Remele read my expression because she said "Call Jay Bequette; he can tell you all about it."

    I called Jay Bequette the next morning. He vaguely remembered Cherrie Johnson but he said he'd get back with me.  He did.  According to Jay, Cherrie Johnson was the Principal at Harris that Linda brought to the Board for termination.  He said, "Neither the Superintendent nor the Deputy Superintendent supported the recommendation to terminate."  "They would not terminate because no one would testify against the lady, but they did move her the next year."

19. 11 / 14 / 17 told her to start following policy on overtime and it must be approved prior to it being taken

    Plaintiff's Response:  I wasn't aware that we weren't following the Overtime (OT) Policy. I'm still not certain what caused Dr. Remele to assumed we were not complying with the Policy or who had advised her we weren't.  Staff OT in PCSSD was high then and it continues to be high.  However, once monthly, Shawn Burgess, then Director of HR, brought the OT report to a Cabinet meeting so that each supervisor could confirm previously approved OT.

20. 4 district admin show up for the ASBA conference in Jan. It was not a joint conference

<u>Plaintiff's Response</u>:  In January 2018, several PCSSD administrators attended the ASBA School Law Conference.  Those attending were Shawn Burgess (Director of HR), John Tackett (Director of Secondary Education), Sherman Whitfield (Interim Assistant Superintendent for Equity and Pupil Services), Stephanie Cole (Director of Special Education) and myself.   The Arkansas School Board Association (ASBA) and the Arkansas Association of Educational Administrators (AAEA) conduct a School Law Workshop usually the second semester of each school year.  Usually 5-7 district administrators attend.  We still attend. With the approval of their immediate supervisors, Administrators have the right to select conferences and to receive reimbursement.

21.  Slush fund comment in board meeting about fund balance

<u>Plaintiff's Response</u>:  I am not certain what this is in reference to.  Therefore, I can't deny or affirm that I made the comment.

22. Handling of issue at Robinson HS with gun. No police and AP chewed out for doing the right thing

<u>Plaintiff's Response</u>:  On January 25, 2018, the gun incident Dr. Remele referred occurred at Robinson High. Initially, there was a concern that a student was selling drugs on the parking lot.  LRPD was called.  After further investigation, it was determined that the sale involved a gun and not drugs, marijuana.  The gun was never found.  The students involved were recommended for expulsion by the Principal and the Assistant Principal, AP. Neither I nor the AP, Brady Bratcher, remember a chewing out.  The AP provided me a copy of the police report; the Police report is attached.

23.  Lance Levar issue

<u>Plaintiff's Response</u>:  Lance Levar, Principal at Robinson Middle School, became frustrated during one of our administrators' meetings about Plan 2000.  He announced to the group that he was "sick of the attention we have to give black students."  Lance went on a rant. There was an exchange of verbal disagreements between him and Mr. Whitfield, who was presenting at the time.  I intervened and the room became silent.  I said to Lance and everyone in the room, "We're under a 30-year federal desegregation order that says we discriminate against black children; until we do what we were supposed to do to eliminate disparities, we will follow Plan 2000."  I further stated that anyone who could not comply with Plan 2000 needed to look elsewhere for employment.  Lance's mother and Dr. Remele are bridge partners.  So, Dr. Remele likely knew about the meeting before everyone left the building.  Jason Young, Sylvan Hills Elementary Principal, called me a few days later to let me know that Dr. Remele was calling principals about my conduct in the meeting.  The irony of this allegation is that after 10 months with PCSSD, Superintendent McNulty demoted Lance Levar to AP at Bates Elementary.

24.  Repeatedly berating the principals for perceived building discrepancies at Mills and Rob

<u>Plaintiff's Response</u>:  In general, I don't berate the principals or anyone; I did and still state the facts and speak the truth.  We have those critical conversations whenever necessary.  I have never blamed the principals for the discrepancies that Derek Scott created.