**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**


**JANICE HARGROVE WARREN**                                    **PLAINTIFF**


   **V.**                     **Case No.:  4:19-cv-655-BSM**


**CHARLES MCNULTY, ET AL.**                                    **DEFENDANTS**


PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


STATEMENT OF FACTS

Pulaski County Special School District ("PCSSD") has the honor of being the nation's school district with the longest record of Federal Court supervision for racial inequities. During the 31st year of its supervision, former Superintendent Jerry Guess, driven by a vision of unification, knew of Janice Warren's earlier successes in substantially reducing the achievement gap between White and Black children, and re-establishing fiscal integrity of a school district in fiscal distress with declining enrollment and a shrinking economic base.  All of this had been accomplished during her ten-year leadership as Superintendent of Crossett School District. Dr. Guess urged her to join his team in 2012 as Director of Elementary Education.  Dr. Warren applied.  Plaintiff's Exhibit 38, Warren's Application for Director of Elementary Education (Public Record Exception to hearsay).

With more than ten years of successful multicultural education experience at the district level, Janice Warren commenced her tenure with PCSSD's with an infectious smile that communicated to all, "We can get this done!" In May of 2013, the duties of Interim Assistant Superintendent for Equity and Pupil Service were added to her responsibilities.  Complaint ¶ 16. Margie Powell, then Federal Monitor in the Little Rock Office of Desegregation Monitoring for the United States District Court, observed in her 2014 Update on the Status of PCSSD's Implementation of Its Desegregation Plan, that after a little more than a year, Janice Warren, while assigned both roles of Interim Assistant Superintendent for Equity and Pupil Service and Director of Elementary Education, both full time jobs, "managed to shepherd the District to within reach of obtaining unitary status."  Plaintiff's Exhibit 1, p. 40.

In an unlikely turn of events Jerry Guess was terminated on July 18, 2017.  The District's new Board, six months in its infancy, didn't like his handling of then 36-year desegregation lawsuit.  Plaintiff's Exhibit 20, Guess' Letter to Keller.  Janice Warren, a Black female, was asked to assume the District's leadership role.  She was PCSSD's first female to lead the District and the third Black to hold the office of Interim Superintendent.  In the District's prior 34-year history, it had hired six White males and three Black males to serve as Superintendent. Two of the Black males were Interim Superintendents when promoted to Superintendent. Complaint ¶18; Plaintiff's Exhibit 74, PCSSD's Superintendent History.

The disparate treatment by the Board commenced, immediately.  The Board led by Linda Remele, a White female, offered and paid Dr. Warren $195,000, $20,000 or 9.3% less, for the same work that Jerry Guess received $215,000 annually from 2011-2016, when the District's status of fiscal distress under Arkansas law made it subject to State control. Plaintiff's Exhibits 4,

Warren's 2017 Contract_ Interim Superintendent; 33 Superintendent Guess' 2011-2013, 2016-2018 Contracts) (See page 28, *infra*, for a discussion of PCSSD's prior treatment of Dr. Warren).

Despite the inequitable salary, Janice Warren commenced her tenure as Interim Superintendent with a "flawless transition and commencement of the academic school year." Plaintiff's Exhibit 55, Board Minutes, August 8, 2017. Shortly, thereafter, when the racial inequity in the construction of District facilities, harkening back to the District's 1950's separate and unequal treatment of Blacks, was revealed, the District fortunately had Janice Warren at its reins. No high level coverup would transpire. The boil of racial discrimination would be lanced and those responsible would resign.

On or about August 24, an irate Mills parent called Dr. Warren and complained about the inequitable construction of Mills High School's athletic facility in the predominately Black community as compared with the Robinson Middle School athletic facility in a predominately White community. After assessing the validity of the complaint, Dr. Warren notified each Board member and scheduled each for a viewing of the video footage that compared the two athletic facilities. Plaintiff's Exhibit 12, p. 68, lines 8- p. 69, line 8, Deposition of Janice Warren ("Warren Deposition"). With the District's Attorney, Sam Jones, she began a proactive process of notifying, correcting, and minimizing as much as possible more than a twenty-million-dollar act of racial injustice to the predominately Black community within the District. Chief Justice Price Marshall commended the District on its proactive notification to the Court of the problems. Plaintiff's Exhibit 12, pp. 120, line 18, p. 121, Warren Deposition (Fed. R. Evid. 801_ not offered for the truth but that it was said).

Seven days after the Court was notified of the inequities by the filing of an updated status report and four days after the status hearing in Federal Court, Linda Remele, the White female

Board President, began on September 12, 2017, at the Board's meeting, a campaign to discredit and taint Janice Warren's impeccable professional history. Defs. Ex. I ("Remele's List").  At this same meeting, the Board, as an official act, decided to commence its search for a permanent superintendent.  Plaintiff's Exhibit 75, Minutes Sept. 12, 2017; Complaint ¶ 22.  Rather than being celebrated, Janice Warren was denigrated and belittled, wrongfully accused of a lack of fiscal integrity, and labeled as incommunicative by Linda Remele and Alicia Gillen, the other White female member of the Board. Motivated by racial animus and "same class" bias, Remele told the 25-year district level education veteran, "We don't air our dirty laundry" and "Just keep the ship afloat." "You're just an interim." Plaintiff's Exhibit 12, pp. 103, line 23 - p. 104, line 25, Warren Deposition; Plaintiff's Exhibit 9, p. 139, line 22 - p. 140, line12, Deposition of Linda Remele ("Remele Deposition").

Linda Remele began compiling a list of malicious criticisms and false, factually erroneous accusations.  Plaintiff's Exhibit 45, Plaintiff's Assessment of Defense Exhibit I, Plaintiff's Exhibit 65, Warren's Response to Remele's List.  Remele's List, inadmissible hearsay with double hearsay entries of events not within Linda Remele's personal knowledge, is being championed by the Defendants as evidence of legitimate reasons for the Board's retaliatory conduct, its justification for not including Janice Warren in the pool of finalist for the position of Superintendent, and not hiring Janice Warren as a permanent Superintendent.  Defendants' Brief in Support of Defendant' Motion for Summary Judgment ("Defs. Brief"), at pp.  19-22.

While asserting friendship and feigning the desire for Janice Warren's success, Linda Remele had staff to monitor and report the Interim Superintendent's every move; Releme called building principals and inquired about the Interim Superintendent's presentations and discussions. "I hear."  "They tell me."  "I told you."  These words often fell from Remele's lips.

This is the environment in which the first Black female Interim Superintendent worked.  When Jerry Guess, a White male, was the District leader, he operated insulated, functioning independently as a "silo with zero communication. "Plaintiff's Exhibit 10, Gillen Deposition, p. 45, line 23 through page 46, line 18 (not hearsay, not offered for the truth of the statement but Gillen perception of the male superintendent's operational methods).

At its November 14, 2017, meeting, Remele and Gillen verbally attacked Dr. Warren's performance again with their lists of accusations further poisoning the perception of the Board's majority male membership against Dr. Warren's suitability for the position.  That same night, the Board received its first presentation by a third-party provider of its superintendent search services and the second on November 29, 2017.  Plaintiff's Exhibit 60, Minutes, November 14, 2017.  The Board voted to hire Ray and Associates at its December 12, 2017. Plaintiff's Exhibit 40, Minutes December 12, 2017. Plaintiff's Exhibit 61, Deposition of Dr. Linda Remele, Beasley v. Dr. Charles McNulty, No.4:18-cv-508-DPM, page 50, lines 18-19 ("Remele depo_Beasley"). The PCSSD Board did not give Dr. Warren an evaluation of her performance as Interim Superintendent before the Board hired Ray and Associates. Complaint ¶ 24; Plaintiff's Exhibit 61, p.133, lines 9-24, Plaintiff's Exhibit 9, Remele Deposition.

Ray and Associates posted the PCSSD's Superintendent opening with PCSSD online at https://www.pcssd.org/superintendent-search. Plaintiff's Exhibit 21.  The application deadline was March 12, 2018.  Dr. Warren applied for the position of PCSSD Superintendent in early 2018. Thirty-six individuals submitted applications for the opening, 14 women and 22 men. Plaintiff's Exhibit 54.  On March 27, 2018, Ray and Associates presented nine individuals, included Dr. Warren, two Black females and seven men -- three White and four Black, screened

as Top Candidates.  These satisfied PCSSD's ten qualifications and were recommended to the PCSSD Board for interviews.  Plaintiff's Exhibit 21, Superintendent Search Ad.

On March 27, 2018, the PCSSD Board selected three males, two Black and one White, for final interviews. In violation of her contract rights and its own policies, the Board did not invite Dr. Warren to interview.  Plaintiff's Exhibit 43, Board Minutes dated March 27, 2018; Plaintiff's Exhibit 7, PCSSD Transfer & Promotion Policy.  The PCSSD Board did not give Dr. Warren a reason for not including her as a finalist, and the Board did not provide her with an evaluation of her performance as Interim Superintendent. Plaintiff's Exhibit 9, Remele's Deposition at p. 133, lines 9-24.

Linda Remele, PCSSD Board President, does not dispute that Dr. Warren was qualified for the position of Superintendent and does not dispute that Dr. Warren did not become less qualified for the position of Superintendent between the time Dr. Warren was appointed Interim Superintendent and when Dr. Warren applied for the position of Superintendent.  Plaintiff's Exhibit 61, p. 40 Remele Dep._Beasley.  Neither Dr. Remele nor other members of the Board sought to include Dr. Warren among the finalists and did not grant Dr. Warren an interview.  Not including Dr. Warren in the pool of finalist for an interview because of her race, sex, and in retaliation of her opposition to PCSSD's discriminatory practices in the construction of its facilities were adverse employment actions and a breach of her employment contract.  Failing to follow its own policies that required interviewing and granting an internal candidate because of her race, sex, and in retaliation for her opposition of PCSSD's discriminatory practices were adverse employment acts. Plaintiff's Exhibit 7, PCSSD Transfer & Promotion Policy.

Dr. Warren filed a charge with the EEOC and thereafter received her right to sue letter. Within the 90-day filing period, Dr. Warren filed her action with this Court under Title VII,

Sections 1981, 1983.  Later, her Complaint was amended to add a State Law breach of contract claim.  Defendants, PCSSD and six of the seven-member Board, have filed their Motion for Summary Judgment.

## MOTION FOR SUMMARY JUDGMENT:  THE APPLICABLE STANDARD

Pulaski County School District ("PCSSD") and its Board of Education ("Board"), both in their official and individual capacities, are defendants in this Title VII, §§ 1981 and 1983 employment discrimination and breach of contract case.  Defendants have moved this Court to grant them judgment as a matter of law pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. Pro.") 56.

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.
>
> The court should state on the record the reasons for granting or denying the motion.

Fed. Civ. Proc. Rule 56(a).

The applicable substantive law is the source of and identifies those facts that are material.  If the parties dispute facts that "affect the outcome of the suit under the governing law," the motion must be denied.  *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).  Defendants must provide a properly supported motion with admissible evidence; only then is the Plaintiff required to go beyond her allegations with "'any significant probative evidence tending to support the complaint.'"  *Id*., at 249, internal citations omitted.  Summary judgment is only proper for the Defendants if, with admissible evidence, they demonstrate that Plaintiff Janice Warren's claims have no basis in fact.  Wright, Miller & Kane, 10A Fed. Prac. & Proc. Civ. § 2727.1 (4th ed. 2020) ("Fed. Prac. & Proc. Civ.").  This Court may only grant summary judgment if "'the moving party has established his right to a judgment with such *clarity*

as to leave no room for controversy and the non-moving party is *not* entitled to recover under any discernible circumstances.'"  *LeCroy v. Dean Witter* Reynolds, Inc, 585 F.Supp. 753 (E.D. Ark. 1984) (emphasis added), *quoting*, *Butler v. MFA Life Insurance Co*., 591 F.2d 448, 451 (8th Cir.1979).  See also *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)(reversing, pointing out that the moving parties' submissions had not foreclosed the possibility of the existence of certain facts from which a jury could infer that there had been a meeting of the minds).

Movant must support its position that there is no genuine dispute of material facts by citing to materials in the record that demonstrate the absence of a dispute, by showing that those materials do not establish the presence of a genuine dispute, or by showing that the opposing party cannot produce admissible evidence to support a material fact.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); 10A Fed. Prac. & Proc. Civ. § 2727.1 (4th ed.). Movant's citations to the record must be to admissible evidence. *Texas Department of Community Affairs v. Burdine* ("Burdine"), 101 S.Ct. 1089, 67 L.Ed.2d 207, 450 U.S. 248 (1981) (the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection); *Walling v. Fairmont Creamery Co*., 139 F2d 318, 323 (8th Cir. 1943) (movant's affidavits contained conclusions not admissible evidence; evidence must be exhibited in full).

*McDonnell Douglas Cop. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817(1973) and its progeny provide the evidentiary burdens of production and persuasion that the parties bear.  A plaintiff must introduce evidence of a prima facie case.  If she is successful, a presumption of discrimination arises.  Then, defendant must meet its burden of production of legitimate nondiscriminatory reasons to rebut the presumption of discrimination with admissible evidence.

Plaintiff, then, has the opportunity to introduce evidence that the purported legitimate nondiscriminatory reasons are pretext.  There are several ways the nonmoving party may demonstrate a material questions of fact:  1) defendant fails to point to admissible evidence in the record to support its motion; *Celotex, supra., Burdine, supra.,* and *Wall, supra.*; 2) plaintiff shows that the defendant's explanation or reasons are unworthy of credence; if, a reasonable jury could disbelieve the purported legitimate reasons put forth by the defendants, plaintiff's prima facie case alone may be sufficient to establish intentional discrimination; *Reeves v. Sanderson Plumbing, Prods. Inc.*, 530 U.S. 133, 134,147, 120 S.Ct. 2097 (2000); and 3) a plaintiff may persuade the court the a discriminatory reason more likely motivated the employer; *Wallace v. DTG Operations*, 442 F.3d 1112 (8th Cir. 2006), *citing*, *Burdine*, *supra*.

In reaching its conclusion on the existence or nonexistence of a dispute on a material fact, the court should review all the evidence in the record, draw all reasonable inference in favor of the nonmoving party, and disregard all evidence favorable to the moving party that the jury is not required to believe.  *Reeves, supra*., p. 150-151. The court may not make credibility determinations or weigh the evidence. *Id.*

## ARGUMENT AND AUTHORITY

I.     PCSSD VIOLATED TITLE VII WHEN IT FAILED TO INCLUDE DR. WARREN IN THE POOL OF FINALIST FOR AN INTERVIEW, DISREGARDED HER CONTRACT RIGHTS, AND FAILED TO PROMOTE HER TO SUPERINTENDENT

When Dr. Warren applied for the position of Superintendent, she was a qualified internal applicant with a contractual right to be interviewed and a preference for appointment as Superintendent. Plaintiff's Exhibit 7, Transfer and Promotion Policy (Public Record).  PCSSD failed to include Dr. Warren in the pool of finalist for an interview and failed to promote her to

Superintendent. These acts by the PCSSD Board were adverse employment actions. These adverse employment acts were motivated by her sex, her race, and in retaliation of her opposition to PCSSD's racial discrimination in the construction of its facilities.

Dr. Warren's admissible evidence satisfies the *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973), standard for a prima facie case.  Contrary to the Defendants' assertion, no direct evidence of discrimination is necessary.  See Defendants' Brief in Support ("Def. Brief") at 9. Indeed, Dr. Warren supplements her prima facie case with substantial admissible evidence that supports an inference that the Board's failure to include her in its pool of finalists or promote her to Superintendent consistent with her contract rights were motivated by unlawful criteria.  Dr. Warren's prima facie case and supplemental evidence, together, provide an inference that if PCSSD's evidence is false, PCSSD is covering up its discriminatory purpose.  *Reeves v. Sanderson Plumbing, Prods. Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097 (2000).

PCSSD's purported legitimate nondiscriminatory reasons for not hiring Dr. Warren are inadmissible. Plaintiff's Exhibit 45, Evidentiary Evaluation of Remele's List. These malicious criticisms and factually erroneous accusations are based on facts not within Linda Remele's or Alicia Gillen's personal knowledge as required by Fed. R. Evid. 602.  Without inadmissible evidence, PCSSD does not rebut the presumption of discrimination that arises from Dr. Warren's prima facie case, let alone her prima facie case and supplemental evidence.  *Walling v. Fairmont Creamery Co*., 139 F2d 318, 323 (8th Cir. 1943) (evidence must be admissible facts).  Therefore, this Court should, pursuant to Fed. R. Civ. Pro. 56 (f)(1), grant summary judgment in favor of Dr. Warren.

Even if PCSSD's evidence is admissible, Dr. Warren's admissible evidence in response establishes that these accusations are false and a pretext for sex discrimination, race

discrimination, and are alleged in retaliation for Dr. Warren's lawful opposition.  These accusations were used to poison the male members of the Board's perception of Dr. Warren and taint her application for appointment as Superintendent. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 807, 93 S.Ct. 1817 (1973).  The male members of the Board in reckless disregard for Dr. Warren's employment rights failed to investigate the allegations raised by Linda Remela, the White female President of the Board, and failed to give Dr. Warren a meaningful opportunity to respond to the allegations.

