**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**JANICE HARGROVE WARREN**                                                                           **PLAINTIFF**

**v.**                                 **No. 4:19-cv-00655-BSM**

**CHARLES MCNULTY, et al.**                                                      **DEFENDANTS**

**MEMORANDUM REPLY BRIEF IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This Memorandum Reply Brief is submitted in response to Plaintiff's Response to Defendants' Motion for Summary Judgment ("Response") (Dkt. No. 36) and in support of its Motion for Summary Judgment ("Motion") (Dkt. No. 27), pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons discussed herein, Defendants are entitled to summary judgment as a matter of law.

    **1. Warren Cannot Prove an Inference of Discrimination.**

Warren concedes she has no direct evidence of intentional discrimination by Defendants. Dr. Warren was asked whether there were any instances she felt the Board had acted in a discriminatory manner towards her, she testified, "I cannot think of any time." *See* Dkt. No. 27-1 (Deposition of Janice Warren, p. 43). Warren must rely on the shifting burden framework of *McDonnell Douglas Corp. v. Green* to prove her case. 411 U.S. 792 (1973). Warren must prove (i) that she belongs to a racial minority; (ii) that she applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite her qualifications, she was rejected; and (iv) the circumstances give rise to an interference of discrimination. *Id.*; *see also Mitchell v. City of Dumas*, 187 F. App'x 666, 668-69 (8th Cir. 2006). Warren included element four in her analysis of a prima facie case. *See* Response at p. 13. Some courts have not required that the element of inference of discrimination be proven in the prima facie stage. *See Dixon v. Pulaski Cty. Special*

*Sch. Dist.*, 578 F.3d 862, 867 (8th Cir. 2009).  Instead, the plaintiff is required to prove an inference of discrimination when the burden shifts back to her—the point at which she must overcome the defendant's proffered legitimate and non-discriminatory reasons for the employment decision.  *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011) (the burden to show pretext "merges with the ultimate burden of persuading the court that [they were] the victim of intentional discrimination," and plaintiffs "retain, at all times, the ultimate burden of proof and persuasion that the [defendants] discriminated against them.").  *Id*.

Whether an inference of discrimination must be proven by Warren in her prima facie case, or after she rebuts PCSSD's legitimate and non-discriminatory reasons for its employment action, Warren cannot meet her burden of production to ultimately prove her case; the burden she always carries.  Warren cannot prove there is sufficient evidence of circumstances giving rise to an inference of discrimination.  Failure to meet this required element leaves Warren unable to prove her case as a matter of law.

Warren first alleges that lesser qualified men were selected for interviews, including McNulty.  *See* Response at p. 16.  The evidence is uncontroverted that McNulty had four years' experience as an associate superintendent in a district of 10,800 students and an annual budget of $130 million at the time of his application.  Dkt. No. 40-25.  Warren completely foregoes mentioning McNulty spent five years as a college professor, while Warren has no college level teaching experience.  *Id*. at p. 6.  Indeed, McNulty was the only candidate with a Ph.D. as a terminal degree, which is the highest academic degree that can be received in education.  Dkt. No. 40-23.  McNulty also has experience as a building principal and district-level administrator.  Dkt. No. 40-25.

Despite Warren claiming she was more qualified to lead a diverse district like PCSSD, Warren concedes that McNulty had multicultural educational experience.  *See* Response at 22.

Furthermore, McNulty testified at length about his experience working in school desegregation at a former district and handling the federal office of civil rights in previous administrative positions. *See* Deposition of McNulty, Dkt. No. 40-28, pp. 27-28.

The fact that Warren was qualified for the Superintendent position does not establish PCSSD discriminated against her. "The mere existence of comparable qualifications between two applicants…, alone does not raise an inference of racial discrimination." *Pierce v. Marsh*, 859 F.2d 601, 604 (8th Cir. 1988). Warren can prove she possessed the "qualities essential for success in the position," but this does not give rise to an inference of discrimination. *Id*.

Even if Warren proves on paper to be more qualified than McNulty, this is of no consequence because the Board has admitted it relied on Warren's interview for the position and past performance when making its decision. "Employers are entitled to compare applicants' performance during interviews." *Tyler v. Univ. of Ark. Bd. of Trs*., 628 F.3d 980, 989 (8th Cir. 2011). Moreover, the Board can rely on the actual interviews of the candidates and the interview may favor a less qualified candidate on paper over another. *See Pierce v. Marsh*, 859 F.2d at 603-04. The Board may also draw upon its own personal knowledge of the candidates' strengths and weaknesses. *Id*.