      A.      Title VII - Legal Standard

     In *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 807, 93 S.Ct. 1817 (1973), the U.S. Supreme Court established a burden-shifting analysis for establishing a violation of Title VII.  Plaintiff has the burden of establishing by the preponderance of the evidence a prima facie case of discrimination. If established, the burden shifts to the defendant employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell, supra.* This burden of production must be met through the introduction of admissible evidence. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Burdine*, 101 S.Ct. 1089, 67 L.Ed.2d 207, 450 U.S. 248 (1981).  If the defendants' burden isn't met, defendants' failure to "introduce evidence which, taken as true, that would permit the conclusion that there was a nondiscriminatory reason for the adverse action," the presumption of discrimination remains. *St. Mary Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2741 (1993).  In that event, whether at trial or motion for summary judgment, the court must award judgment to the plaintiff as a matter of law. *Id*. (in the case of a jury trial, under Fed. R. Civ. Pro. 50(a)(1) which is analogous to Fed. R. Civ. 56).  Because the goal of summary judgment is to avoid useless trials, the results must be the same pursuant to Fed. R. Civ. Pro. 56.

If the defendant does not satisfy its burden of production, but reasonable minds could differ as to whether a preponderance of the evidence establishes the prima facie case, then a question of fact remains and summary judgment must be denied. *St. Mary Honor, supra*., at 510.

If the defendant's burden of production is met, the plaintiff has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *St. Mary Honor, supra.,* at 515. Having satisfied its burden of production, the inference of discrimination is rebutted. However, "[p]roof of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact." *Wallace v. DTG Operations*, 442 F.3d at 1120 n. 2, *citing* Reeves, 530 U.S. at 148, 120 S.Ct. 2097. Although the employee retains the ultimate burden of proof and persuasion of discrimination, a factual inquiry may remain. *Wallace, supra*., at 1119; *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011), *Tribble v. Westinghouse Electric Co*rp., 669 F.2d 1193, 1196 (8th Cir. 1982) (affirming the denial of employer's motion for a directed verdict on an ADEA claim). The "'factual inquiry' in a Title VII case[is] . . . 'whether the defendant intentionally discriminated against the plaintiff. [I]s the employer . . . treating some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Burdine*, 450 U.S. 248, n.5, 101 S.Ct. 1089 (1981), *referencing*, *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977).

As Plaintiff demonstrates below, Defendants are not entitled to summary judgment. Plaintiff's admissible evidence establishes a prima facie case; Defendants' evidence is inadmissible.  Even assuming the admissibility of Defendants' evidence, a reasonable jury would find that Plaintiff's evidence establishes that the purported legitimate reasons were false and a pretext for discrimination.

1.    The Prima Facie Case

"Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish her prima facie case, Plaintiff's must demonstrate (i) that she belongs to a protected class; (ii) that she applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite her qualifications, she was rejected; and (iv) the circumstances give rise to an inference of discrimination.  *McDonnell*, *supra.*; *Nitschke v. McDonnell Douglas Corp.,* 68 F.3d 249, 251 (8th Cir.1995)(discussing the fourth factor in the context of ADE: the plaintiff must also "provide some 'additional showing' that age was a factor in the termination); *Halsell v. Kimberly-Clark Corp*., 683 F.2d 285 (8th Cir. 1982) (discussing the fourth factor; the employer continued to seek applicants of comparable qualifications).

a.    Dr. Warren's evidence satisfies the standard for a prima case under Title VII for sex discrimination.  The burden of production shifts to PCSSD.

Dr. Warren's admissible evidence satisfies the prima case standard for Title VII for sex discrimination.  The burden of production shifts to PCSSD.

(1).    Janice Warren is within the protected class of sex.

Janice Warren is a female who falls within the protected class of sex.  Her employment records with PCSSD indicated her protective status when she applied for the position of Director of Elementary Education in 2012. Plaintiff's Exhibit 38, (Public Record). In March of 2018 when she applied for the position of Superintendent, PCSSD knew that she fell within the protected class of sex. *Id.*  Dr. Warren held Arkansas State Licenses that certifies her for district level employment as Assistant Superintendent, Deputy Superintendent, and Superintendent.  Plaintiff's Exhibit 39 (Public Record).

b.    Janice Warren, a certified employee, applied for the position of
Superintendent and was qualified.

At its December 12, 2017, meeting, the Board voted and hired Ray and Associates to conduct the

search for PCSSD's next Superintendent. Plaintiff's Exhibit 40, PCSSD Board Minutes dated December

12, 2017 (Plaintiff's Exhibit is within Fed. R. of Evid. 803(8) Public Record exception "Public Record");

Plaintiff's Exhibit 61, Remele Dep._Beasley, page 50, lines 18-19 (Fed. R. Evid. 801(d)(2)(a) Opposing

Party Statement). Ray and Associates posted the PCSSD's Superintendent opening with PCSSD online at

https://www.pcssd.org/superintendent-search.  Plaintiff's Exhibit 21 (non-hearsay; offered to establish

notice).  The application deadline was March 12, 2018. *Id.*  Through its network of associates, Ray and

Associate solicited applications from 1,177 people in 47 states.  Of those 1,177 individuals, 36 submitted

an application and became candidates for the superintendent position.  *See* Plaintiff's Exhibit 54, PCSSD

Superintendent Search Report. (Plaintiff's Exhibit is a document generate by Ray and Associates as a

report of its performance, contains hearsay but is sufficiently reliable for admission (Inherent Reliability,

Fed. R. Evid. 807, & Public Record[1]).  *Westborough Mall, Inc. v. City of Cape Girardeau, Mo*., 693 F2d.

733 n.2 (8th Cir. 1982)].  The applicant pool consisted of 14 women and 22 men.  Plaintiff's Exhibit 54

(Inherently Reliable, Fed. R. Evid. 807, & Public Record).  Ray and Associates screened the 36 applicants

based on PCSSD's ten qualifications and recommended nine as top candidates to the PCSSD Board.

Defendants' Ex. Matrix; Plaintiff's Exhibit 72, Candidate Matrix.

Janice Warren applied for the position in early March of 2018.  She was included among

the nine Top Candidates, seven men (four Black and three White) and two Black women, who

were recommended as Top Candidates, qualified for the position of Superintendent.  See the

---

[1] Under Arkansas Freedom of Information Act, Ark. Code Ann § 25-19-103, documents generated by a third party
performing an official function are public records.  *City of Fayetteville v. Edmark*, 304 Ark. 179, 801 S.W.2d 275
(Ark. 1990).

image of the video presentation of the nine top candidates.  Plaintiff Exhibit 22. Dr. Warren was qualified for the position of Superintendent.  See *Hase v. Missouri Div. of Employment Sec.*, 972 F.2d 893, 896 n. 1 (8th Cir.1992) (where state agency was considering the top ten candidates on a list from the personnel department, plaintiff's inclusion on list showed qualifications sufficient to establish a prima facie case).

c.      Janice Warren's application was rejected.

On March 27, 2018, Ray and Associates made a video presentation of the top candidates to PCSSD's Board.  Plaintiff's Exhibit 5, Search timeline (Inherently Reliable, Fed. R. Evid. 807, Public Record). The PCSSD Board selected three males, two Black and one White, for interviews. The Board did not invite Dr. Warren to interview; her application was rejected. Plaintiff's Exhibit 42, PCSSD Board Minutes dated March 27, 2018, (Public Record).

As a general rule under *McDonnell*, *Burdine,* and their progeny, "the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Burdine, supra.,* at 249.  Here, however, PCSSD's own Transfer and Promotion Policy for Certified employees and its customary hiring processes *require* the interviewing of qualified internal candidates and grant certified employees a hiring preference over equally qualified external candidates.  See Plaintiff's Exhibit 7 (Public Record Exception). Not only was her non-inclusion in the pool of finalist because of her sex an adverse employment act, it was also a denial of her contract right to be hired, if equally qualified.  This too was an adverse employment act.

d.      Circumstances giving rise to an inference of discrimination

In addition to the primary elements of a prima facie case, (1) plaintiff is a member of a protected class; (2) plaintiff applied and was qualified for the position; and (3) plaintiff's

application was rejected, evidence of circumstances giving rise to an inference of discrimination must be provided.

(1) Lesser qualified men were selected for interviews

The PCSSD Board selected Dr. Charles McNulty, a White male, and two Black males, Mr. James Harris and Dr. Erick Pruitt for interviews.  Dr. Warren's qualifications were superior to those of the three male candidates selected. Plaintiff's Exhibit 23, PCSSD Superintendent Candidate Comparison Table. Plaintiff's Exhibits 24, 25, 26, 27, Candidate Applications for Janice Warren, Charles McNulty, James Harris, and Rick Pruitt (Public Records).  Dr. Warren's eleven years of experience as a superintendent for student populations of 2500 to 12,101 exceeded Dr. McNulty's *three* years of experience as Superintendent over a meager student population that averaged 436 students during his tenure as Superintendent and James Harris' ("Harris") *two and a half* years as Superintendent over 3700 students.

Harris withdrew his application on the day of his interview.  A cursory review of Harris' application reveals that he lacked four years of teaching experience required for a Superintendent's License in Arkansas.  Plaintiff's Exhibit 26 (Public Record).  Linda Remele, a former PCSSD Principal, Deputy Superintendent, and Arkansas Department of Education employee, should have recognized this omission when she reviewed Harris' application during the March 27, 2020, Board meeting.  The entire Board should have reviewed the requirements for licensure in preparation for its hiring processes.  Linda Remele was the sole district-level license holder and professional educator on the Board; the other Board members likely looked to her to call this glaring omission to their attention.

Although Dr. Erick Pruitt ("Pruitt") had oversight responsibilities for 23,000 students, he was an Area Superintendent with only *15 months'* experience in that role.  None of the three

males dealt, in their leadership capacity, with overhanging federal court supervision in a desegregation case.  Neither male managed an educational program for an approximately 50% racial distribution between Whites and non-Whites and the accompanying disparities in educational preparation and exposure, severe dissimilarity of socioeconomic status, and adverse family and discipline variables such as truancy and failure to graduate that the PCSSD student demographics reflected.  Dr. McNulty's student population was homogeneous, 98.5% White.  Only seven non-White students were enrolled in the schools he supervised as Superintendent.  Likewise, Harris' student population was nearly homogeneous, 89% White and 11% non-White.  Neither was prepared for the problems inherent in PCSSD's pupil enrollment and community composition.  Pruitt's student population was the inverse of McNulty and Harris.  The 2017-18 demographics of the Houston Independent School District were 8.7% White and 91.3% non-White with a 61.3% Hispanic/Latino student population,[2] substantially different from PCSSD.  Neither man was qualified to address the substantive non-financial issues facing the students, teachers, staff, administration, and communities of PCSSD.

As PCSSD Interim Superintendent, Dr. Warren had budgetary oversight of $244,895,652.58 with a per pupil allocation of $12189.58.  Neither McNulty nor Harris, as Superintendents, had budgetary oversight that reached $60 million much less $244 million, but both enjoyed during their limited experience as Superintendents per student allocations that exceeded that of PCSSD by approximately $2000 to $3000 per student!  As an Area Superintendent, Pruitt managed a budget equivalent to that of PCSSD of $264,546,000 out of the

---

[2] Houston Independent School District ("Houston ISD"), 2017-2018 Facts & Figures (https://www.houstonisd.org/site/handlers/filedownload.ashx?moduleinstanceid=48525&dataid=217137&FileName=2017-18_FactsFigures.pdf)

total Houston ISD budget of $2,096,294,796, with a $658 per student allocation less than PCSSD but for only 15 months.

Dr. Warren's credentials and experience were superior to the three men selected as finalists for the position of PCSSD Superintendent.  Furthermore, only Dr. Warren qualified for the PCSSD hiring preference as an internal candidate.  Not only was she entitled to an interview but, if equally qualified, she was to be hired.  The Board did not compare the relative qualifications of the nine Candidates before selecting the three finalists for interviews. Plaintiff's Exhibit 9, p. 117, lines 12-21, Remele Deposition. (Opposing Party Statement).

In addition to her eleven years' experience as a superintendent, Dr. Warren had 15 years of central office experience, three years as a principal, and completed her terminal degree in Education ten years before she applied for the position of PCSSD Superintendent.  Her qualifications were superior to the men selected for final interviews.

The qualifications of the two Black males were substantially less than the one White male in the pool of finalists.  Among the male finalists, Dr. McNulty had the longest tenure of three years as a superintendent, 12 years' experience as a central office administrator, seven years of service as a principal, and he held a terminal degree, Ph.D, for seven years. Harris had not served as a teacher or as a principal and had not completed a terminal degree in Education.  Harris had, however, seven years of central office administrator experience. Harris withdrew from consideration on the day of his interview.

Pruitt did not have *any* central office experience but served as a principal for six years. He had completed a terminal degree in Education four years before he applied for the position. Of the three males selected as finalists, Dr. McNulty, the sole White male in the pool of finalist, was the most qualified and was the first to interview.

Why were Harris and Pruitt, the substantially less qualified Black males, included in the tiny pool of finalists?  Their presence served as a pretext for creating a racially diverse pool, nothing more!  The PCSSD Board assumed that no one could complain about the pool's diversity because the majority of finalists in the pool were Black males. Neither had the experience of Dr. Warren nor Dr. McNulty.  See Plaintiff's Exhibit 23, Candidate Comparison Table.

McNulty, the first finalist to interview, interviewed on April 3, 2018.  Shortly after that interview concluded, the Board offered Dr. McNulty the position of PCSSD Superintendent. Plaintiff's Exhibit 62, McNulty Dep._Beasley, page 11, lines 19-25 through page 12, lines 1-4. Plaintiff's Exhibit 43, April 3, 2017, Board Minutes. The substantially different qualifications among the Black males and the sole White male in the pool assured Dr. McNulty's selection as PCSSD Superintendent.

### (2) A lesser qualified male was hired.

Charles McNulty, the sole White male in the pool of finalists, was offered and accepted the position of Superintendent of PCSSD.  Defendants contend that McNulty was a superior candidate as compared with Dr. Warren.  Answer ¶¶ 21, 23, & 28.  A review of their relative credentials indicates otherwise.  In 2017, Dr. Warren, a Black female, had eleven years' experience as a superintendent for student populations of 2500 to 12,101 exceeding Dr. McNulty's *three* years of experience as Superintendent over a meager student population that averaged 436 students during his tenure as Superintendent. Dr. Warren had 15 years of central office experience, three years as a principal, and completed her terminal degree in Education ten years before she applied for the position of PCSSD Superintendent.  McNulty had 12 years' experience as a central office administrator, seven years of service as a principal, and he held a terminal degree, Ph.D., for seven years.

Dr. Warren managed an educational program for an approximately 50% racial distribution between Whites and non-Whites and the accompanying disparities for eleven years; Dr. McNulty's student population was homogeneous, 98.5% White.  Only seven non-White students were enrolled in the schools he supervised as Superintendent.

When asked what evidence she had to support the Board's contention that McNulty was a superior candidate to Warren, Dr. Remele, the White female Board President, replied:

Page 116: 8 A From his interview.

 9 Q His interview. All right. What is the evidence

 10 from his interview?

 11 . . . His people

. . . .

 14 skills, the fact that he had a degree, a doctorate in

 15 multi-cultural education, he had worked in multi-cultural

 16 education, and was very conversant with --

. . . .

Page 117: 14 Q And so, you are saying that his experience in

 15 multi-cultural education exceeded that of Doctor

 16 Warren? Is that what you are saying?

 17 A If you will go back to the fact that Doctor

 18 Warren was not interviewed at that point in time. She

 19 was in the nine. At this point, we are comparing him

 20 with the other people that interviewed in a

 21 face-to-face interview.

22      Q But that's not -- was not my question. My

23      question was, what is the evidence that he is a

24      superior candidate to Doctor Warren? You have that

25      contention in the Answer to the Complaint and in at

Page 118:    1      least one other filing. So, I'm just asking, what

2      evidence do you have that he was -- to support your

3      contention that he was superior?

4      A Well, I don't have his packet here to look at

5      it. So, I would have to have his packet to be able to

6      give you a more specific answer that you want. But

7      that, yes, my reviewing that packet that we have and

8      his answers and responses to the questions that we

9      asked him indicated to me that he was a superior

10      candidate.

Plaintiff's Exhibit 9, p. 116-118, Remele Deposition (Opposing Party Statement, Fed. R. Evid. 801(d)(2)(A).