Here, Warren concedes that Board Member Remele found McNulty's interview to be superior. *See* Response at p. 20. Indeed, Remele testified that McNulty had the superior interview, including superior "people skills," that he was "very conversant," that he had high enthusiasm, talked about building morale with the staff." Dkt. No. 40-9 at p. 61 of 78 (McNulty Depo.). Remele expounded that the Board really wanted to raise teacher morale, especially given years of no teacher pay raises, and McNulty impressed on the Board that he could build a declining teacher morale. *Id*. at 62 of 78. Board Member Shelby Thomas (black male) also agreed that McNulty was the superior candidate based on his interview. Dkt. No. 40-32 at p. 23 of 27 (Thomas Depo.).

3

The video interview that Warren and McNulty participated was a uniformly applied process and the Board using the subjective considerations of the candidates' performance does not give rise to an inference of discrimination.  *See Torgerson*, 643 F.3d at 1049 and *Elliott v. Montgomery Ward & Co.*, 967 F.2d 1258, 1262-63 (8th Cir. 1992).

The Board also used an objective matrix provided by its outside search firm, Ray and Associates, to score the nine applicants during the first round of interview on March 27, 2018.  *See* District's Opening Motion, Dkt. No. 28 at p. 13.  During this interview, the seven-member Board was instructed to complete a "Matrix for Reaching Candidate Consensus" in order to determine which candidates would move on to the in-person interview.  *Id.*  This scoring rubric (The Consensus-Building Matrix) helped ensure an objective process where the top three scoring candidates received an additional interview.  *See* Dkt. No. 40-8 (Matrix).  This objective criterion to help select the Superintendent further strengthens the District's position.  Private, outside firms helping in the selection process support a finding that there was no racial animus in the process.  *See Torgerson*, 643 F.3d at 1050.

Nonetheless, Warren attacks the qualifications listed by the Board for its preferred candidate, claiming the qualifications allowed the Board to pick and choose as it wanted and to disregard Warren.  *See* Response at p. 24 and 26.  Warren provides no support for this claim, but still, "[T]he presence of subjectivity in employee evaluations is itself not a grounds for challenging those evaluations as discriminatory." *Wittenburg v. Am. Express Fin. Advisors, Inc.*, 464 F.3d 831, 839 (8th Cir 2006).  Even if Warren could prove the criteria set by the Board for the Superintendent disfavored her (which she cannot), this does not add anything to the lack of showing of pretext by Warren.  *See McCullough v. Real Foods, Inc.*, 140 F.3d 1123, 1129 (8th Cir. 1998) (requiring both an "extremely subjective" employer's process and "a substantially better qualified" applicant in order to reverse summary judgment).

Even if Warren was qualified for the Superintendent position or looked better on paper (which the Board does not concede), other factors are relevant to the inquiry, and they all disprove Warren's claim of discrimination. *See Lidge-Myrtil v. Deere & Co.*, 49 F.3d 1308, 1311 (8th Cir. 1995) ("Although [an employee] does possess the experience and some of the other qualities essential for success in the position, this does not suffice to raise an inference that [the employer's] stated rationale for giving the position to another is pretextual").

Warren next argues that PCSSD did not have the liberty to select the candidate of its choice, but had to choose Warren, based on a skewed reading of an inapplicable PCSSD policy. Warren contends she was entitled to a hiring preference when she applied for the position of Superintendent. *See* Response at p. 24. Warren argues that the "Board's policy preference of promoting internal candidates over hiring equally qualified external candidates applied to the Board's process in selecting a Superintendent in 2018." *Id.* As a result, she argues, "the Board had a duty of substantial compliance with its declared policy to prefer internal candidates when selecting the three finalists and in selecting the person to be offered the position of Superintendent." *Id.* at ¶ 77.