In point of fact, no comparison was made of Dr. Warren's and Dr. McNulty's credentials. *Id*., p. 117, lines 19-21.  Dr. McNulty's testified that his professional training in multicultural education was limited to course work, writing his dissertation, participating in professional development opportunities, and working with leaders in the African-American community in Waterloo, his prior appointment before becoming Superintendent in Little Rock.  His experience was at a "building level."  Dr. McNulty did not testify that he held a degree in multicultural

education.  Plaintiff's Exhibit 28, McNulty Deposition, pp. 85, line 20, through 86, line 11; Plaintiff's Exhibit 25, McNulty's application for Superintendent (Public Record).

On the other hand, Dr. Warren's professional career has focused on providing multicultural education for public school children and staff on a "district level."  From 1992-2001, she served as Equity Coordinator for Crossett School District, overseeing all areas related to discrimination and allegations relating to race, gender, Title VI, Title IX, and Section 504 of the Rehabilitation Act.  Plaintiff's Exhibit 24, Warren's Application for Superintendent.  She provided and implemented professional development for staff on bias, culture sensitivity, and race relations to create a positive multicultural environment for educators, paraprofessionals, and students.  Dr. Warren implemented and facilitated equity initiatives.  From 2013-2017, Dr. Warren served as Assistant Superintendent of Equity and Pupil Services.  During this period, she implemented, coordinated, and monitored PCSSD's desegregation plan that mandated the use of multicultural resources within the classroom and the reduction in the achievement gap; she coordinated the District's goals and objectives related to gender, race, disability and non-discrimination; and systematized the District's hiring processes to pursue equity for District staff. Plaintiff's Exhibit 3, Plan 2000 (Public Record). Finally, her responsibilities included the planning, developing, and offering professional development on equity initiatives.  Plaintiff's Exhibit 25, Warren's Application for Superintendent (Public Record).

Both Warren and McNulty have multicultural educational experience.  Neither hold an advance degree in multicultural education.  The Board did not include a specific requirement for multicultural education in the list of qualifications it was seeking.  See Plaintiff's Exhibit 21 Ten Qualifications (Public Record).

In addition to asserting that McNulty's doctorate in multicultural education and multicultural experience were superior, Remele testified that McNulty was a superior candidate because,

> [B]ased on his interview, And, of course you know, you don't ever really know until you get into the job.  But from the interview, he came off with good people skills.  He had high enthusiasm, talked about building morale with the staff."

Plaintiff's Exhibit 9, p. 116, Remele Deposition.  Unlike the unproven quality that Dr. McNulty posed in having good people skills, Dr. Warren was tested in the actual environment in which performance was required.  Those who knew best spoke loudly when Dr. Warren was not included in the finalists to be interviewed.  See Plaintiff's Exhibit 29, Signed position statement of 65 employees.  They declare:

> It is our belief that failure to grant Dr. Janice Warren an interview for the position of Superintendent of Schools for the Pulaski County Special School District would be detrimental to the students in this district and the overall morale/culture of the district as a whole.

The District's Elementary Principals voiced a concern when Dr. Warren was not included as one of the finalists:

> For the first time, we have had a superintendent who goes into classrooms and thank teachers for the good jobs they are doing.  Teachers appreciate that; especially acknowledgment from the superintendent.  That means 'Dr. Warren has been visible.  Dr. Warren takes time to meet with principals and parents for student conferences.  We have not had that support before.
>
> . . . .
>
> If you truly wish to make a difference in the selection of the next PCSSD Superintendent, we challenge you to poll the entire staff and do not secure the opinion of just a few to get total perspective before hiring someone outside.

Plaintiff's Exhibit 50, Elementary Principals' Concern-Finalists Selection.  See also, Plaintiff's

Exhibits 56 (PCSSD teacher), 57 (contract employee), 58 (citizen comment).

Two of the ten generic, generalized qualifications listed by the Board in its

advertisements could be read to suggest that multicultural educational experience and people

skills were important, the second and the last.   The second reads:  "Seeking a Superintendent

who:  Possesses the leadership skills required to respond to the opportunities and challenges

presented by an ethnically and culturally diverse community."  The last one provides:  "Seeking

a Superintendent who:  Promotes a positive and professional environment for district employees

and the PCSSD Board of Education."  The use of generic, nebulous, indistinct, and

indeterminable qualifications permits the Board to pick and choose as it wants and to disregard

qualified female, protected class, applicants and to do so without accountability of

discrimination.  As a general rule, employers are free to select among qualified candidates.

*Kincaid v. City of Omaha*, 378 F.3d 799 (8th Cir. 2004). See Defs. Brief in Support of its

Motion, at p. 24.  But, not PCSSD!

> (3) PCSSD Does not have unrestricted liberty to choose among qualified candidates.

Contrary to Defendants' assertion (Def. Brief, p. 24), PCSSD does not have the freedom

to choose among qualified candidates.  Its Board Policies for Certified Staff provide otherwise.

Plaintiff's Exhibit 7, PCSSD Transfer and Promotion Policy (Public Record).  The Board's policy

states a preference for promoting *internal* candidates over hiring *equally* qualified external

candidates.  *Id*.

> The general policy of the district is to employ the most able and best qualified
>
> persons with the proper credentials for all positions.  However, PCSSD favors
>
> promotions from within so that where, in the opinion of the administration,

> ability, qualifications, and credentials of an existing employee are equal to those
>
> of an outside applicant, the existing employee will be favored for promotion.

*Id.* This policy is implemented through a procedure delineated in the Appendix to the Transfer and Promotion Policy entitled:  Promotion and Employment for Above Entry Level Position (Plaintiff's Exhibit 7) and PCSSD custom of interviewing all qualified internal candidates. (Plaintiff's Exhibit 30, ¶4, Email from Derrick Williams, April 29, 2020, re: Job Postings (Public Record).

> Interview Committee -- The appropriate assistant superintendent in
>
> conjunction with the office of desegregation will set up a bi-racial interview
>
> committee, chaired by the immediate supervisor. This committee may vary
>
> in size and make-up as needs dictate. The interview committee will screen all
>
> applications to determine whether the applicant meets the minimum qualifications
>
> for the position.  The interview committee will provide written notification to the
>
> individuals who do not met the minimum qualifications.  *All candidates meeting*
>
> *the minimum qualifications will be offered a personal interview.*

Plaintiff's Exhibit 7 PCSSD Certified Staff, Transfer and Promotion Policy, Appendix, Promotion and Employment For Above Entry Level Position. These and other policy innovations were implemented to ensure that PCSSD would "eliminate and forever erase the vestiges of segregation from PCSSD employment."  Plaintiff's Exhibit 44, page 3, ¶6, Proposed Stipulation by Joshua and PCSSD Regarding Unitary Status--Staffing.  PCSSD was released from Federal Court supervision in Staffing on July 14, 2017. *Id.,* p. 6.

The Transfer and Promotion policies were incorporated into Dr. Warren's annual contract with PCSSD and were binding on both parties.  Ark. Code Ann. § 6-17-204 (a)(2018).  The

Board's policy preference of promoting *internal* candidates over hiring *equally* qualified external candidates applied to the Board's processes in selecting a Superintendent in 2018. Plaintiff's Exhibit 31, p. 11, line 3- p. 12, line 18, Deposition of Paul Brewer, former PCSSD Assistant Superintendent for Personnel ("Brewer Deposition").

The Board did not determine if Dr. Warren and the three males selected for interviews were equally qualified for the position of Superintendent.  Plaintiff's Exhibit 9, p. 117, line 17-21, Remele Deposition; Plaintiff's Exhibit 10, p. 82, line 3-p. 86, line 12, Gillen Deposition, Plaintiff's Exhibit 32, p. 38, line 23-p. 40, line 1, Thomas Deposition.  The Board did not determine if Dr. Warren was entitled to a preference and did not grant her an interview.  The Board failed to follow its own policies, providing an inference of discrimination. *Young v. Warner-Jenkinson Co*., 152 F.3d 1018, 1024 & n.6 (8th Cir. 1998) (employer's failing to follow its policy on subpoenaed witnesses and mischaracterizing its reasons for dismissal resulted in an inference of improper motive); see, also, *Patterson v. McLean Credit Union*, 491 U.S. 164, 187-188 (1989) (failing to train and to promote).

> (4)  The Board's rubric was designed to point away from Dr. Warren.

The stakeholders' fora hosted by Ray and Associates, the Superintendent Search firm, for staff, parents, students, community and business leaders to assist the Board in setting the qualifications or rubric for identifying qualified candidates produced a list of Top Ten Themes. Plaintiff's Exhibit 71 (Public Record).  These Themes identified the pressing needs of the District and the desired skills and training that the selected candidate should possess.  When the needs listed are compared with the qualifications and experience of the three men selected for interviews and Dr. Warren, the needs point to Dr. Warren as the ideal candidate.  In her position of Assistant Superintendent for Equity and Pupil Services, she had handled the issue, items 1, 2,

3, 4, 5, 7, 8, 10, or was delegated the issue after Dr. McNulty's appointment as Superintendent, items 3 & 6.  Rather than using these specific, unambiguous, and definitive characteristics identified by the people invested in the District, the Board chose a generic, general, ambiguous listing of qualifications.  Was the Board trying to point away from the most qualified woman in the Top Candidate pool?  Was the Board implementing, for discriminatory purposes, the training it received entitled: Employing a Superintendent: From Dating to Divorce, Arkansas School Boards Association, Legal Seminar 2018?  Plaintiff's Exhibit 34, ASBA Training (Public Record).  The training was taught by the Board's legal counsel.  A hypothetical in the presentation is significant:

> SEARCH PROCESS:
>
> • You want to stay in-house and have two administrators with a superintendent certificate: your assistant superintendent for finance/Hit (male) and your federal programs director (female).
>
> • The board prefers the assistant superintendent for finance/HR because it wants someone with a strong finance background, but the female federal programs director has more years in education and in administration. What do you do?
>
> • 1. Interview both candidates *using a unique rubric that places greater weight* on financial strength. *Presumably this would favor your preferred candidate*.

Plaintiff's Exhibit 34 Employing a Superintendent: From Dating to Divorce, pp. 6-7, *emphasis added* (Public Record).  The Board's generic, ambiguous rubric points away from the specific needs and skills identified by the District's stakeholders and creates the opportunity for a pool of generalist from whom the Board could choose subject to its Transfer and Promotion Policy.

McNulty was not a superior candidate.  PCSSD's Transfer and Promotion Policies imposed an obligation on the Board to compare the "ability, qualifications, and credentials" of qualified internal candidates with those of external candidates.  If "in the opinion of the administration" they are equal, the Board must favor the promotion of the internal candidate. The nebulous qualifications used by the Board permitted it to steer its determination as it pleased.  Here, the Board in violation of its Board Policy did not include Dr. Warren in the pool of candidates to be interviewed and did not compare the abilities, qualifications, and credentials of McNulty and Warren because of her sex.  This was an adverse employment action because of Dr. Warren's sex.

(5)  Prior Treatment of Dr. Warren: Unequal Pay for Equal Work.

When Superintendent Jerry Guess was terminated in July of 2017, Janice Warren was offered the position of Interim Superintendent.  Plaintiff's Exhibit 35, Board Minutes, July 18, 2017 (Public Record).  The offer came after Linda Remele, the White female President of the Board and a decision maker, approached a lesser qualified White male before offering the position to Janice Warren. Plaintiff's Exhibit 31, p. 13, line 16 - p. 15, line 13, Brewer Deposition.  At the time, Paul Brewer was PCSSD's Assistant Superintendent for Personnel.  He had no experience as a Superintendent.  *Id.*  Although Paul Brewer did not characterize the conversation as an "offer," the conversation was serious enough that he conferred with at least one other person before deciding that loyalty to the former Superintendent necessitated that he decline the opportunity to take the position vacated by Dr. Jerry Guess.  *Id.,* p. 15, lines 1-13.

After Dr. Warren accepted the Board's offer, disparate treatment by the Board under Linda Remele's, a White female, leadership commenced immediately.  The Board offered and paid Dr. Warren $195,000, $20,000 or 9.3% less, for the same work that Dr. Guess received

$215,000 annually from 2011-2013, while the District was under State control as a district in

fiscal distress.  Plaintiff's Exhibit 59, Guess' Superintendent Contracts.  Dr. Guess was to receive

$215,000 from 2016-2018, after the District was released and the status of the fiscal distress was

eliminated, had he not been terminated in 2017. Plaintiff's Exhibit 59, Guess' Superintendent

Contracts.  Similarly, the White male hired by the District at the end of its 2018 search, Charles

McNulty, is compensated annually from 2018-2021 with a package equal to $215,000, $205,000

in salary and a $10,000 annual annuity.  Plaintiff's Exhibit 36 (Public Record Exception).

McNulty's package would be later be modified in 2019 to $215,000 after the annuity was

dropped into his salary. Plaintiff's Exhibit 28, McNulty Deposition, p. 34.  Nothing in McNulty's

or Guess' experience explains the disparate salary for Janice Warren; her race and gender were

the distinctions.  In point of fact, Janice Warren's salary was not only disproportionate to the men

who preceded and followed her but also disproportionate to regional superintendent salaries from

2015-2017.  See Plaintiff's Exhibit 37, Regional Superintendent Salary Comparis [sic], prepared

by Ray and Associates in 2018 (Public Record, Inherently Reliable & Fed. R. Evid. 807).

Dr. Warren's admissible evidence establishes a prima facie case of sex discrimination.  A

presumption of discrimination arises.  *McDonnell*, *supra*., *Burdine, supra., St. Mary Honor,*

*supra.*  PCSSD must provide admissible evidence to rebut the presumption.  Failure to do

provide admissible evidence of a legitimate nondiscriminatory reason entitles Dr. Warren to an

order of summary judgment in her favor unless reasonable people might differ on whether her

evidence satisfies the requirements for a prima facie case. *Reeves v. Sanderson Plumbing*

*Products*, 530 U.S. 133, 146, 120 S.Ct. 2097, 2108 (2000), *St. Mary Honor, supra.*

        a.        Dr. Warren's evidence satisfies the standard for a prima case under Title
VII for race discrimination.  The burden of production shifts to PCSSD.

29

Dr. Warren's admissible evidence satisfies the prima case standard for Title VII for race discrimination.  The burden of production shifts to PCSSD.

(1).     Janice Warren is within the protected class of race.

Janice Warren is Black and falls within the protected class of race.  Her employment records with PCSSD indicated her protective status when she applied for the position of Director of Elementary Education in 2012. Plaintiff's Exhibit 38, (Public Record). In March of 2018 when she applied for the position of Superintendent, PCSSD knew that she fell within the protected class of race.  Dr. Warren holds Arkansas State Licenses that certifies her for district level employment as Assistant Superintendent, Deputy Superintendent, and Superintendent.  Plaintiff's Exhibit 39 (Public Record).

b.      Janice Warren, a certified employee, applied for the position of Superintendent and was qualified.

At its December 12, 2017, meeting, the Board voted and hired Ray and Associates to conduct the search for PCSSD's next Superintendent. Plaintiff's Exhibit 40, PCSSD Board Minutes, December 12, 2017 (Public Record); Plaintiff's Exhibit 9, Remele Dep. Beasley page 50, lines 18-19 (Fed. R. Evid. 801(d)(2)(a) Opposing Party Statement). Ray and Associates posted the PCSSD's Superintendent opening with PCSSD online at https://www.pcssd.org/superintendent-search.  Plaintiff's Exhibit 21 (non-hearsay; offered to establish notice).  The application deadline was March 12, 2018. *Id.*  Through its network of associates, Ray and Associate solicited applications from 1,177 people in 47 states.  Of those 1,177 individuals, 36 submitted an application and became candidates for the superintendent position.  *See* Plaintiff's Exhibit 41, PCSSD Superintendent Search Report (Inherent Reliability, Fed. R. Evid. 807, & Public Record[3]).  *Westborough Mall, Inc. v. City of Cape Girardeau, Mo.*, 693 F2d. 733 n.2 (8th Cir.

---

[3] Under Arkansas Freedom of Information Act, Ark. Code Ann § 25-19-103, documents generated by a third party performing an official function are public records.  *City of Fayetteville v. Edmark*, 304 Ark. 179, 801 S.W.2d 275 (Ark. 1990).

1982)].  Ray and Associates screened the 36 applicants based on PCSSD's ten qualifications and recommended nine as top candidates to the PCSSD Board. Defendants' Exhibit, Matrix.

Janice Warren applied for the position in early March of 2018.  She was included among the nine Top Candidates, six Blacks and three Whites, who were recommended as Top Candidates, qualified for the position of Superintendent. See the image of the video presentation of the nine top candidates, Plaintiff's Exhibit 22.  Dr. Warren was qualified for the position of Superintendent.  See *Hase v. Missouri Div. of Employment Sec.*, 972 F.2d 893, 896 n. 1 (8th Cir. 1992) (where state agency was considering the top ten candidates on a list from the personnel department, plaintiff's inclusion on list showed qualifications sufficient to establish a prima facie case).

c.      Janice Warren's application was rejected.