The plain reading of the policy, Promotion and Transfer Policy ("Policy"), indicates it is not applicable to the role of Superintendent. The Policy reads:

> The general policy of the District is to employ the most able and best qualified persons with the proper credentials for all positions. However, PCSSD favors promotions from within so that where, in the *opinion of the administration*, ability, qualifications, and credentials of an existing employee are equal to those of an outside applicant, the existing employee will be favored for promotion.
>
> Normally this will be accomplished by licensed employees within the District being extended the advantage of first consideration for promotion.
>
> Vacant or new positions shall be advertised internally and externally *by the administration*. The *administration shall in its sole discretion* determine the minimum qualifications related to degrees, certifications, experience, and the like, for each position and clearly state the same in the written notice of

5

>vacancy. Internal advertising will be by posting of vacancies within the various buildings and at the central office. The duration of inside and outside advertising, and the media and targets for outside advertising, *will be determined by the administration*. Deadlines for applying shall be clearly stated on the face of any advertisements or notices.
>
>All teachers are subject to assignment and transfer at the direction of the Superintendent. Insofar as possible, teachers shall be assigned to positions for which they are best qualified. Also, while keeping in mind the needs of students, the need to have a balanced faculty, and in the interest of efficiency and economy, reasonable effort shall be made to honor teacher preference in assignments. When a tentative decision has been made to transfer a teacher to another school, he/she will be notified by the Superintendent or his or her designee. When the tentative assignment involves changes within a building, the teacher will be notified by the principal. In all transfer cases, every effort will be made to advise the teacher at the earliest possible time.

*See* Policy, Dkt. No. 40-7, p. 1 of 13 (emphasis added).

In the "opinion of the administration" language in the first paragraph, along with the other references to the administration's role in the Policy, is the operative language that clearly instructs the Policy is not applicable to the superintendent position. It is the Board that selects a superintendent, not the administration. It is the Board that determines the minimum qualifications for the superintendent, not the administration. It is the Board that decides the advertising for the position, not the administration. Instead, the administration is charged with interviewing and recommending for hire every other employee of PCSSD, but not the superintendent. The Arkansas General Assembly has made clear its intent that the school board selects the superintendent, and the superintendent thereafter oversees the day-to-day operations of the district. *See* Ark. Code Ann. § 6-13-620. This is reflected in PCSSD policies, whereas the Board elects and employs the superintendent and thereafter, the Board employs staff only upon a recommendation of the administrative staff of PCSSD. *See* Dkt. No. 40-14, p. 5 of 11 (PCSSD Policy 1.7P Powers and Duties of the Board). The Transfer Policy cannot be applicable to the superintendent, as it would contravene the exclusive role of the Board to hire the position of superintendent and would be an illogical reading of the Policy.

Further support that the Policy is not applicable to the selection of a superintendent is located under the heading, <u>Promotion to Administrative Position</u>, which then references the "*Employment Guidelines for Above Entry Level Positions*." The document discusses an interview committee for selecting administrative positions, which includes the appropriate assistant superintendent and the immediate supervisor for the open position. Dkt. 40-7, p. 8 of 13. Yet, the superintendent is interviewed and selected by the Board, as was the case here. It is clear the Policy has no application to the search for a superintendent.

Members of the PCSSD Board also testified that the internal preference highlighted by Dr. Warren only applies to the hiring of certified staff, and not to the hiring of a superintendent. *See* Dkt. No. 40-9, p. 57-58 of 78 (Remele Depo.) and Dkt. No. 40-10, p. 44 of 60 (Gillen Depo.). The Board's understanding of the Policy is consistent with its plain reading – it is not applicable to the superintendent.

Warren next highlights an email from the PCSSD's Director of Human Resources as describing "interview custom" within the District. *See* Dkt. No. 40-30 ("Email from PCSSD Director of Human Resources"). The email, dated Wednesday, April 29, 2020, was sent to the listserv "PRINCIPALS" and appears to specifically apply to "teaching positions for the 2020-2021 school year." *Id*. While Warren may assert that this email details "interview custom" within PCSSD, it was sent more than three years after she applied for the Superintendent vacancy, is directed to Principals in the District – not the PCSSD Board and, most importantly, is seemingly limited to the hiring of teachers, not of Superintendents. Consequently, neither the Policy nor the email from PCSSD's Director of Human Resources establish that Warren suffered an adverse employment action when she was not granted an interview for the superintendent position.