On March 27, 2018, Ray and Associates made a presentation of the top candidates to PCSSD's Board.  Plaintiff's Exhibit 5, Search timeline (Inherently Reliable, Fed. R. Evid. 807, Public Record). The PCSSD Board selected three candidates, two Blacks and one White person for interviews. The Board did not invite Dr. Warren to interview; her application was rejected. Plaintiff's Exhibit 43, PCSSD Board Minutes dated March 27, 2018 (Public Record).

As a general rule under *McDonnell*, *Burdine,* and their progeny, "the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Burdine, supra,*.  Here, however, PCSSD's own Transfer and Promotion Policy for Certified employees and its customary hiring processes *require* the interviewing of qualified internal candidates and grant certified employees a hiring preference over equally qualified external candidates.  See Plaintiff's Exhibits 7 and 30 (Public Record Exception).  Not

only was her non-inclusion in the pool of finalist because of her race an adverse employment act, it was also a denial of her contract right to be hired, if equally qualified.  This too was an adverse employment act.

          d.        Circumstances giving rise to an inference of discrimination

In addition to the primary elements of a prima facie case, (1) plaintiff is a member of a protected class; (2) plaintiff applied and was qualified for the position; and (3) plaintiff's application was rejected, evidence of circumstances giving rise to an inference of discrimination must be provided.

          (1) Lesser qualified candidates were selected for interviews

The PCSSD Board selected Dr. Charles McNulty, a White male, and two Black males, Mr. James Harris and Dr. Erick Pruitt for interviews.  Dr. Warren's qualifications were superior to those of the three candidates selected. Plaintiff's Exhibit 23, PCSSD Superintendent Candidate Comparison Table. Plaintiff's Exhibit 24, Warren Application; Exhibit 25, McNulty Application; Exhibit 26, Harris Application; and 27, Pruitt Application (Public Records).  Dr. Warren's eleven years of experience as a superintendent for student populations of 2500 to 12,101 exceeded Dr. McNulty's *three* years of experience as Superintendent over a meager student population that averaged 436 students during his tenure as Superintendent and James Harris' ("Harris") *two and a half* years as Superintendent over 3700 students.

Harris withdrew his application on the day of his interview.  A cursory review of Harris' application reveals that he lacked four years of teaching experience required for a Superintendent's License in Arkansas.  Plaintiff's Exhibit 26 (Public Record).  Linda Remele, a former PCSSD Principal, Deputy Superintendent, and Arkansas Department of Education employee, should have recognized this omission when she reviewed Harris' application during

the March 27, 2020, Board meeting.  The entire Board should have reviewed the licensure requirements in preparation for its hiring processes.  Linda Remele was the sole district-level license holder and professional educator on the Board; the other Board members likely looked to her to call this glaring omission to their attention.

Although Pruitt had oversight responsibilities for 23,000 students, he was an Area Superintendent with only *15 months'* experience in that role.  None of the three candidates dealt, in their leadership capacity, with overhanging federal court supervision in a desegregation case.  Neither of the three candidates managed an educational program for an approximately 50% racial distribution between Whites and non-Whites and the accompanying disparities in educational preparation and exposure, severe dissimilarity of socioeconomic status, and adverse family and discipline variables such as truancy and failure to graduate that the PCSSD student demographics reflected.  Dr. McNulty's student population was homogeneous, 98.5% White.  Only seven non-White students were enrolled in the schools he supervised as Superintendent.  Likewise, Harris' student population was nearly homogeneous, 89% White and 11% non-White.  Neither was prepared for the problems inherent in PCSSD's pupil enrollment and community composition.  Pruitt's student population was the inverse of McNulty and Harris.  The 2017-18 demographics of the Houston Independent School District were 8.7% White and 91.3% non-White with a 61.3% Hispanic/Latino student population,[4] substantially different from PCSSD.  Neither of the candidates were qualified to address the substantive non-financial issues facing the students, teachers, staff, administration, and communities of PCSSD.

---

[4] Houston Independent School District ("Houston ISD"), 2017-2018 Facts & Figures (https://www.houstonisd.org/site/handlers/filedownload.ashx?moduleinstanceid=48525&dataid=217137&FileName=2017-18_FactsFigures.pdf)

As PCSSD Interim Superintendent, Dr. Warren had budgetary oversight of $244,895,652.58 with a per pupil allocation of $12189.58.  Neither McNulty nor Harris, as Superintendents, had budgetary oversight that reached $60 million much less $244 million, but both enjoyed during their limited experience as Superintendents per student allocations that exceeded that of PCSSD by approximately $2000 to $3000 per student!  As an Area Superintendent, Pruitt managed a budget equivalent to that of PCSSD of $264,546,000 out of the total Houston ISD budget of $2,096,294,796, with a $658 per student allocation less than PCSSD but for only 15 months.

Dr. Warren's credentials and experience were superior to the three candidates selected as finalists for the position of PCSSD Superintendent.  Furthermore, only Dr. Warren qualified for the PCSSD hiring preference as an internal candidate.  Not only was she entitled to an interview but, if equally qualified with the selected external candidate, she had to be hired.  Plaintiff's Exhibit 7, PCSSD Certified Transfer and Promotion Policy.  The Board did not compare the relative qualifications of the nine Candidates before selecting the three finalists for interviews. Plaintiff's Exhibit 9, p. 117, lines 12-21, Remele Deposition (Opposing Party Statement).

In addition to her eleven years' experience as a superintendent, Dr. Warren had 15 years of central office experience, three years as a principal, and completed her terminal degree in Education ten years before she applied for the position of PCSSD Superintendent.  Her qualifications were superior to the candidates selected for final interviews.  Plaintiff's Exhibit 24, Warren's Application.

The qualifications of the two Black males were substantially less than the one White male in the pool of finalists.  Plaintiff's Exhibits 25, 26, 27, Candidate Applications.  Among the finalists, Dr. McNulty had the longest tenure of three years as a superintendent, 12 years'

experience as a central office administrator, seven years of service as a principal, and he held a terminal degree, Ph.D., for seven years. Harris had not served as a teacher or as a principal and had not completed a terminal degree in Education.  Harris had, however, seven years of central office administrator experience. Harris withdrew from consideration on the day of his interview.

Pruitt did not have *any* central office experience but served as a principal for six years. He had completed a terminal degree in Education four years before he applied for the position. Of the three candidates selected as finalists, Dr. McNulty, the sole White in the pool of finalist, was the most qualified and was the first to interview.

Why were Harris and Pruitt, the substantially less qualified Blacks, included in the tiny pool of finalists?  Their presence served as a pretext for creating a racially diverse pool, nothing more!  The PCSSD Board assumed that no one could complain about the diversity of the pool of finalists because the majority of finalists were Black. Neither had the experience of Dr. Warren nor Dr. McNulty.

McNulty, the first finalist to interview, interviewed on April 3, 2018.  Shortly after that interview concluded, the Board offered Dr. McNulty the position of PCSSD Superintendent. Plaintiff's Exhibit 62, McNulty Dep._Beasley, page 11, lines 19-25 through page 12, lines 1-4. Plaintiff's Exhibit 43, April 3, 2017, Board Minutes. The substantially different qualifications among the Black candidates and the sole White candidate in the pool assured Dr. McNulty's selection as PCSSD Superintendent.

(2) A lesser qualified White candidate was hired.

Charles McNulty, the sole White male in the pool of finalists, was offered and accepted the position of Superintendent of PCSSD.  Defendants contend that McNulty was a superior candidate as compared with Dr. Warren.  Answer ¶¶ 21, 23, & 28.  A review of their relative

credentials indicates otherwise.  In 2017, Dr. Warren, a Black female, had eleven years' experience as a superintendent for student populations of 2500 to 12,101 exceeding Dr. McNulty's *three* years of experience as Superintendent over a meager student population that averaged 436 students during his tenure as Superintendent. Dr. Warren had 15 years of central office experience, three years as a principal, and completed her terminal degree in Education ten years before she applied for the position of PCSSD Superintendent.  McNulty had 12 years' experience as a central office administrator, seven years of service as a principal, and he held a terminal degree in Education for seven years

Dr. Warren managed an educational program for an approximately 50% racial distribution between Whites and non-Whites and the accompanying disparities for eleven years; Dr. McNulty's student population was homogeneous, 98.5% White.  Only seven non-White students were enrolled in the schools he supervised as Superintendent.

When asked what evidence she had to support the Board's contention that McNulty was a superior candidate to Warren, Dr. Remele, the White female Board President, replied:

Page 116:   8      A From his interview.

9      Q His interview. All right. What is the evidence

10      from his interview?

11      . . . His people

. . . .

14      skills, the fact that he had a degree, a doctorate in

15      multi-cultural education, he had worked in multi-cultural

16      education, and was very conversant with --

. . . .

Page 117:    14    Q And so, you are saying that his experience in

             15    multi-cultural education exceeded that of Doctor

             16    Warren? Is that what you are saying?

             17    A If you will go back to the fact that Doctor

             18    Warren was not interviewed at that point in time. She

             19    was in the nine. At this point, we are comparing him

             20    with the other people that interviewed in a

             21    face-to-face interview.

             22    Q But that's not -- was not my question. My

             23    question was, what is the evidence that he is a

             24    superior candidate to Doctor Warren? You have that

             25    contention in the Answer to the Complaint and in at

Page 118:     1    least one other filing. So, I'm just asking, what

              2    evidence do you have that he was -- to support your

              3    contention that he was superior?

              4    A Well, I don't have his packet here to look at

              5    it. So, I would have to have his packet to be able to

              6    give you a more specific answer that you want. But

              7    that, yes, my reviewing that packet that we have and

              8    his answers and responses to the questions that we

              9    asked him indicated to me that he was a superior

             10    candidate.

In point of fact, no comparison was made of Dr. Warren's and Dr. McNulty's credentials. Dr. McNulty's testified that his professional training in multicultural education was limited to course work, writing his dissertation, participating in professional development opportunities, and working with leaders in the African-American community in Waterloo, Illinois, his prior appointment before becoming Superintendent in Little Rock.  His experience was "building level."  Dr. McNulty did not testify that he held a degree in multicultural education. Plaintiff's Exhibit 28, McNulty Deposition, pp. 85, line 20, through 86, line 11.

On the other hand, Dr. Warren's professional career has focused on providing multicultural education for public school children and staff on a "district level."  From 1992-2001, she served as Equity Coordinator for Crossett School District, overseeing all areas related to discrimination and allegations relating to race, gender, Title VI, Title IX, and Section 504 of the Rehabilitation Act.  She provided and implemented professional development for staff on bias, culture sensitivity, and race relations to create a positive multicultural environment for educators, paraprofessionals, and students.  Dr. Warren implemented and facilitated equity initiatives.  From 2013-2017, Dr. Warren served as Assistant Superintendent of Equity and Pupil Services.  During this period, she implemented, coordinated, and monitored PCSSD's desegregation plan that mandated the use of multicultural resources within the classroom and the reduction in the achievement gap; she coordinated the District's goals and objectives related to gender, race, disability and non-discrimination; and systematized the District's hiring processes to pursue equity in hiring for District staff.  Finally, her responsibilities included the planning, developing, and offering professional development on equity initiatives.

Both Warren and McNulty have multicultural educational experience.  Neither holds an advance degree in multicultural education.  The Board did not include a specific multicultural

education requirement in the list of qualifications it was seeking.  See Plaintiff's Exhibit 21 Ten

Qualifications (Public Record).  Two of the ten generic, generalized qualifications listed by the

Board in its advertisements could be read to suggest that multicultural educational experience is

important, the second and the last.   The second reads:  "Seeking a Superintendent who:

Possesses the leadership skills required to respond to the opportunities and challenges presented

by an ethnically and culturally diverse community."  The last one provides:  "Seeking a

Superintendent who:  Promotes a positive and professional environment for district employees

and the PCSSD Board of Education."  The use of generic, nebulous, indistinct, and

indeterminable qualifications permits the Board to pick and choose as it wants and to disregard

qualified Black applicants without accountability for discrimination.

Indeed, the stakeholders' fora hosted by Ray and Associates, the Superintendent Search

firm, for staff, parents, students, community and business leaders to assist the Board in setting

the qualifications or rubric for identifying qualified candidates produced a list of Top Ten

Themes. Plaintiff's Exhibit 71 (Public Record).  These Themes identified the pressing needs of

the District and the desired skills and training that the selected candidate should possess.  When

the needs listed are compared with the qualifications and experience of the White male selected

as Superintendent and Dr. Warren, the needs point to Dr. Warren as the ideal Superintendent.  In

her position of Assistant Superintendent for Equity and Pupil Services, she was either handling

the issue, items 1, 2, 3, 4, 5, 7, 8, and 10, or was delegated the issue after Dr. McNulty's

appointment as Superintendent, items 3 and 6.  Rather than using these specific, unambiguous,

and definitive characteristics identified by the people who are heavily invested in the District, the

Board chose a generic, general, ambiguous listing of qualifications.  Was the Board trying to

point away from the most qualified Black in the Top Candidate pool?  Was the Board

implementing, for discriminatory purposes, the training it received entitled: Employing a Superintendent: From Dating to Divorce, Arkansas School Boards, Association Legal Seminar 2018?  Plaintiff's Exhibit 34 (Public Record).  The training, taught by the Board's legal counsel, provided an example of designing a rubric to achieve a desired result.  A hypothetical in the presentation is significant:

**SEARCH PROCESS**:

• You want to stay in-house and have two administrators with a superintendent certificate: your assistant superintendent for finance/HR (male) and your federal programs director (female).

• The board prefers the assistant superintendent for finance/HR because it wants someone with a strong finance background, but the female federal programs director has more years in education and in administration. What do you do?

• 1. Interview both candidates *using a unique rubric that places greater weight* on financial strength. *Presumably this would favor your preferred candidate*.

Plaintiff's Exhibit 34, Employing a Superintendent: From Dating to Divorce, pp. 6-7 (Public Record) (emphasis added).  Did the Board select a rubric that pointed away from its Interim Superintendent?

McNulty was not a superior candidate.  PCSSD's Transfer and Promotion Policies imposed an obligation on the Board to compare the "ability, qualifications, and credentials" of qualified internal candidates with those of external candidates.  If "in the opinion of the administration" they are equal, the Board must favor the promotion of the internal candidate. The nebulous qualifications used by the Board permitted it to steer its determination as it pleased.  Here, the Board did not compare the abilities, qualifications, and credentials of

McNulty and Warren because of her race.  This was an adverse employment action because of

Dr. Warren's race.

### B.     PCSSD RETALIATED AGAINST DR. WARREN'S OPPOSITION TO RACIAL DISCRIMINATION:  PLAINTIFF'S TITLE VII RETALIATION CLAIM

Background

By letter dated March 10, 2016, the Arkansas Department of Education Coordinator of

Fiscal Services and Support, confirmed to PCSSD Superintendent Jerry Guess, that the State

Board of Education approved PCSSD's removal from Fiscal Distress status and State control.

Plaintiff's Exhibit 46.  Both statuses were effectively removed on March 10, 2016.  Five days

later, Johnny Key, Commissioner of Arkansas Department of Education, approved

Superintendent Guess' recommendation for Replacement project for the Mills High School, in

the predominately Black quadrant of the District, and the Robinson Middle School, in the

predominately White West Little Rock area. Plaintiff Exhibit 64, Commission Key Doc.  Rumors

persist of a side deal to divide the District, spinning off Sherwood and Saline County as separate

districts.  See Plaintiff's Exhibit 10, p. 37, line 23 - p. 42, line 13, Gillen Deposition; Plaintiff's

Exhibit 63, Walker Letter re Stipulation.

The one-page document prepared by Derek Scott, Executive Director of Operations,

stated a Rational for the two replacement projects for a total cost of $80 Million.  The Rationale

did not state a pro rata allocation of project funds or require any specific allocation of funding for

either project.  Plaintiff's Exhibit 64.  The Rationale did not mention the standing Order of the

Federal Court that PCSSD must invest $55,000,000 for the construction of high school and

renovation of middle-school facilities in the predominate Black quadrant of the District

comparable to those previously built in Maumelle.  Five of the 2017-2018 PCSSD Board,

Remele (Sherwood), Thomas (Sherwood), Keller (Maumelle), Kemp (Saline County), and

Maune (Chenal) were members of the Community Advisory Board at the time these replacement projects were approved.  Dr. Guess' role as Superintendent was terminated 16 months later, July 18, 2017, and Dr. Janice Warren was appointed Interim Superintendent.  Approximately forty-days later, an irate parent notified Dr. Warren of alleged inequities in the construction of the athletic facilities at Mills High and Robinson Middle.  Dr. Warren immediately notified the Board and Attorney Sam Jones, the District's legal counsel.

Harkening back to the era of dual and unequal school systems, the construction of the sports facilities lacked comparable equipment, space, and appointments.  The previously designed $52,000,000 Mills High School Campus had been scaled back to a meager $37,000,000 for school building and field house with the District assuming responsibility for flag poles and visual displays.  Plaintiff Exhibit 66, p. 41, line 8 - p. 45, line 4, Earnest Duckery Deposition (architect for Mills High School).  Did other downgrades further reduce the value below the $37,000,000?