Warren next argues that Warren was paid less than an interim as her predecessor, Dr. Guess, and her successor, Dr. McNulty, and this prior unfair treatment is proof of disparate

treatment by the Board and evidence of discrimination. This argument has one glaring omission – Dr. Warren was an interim, Guess and McNulty were permanent. To prove disparate treatment Warren must prove she was similarly situated to her comparators "in all relevant respects" – a "rigorous" standard at the pretext stage. *See King v. Hardesty*, 517 F.3d 1049, 1063 (8th Cir. 2008). Warren was not the permanent superintendent, but simply a placeholder until one could be hired. Warren knew that when offered the interim position and she knew she would be returned to her prior position. For this reason, Warren was not similarly situated in all relevant aspects capable of proving pretext.

Moreover, the contract of Dr. Guess that Warren relies on (Dkt. No. 40-59) was negotiated by Johnny Key, serving as Commissioner of the Arkansas Department of Education and the PCSSD Board while under state control. The terms of Guess's contract were not negotiated by the PCSSD Board. Again, Warren cannot be similarly situated to Guess since the Board was not a party to Guess' contract. Furthermore, Warren's interim contract contains language that allowed her to return to her position of Assistant Superintendent when her interim term was over, a term that has considerable value and is not in McNulty's contract. *See* Dkt. No. 40-4 at p. 4 (Warren's Contract) and Dkt. No. 40-36 (McNulty's Contract).

**2. Warren Cannot Overcome PCSSD's Legitimate, Nondiscriminatory Reasons.**

Warren's case survives summary judgment only if she can prove by a preponderance of the evidence that the legitimate reasons offered by PCSSD were not its true reasons but were instead a pretext for discrimination. *Texas Dep't of Cmty. Affairs*, 450 U.S. at 256. Warren argues the legitimate and non-discriminatory reasons offered by PCSSD are inadmissible. Response at p. 10 and 52, namely. PCSSD relies on a document authored by Board President Remele, *Issues leading to a lack of confidence in Dr. Warren*, where Remele kept a contemporaneous timeline of issues she and the Board had with Warren during her tenure as Interim Superintendent. *See* Dkt.

No. 27-9.  These issues documented by Remele, while they occurred, are in conjunction with issues Board Member Alicia Gillen noted during Warren's interim tenure.  *See* Dkt. No. 27-3.  Warren attacks all this contemporaneous evidence as non-admissible, arguing it cannot be considered for proof of legitimate and non-discriminatory reasons for not hiring Warren.  Warren's counsel even goes as far as to become a witness in the case by authoring a document where she peculiarly analyzes each statement written or said by Remele under the hearsay rules.  *See* Dkt. No. 40-45.  Warren is arguing form over substance.  Warren is incorrect that the concerns by Remele and Gillen cannot be used as the basis for summary judgment.

Warren always holds the burden of proving discrimination by a preponderance of evidence; PCSSD only bears the burden of "explaining clearly the nondiscriminatory reasons for its actions." *See Texas Dep't of Cmty. Affairs*, 450 U.S. at 259-260.  All PCSSD must do is "explain what [it] has done or [produce] evidence of legitimate nondiscriminatory reasons."  *Id*. at 256.  The documents and testimony of Remele and Gillen are proper evidence.  Even if the evidence is presently inadmissible hearsay, it need only be admissible or usable at trial.  *See Multi-Tech Sys., Inc. v. Hayes Microcomputer Prods., Inc.*, 800 F. Supp. 825, 844 (D. Minn. 1992).  PCSSD need only "show that admissible evidence will be available at trial to establish a genuine issue of material fact."  *Id*.  Moreover, Fed. R. Civ. P. 56 "does not require an unequivocal conclusion that the evidence will be admissible at trial as a condition precedent to its consideration on a summary judgment motion, nor need the evidence be  judged on the same basis as evidence at trial." *Reed v. Ford Motor Co.*, 679 F. Supp. 873, 874 (S.D. Ind. 1988) (citing *Securities and Exch. Comm'n v. American Commodity Exch., Inc.*, 546 F.2d 1361 (10th Cir. 1976); *Corley v. Life and Casualty Ins. Co. of Tennessee*, 296 F.2d 449 (D.C. Cir. 1961)).

Board members Remele and Gillen are party opponents who will be available at trial to testify to their interactions and criticisms of Warren.  As to Remele's contemporaneous written

9

concerns regarding Warren, the document proves that the Board president was concerned enough about Warren's performance that she began documenting her deficiencies in September of 2017, just two months after Warren began her interim tenure.  *See* Dkt. No. 40-9, p. 40.  This document, along with the testimony of Board Members Remele and Gillen, are being used to prove that the Board had issues with Warren early in her tenure and the performance did not improve.  This all occurred months before Warren's interview for the Superintendent's position in April of 2018.  Warren can critique the reasons and call them hearsay, but it does not devoid the true value of the evidence – that Board members had legitimate concerns of Warren early in her tenure that persisted.