PCSSD had filed an August 25th Status Report for its September 8, 2017, Status Conference.  Agreeing with the advice of legal counsel to be transparent, Dr. Warren commenced conferences with the architects and general contractor and assisted legal counsel in investigating, evaluating, and processing the information gleaned from those involved the sessions to discover that led to the discriminatory construction.  Dr. Remele, in violation of Board Policy requested that Dr. Warren hold off notifying the other Board Member until Dr. Remele had viewed the two facilities.  Defs. Ex. I.  Consistent with Board Policy, Dr. Warren had notified and scheduled the other six at the same time she notified Dr. Remele.  Plaintiff Exhibit 14, § 1.1, ¶ 2, PCSSD Board Policies; Plaintiff's Exhibit 12, p. 81, line 2 - p. 82, 8, Warren Deposition.  Dr. Warren and legal counsel executed on their proactive transparency

approach, initiating notice to the Court, constituencies, and opposing parties.  Dr. Warren commenced regular meetings with the architects and general contractors and authorized ameliorative and corrective processes to restore value to the Mills High School project.

These steps in opposition to the discriminatory practices in constructing public school facilities were costly for her and would likewise be to any reasonable employee.  Dr. Warren was fulfilling her employment obligations as required by Board Policy "to administering the school system according to the mandates of the laws" with the specific responsibility "for the planning and implementation of an educational program in accordance with State and Federal requirements and the needs of the District."  Plaintiff's Exhibit 14, Board Policy 2.1P:  Duties of the Superintendent.

Dr. Warren, a twenty-five-year veteran of district level public education leadership, was accused of poor judgment in approving the Executive Director of Operation's recommendation that the superintendent's office walls be painted and for replacing the desk that was resting on bricks. Plaintiff's Exhibit 15, Warren Affidavit, 9/9/20.  As the ten-year Superintendent of Crossett School District Dr. Warren had oversight of a $16,000,000 budget and retired with an unblemished record.  At PCSSD she was highly respected by personnel at all levels and was the instrument of change that ushered in the acquisition of unitary status in all but three areas in four years after her arrival.  Plaintiff's Exhibit 1, p. 40, Plaintiff's Exhibit 50, Principals' Letter, Plaintiff's Exhibit 56, Teacher's Letter.  As the processes for hiring the Superintendent progressed, the Board failed to include Dr. Warren in the interviews for Superintendent.

1.   Dr. Warren's evidence satisfies the standard for a prima case under Title VII for Retaliation.  The burden of production shifts to PCSSD.

a.   Dr. Warren took part in protected conduct under the 1964 and 1991 Civil Rights Act

Although Title VII recognizes retaliation and makes unlawful discrimination because an individual opposed any practice made unlawful under 42 U.S.C. § 2000e-3(a), Plaintiff urges, in good faith, an extension of Title VII Retaliation provision when an employer uses employment rights or other conduct as a sword to retaliate against an employee's opposition to employer conduct that is adverse to the underlying goals of the 1964 and 1991 Civil Rights Acts of which Title VII is a part.  This extension is appropriate, especially here, given the 60-year history of State and local racial discrimination in public education and employment in public education. See, e.g., Little Rock School District v. Pulaski County Special School District No. 1, 778 F.2d 404 (8th Cir. 1985).

Retaliation is so prevalent within the PCSSD staff community that high level personnel with critical facts regarding this case will only participate if subpoena or are willing to provide information anonymously but will not risk the retaliatory conduct of the PCSSD Board President, Linda Remele. Others recount anecdotal evidence of a fiance or husband or wife being terminated because he or she was a witness in a case.  This intimidation of Black and White employees defeats the workplace goals of Title VII.

> The anti-retaliation provision seeks to secure that primary objective [a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status] by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees.
>
> . . . .
>
> The antiretaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct.

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 63, 126 S Ct 2405 (2006).
A highly redacted letter shares the extend of the Constitutional depravations being experienced.
See, e.g., Plaintiff's Exhibit 69. The guarantees of Title VII are no better than a myth.

Assuming this Court willingness to extend the applicability of 42 U.S.C. § 2000e-3(a) to
opposition to other illegal acts of discrimination prohibited by the 1964 Civil Rights Act,
especially 42 U.S.C. § 2000c, Dr. Warren can demonstrate that she took part in protected
conduct.  In opposition to the discriminatory practices in constructing public school facilities in a
predominately Black community, Dr. Warren notified the District's Board, legal counsel, and
participated with legal counsel in investigating and reporting the District's wrongful conduct to
the Federal Court under whose supervision the District remains.

b.      Dr. Warren was subject to an adverse employment.

As an applicant for permanent appointment as Superintendent in March of 2018, Dr.
Warren was not selected for an interview in contravention of her contract rights, terms and
conditions of her employment.  As a qualified, Certified, internal candidate, Dr. Warren was
entitled to an interview. Plaintiff's Exhibit 7, Transfer and Promotion Policy. Moreover, after a
comparative assessment by the Board, if she was equally qualified as an external candidate, she
held a hiring preference.  Plaintiff's Exhibit 30, Interview Custom.  As part of its processes, the
Board did not interview Dr. Warren, did not assess her credentials against those of the three
males granted an interview, and did not hire her.  More importantly, Dr. Warren suffered
malicious criticism and false accusations by the White female membership of the Board in their
attempts to adverse impact the male majority's perception of Dr. Warren's suitability
Superintendent.  Dr. Remele's retaliation for Dr. Warren's opposition to racial discrimination

carried the risk of besmirching her impeccable record, along with the risk of adversely impacting

future employment opportunities as a superintendent, especially within the State of Arkansas.

> c.  A causal nexus exists between the protected conduct and the
> adverse action.

Seven days after notifying the Court of the inequities in construction by the filing of an

updated status report and four days after the status hearing in Federal Court, Linda Remele, the

President of the Board and a decisionmaker began, at the Board's September 12, 2017, meeting, a

campaign to discredit Janice Warren.  Dr. Remele "heard" that the Superintendent's office was

being painted on July 19, 2017; but Dr. Remele did not raise her critical assessment of Dr.

Warren until September 12, 2017, four days after the Status Hearing.  Remele's List includes an

allegation that on "September 12 in executive session the board reminds you that you are interim

and just to keep the ship afloat. Not make major changes and not remodel offices." Defendants'

Exhibit I, Remele's List, Entry #7.  Review of the Board's minutes between September 1st and

November 14, reveals that September 12th was the one executive session that permitted

sufficient time to decide as a Board to commence its processes for engaging a Superintendent,

unless the Board met outside of its duly convened sessions.  Here, an inference of a causal

relationship between the protected conduct and the adverse action is substantial.  *Wallace,*

*supra.*, p. 1119.  Similarly, Dr. Remele's comments on the same day reflected animus.  "We don't

air our dirty laundry."  "You're just an interim."  "Just keep the ship afloat!"

At the November 14, 2017, meeting, Dr. Remele and Ms. Gillen verbally attacked Dr.

Warren performance with lists of factually erroneous allegations about her communicating and

cooperating with the Board.  Coincidentally, the Board received its first presentation by a

Superintendent search company that evening.  Plaintiff's Exhibit 60.

Assuming the extension of 42 U.S.C. 2000e, Dr. Warren demonstrates a prima facie case for retaliation.  The burden of production shifts to PCSSD.

C.      PCSSD RETALIATED AGAINST DR. WARREN'S OPPOSITION TO RACIAL DISCRIMINATION:  PLAINTIFF'S § 1981 RETALIATION CLAIM

Thirty-three days after the Federal Court expert filed her report on the substantial deficiencies between two construction projects, one is a predominately Black community and the other in a predominately White community, the PCSSD Board hired Ray and Associates to commence a search for a new superintendent. Review of the Board's minutes for September suggests that the members of the PCSSD Board made the decision to not extend Dr. Warren's services as Interim Superintendent at its September 12, 2017, meeting. This Board meeting was held seven (7) days after the Federal Court was notified of the District's construction deviation. Plaintiff's Exhibit 75, Board Minutes, Sept. 12, 2017.  The Board's decision was made in retaliation because Dr. Warren challenged the District's racially discriminatory practices in violation of its desegregation plan, Plan 2000, and Federal Court orders directing the expenditure of $55,000,000 on facilities in the predominately Black community. The Board's decision was an adverse employment action that violated Dr. Warren's statutory right to challenge racially discriminatory practices by her employer and not be retaliated against for doing so. CBOCS West, Inc. v. Humphries, 553 U.S. 442, 445-457, 128 S.Ct. 1951 (2008) (42 U.S.C. § 1981 encompasses retaliation claims).  This conduct was also designed to adversely impact Dr. Warren's application for the permanent position of Superintendent and violated her Constitutional and statutory right to be free of discrimination in contractual relationships.

1.      Dr. Warren's evidence satisfies the standard for a prima case for
        Retaliation under Section 1981.  The burden of production shifts to PCSSD.

a.      Dr. Warren took part in protected conduct when she opposed racial discrimination by PCSSD in its inequitable construction of Public School facilities in the predominately Black community.

Dr. Warren engaged in protected conduct.  In opposition to the District's discriminatory practices in constructing its public school facilities in a predominately Black community, Dr. Warren notified the District's Board and legal counsel, investigated the problem, developed with legal counsel a strategy of transparency, informed constituents, assessed the extent of harm, identified responsible parties, and assisted legal counsel in notifying opposing parties and the Federal Court under whose supervision the District remains.

b.      Dr. Warren was subject to adverse employment actions.

As a result of her opposition to racial discrimination, Dr. Warren suffered malicious criticism and false accusations by the White female membership of the Board in their attempts to adverse impact the male majority's perception of Dr. Warren's suitability as Superintendent.  Dr. Remele's retaliation for Dr. Warren's opposition to racial discrimination carried the risk of besmirching Warren's impeccable record, along with the risk of adversely impacting future employment opportunities as a superintendent, within the State of Arkansas.  Dr. Remele's retaliatory conduct distracted from the high-quality performance of Dr. Warren's duties as Interim Superintendent. Plaintiff's Exhibits 50, 56, 57, Employees' Support/Concern. While managing a district with 12,000 students plus staff and seeking to ameliorate a twenty million-dollar discriminatory act, Dr. Warren was confronted with Dr. Remele's efforts to marginalize Dr. Warren's effectiveness as Interim Superintendent.  In violation of District policy, District legal counsel blind copied Dr. Remele on all communications after September 5, 2017.  See Plaintiff's Exhibit 14, Board Policy 1.1.  Staff was asked to report to Dr. Remele on Dr. Warren's decisions and activities.  Principals were called and were asked to share the nature and scope of

Dr. Warren's presentations.  "I hear."  "I told you!" "You said!"  Animus recriminations often fell

from Dr. Remele's lips.  Plaintiff's Exhibit 45, Evidentiary Summary of Defendants' Exhibit I.

Dr. Warren's application for appointment as Superintendent in March of 2018 was tainted

by Dr. Remele's and Alicia Gillen's accusations.  In contravention of the terms and conditions of

her employment contract, Dr. Warren was not selected for an interview during the 2018

Superintendent search.  As a qualified, Certified, internal candidate, Dr. Warren was entitled to

an interview. Plaintiff's Exhibit 7, Transfer and Promotion Policy.  Moreover, the Board was

contractually obligated to engage in a comparative assessment of Dr. Warren's abilities, skills,

experience, and credentials, if she was equally qualified as an external candidate.  If equally

qualified, she held a hiring preference.  Plaintiff's Exhibit 7, Transfer and Promotion Policy.  As

part of its 2018 processes, the Board did not interview Dr. Warren, did not assess her credentials

against those of the three external male candidates who were granted interviews, did not compare

her skills, ability, and credentials with those of the external candidate who was hired.  On April

3, 2018, the Board hired an external candidate whose abilities, skills, experience, and credentials

were inferior to hers.  See Plaintiff's Exhibits 23 (Candidate Comparison), 24 (Warren

Application) and 25 (McNulty Application).  The Board did not hire Dr. Warren, a Black female,

in retaliation against her protected activity but rather hired a White male.

        c.     A causal nexus exists between the protected conduct and the
             adverse action.

Seven days after notifying the Court of the inequities in construction by the filing of an

updated status report and four days after the status hearing in Federal Court, Linda Remele, the

President of the Board and a decisionmaker began, at the Board's September 12, 2017, meeting, a

campaign to discredit Janice Warren.  Dr. Remele "heard" that the Superintendent's office was

being painted on July 19, 2017; but Dr. Remele did not raise her critical assessment of Dr.

Warren until September 12, 2017, four days after the Status Hearing.  Remele's List includes an allegation that on "September 12 in executive session the board reminds you that you are interim and just to keep the ship afloat. Not make major changes and not remodel offices." Defendants' Exhibit I, Remele's List, Entry #7.  Here, Dr. Remele is directing, in violation of Board Policy, the day to day administration of the District which is within the sole authority of the Superintendent.  Plaintiff's Exhibit 14, Board Policy: Superintendent's Duties §§ 1.3 & 2.1P.  Review of the Board's minutes between September 1st and November 14, reveals that September 12th was the one executive session that permitted sufficient time for the Board to take official action to commence its processes for engaging a Superintendent, unless the Board met outside of its duly convened sessions.  Here, an inference of a causal relationship between the protected conduct and the adverse action is substantial. *Wallace, supra.*, p. 1119.  Similarly, Dr. Remele's comments on the same day reflected animus.  "We don't air our dirty laundry."  "You're just an interim."  "Just keep the ship afloat!"

At the November 14, 2017, Board meeting, Dr. Remele and Ms. Gillen verbally attacked Dr. Warren's performance with their lists of factually erroneous allegations about her failure to communicate and cooperate with the Board.  They mischaracterized her intentions without an investigation or giving Dr. Warren an opportunity to explain.  For an analysis of the Remele List, see Plaintiff's Exhibit 45; for a discussion of Gillen's List, see Plaintiff's Brief, *infra.,* pp. 77-77.  Was it coincidental that the Board received its first presentation by a Superintendent search company the evening of November 14, 2017. Plaintiff's Exhibit 60, Minutes, Nov. 14, 2017.

Dr. Warren demonstrates a prima facie case for retaliation under Section 1981.  The burden of production shifts to PCSSD.  As demonstrated below, Defendants' arguments regarding their legitimate reasons for their conduct are false and is a cover for discrimination

because of her race and discriminatory because of her sex and in retaliation for her protected

conduct.  PCSSD does not have admissible evidence to meet its burden of production.  Even

assuming PCSSD's evidence is admissible evidence, it is false and a pretext to cover its

intentional discrimination as demonstrated below.

D.     PCSSD'S EVIDENCE OF ITS PURPORTED LEGITIMATE NONDISCRIMINATORY
       REASONS IS *INADMISSIBLE* AND A PRETEXT TO COVER INTENTIONAL
       DISCRIMINATION

       In this case, Plaintiff's obligation to establish the circumstance that give rise to

discrimination by providing admissible evidence of a prima facie case. Plaintiff's obligation to

assert admissible evidence that the purported legitimate reasons are pretext for discrimination

only arises if PCSSD satisfies its burden of production of a legitimate, nondiscriminatory reasons

for rejecting Dr. Warren's application with admissible evidence.  *McDonnell, supra*., at 802.  If

PCSSD's evidence is inadmissible, the presumption of discrimination remains and Dr. Warren is

entitled to summary judgment unless reasonable jurors might differ on whether Dr. Warren's

evidence establishes a prima facie case.  *Reeves, supra*., *St. Mary Honor, supra.,* Fed. R. Civ.

Pro. 56(c)(1)(B), (e)(4), & (f)(1).  Similarly, if PCSSD's evidence is false or the factfinder

disbelieves the purported "legitimate" reason, the factfinder may couple the falsity of the

purported reasons with the prima facie case to find intentional discrimination, especially where a

suspicion of mendacity is present.  *Reeves v Sanderson Plumbing Products*, 530 U.S. 133, 120 S.

Ct. 2097, 147 L. Ed. 2d 105 (2000).  PCSSD's evidence is inadmissible, it is false, and a

suspicion of mendacity is pervasive.

       **Factual Background on PCSSD's Purported Legitimate Nondiscriminatory Reasons**

       On August 24, an irate Mills High School parent called Dr. Warren and complained about

the inequitable construction of Mills High School's athletic facility in the predominately Black

community as compared with the Robinson Middle School athletic facility in the predominately White Chenal Valley Community.  After assessing the validity of the complaint, Dr. Warren notified each Board member on August 24, 2017, and scheduled each Board member for a viewing of the video footage that compared the two athletic facilities.  Plaintiff's Exhibit 12, p. 81, Warren Deposition.