Warren argues that the criticism of the Board was limited to just Remele and Gillen, labeling them as "white female decisionmakers."  Response at p. 52.  However, every Board member voted to not advance Warren to a final interview after her video interview of March 27, 2018.  *See* Dkt. 40-42 (March 27, 2018 Board Minutes).  In a unanimous vote of 7-0, each Board member took the public position that Warren should not be afforded a final interview.  The mere fact that Warren must painstakingly attack each performance issue presented by the Board is proof in itself she was not fit to hold the job permanently.  Warren must prove more that the reasons advanced by the Board were false, rather, "must demonstrate that a discriminatory animus lies behind the defendants' neutral explanations."  *Wilking*, 153 F.3d at 874 (quoting *Roxas v. Presentation College*, 90 F.3d 310, 316 (8th Cir. 1996)).

At bottom, where is the racial animus from the Board?  Where is any evidence that the reasons presented were a pretext for discrimination?  There are none – this is simply a case of Warren being displeased with the outcome.  A seven-member board comprised of two females and two African Americans unanimously chose not to advance Warren to a final interview.  This decision, in and of itself, is not an illegal one, so long as that decision was not based on a

discriminatory motive. *Carlisle v. St. Charles Sch. Dist.*, 507 F. Supp. 2d 1018, 1027 (E.D. Mo. 2007). Merely asserting that the PCSSD Board did not select the most qualified candidate does not make its decision actionable, as it is ultimately the Board's prerogative to identify who it thinks is the best candidate for the job. *Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004). Dr. McNulty has proven himself to be a strong leader for PCSSD and even Dr. Warren conceded he was qualified for the position. When asked about how she viewed Dr. McNulty professionally, Warren told the story of when she introduced him to administrators, testifying "At that meeting, I said to the building administrators, 'This is Doctor McNulty. I have been with him the last two days. I think he is a person of integrity. I do believe that he can be trusted. I'm going to support him in making sure that PCSSD becomes unitary, and I would like for you all to do the same thing.'" Dkt. No. 27-1, p. 26 of 29 (Warren Depo.). When asked if that opinion had changed, Warren replied "no." *Id*.

### 3. Defendants Did Not Retaliate Against Warren.

Warren's entire argument that the Board did not award her the Superintendent position is based on a theory that Board was upset she notified them of alleged disparity issues with PCSSD facilities. Warren's argument fails because the evidence is clear no Board member took issue with her notifying the Board of the matter, but only how Warren handled the situation; ergo more reason the Board determined Warren was not the best candidate for the permanent role.

Prior to her appointment as Interim Superintendent, Warren served as the Assistant Superintendent for Equity and Pupil Services at PCSSD. *See* Dkt. No. 27-1, p. 4 of 29 (Warren Depo.). While in this role, she oversaw the district's desegregation efforts under Plan 2000. *Id.* At that time, PCSSD was working towards unitary status in the following areas: (1) discipline, (2) facilities, (3) special education, (4) staff, (5) student achievement, and (6) monitoring. *See* "Update on the Status of the PCSSD's Implementation of its Desegregation Plan," Dkt. No. 40-1.

Derek Scott, the Executive Director of Operations at PCSSD, oversaw the area of 'facilities.' *See* Amend. Compl. ¶ 23; Dkt. 27-1, p. 4 of 29 (Warren Depo.). As a function of this position, Mr. Scott provided a weekly Cabinet report, as well as a monthly report to the PCSSD Board. Dkt. No. 27-1, pp. 4-6 of 29 (Warren Depo.). As the District's Equity Officer, Warren bore the ultimate responsibility for monitoring all desegregation efforts undertaken in regard to facilities, just as she did for the other five areas under Plan 2000. Dkt. No. 27-1, p. 4 of 29 (Warren Depo.).