Following Sam Jones', the District's Attorney, counsel and advice, Dr. Warren began a proactive process of notifying, correcting, and minimizing as much as possible a more than a twenty-million-dollar act of racial injustice to the District's predominately Black community. Chief Justice Price Marshall commended the District on its proactive notification to the Court of the problems.  Plaintiff's Exhibit 18, Email from Sam Jones (Public Record). Seven days after notifying the Court of the inequities in construction by the filing of an updated status report and four days after the status hearing in Federal Court, Linda Remele, the White female President of the Board and a decision maker, began at the Board's meeting on September 12, 2017, a campaign to discredit Janice Warren. Alicia Gillen, the other White female Board member and decision maker would later join the campaign.  At the meeting, the Board, as an official act, decided to commence its search for a permanent superintendent.  Complaint ¶ 22, Plaintiff's Exhibit 75.

Rather than being celebrated for her efforts, Janice Warren was denigrated and belittled, wrongfully accused of a lack of fiscal judgment, and labeled as incommunicative by Linda Remele and Alicia Gillen, the two White female members of the Board.  Defendants refer to "*Multiple* PCSSD Board members testified" regarding concerns about Dr. Warren's performance. Defs' Brief in Support, p. 20, ¶ 1 (emphasis added).  TWO board members, two White female decisionmakers, testified about "their concerns." Motivated by racial animus and "same class"

bias, Remele told the 25-year district level educator, referring to the Status Hearing, "We don't air our dirty laundry." "Just keep the ship afloat." "You're just an interim." Plaintiff's Exhibit 12, pp. 103, line 23, -104, line 25, Deposition of Janice Warren (Opposing Party Statement); Plaintiff's Exhibit 9, pp. 71 - 72; 141, line 22 - p. 142, line 12, Remele Deposition (Non-hearsay, not offered for the truth of the contents of the statement but that it was said).

Immediately following the Status Hearing regarding the inequitable construction of Mills High School, Linda Remele began compiling her list of malicious criticisms and false, factually erroneous accusations. Plaintiff's Exhibit 15 Warren Affidavit. Remele's document and her deposition testimony regarding the document and the events listed are inadmissible accusations, hearsay and double hearsay of events, *not* within Linda Remele's personal knowledge. The allegations presented as legitimate nondiscriminatory reasons in Defendants' Brief, pages 20-22, fall within Federal Rules of Evidence ("Fed. R. of Evid.") 602, 801(c), 805. The movant for summary judgment may not support its motion with inadmissible evidence. Without admissible evidence, the movant is deemed not to have answered the non-moving party's evidence and summary judgment must be denied. (This list of accusations and Linda Remele's deposition testimony is being championed by the Defendants as evidence of legitimate reasons for the Board's retaliatory conduct, its justification for not including Janice Warren in the pool of finalist and not hiring Janice Warren as a permanent Superintendent.

Below, Plaintiff evaluates the inadmissibility each of the events argued on pages 20-22. A chart, dated and authenticated by Plaintiff's counsel, addresses each of the items listed in Defendants Exhibit I, "Issues Leading to a Lack of Confidence with Dr. Warren," ("Remele's List"). Plaintiff's Exhibit 45. Plaintiff objects to the admissibility of both Remele's List and her deposition testimony about Remele's List and moves to strike the list and Dr. Remele's

deposition testimony on all event listed.  Below is Plaintiff itemized assessment the inadmissibility and the falsity of each assertion argued.  Attached as Plaintiff's Exhibit 45 is an assessment of the admissibility of each entry included in Remele's List, Defendants' Exhibit I.

      1.     Dr. Remele lacks personal knowledge.

Fed. R. Civ. Pro. 56(c) requires a party asserting that a fact cannot be or is genuinely disputed to support the assertion by citing to particular parts of materials in the record.  The types of materials are broad.  Fed. R. Civ. Pro. Civ. 56(c)(1)(A). In order to prevail on a Motion for Summary Judgment, the movant must provide a properly supported motion, only then is the nonmovant required to go beyond her allegations with "any significant probative evidence tending to support the complaint." *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Material cited by the movant to support a fact must be in a form that is admissible in evidence at trial.  Wright, Miller & Kane, 10A Federal Practice & Procedure Civil § 2727.2 (4th ed. April 2020) ("Fed. Prac. & Pro. Civ.").  The 2010 Amendments to Rule 56(c) of the Fed. R. Civ. Pro. abrogated the need for authenticating documents but required citation to the relevant part of the document.  10A Fed. Prac. & Pro. Civ. § 2722 (4th ed. April 2020).  Defendants' authenticating inadmissible hearsay does not purge the evidence of its character as hearsay.

The facts asserted by Defendants as legitimate nondiscriminatory reasons for their behavior are not supported by material that can be presented in a form that is admissible evidence at trial.  Fed. R. Civ. Pro. Civ. 56(c)(2).  Neither the document referred to as Remele's List, Defendant's Exhibit I nor Linda Remele's deposition testimony about her concerns can be presented in a form that is be admissible.  First, the much of the contents of both materials, Linda Remele's list and her testimony about the events on her list, are *not* within Linda Remele's

personal knowledge as required by Fed. R. Evid. 602.  Second, these "concerns" are hearsay and,

in some instances, double hearsay and are inadmissible into evidence.  *Arkansas Right to Life v.*

*Bulter*, 983 F.Supp. 1209 (W.D. Ark. 1997), judgment aff'd and remanded on other grounds,

1146 F.3 558 (8th Cir. 1998); *Walling v. Fairmont Creamery Co.*, 139 F2d 318, 323 (8th Cir.

1943); *Martinez v. Norris*, Case No. 5:15-cv-171-JM-BD (E.D. Ark. July 13, 2020).

      2.      Mischaracterization of the Context of Allegation of Poor Judgment in Handling of District Finances.

Defendants preface their concern for Dr. Warren's poor judgment in handling the

District's finances by asserting that "PCSSD had recently come out of fiscal distress."  PCSSD

was released from State control in March of 2016, sixteen months before the events alleged in

this case.  Plaintiff's Exhibit 46, Letter Notifying PCSSD of its Release (Public Record).  Four

Board members testified during their depositions that the April and July end of quarter financial

updates by District CFO, Denise Palmer, assured the Board that the District was on budget.

Board member Shelby doesn't recall being put on notice of budgetary problems by the CFO's

reports.  Plaintiff's Exhibit 32, p. 32, p. 14 -16 Thomas Deposition. Gillen doesn't recall specifics

from the April and June updates by the CFO; Gillen's concerns arose in January of 2017.

Plaintiff's Exhibit 10, p. 27-30, Gillen Deposition

      a.      "Remodeling of the Superintendent's Suite" -- Argument page 20. "On July 19, I hear she is having paneling in the supt [superintendent's] office painted -- later find out it has been removed."  Entry #2, Remele's List, Defendants' Exhibit I."

Linda Remele heard from a third party that the Superintendent's Office was being painted

and that the paneling was removed.  Linda Remele isn't competent to testify about what she

heard or later learned.  If she cannot testify without personal knowledge, her document

containing a written statement of what she heard likewise lacks competency.  Fed. R. Evid. 602.

Furthermore, the statement is hearsay and not within a recognized exception. Remele's List, Entry #2 is an out of court statement offered for the truth of the matter contained in the statement to prove that Dr. Warren lacked judgment regarding District finances.  The statement is inadmissible.

Not only is the statement inadmissible, is mischaracterizes the facts.  As Dr. Warren shares in her deposition:

Page 112

11 Q Explain what you would have done about the

12 painting.

13 A And it might have been on the 19th, but I don't

14 think so, that Derek walked in the Superintendent's

15 office, and Doctor Guess and I were in there, and he

16 said that they had planned to paint the office. And I

17 remember asking him, "How are you going to pay for

18 that?" He said, "It's part of SRM [Sustainment, Restoration, and Modernization]." I said, "Oh,

19 okay." So, that's how it started, with the walls.

20 Q Okay. So, you are saying that -- are you

21 testifying that Derek Scott told you that that was

22 already in motion?

23 A It was already in the budget, yes.

24 Q Okay.

25 A That that was part of the plan for that

0113

1 particular school year. We had -- he had had a

2 three-year phase. And I remember this because I had

3 been on that SRM Committee, of different repairs

4 around the district that were being done, and Central

5 Office was a part of it.

Plaintiff's Exhibit 12 Warren Deposition, pp. 112-113 (Opposing Party Statements by Agents

Fed. R. Evid. 801(d)(2)(D) and a secondary basis for Derek Scott's statement, it is not offered for

the truth of the contents but that the words were spoken; not hearsay); Plaintiff's Exhibit 15,

Warren Affidavit. Dr. Warren wasn't remodeling; she approved the recommendation of Derek

Scott, Executive Director of Operations, to paint the walls. He recommended that the walls be

painted as planned in the SRM Budget.  Only after inquiring about the source of the funds for the

painting did Dr. Warren approve the painting of the office. See also Plaintiff's Exhibit 13,

PCSSD 2017-18 SRM Budget, p.2 Paint & Finishes (Public Record).  The SRM Budget

allocated $950,000 for Paint and finishes and $230,000 for "District wide various cafeteria and

Kitchens repainting/ceiling tile." Plaintiff's Exhibit 13, PCSSD 2017-18 SRM Budget (Public

Record).

Board member Alicia Gillen testified that the Superintendent's office was inadequate but

felt Dr. Warren needed "her bosses" to approve the painting of the office. Plaintiff's Exhibit 10,

Gillen Deposition, p. 108, lines 6-23. Board Policy delineates the relative spheres of

responsibility, day to day operations are within the Superintendent's jurisdiction; matters of

policy are within the preview of the Board.  This, Gillen later acknowledges that the painting was

not a matter of policy.  Plaintiff's Exhibit 10, Gillen Deposition, pp. 108, line 24 - 110, line 18.

The most troubling aspect of the Defendants' attempt to use this inadmissible hearsay allegation as a legitimate reason for their employment decision is the timing of Dr. Remele's accusation. Dr. Remele "heard" that the Superintendent's office was being painted on July 19, 2017; but Dr. Remele did not share her critical assessment of Dr. Warren until September 12, 2017, four days after the Status Hearing.  "September 12 in executive session the board reminds you that you are interim and just to keep the ship afloat. Not make major changes and not remodel offices." Defendants' Exhibit I, Remele's List, Entry #7; See also, Plaintiff's Exhibit 67, Remele's List with Warren's Responses, and Plaintiff's Exhibit 45, for an evidentiary evaluation of all the entries on Remele's List.

> b.      Warren purchased new office furniture:  Remele's List Entry #8.
> Defendants' offer the following allegation to prove that Dr. Warren demonstrated poor judgment:
>
> Sept 22 I hear you have purchased and installed new furniture in your offices. I call you and tell you as a friend that the board as a whole would not be happy with this as we told you not to remodel and I suggested you send the furniture back. You said you didn't think you could and I assured you the company would take it back as they do a huge volume of business with us and want to continue outfitting three new schools.

Remele's List Entry #8, Argument, Defs. Brief, p. 20.  Again, Linda Remele lacks personal knowledge about the facts alleged.  Linda Remele heard from a third party that Dr. Warren had ordered a new desk to replace the one resting on bricks.  Linda Remele isn't competent to testify about what she heard or later learned.  If she cannot testify without personal knowledge, her document containing her written statement of what she heard likewise lacks competency.  Fed.

R. Evid. 602, 10A Fed. Prac. & Proc. Civ. § 2722 (4th ed.).  Furthermore, the statement is

hearsay, containing hearsay; neither statement is within a recognized exception.

> " Sept 22 I hear you have purchased and installed new furniture in your
>
> offices."

Out of court statement, offered for the truth of the contents.  This statement by declarant,

Linda Remele, is being offered against Janice Warren and isn't within an exception.

> "I call you and tell you as a friend that the board as a whole would not be
>
> happy with this as we told you not to remodel"

Here, Linda Remele has personal knowledge of what she said, but this portion of her

statement is an out of court statement offered to prove that Dr. Warren demonstrated poor

judgment.  It too is not within an exception to hearsay.  Although it is a party's statement, isn't

being offered against the party who spoke it.  Fed. R. Evid. 801(d)(2).  On September 12, 2017,

Linda Remele presented her accusation of remodeling to the Board and only then is Dr. Warren

told not to "remodel".  The desk was order by the Secretary to the Executive Director of

Operations on July 28, 2017, to replace the one resting on bricks, along with a credenza for

storage, and six chairs for the conference table.  Plaintiff's Exhibit 47, Virgo Invoice (Public

Record).  The 2017-2018 SRM Budget included $570,000 for "Furnishings, Fixtures and

Equipment (includes cafeteria tables at various schools)".  Plaintiff's Exhibit 13, 2017-2018 SRM

Budget (Public Record). The items ordered for Dr. Warren to make the office functional cost

$6,078.66, including tax.  Plaintiff's Exhibit 47, Virco Invoice (Public Record).

> "I suggested you send the furniture back."

Linda Remele has personal knowledge of what she said, but this portion of her statement is an

out of court statement offered to prove that Dr. Warren demonstrated poor judgment.  It too isn't

within an exception to hearsay.  It is a party's statement; but the statement is not being offered against the party who spoke it.  Fed. R. Evid. 801(d)(2)(A).

"You said you didn't think you could."

This portion of Entry #8 of Remele's List, is double hearsay.  The statement "you didn't think you could," is hearsay, Dr. Remele's statement about Dr. Warren's statement.  Had Remele stated "She said, 'I don't think I can'" double hearsay would be avoided.

More importantly, the Conditions of Sale provided that an acknowledged purchase orders cannot be changed or cancelled without the seller's, Virco, consent.  That consent might be conditioned upon the payment of increased or additional expenses including a 25% cancellation fee, if the order was cancelled or changed within a minimum of 20 days prior to the expected delivery date as acknowledged.  Plaintiff's Exhibit 47, p. 21, Virco Invoice, footnoted boilerplate (Public Record).  Virco acknowledged the order on July 31, 2017, and gave a three to four weeks expected delivery date.  Plaintiff's Exhibit 47, p. 21, Virco Invoice, handwritten note (Public Record).  The expected delivery date was August 21 through August 28, 2017.  Linda Remele's September 22nd request that the furniture be returned was well beyond the 20-day period before August 21 through August 28.  Dr. Warren, however, was concerned about PCSSD's business reputation with a valued supplier.  Plaintiff's Exhibit 15,Warren's Affidavit.  Plaintiff objects to the admission of Entry #8, Remele's List.

> c.    Work load of testing coordinators:  Remele's List, Entry #11.
>
> You said the 4 high schools would continue to hire a testing coordinator. As of the meeting on Nov 2 *I believe* all 4 high schools have a testing coordinator but that has not relieved the media specialist at those 4 high schools of the testing responsibility. The newly hired coordinators are on contract and working *but have*

> *been told to only take over a helping role* and the media specialist is still the responsible person for testing up until the summative testing and then they will be in charge of the testing. This is another COST item. *We are paying for 4 testing coordinators who are not coordinating testing until April.*

Defendants' Exhibit I, Remele's List, Entry #11, Argument, Defs. Brief, p. 21 (emphasis added).

Here, again, Dr. Remele lacks personal knowledge and is opining about the status of the hiring of the testing coordinators and their work load.  "I believe."  The coordinators "have been told".  Entry #11 reflects a lack of personal knowledge and the absence of an investigation or inquiry by Remele to determine the facts or the role of the District employees.  What the testing coordinators were told is double hearsay. In point of fact, two of the District's testing coordinators resigned because of the work load.  Plaintiff's Exhibit 15, Warren Affidavit.

> 2017 was the second year ACT Aspire was being used as the ADE summative assessment.  I was informed by Sam Altschul, Director of Federal Programs, that Instructional coaches could not administer the summative assessment because the test was a State required test and the coaches were paid with Title 1 funds.  Therefore, we assigned interim assessments to coaches and summative assessments to media specialists. The volume of the work and time spent preparing, testing was overwhelming for everyone.

Plaintiff's Exhibit 15, Warren Affidavit.  Dr. Remele admits in her deposition testimony that under Board Policy the organization of testing to comply with a Federal mandate was within the Superintendent's authority.  Plaintiff's Exhibit 9, p. 91, line 8 - p. 92, line 4; Remele Deposition (not hearsay Fed. R. Evid. 801 (d)(2)(A)).

Plaintiff objects to the admission of Entry #11, Remele's List, Linda Remele lacks personal knowledge of the facts. Entry #11 contains double hearsay.  Entry #11 is an out of court statement offered to prove the truth of what is stated and contains hearsay, "The newly hired coordinators have been told *to only take over a helping role* and the media specialist is still the responsible person for testing up until the summative testing and then they will be in charge of the testing."

> d.   Dr. Warren purchased umbrellas for Central Office Staff:  Remele's List Entry #15, Defendants' Argument, p. 21.

> 11/14/17 ordered a hundred and fifty imprinted umbrellas for central office staff to give as Christmas gifts. Cost of $2,436.84 was told it would be an audit finding as you can't do that with taxpayer dollars. Dr. Warren said she was told it was not an audit finding. I know she was told exact opposite.