Warren received updates from Mr. Scott on each of the construction projects at various Cabinet and PCSSD Board meetings throughout the 2016-2017 school year. *See* Dkt. No. 27-1, pp. 4-5 of 29 (Warren Depo.). She did not, at any point, however, meet with Mr. Scott personally to view building plans, walk through the joint budget for the two projects, or critique either building's compliance with Plan 2000. *Id*. at 5-6 of 29. Moreover, the first time Warren expressed interest in viewing the progress being made at either campus was only after receiving an irate phone call from a parent about the glaring differences between the newly constructed Mills High School and Robinson Middle School. *Id.* at 3 of 29.

After Warren learned of the disparities between Mills and Robinson, she contacted each Board Member individually to inform them of the issue and to schedule a time for each to view footage of the properties, as well as contacting PCSSD's legal counsel, Sam Jones. *See* Dkt. No. 40-12, p. 36-38 of 84 (Warren Depo.). Mr. Jones instructed that a Status Report should be submitted to the Federal Court to update it, to which the Board vehemently agreed. *Id.*; *see also* Dkt. No. 40-9, p. 29 of 30 (Remele Depo.). The only misgivings the PCSSD Board had with Warren's handling of the entire situation were: (1) Warren's refusal to allow the Board to provide any input as to the tone or content of the Update, and (2) her holding out to Mr. Jones that the Board had reviewed and approved the draft prior to its filing, which it had not. *See* Dkt. No. 27-8, pp. 29-30 of 30 (Remele Depo.). Otherwise, Remele testified that she was, "very appreciative

of [Dr. Warren]," "held no ill-will," towards her and, ultimately, that her informing the Board of the disparities did not adversely impact her candidacy for superintendent in any way. *See* Dkt. No. 40-9, p. 138-139 (Remele Depo.).

To create an inference of retaliation, Warren must demonstrate that: (1) she engaged in protected conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. *Sutherland v. Mo. Dep't of Corr.*, 580 F.3d 748, 752 (8th Cir. 2009).

At the core of her argument, Warren alleges that she engaged in protected conduct when she informed Mr. Jones and the PCSSD Board of violations of the District's desegregation plan, and the Federal District Court's orders regarding the construction of PCSSD facilities. Pl's Amend. Compl. ¶ 53, ¶ 61. This argument fails for two reasons: (1) Dr. Warren's conduct is not "protected conduct" as prescribed by Title VII, and (2) the PCSSD Board was not, and has never been, displeased with Warren for informing it of the alleged disparities between Mills High School and Robinson Middle School.

To constitute protected activity, a plaintiff must either have opposed an unlawful employment practice under Title VII or participated in an investigation of an unlawful employment practice under Title VII. *Artis v. Francis Howell N. Band Booster Ass'n*, 161 F.3d 1178, 1183 (8th Cir. 1998). Warren's notification constitutes neither. Conversely, informing the relevant parties as to any potential issue with District facilities was within Warren's purview as the Assistant Superintendent for Equity and Pupil Services and later Interim Superintendent, and, further, does not specifically relate to a term or condition of Warren's employment. Frankly, it was a function of Warren's job to monitor the District's facilities and their compliance, or lack thereof, with Plan 2000.

Warren argues that an extension of the Title VII retaliation provision is appropriate when, "an employer uses employment rights or other conduct as a sword to retaliate against an employee's opposition." Response at p. 44. This assertion, however, is wholly without merit. Warren attempts to argue that the Board took a proverbial sword to her employment rights but does not provide an explanation as to how. Warren's tenure as Interim Superintendent was not cut short because of her notification. *See* Dkt. No. 27-1, p. 17 of 29 (Warren Depo.). In fact, she served dutifully in the role from July 17, 2017 until June 30, 2018 – the entire term of the contract. *Id.* at p. 2 of 29; *see also* Dkt. 27-7, p. 2 of 2 (McNulty Depo.). Further, her opportunity to apply for the position of Superintendent was not torn away – quite the opposite, in fact, as she was one of only two women included in the pool of finalists. *See* Screen Shot of 9 Interviewed Applicants, Dkt. No. 27-13. Moreover, after the position of Superintendent was filled and Warren's contract as Interim ended, she resumed her role as the Assistant Superintendent for Equity and Pupil Services – a position she occupies yet today. In other words, Dr. Warren has not demonstrated a single way in which her contract rights or the terms and conditions of her employment were affected.

If her conduct does not fall under the purview of Title VII and, further, did not conflict with the wishes of the Board, how can a decision made by the Board more than six months later be ascribed as retaliation? The simple answer is it cannot.