Defs. Exhibit I, Remele's List Entry #15, Defendants' Argument, p. 21.  Linda Remele lacks personal knowledge of the facts asserted and isn't competent to testify about the facts asserted. Fed. R. Evid. 602.  If her testimony regarding the facts is inadmissible, a document containing the same assertion is likewise inadmissible.  Although the form of material that may be considered for a motion for summary judgment is broad, the evidence must be admissible.  Fed. R. Civ. Pro. 56(c)(A)(4), 10A Fed. Prac. & Proc. Civ. § 2722 (4th ed.).

As Dr. Warren states in her affidavit, after visiting with the State Auditor and being told that the umbrellas might raise a red flag, she decided to purchase the umbrellas rather than T-shirts as recommended by the Auditor, knowing that the umbrellas would be a personal expense. The invoice for the umbrellas was not presented to the Board and the Board was not asked to approve the purchase.  The Board never inquired about Dr. Warren's plans. Plaintiff's Exhibit 15, Warren Affidavit. The inadmissible statement mischaracterizes the facts and the inference that

Dr. Warren intended to use taxpayer money for the gift is false.  The allegation that the Board denied Dr. Warren's purchase order is false!

Plaintiff objects to the admission of Entry #15, Remele's List. Linda Remele lacks personal knowledge of the facts and the statement is hearsay. Entry #15 is an out of court statement offered to prove the truth of what is stated.  Furthermore, Entry #15 contains double hearsay, the statement of what the Auditor said. Neither statement is within a hearsay exception. Linda Remele has personal knowledge of statements made to her by Dr. Warren.  The statement, "Dr. Warren said she was told it was not an audit finding," is not hearsay.  It is an Opposing Party Statement offered against the party who purportedly made the statement. Fed. R. Evid. 801(d)(2)(A).  Only this phrase of Entry #15 is admissible in the form presented.  10A Fed. Prac. & Proc. Civ. § 2722 (4th ed.).

Linda Remele did not inquire about Dr. Warren's plans.  Her goal was to accuse, discredit, and malign Dr. Warren's credibility as the Board entered it processes for selecting a superintendent search firm.  The accusation was made on November 14, the date of the first presentation by a superintendent search firm.  Without asking Dr. Warren about her plans for paying for the umbrellas, Entry #15 results in an inference that mischaracterizes Dr. Warren's intent.

        e.      Board's purported concerns about communications -- Status
                Report:  Defendants' Argument, ii., page 21

Defendants argue that the Board was concerned about Dr. Warren's communication skills and assert that Dr. Warren failed to work cooperatively with the Board.  Two White women, Linda Remele and Alicia Gillen, falsely accuse Dr. Warren of failing to work cooperatively with the Board as the District sought to update its previous Status Report filing in advance of the scheduled September 8, 2017, Status Hearing.  Documents in the email exchange were provided

to Defense counsel before the filing of Defendants' Motion for Summary Judgment. These emails establish that Attorney Sam Jones emailed Dr. Warren his draft at 2:23:47 p.m.  Plaintiff's Exhibit 18, page 1, bottom section. Dr. Warren forwarded Attorney Jones' email at 3:10 p.m. Plaintiff's Exhibit 18, page 1, middle section. At 4:27 p.m., Attorney Jones emailed Dr. Warren and stated:  "About to file.  Is the Board fully informed?"  At 5:00 p.m., Dr. Warren replied: "Yes."  Contrary to Defendants' allegation, Defs. Brief p. 22, Attorney Jones did not ask Dr. Warren if the draft had been discussed or if she had reviewed it with the Board.  "Is the Board fully informed?"  In her 3:10 p.m. email, Dr. Warren attached the draft of the Supplemental Status Report, shared the purpose of the filing, indicated that questions remained, reviewed the number of meetings undertaken with the architects and general contractor, and invited the members to call if they had questions.  Plaintiff's Exhibit 18, p. 2, Email exchange re Jones' Supplemental Status Report.

Alicia Gillen responded at 6:18 p.m. Plaintiff's Exhibit 18, page 2, top four lines. The Board received the draft of Attorney Sam Jones' intended filing as Dr. Warren represented.[5] Plaintiff's Exhibit 18, Emails re Status Hearing Update (Opposing Party's Statements by its Agents 801(d)(2)(D)).

(1)     Board Policy allocates responsibility for administrating the District consistent with the mandates of the law to the Superintendent.

Board Policy 2.1P Duties of the Superintendent describes the responsibilities of the Superintendent.  Included in that description is the responsibility to administer "the school

---

[5] Including this allegation in the Motion for Summary Judgment raises an issue of Defense counsel's compliance with Fed. R. Civ. Pro. 11(b)(2)(3) and his ethical duty of candor before this Court.  Plaintiff's Second Supplementary Response on August 3, 2020, included emails to the Board on September 5, 2017, from Dr. Warren forwarding Attorney Sam Jones' draft supplemental status report.  Alicia Gillen's September 5, 2017, response to the email was also provided.

system according to the mandates of the law."  Plaintiff's Exhibit 14, Board Policy 2.1P.  After

the Board terminated Attorney Allen Roberts and Superintendent Jerry Guess, the services of

Attorney Sam Jones were engaged to continue the representation of the District in its thirty-first

year of the desegregation lawsuit.  Attorney Sam Jones drafted the Supplemental Status Report.

See Plaintiff's Exhibit 48, Supplemental Status Report.  He sought information from Dr. Warren.

Dr. Warren sought information from Dr. Remele who served on the Community Advisory Board

that functioned alongside Commissioner Key while the District was subject to State control.

Attorney Sam Jones attended three meetings arranged by Dr. Warren with the architects that

designed and oversaw the construction and the general contractor who managed the construction

to grasp the factual data needed for the Supplemental Status Report.  Dr. Remele and Alicia

Gillen complain that they weren't asked to assist in the drafting.  Neither of these women alleges

that she holds a license to practice law.  Neither alleges that she is admitted to practice before the

United States District Court for the Eastern District of Arkansas.  Neither alleges that she had

access to facts that were material to the issues Attorney Jones needed and wanted to address.

Both women, along with the silent male majority of the Board, were given an opportunity to

review the draft before it was filed.  The Supplemental Status report was filed on Tuesday,

September 5, 2017, at 6 p.m., two business days before the Friday, September 8, 2017, Status

Conference to put the Judge on notice of the District's discriminatory conduct.  The District had

twelve days from the discovery of its discriminatory conduct to the Status Conference to

investigate the problem, develop a strategy, inform constituents, assess the extent of harm,

identify responsible parties, and notify the Court and opposing parties.  Prior to receiving the

September 5th draft of the Supplemental Status Report, the record does not reflect that the Board

received, expected, or requested the quarterly Status Reports required by Judge Marshall from 2016 forward.  See Plaintiff's Exhibit 15, Warren Affidavit.

On Wednesday, September 6, 2017, the Director of Communications provided a position statement for the Board's review that would be used to respond to the envisioned Press coverage of the District's discriminatory conduct.  On Thursday, September 7, 2017, Dr. Warren emailed the Board a copy of the Intervenor's Comments for the September 8, 2017, Status Conference. Plaintiff's Exhibit 49, Intervenors' response.  Because she was not invited to participate in the drafting, Dr. Remele, in violation of Board Policy, requested Attorney Jones to copy her on any communication sent to Dr. Warren.  Plaintiff's Exhibit 15, Warren Affidavit.

> While the Board has a broad range of powers and duties, its individual members only have authority when exercising their responsibilities in a legally convened meeting acting as a whole.  The sole exception is when an individual member has been delegated authority to represent the Board for a specific, defined purpose.

Plaintiff's Exhibit 14, Board Policy 1.1:  Legal Status of the Board of Directors (Public Record).

### (2)   Linda Remele's Deposition Testimony Regarding the Supplemental Status Report Lacks Credibility.

Dr. Remele states in her deposition that Sam Jones told her that Dr. Warren met with or emailed a copy of the Supplemental Status Report to Attorney John Walker, legal counsel for the Intervenors in the desegregation case, before sending it to the Board. Defs. Exhibit H, p. 141 line 12 through p. 142, line15, Remele Deposition.  This contradicts Sam Jones' email to John Walker requesting a meeting with John Walker.  Plaintiff's Exhibit 18, p. 1, Email exchange re Jones' Supplemental Status Report.  Defendants assert that Dr. Warren "failed to share the report with any member of the Board prior to its filing."  Defs. Brief p. 22, ¶ 1, line 6.  Linda Remele

testified that she called Sam Jones. The conversation indicates that she received the

Supplemental Status Report and read it before calling Sam Jones.

> Page 140:
>
> 16 A I called Sam Jones and said, "Sam, I hope this
>
> 17 is draft and not the real thing." And he said, "No.
>
> 18 Haven't you seen it?" And I said, "No. This is the
>
> 19 first time seeing it." And he said, "Doctor Warren
>
> 20 has assured me you have seen it and you approved of
>
> 21 it." But Sam is the one that would have said that.
>
> 22 And I said, "Sam, I would have never said this." He
>
> 23 said, "Well, I'm surprised, but this is what Doctor
>
> 24 Warren said you all wanted to be put on it."

Defs. Exhibit H, p. 140, lines 16 - 24.  This testimony is contrary to the email exchange between

Dr. Warren and Sam Jones.  The email exchange does not include any statement concerning the

Board's approval or the contents the Board wanted in the Supplemental Status Report.

Defendants' allegations that Dr. Warren was not communicating with the Board and

refused to work cooperatively with the Board are false.  Defendants' evidence does not support

the allegations made but rather contradicts.

> f.      Purported Failure to report a dangerous situation to the Board:  Remele's
> List, Entry #14, Defs. Argument at p. 22.
>
> On Wed Oct 25 a potentially dangerous situation occurred at SH Freshman
>
> Academy.  The board was not notified of this and had to hear it from
>
> the community later that night. I called you about it on Thursday to see why we
>
> were not notified and why Freshman Academy and Cato were not placed on

> lockdown. You indicated you had just heard the details that morning. That it is
> not true and should not be true. Your staff should keep you aware of any
> potential threat to students and staff and I know they did. You did not choose to
> inform the Board and did not question why the schools were not placed on
> lockdown once it was determined a threat have been made against a school.

Linda Remele lacks personal knowledge of the incident at Sylvan Hills Freshman Academy.  She is not competent to testify on these facts.  If her testimony about the alleged event is inadmissible, the document, Def. Ex. I, restating the inadmissible testimony is likewise inadmissible.

Dr. Remele accuses Dr. Warren of choosing not to inform the Board of the incident. Yvone West, then Principal at Sylvan Hills Freshman Academy recalls that a new student's refusal to enter the scanning device led to the discovery of a knife in her possession.  He states under oath:

> At no time was any other students or staff in imminent danger.  The student was
> issued a citation by the Sherwood Police Department and was sanctioned
> according to the PCSSD student handbook.  This is a common practice when
> incidents such as this occur.  Instances and cases where there is an imminent or
> immediate threat, district level officials (the superintendent or his/her designee)
> are notified and guidance is given on the next steps.  Because it was determined
> that there was not any immediate threat or concern, this incident was handled at
> the local school building.

Plaintiff's Exhibit 19, Affidavit Principal West, Sylvan Hills.  The Principal handled the incident as is customary at the building level without notifying the Superintendent or her designee.  Dr.

Remele is wrong.  Her allegation is false.  Dr. Warren had no notice of the incident and had nothing to share with the Board.  Defendants' allegations that it had "serious concerns" over the lack of communication by Dr. Warren with the Board lack bases in fact.  Defendants' evidence supports an inference that Dr. Warren communicated with the Board when appropriate.

Defendants' evidence to support its purported legitimate nondiscriminatory reasons for its conduct is inadmissible and false or mischaracterized the true facts.  Having failed to satisfy its burden of production, the presumption of discrimination remains effective.  *St. Mary Honor, supra.* Defendants have not established a rational basis for its conduct.  *Torgerson, supra.*, (the City met its burden with a consistently stated reason for its conduct).  Dr. Warren has established a prima facie case of sex and race discrimination and retaliation. Unless, reasonable minds might differ on whether Dr. Warren has met her burden of persuasion, she should be granted summary judgment.  *St. Mary Honor, supra.*

E.      Assuming the defendants' evidence is admissible, the evidence is false and a pretext to cover discrimination.

Under *McDonnell,* if an employer satisfies its burden of production of legitimate nondiscriminatory reasons for its conduct, the employee must be given an opportunity to establish that the purported legitimate reasons are a pretext for intentional discrimination.  The Supreme Court and the Eighth Circuit have recognized several approaches to proving pretext:  1) rejection of the employers' reasons, especially if accompanied by a suspicion of mendacity, permits an inference of intentional discrimination.  *Reeves v Sanderson Plumbing Products*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation); and 2) by persuading the court that a prohibited reason more likely motivated the employer (*Wallace, supra.* at 1120;

In reaching its decision as a matter of law, this Court must consider, first, Plaintiff's evidence of her prima facie case -- (i) that she belongs to a protected class; (ii) that she applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite her qualifications, she was rejected; and (iv) the circumstances give rise to an inference of discrimination; second, all reasonable inferences in favor of the nonmoving party, third, Defendants' admissible evidence; and fourth, disregard all evidence favorable to the moving party that the jury is not required to believe -- evidence that employer's explanation is "unworthy of credence." *Reeves v Sanderson Plumbing Products*, 530 U.S. 133, 143-149, 120 S. Ct. 2097, 2106-2109 (2000).

1.      Plaintiff has demonstrated the absence of a basis in fact of Defendants' purported legitimate reasons.

Assuming for the sake of argument that the Defendants evidence, Exhibit I and Dr. Remele's Deposition testimony about Exhibit I are admissible, Plaintiff demonstrated that the allegations were false or mischaracterized to taint Dr. Warren's impeccable 25-year employment record.  Painting the Superintendent's office as recommended by the Executive Director of Operations, and replacing the desk supported by bricks were within the District's 2017-18 SRM Budget.  Dr. Warren inquired about the source of funds from the District administrator responsible for supervising and maintaining the District real and personal properties before approving the recommendation.

No complaint was made regarding the painting or the Executive Director of Operations' decision to remove the paneling until 55 days after Linda Remele heard about the painting, but four days after the Status Conference and seven days the filing of the Supplemental Status Report.  Linda Remele, a decisionmaker, was retaliating because Janice Warren had taken a position in opposition to the District's discriminatory conduct regarding the construction of the

facilities.  The District under Dr. Warren's leadership would be transparent.  Dr. Remele's response was: "We don't air our dirty laundry."  Plaintiff's Exhibit 9, p. 22, line 22.

When Dr. Warren assumed the role of Interim Superintendent, she began monthly activities for the Central Office staff to boost morale and encourage camaraderie.  For the month of December, she wanted to deliver a special gift to thank the staff for their hard work.  Armed with the information she needed to make a decision on the desired purchase, she decided to purchase the umbrellas at her own expense.  Plaintiff's Exhibit 17, Warren's Check.  During her tenure as Interim Superintendent morale increased, fear of being fired dissipated, spirits rallied.  See Plaintiff's Exhibit 56, Teacher's Letter of Support.

Dr. Warren is falsely accused of "choosing" not to inform the Board of a nonthreatening incident at Sylvan Hills Freshman School.  Consistent with District custom, the incident was not reported to district level administrators.  Dr. Warren was falsely accused of not providing a copy of Attorney Jones' draft of the Supplemental Status Report; falsely accused of meeting with opposing counsel and sharing a copy of the Supplemental Status Report before sharing it with the Board.  She was falsely accused of not cooperating with the Board by not including the seven of them in the drafting of the Supplemental Status Report when the attorney was responsible for the drafting.  The record suggests that the former Superintendent did not share filings for more than a year or that the Board requested copies of the quarterly Status Reports.  Two White female-decisionmakers and a silent male majority Board did not investigate or inquire about the facts but layered false, mendacious accusation upon false, mendacious accusation.  Plaintiff's evidentiary analysis of Defendants' Exhibit I and corresponding deposition testimony demonstrates that 26 of the assertions contained in Defendants' Exhibit I are false, nine are mischaracterizations. Plaintiff's Exhibit 45, Analysis of Defendants' Exhibit I.

The Defendants' evidence is inadmissible.  Even if admissible, a rationale jury would not believe the evidence that Defendants' seek to use to support its Motion for Summary Judgment. Therefore, the Defendants' Motion for Summary Judgment must be denied.  Given the absence of admissible evidence of legitimate nondiscriminatory reasons by the Defendants, and Plaintiff's substantial evidence supporting an inference of intentional discrimination and probative evidence of the falsity of Defendants' false allegations, Plaintiff requests that she be granted Summary Judgment.

2.      Other evidence supporting an inference that PCSSD's decision was based on unlawful criteria of sex, race, and retaliation.

There is substantial admissible evidence in both PCSSD's history and its hiring processes that provide inferences that PCSSD's decision was based on unlawful criteria of race or sex or both protected classifications.

a.      PCSSD's History of Sex Discrimination in the Office of Superintendent.