Lastly, assuming, *arguendo*, that Dr. Warren engaged in protected conduct *and* suffered an adverse employment action, she cannot demonstrate that a causal connection existed between her conduct and the Board's decision not to grant her an interview.

"The plaintiff's ultimate burden in a Title VII retaliation case is to prove an impermissible retaliatory motive was the 'but-for cause' of the adverse employment action." *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739 (8th Cir. 2017) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*,

570 U.S. 338, 360 (2013)) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation [...] This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer").

Warren puts forth little evidence to support her claim that a causal connection existed between her notifying the District's legal counsel and the Board, and the Board's decision not to interview her for the Superintendent position. Moreover, the evidence she puts forth is inaccurate, mischaracterized and not wholly inclusive.

She first speculates that on September 12, 2017, "seven days after notifying the Court" and "four days after the status hearing in Federal Court," Remele began "a campaign to discredit Janice Warren." Response at p. 46. This assertion, however, conflicts with Warren's original Complaint wherein she asserts that the PCSSD Board had already decided to terminate her at its September 12, 2017 meeting. Compl. ¶ 57. Why would Remele launch a crusade to tarnish Warren and her reputation if the Board had already decided to terminate her, as she alleges? To do so would be counter-productive and, stated bluntly, a waste of Remele's time. Additionally, the Board did not make its decision to decline Warren an interview – the alleged harm suffered – until March 27, 2018, which was more than six months after Warren reported to the Board and the District's attorney. Compl. ¶ 29, ¶ 20.

Warren places further support on a comment allegedly made by Remele, wherein Remele reportedly told her, "We do not air our dirty laundry in public." Response at p. 46. Remele does not deny that she *may* have made this statement but testified that if she did, it was in reference to the tone and phrasing of the Status Report and not in regard to whether a report should be made, as Warren eludes. *See* Dkt. No. 27-8, pp. 27, 29 of 30. Conversely, Remele fervently agreed that a report should be made. *Id*. Warren additionally opines that Remele acted with animus towards her, but Warren only makes this point by taking Remele's statements out of context and using

15

punctuation to create the illusion that everything Dr. Remele said to her was inflammatory. Response at p. 46.

This scant evidence cannot preclude summary judgment because speculation is insufficient to establish a causal connection. *Caudill v. Farmland Industries, Inc.*, 919 F.2d 83, 86-87 (8th Cir. 1990) (close temporal proximity between filing of age discrimination charges and firing of plaintiff was only a "slender reed of evidence" for which "rank speculation" would be required to assume causal connection between the two events); *see also Quiroga v. Hasbro Inc.*, 934 F.2d 497, 501 (3d Cir. 1991), *cert. denied*, 502 U.S. 940 (1991) ("inference based on timing alone" was insufficient in light of other evidence presented).

Ultimately, Warren has not – and cannot – demonstrate that: (1) she engaged in protected conduct under Title VII, (2) she suffered an adverse employment action, or (3) her report to the Board and Mr. Jones was the but-for cause of the Board's decision not to interview her for role of Superintendent. As Warren cannot demonstrate the existence of any of the necessary criteria, she has not established a prima facie case of retaliation sufficient to survive summary judgment.

## CONCLUSION

For the foregoing reasons, Defendants, Pulaski County Special School District, Mr. Mike Kemp, Dr. Linda Remele, Mr. Shelby Thomas, Ms. Alicia Gillen, Mr. Eli Keller, and Mr. Brian Maune, respectfully submit that they are entitled to judgment as a matter of law and that Plaintiff's Complaint be dismissed with prejudice.

In the alternative, Defendants respectfully request that Mr. Mike Kemp, Dr. Linda Remele, Mr. Shelby Thomas, Ms. Alicia Gillen, Mr. Eli Keller, and Mr. Brian Maune be dismissed in their personal capacities as each was acting in an official capacity at the time of the alleged intentional discrimination. Defendants further request that Plaintiff's request for punitive damages be dismissed.

Respectfully submitted,

BEQUETTE, BILLINGSLEY & KEES, P.A.
425 West Capitol Avenue, Suite 3200
Little Rock, AR 72201-3469
Phone: (501) 374-1107
Fax: (501) 374-5092
Email: jbequette@bbpalaw.com
Email: ckees@bbpalaw.com

By: **W. Cody Kees**
     W. Cody Kees, Ark. Bar #2012118
     Jay Bequette, Ark. Bar #87012

17