Between 1984 and 2018, the PCSSD hired nine males to serve as Superintendent.  Dr. Warren is the first and only woman to lead the District as Interim Superintendent.  In 2018, approximately sixty-five percent (65%) of PCSSD Certified Secondary Staff, Teachers and Administrators, who created a pool of individuals qualified to apply for the position of Superintendent, were female and thirty-five point forty-nine percent (35.49%) male. Plaintiff's Exhibit 52, PCSSD 2017-2018 Annual Personnel Hiring and Deployment Report, June 1, 2018, Appendix VIII, page 11 (Public Record).  In 2017-2018, Arkansas boasted of 43 female Superintendents.  Arkansas Department of Education, Superintendent Contact List.  Plaintiff Exhibit 53 (Public Record).

Thirty-six individuals submitted applications for the PCSSD opening.  Fourteen were women and twenty-two were males.  Plaintiff's Exhibit 54.  Thirty-eight point eighty-eight per cent (38.88%) of the applicants for PCSSD's job opening were female.  Fifty percent (50%) of the female applicants where superintendents or chief academic officers of their districts. Plaintiff's Exhibit 54 (Public Record & Inherently Reliable).  Janice Warren was the *only* female applicant from Arkansas.  *Id*.  Ray and Associates included Dr. Warren and one other Black female in the pool of nine applicants screened as satisfying PCSSD's ten qualifications. Twenty-two percent of the pool of Top Candidates was female, despite the fact that thirty-nine percent of the applicants were female.  Ray and Associates recommended to the PCSSD Board for interviews seven males, two from Arkansas, even though Arkansas boasted of 43 female Superintendents in 2017-2018.  Plaintiff's Exhibit 53, Arkansas Department of Education, Superintendent Contact List (Public Record). No White women were included in the pool of Top Candidates.  None of the four members of the Board who were deposed, recognized the absence of White females from the pool of Top Candidates.

Defendants scoff at the "attribution of an alleged '34-year pattern of discrimination' based on sex' as illogical."  Def. Brief in Support of its Motion at p. 7. The Board "cannot be responsible for long-standing pattern of discrimination when it had only been in operation for 15 months" when it selected a White male as Superintendent.  *Id.,* at 8.

Defendants' argument misses the mark.  The PCSSD Board is a legal entity, a public corporation with powers, duties, and privileges created by State law.  Ark. Code Ann. §§ 6-13-101, -102.  Board members are representatives of their constituencies, communities within Pulaski County, and the values held by those communities of which PCSSD's Board members are a part.  See, generally, Plaintiff's Exhibit 73, Handbook for Arkansas School Board Members,

Chapter 2, page 8, describing a school board as a "*continuing* body . . . while members may come and go, the board continues to exist as a legal entity beyond the terms of its individual members" (emphasis in the original).

The continued, long-term pattern of discrimination reflects a reality that community values that support and approve of the disparate treatment of women, a protected class, in the workforce has not changed in 34 years. These facts support an inference that purposeful discrimination occurred in the hiring of PCSSD's Superintendent in 2018. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) (statistics showing an imbalance is often a telltale sign of purposeful discrimination).

    b. PCSSD's History of Race Discrimination in the Office of Superintendent.

Between 1984 and 2018PCSSD hired four Black persons to serve as Superintendent. Dr. Warren is the fourth Black person to lead the District and only as Interim Superintendent. Thirty-six percent, 36%, of the Superintendents have been Black in PCSSD's recent history. With the District's birth in 1927, the additional sixty-seven years, the true facts paint a dim picture. In October of 2017, 42.12 % of PCSSD's secondary students were Black; 31.83% of certified secondary (middle school) teachers and administrators were Black and 25.70% of certified secondary (high school) teachers and administrators were Black. In 2018, 28.27% of PCSSD Certified Secondary Staff, Teachers and Administrators, who created a pool of individuals qualified to apply and with an interviewing and a hiring preference were Black. See Plaintiff's Exhibit 52, PCSSD 2017-2018 Annual Personnel Hiring and Deployment Report, June 1, 2018, Appendix VIII, page 11 (Public Record). Only one Black administrator from PCSSD and Arkansas applied. The ratio of Black teachers and administrators to Black students was 2.6% in the 2017-2018 school year. This is a dismal number for role modeling purposes.

Sixty-seven percent of the Top Candidates for the position of PCSSD Superintendent were Black, yet, none was impressive enough to be selected by the Board for the job.  Plaintiff's Exhibit 22, Image of the Top Candidate Pool. Given the dire need for Black leaders and the huge success that Ray and Associates had in recruiting Black leaders, a reasonable person might believe that the pool was staged.  This is the perspective from which this Court must view the trifling, unfounded accusations that the leaders of the PCSSD Board of Education are asserting as legitimate reason for their conduct.  PCSSD's history, including its recent history with the Mills High School inequities, suggests that these malicious criticisms are a coverup for race discrimination.

       c.     Alicia Gillen's testimony about her concerns and related list are inadmissible but provide evidence of pretext.

Defendants refer to Alicia Gillen's, the other White female Board member, "serious concerns" about Dr. Warren's performance as Interim Superintendent and cite Alicia Gillen's deposition testimony at p. 15-16.  Defs. Brief, p. 20, line 5. The referenced testimony refers to a list of concerns.  Gillen also compiled a list of concerns.  Plaintiff's Exhibit 70, "Gillen's List."  See also, Plaintiff's Exhibit 67, Warren's Response to Gillen.  Gillen's List like Remele's List and much of Gillen's testimony is inadmissible.  Gillen's undated list is a series of accusations that reveal both her lack of personal knowledge about the event or topic, and the operation of the District. These allegations are hearsay and most are not within an exception. More importantly, Gillen repudiates several of her concerns in her deposition testimony.  Gillen's List and her testimony are a pretext to cover intentional discrimination.

     (1)     "New furniture lying to the Board about funding"

This is an out of court statement offered for the truth of the contents to prove that Dr. Warren demonstrated poor judgment when handling District finances.  Defs. Brief, p. 20.  This

written statement is hearsay and isn't within an exception to hearsay.  Fed. R. Evid. 801.  Gillen admits in her deposition that she lacked personal knowledge regarding the source of funding for the furniture, and lacked knowledge that Derek Scott, Executive Director of Operations, made the recommendation to paint.  Plaintiff's Exhibit 10, p. 105, line 13 - p. 107, line 17.  Gillian's testimony is not hearsay and is admissible against her as an Opposing Party Statement.  Fed. R. Evid. 801(d)(2)(A).  Plaintiff objects to the admission of Gillen's List and Entry #1 of that List.

      (2)     "Law suit documents that were filed.  That were not sent to board"

This is an out of court statement offered for the truth of the contents to prove that Dr. Warren was not working cooperatively with the Board.  Defs. Brief, p. 21.  This written statement is hearsay and isn't within an exception to hearsay.  Fed. R. Evid. 801.  Here, the statement lacks specificity to determine if Gillen is referring to the copy of the Supplemental Status Report that was forwarded to her on September 5, 2017, at 3:10 p.m. and responded to at 6:18 p.m. or some other unidentified court documents.  Plaintiff's Exhibit 18, Status Report Emails.  Plaintiff objects to the admission of Gillen's List and entry #2 of that List.

      (3)     "None of this facilities [sic] would be over budget would have happen if she would have done her job in Equity Services"

This is an out of court statement offered for the truth of the contents to prove that Dr. Warren was not working cooperatively with the Board.  Defs. Brief, p. 21.  This written statement is hearsay and isn't within an exception to hearsay.  Fed. R. Evid. 801.  Alicia Gillen's evasive deposition testimony demonstrates that she lacks personal knowledge about Dr. Warren's job responsibilities and isn't competent to testify on the question of whether Dr. Warren performed her job.  See Plaintiff's Exhibit 10, p. 16, line 5 - p. 25, line 24.  Plaintiff objects to the admission of Gillen's List and Entry #3 of that List.

      (4)     "What was her role . . . she knew about the court order"

This is an out of court statement offered for the truth of the contents to prove that Dr. Warren was not working cooperatively with the Board. Alicia Gillen's deposition testimony demonstrates that she lacks personal knowledge about Dr. Warren's responsibilities and Plan 2000. Plaintiff objects to the admission of Gillen's List and Entry #4 of that List.

(5)     "Where is [sic] the monitoring reports with facilities"

Entry #5 is an out of court statement offered for the truth of the contents to prove that Dr. Warren was not working cooperatively with the Board. Alicia Gillen's deposition testimony demonstrates that she lacks personal knowledge about Dr. Warren's responsibilities and isn't competent to testify on the issue of Dr. Warren's responsibilities. When asked if the monthly monitoring reports by Derek Scott on facilities that were recorded in the Board minutes caused her concern, Gillen stated that she did not believe that facilities reports were factual and did not communicate her concerns to Dr. Warren or anyone else. Plaintiff's Exhibit 10, p. 32, line 22 - p. 34, line 18.

(6)     "Terminated a coach when Paul Brewer was on Vacation against his instructions"

Gillen lack personal knowledge about the circumstances referenced in her statement and isn't competent to testify. Consequently, her written statement isn't admissible. This assertion also demonstrates her lack of knowledge regarding the order of authority within the District. She assumes that the Black female Interim Superintendent is subject to the direction of the Assistant Superintendent of Personnel, a White male. Similarly, in Entry #8, Gillen characterizes the Black female Interim Superintendent's desire to terminate Denise Palmer, the District's former CFO as an abuse of power but explains that Charles McNulty's termination of Denise Palmer is permissible because he is forming his Cabinet. Gillen clearly has separate standards for White males and Black women. Plaintiff's Exhibit 10 p.110, line 25 - p. 113, line 16. Plaintiff objects

to the admission of Gillen's List and entry #6 of that List.  Entry #8 is not hearsay but an

Opposing Party Statement that is offered against the Party to show that the list is a pretext for

intentional discrimination.  Fed. R. Evid. 801(d)(2)(A).

        (7)     Prior Treatment of Dr. Warren: Unequal Pay for Equal Work.

When Superintendent Jerry Guess was terminated in July of 2017, Janice Warren was

offered the position of Interim Superintendent.  Plaintiff's Exhibit 35, Board Minutes, July 18,

2017 (Public Record).  The offer came after Linda Remele, the White female President of the

Board and a decisionmaker, approached a lesser qualified White male before offering the

position to Janice Warren. Plaintiff's Exhibit 31, p. 13, line 16 - p. 15, line 13, Brewer

Deposition.  At the time, Paul Brewer was PCSSD's Assistant Superintendent for Personnel.  He

had no experience as a Superintendent.  *Id.*  Although Paul Brewer did not characterize the

conversation as an "offer," the conversation was serious enough that he conferred with at least

one other person before deciding that loyalty to the former Superintendent necessitated that he

decline the opportunity to take the position vacated by Dr. Jerry Guess.  *Id.,* p. 15, lines 1-13.

After Dr. Warren accepted the Board's offer, disparate treatment by the Board under

Linda Remele's, a White female, leadership commenced immediately.  The Board offered and

paid a Black woman $195,000, $20,000 or 9.3% less, for the same work that the former White

male who received $215,000 annually from 2011-2013, while the District was under State

control as a district in fiscal distress.  Plaintiff's Exhibit 59, Guess' Superintendent Contracts.  Dr.

Guess was to receive $215,000 from 2016-2018, after the District was released and the status of

the fiscal distress was eliminated, had he not been terminated in 2017. Plaintiff's Exhibit 59,

Guess' Superintendent Contracts.  Similarly, the White male hired by the District at the end of its

2018 search, Charles McNulty, is compensated annually from 2018-2021 with a package equal

to $215,000, $205,000 in salary and a $10,000 annual annuity.  Plaintiff's Exhibit 36 (Public

Record Exception).  McNulty's package would be later be modified in 2019 to $215,000 after the

annuity was dropped into his salary. Plaintiff's Exhibit 28, McNulty Deposition, p. 34.  Nothing

in McNulty's or Guess' experience explains the disparate salary for Janice Warren; her race and

gender were the distinctions.  In point of fact, Janice Warren's salary was not only

disproportionate to the men who preceded and followed her but also disproportionate to regional

superintendent salaries from 2015-2017.  This is astounding; PCSSD has historically been the

second largest district in the State.  See Plaintiff's Exhibit 37, Regional Superintendent Salary

Comparis [sic], prepared by Ray and Associates in 2018 (Public Record, Inherently Reliable &

Fed. R. Evid. 807).

Plaintiff has met not only her burden of production but also her burden of persuasion on

the ultimate fact of intentional discrimination because of Dr. Warren's sex, her race, and in

retaliation for opposing racial discrimination.  If the evidence of PCSSD's purported reasons is

admissible, no reasonable jurors could believe that the purported accusations are true or

*legitimate* explanations for the Board's conduct.  Plaintiff has demonstrated her prima facie case

with substantial evidence of discriminatory intent, defendants evidence is inadmissible, and

plaintiff should be granted summary judgement on her Title VII claims.

## III.    RACE & SEX DISCRIMINATION VIOLATING FEDERAL RIGHTS UNDER 42 U.S.C. § 1983

Mike Kemp, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller, and Brian

Maune are members of the PCSSD Board of Educations.  Each has been sued in their individual

capacities and are within the statutory definition of "Person" for the purposes of Section 1983. 42

U.S.C. §1983; *Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Kentucky v. Graham*, 473 U.S.159 (1985).

On March 27, 2018, Mike Kemp, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller, and Brian Maune did not discuss Dr. Warren's contract right to an interview or to a hiring preference.  Plaintiff's Exhibit 9, p. 117, line 7, Remele Deposition.  See Plaintiff's Exhibit 7, Transfer and Promotion Policy.  In their identical responses to Plaintiff's First Set of Interrogatories neither voted for Dr. Warren nor determined if Dr. Warren was entitled to a hiring preference.  Plaintiff's Exhibit 68, Chart of Individual Defendants' Interrog.  Each excluded her from the pool of finalists.  Three male applicants were selected.  Each voted to hire a lesser qualified White male as Superintendent. Plaintiff's Exhibit 43, Minutes April 3, 2018. When they engaged in these hiring activities, each acted under color of state law, exercising their authority as individual members of the PCSSD Board of Education and without immunity.

When Mike Kemp, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller, and Brian Maune engaged in adverse employment actions by failing to accord her these specific contract rights, they deprived Dr. Warren of her Federal statutory rights to free of race and sex discrimination, and retaliation because of race in employment and contractual relations. Each is liable in their individual capacities for the harm that resulted and punitive damages. 42 U.S.C. §§ 1983, 1981(a) (b) & (c).

It is common knowledge, especially in the State of Arkansas, that race discrimination in public education is illegal under federal law. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401 (1958); Little Rock School Dist. v. Pulaski County Special School Dist. No. 1, 921 F.2d 1371 (8th Cir. 1990). As the Board of Education of a District that has been under Federal Court Supervision for thirty-six years, Mike Kemp, Linda Remele, Shelby Thomas, Alicia Gillen, Eli Keller, and Brian

Maune cannot claim ignorance of this fact. Plus, several of the attended the Arkansas School Boards Association meeting and participated in a session of discrimination in hiring.  Plaintiff's Exhibit 34, ASBA Training.  Thus, when they deprived her of her contract rights because of her sex and race and retaliated against Dr. Warren for notifying the District's attorney of racial discrimination in the construction of the District's facilities, they were aware of Dr. Warren's right to be free from race discrimination by her employer and acted intentionally not accidentally with malice or with a reckless indifference to Dr. Warren's right to be free from race discrimination by her employer.  Mike Kemp, Shelby Thomas, Eli Keller, and Brian Maune permitted Linda Remele and Alicia Gillen engage in malicious criticism of Dr. Warren because of her race and sex and in retaliation of Dr. Warren's engagement in protected activity under Section § 1981.  Mike Kemp, Shelby Thomas, Eli Keller, and Brian Maune did not investigate the allegations, did not insisting on an investigation and did not permitting Dr. Warren to explain her position.  They acted with reckless indifference of her contract rights, her Federal Right to be free of racial discrimination. Consequently, they are personally liable for compensatory and punitive damages. Smith v. Wade, 461 U.S. 30 (1983); 42 U.S.C. §§ 1983, 1981(a) (b) & (c), and 2000e; *Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Giron v. City of Alexander*, 693 F. Supp.2d 904 (E.D. Ark. 2010).

## Conclusion

Plaintiff has established her prima facie case for each cause of action and has provided substantial evidence that the purported legitimate reasons for the Board's conduct was pretext to cover intentional discrimination.  For the set forth herein, defendants' motion for summary judgment must be denied.

Respectfully submitted this 9th day of September, 2020,

<u>Sarah Howard Jenkins</u>
Arkansas Bar #97046
SARAH HOWARD JENKINS, PLLC
P.O. Box 242694
Little Rock, Arkansas 72223
Phone: (501) 406-0905
sarah@shjenkinslaw.com (email)