IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

JANICE HARGROVE WARREN                                      PLAINTIFF

VS.                          CASE NO. 4:19-CV-00655 BSM

KEMP, ET AL.                                              DEFENDANTS

| | |
|---|---|
| Sarah Howard Jenkins, PLLC<br>Attorney at Law<br>Arkansas Bar No. 97046<br>P. O. Box 242694<br>Little Rock, Arkansas 72223<br>Telephone: 501-406-0905<br>Email: sarah@shjenkinslaw.com<br><br>Attorney for Plaintiff | William Cody Kees, No. 2012118<br>George Jay Bequette, No. 87012<br>BEQUETTE, BILLINGS & KEES, P.A.<br>425 W. Capitol Avenue, Suite 3200<br>Little Rock, Arkansas 72201<br>Telephone: 501-374-1107<br>Facsimile: 501-374-5092<br><br>jbequette@bbpalaw.com<br>ckees@bbalaw.com<br><br>Attorneys for Defendant |
| Austin Porter Jr., Ark. Bar No. 86145<br>PORTER LAW FIRM<br>Catlett-Prien Tower Building<br>323 Center Street, Suite 1035<br>Little Rock, Arkansas 72201<br>Telephone: 501-244-8200<br>Facsimile: 501-372-5567<br>Email: Aporte5640@aol.com<br><br>Attorney for Plaintiff | |

## PLAINTIFF'S *AMENDED* AND *SUBSTITUTED* BRIEF IN SUPPORT OF HER MOTION FOR EQUITABLE RELIEF

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

ISSUES PRESENTED …………………………………………………………… iii

CONTROLLING AUTHORITY …………………………………………………… iv

INTRODUCTION …………………………………………………………….. 1

STATEMENT OF FACTS …………………………………………………… 1

STATEMENT OF LAW …………………………………………………… 9

CONCLUSION ……………………………………………………………….. 18

CERTIFICATE OF SERVICE …………………………………………………….. 19

## ISSUES PRESENTED

1.      WHETHER THE COURT HAS THE POWER TO FASHION A REMEDY
        WHICH IS DESIGNED TO MAKE THE PLAINTIFF WHOLE DUE
        TO BEING A VICTIM OF RETALIATION WHEN SHE WAS DENIED
        THE SUPERINTENDENT'S POSITION?

        Plaintiff: Yes
        Defendant: No

2.      WHETHER THE COURT HAS THE POWER TO ISSUE INJUNCTIVE
        RELIEF TO ORDER THE DEFENDANT TO PUT THE PLAINTIF IN
        THE SUPERINTENDENT'S POSITION?

        Plaintiff: Yes
        Defendant: No.

3.      WHETHER THE COURT HAS THE POWER TO ORDER THE
        DEFENDANT TO ADJUST THE PLAINTIFF'S SALARY TO
        EQUAL THAT OF THE SUPERINTENDENT'S POSITION?

        Plaintiff: Yes
        Defendant: No.

## CONTROLLING AUTHORITY

CASES:                                                                                          Page

*Dependahl, et al v. Falstaff Brewing Corporation, et al.*, 653 F.2d 1208 (8th Cir. 1981) .      12

*Doane v. City of Omaha*, 115 F.3d 624, 629 (8th Cir. 1997) ……………………………..      9, 17

*Excel Corp. v. Bosley*, 165 F.3d 635, 639 (8th Cir. 1999) …………………………….…..      15

*Floca v. Homcare Health Services, Inc.*, 845 F.2d 108, 111 (5th Cir. 1988) …………      10

*Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1194 (8th Cir. 2000) …………      12, 13

*Ingram v. Missouri Pacific Railroad Company*, 897 F.2d 1450, 1456 (8th Cir. 1990) ….      17

*Harper v. General Grocers Co.*, 590 F.2d 713, 717 (8th Cir. 1979) …………………….      9, 11

*Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1063 (8th Cir. 2002) …………………………      14

*King v. Staley*, 849 F.2d 1143, 1144 (8th Cir. 1988) ……………………………………..      9, 11

*Kramer v. Logan County School District No. R-1*, 157 F.3d 620 (8th Cir. 1998) ……….      14

*Marshfield Steel Co. v. N.L.R.B.*, 324 F.2d 333, 338 (8th Cir. 1963) …………………….      12

*Mills v. Board of Education of Anne Arundel County*, 30 F.Supp. 245, 249
        (D.C. Maryland, 1939) …………………………………………………………..      17

*Morris v. Williams*, 149 F.2d 703, 709 (8th Cir. 1945) …………………………………      17

*Pedigo v. P.A.M. Transport, Inc.*, 60 F.3d 1300, 1301 (8th Cir. 1995) ………………….      9, 17

*Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 121 S.Ct. 1946,
        150 L.Ed.2d 62 (2001) …………………………………………………………..      14

*Sherko v. State of Wisconsin, Department of Public Instruction*, 630 F.2d 498,
        504 (4th Cir. 1980) ……………………………………………………………..      15, 16,

*Teamsters v. United States*, 431 U.S. 324, 364, 52 L.Ed.2d 396, 97 S.Ct. 1843 (1977) …      9

*Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1171 (6th Cir. 1996) …………..      17

*Wallace v. Dunn Construction Company, Inc.*, 968 F.2d 1174, 1182 (11th Cir. 1992) ....   17

<u>Arkansas Code</u>:                                                                                              <u>Page</u>

Ark. Code Ann. § 16-65-114 ……………………………………………………….   13

<u>Introduction</u>

This is a civil rights action brought pursuant to 42 U.S.C.S. § 2000e *et seq*.  (Title VII of the Civil Rights Act of 1964, as amended), 42 U.S.C.S. § 1981 (as amended by the Civil Rights Act of 1991, which is codified at 28 U.S.C.S. § 1658), and pursuant to the Fourteenth Amendment to the United States Constitution, to recover damages against the defendants for subjecting Dr. Janice Warren, a black female, to unlawful employment practices on account of her race, sex, and in retaliation for having protected the rights of black administrators, teachers, and students within the Pulaski County Special School District (PCSSD).  The plaintiff also seeks relief pursuant to 42 U.S.C.S. § 1983, because unlawful employment practices were committed by the defendants while acting under color of law.  The plaintiff is also seeking equitable relief and injunctive relief as well.   This matter was tried to a jury of eight (8) citizens from February 14, 2022 – February 25, 2022, which resulted in a jury verdict in the plaintiff's favor.

<u>Statement of Facts</u>

The plaintiff Janice Hargrove Warren, Ed.D, formerly served as the Superintendent of the Crossett School District.  Dr. Warren graduated from Crossett High School, and later went to the University of Arkansas at Pine Bluff (UAPB), where she obtained her bachelor's degree.  Dr. Warren then went to the University of Arkansas, and obtained her master's degree, and later obtained her Educational Doctorate (Ed.D.).  Dr. Warren taught in the classroom for eleven years, and then went to central office, where she was over elementary education, and equity for the Crossett School District.  Dr. Warren became the Assistant Superintendent of the Crossett School District, and later became the superintendent in Crossett in July 2001.

When Dr. Warren became the superintendent of the Crossett School District, she discovered that the district was in financial trouble because of declining enrollment. The timber industry was relocating and families were moving, following the industry. The Arkansas

Department of Education (ADE) placed the district in fiscal distress.  Dr. Warren was able to place a team together, and the district was able to get out from under the fiscal distress designation after only two (2) years, which was a tremendous feat.  The ADE applauded the Crossett School District for being able to be released so soon.  When Dr. Warren was appointed as the Superintendent for the Crossett School District, they had an ending legal balance of a little over $1 million dollars, and when she left in 2011, the district had an ending legal balance of $5.1 million.

The Pulaski County Special School District (PCSSD) was placed in fiscal distress in 2011, and the Board of Education was dissolved.  Pursuant to Arkansas Law, then Commissioner of Education Tom Kimbrell became the school board.   Mr. Kimbrell then hired Dr. Jerry Guess as the superintendent.

Dr. Warren decided to retire from education, and moved to the Little Rock area to be close to her grandchildren.  Dr. Warren came out of retirement and went to work as a curriculum auditor for the ADE.  In February/March 2012, Dr. Warren was assigned to Harris Elementary School with the PCSSD, and ran into Paul Brewer, who was the Assistant Superintendent for the PCSSD. Mr. Brewer tried to convince Dr. Warren to come to the PCSSD to work, but she was not interested at that time.  Dr. Warren then got a call from Dr. Jerry Guess, who asked Dr. Warren to come to the PCSSD to help with the schools.  Dr. Warren applied in July 2012, and she was hired as the Director of Elementary Education.   In 2013, the responsibilities of Interim Assistant Superintendent for Equity and Pupil Services were added to Dr. Warren's workload.  Although Dr. Warren was promoted to the position of Assistant Superintendent for Equity and Pupil Services, she continued in her role as the Director of Elementary Education.  Dr. Warren was performing two (2) fulltime jobs.

The PCSSD has been under federal court jurisdiction since 1982, when the Little Rock School District filed a lawsuit against the Pulaski County Special School District, North Little Rock School District, and the State of Arkansas, contending that these entities committed certain acts that resulted in white students leaving the Little Rock School District, causing it to become segregated.   John W. Walker filed a petition to intervene on behalf of black students and parents, contending that the parties could not adequately protect the interests of these students and parents. The court allowed the intervention, and they were called the *Joshua Intervenors*.   In November 1999, the parties entered into a settlement, and the court adopted the parties' agreement, and entered *Plan 2000*, which is a consent decree.   Contained within *Plan 2000*, were the requirements that PCSSD had to do certain things with staffing, special education, monitoring, student assignments, and facilities, *inter alia*.

Over the course of the years, PCSSD became unitary in certain areas as required by *Plan 2000*.   Judge D. Price Marshall, who was overseeing the desegregation case, required the PCSSD, Jacksonville North/Pulaski School District, and the *Joshua Intervenors*, later changed to *McClendon Intervenors* to hold monthly meetings, and the parties were to have quarterly status hearings with the court.   On March 10, 2016, the ADE releases PCSSD from fiscal distress.   In November 2016, new board members were elected, and they took office in December 2016.   Dr. Linda Remele was elected as the President of the Board of Education for the PCSSD.   The board consisted of seven members: five Caucasian board members and two African American board members.

The PCSSD was allowed to construct two (2) schools – Robinson Middle School and Mills High School.   Judge Marshall ordered PCSSD to construct the new Mills High School of similar quality to that of Maumelle High School, and that the project had to be constructed in the price

range of $50,000,000.00.   Judge Marshall also required that the Mills High School had to be completed first, before the Robinson Middle School.  The Mills High School has feeder schools in the Southeast sector of Pulaski County, Arkansas, which is the predominantly black areas, and the Robinson Middle School is located on  Highway 10, near Pinnacle Mountain in the western section of Pulaski County, the predominantly white area.   Dr. Jerry Guess appointed Derek Scott, a Caucasian male, then Executive Director of Operations, to be in charge of the construction projects.  The PCSSD hired the architecture firm of *Wittenburg, Delony, and Davidson* (WD&D) to prepare the plans, and *Baldwin & Shell* to handle the construction.

The evidence revealed that Derek Scott directed that the Mills project be scaled back, and that lesser quality materials (valued engineering) be used in order to cut costs.  Mr. Scott was diverting funds from the Mills High School project and redirecting those funds to the Robinson Middle School project.  Over the course of the construction, Mr. Scott would make monthly reports to the board telling the members that all was going well, the projects were on schedule and on budget.  The board was also given monthly financial reports by CFO Denise Palmer as well.  Also, during the course of the construction projects, Derek Scott held meetings with representatives of WD&D and Baldwin & Shell.  Dr. Warren was not privy to these meetings.

In May 2017, board member Alicia Gillen did a FOIA request, and discovered a letter from John W. Walker to Allen Roberts agreeing as requested by Allen Roberts to certain stipulations to allow unitary status in Staffing, Section L of *Plan 2000*, in exchange for itemized equitable adjustments consistent with *Plan 2000*.  Among them was a commitment to recommend Dr. Janice Warren for the position of Deputy Superintendent.  When Dr. Guess made the recommendation, the board denied the request. On July 18, 2017, there was an emergency board meeting, and the members of the board decided to terminate the services of the Allen Roberts Law Firm.  Dr. Guess

4

stated that he was not willing to work with any other law firm, and offered his resignation, which the board accepted.  The board hired Dr. Warren as the interim superintendent.

On July 19, 2017, Dr. Warren met with Dr. Guess as he packed his things. Derek Scott, the Executive Director of Operations, joined them in the superintendent's office, and recommended to Dr. Warren that the office be painted.  When asked about funding for the repainting, Derek Scott assured Dr. Warren that the funding would come from the SRM budget; with these assurances, Dr. Warren agreed.  Dr. Warren spent about five (5) days cleaning the superintendent's office, which was filthy.  Dr. Warren also requested a desk to replace the one that rested on bricks, a credenza for storage, and six chairs.

During the board meeting in August 2017, the board members commended Dr. Warren on a smooth transition for the opening of school, and told her that she was doing a good job.  On August 28, 2017, an irate parent of a Mills High School athlete contacted Dr. Warren, complaining about the state of the Mills athletic facilities as compared to Robinson Middle School.  The parent stated that the facilities at Mills High School, which were about 90% complete, were inferior to those at Robinson Middle School.  Dr. Warren asked Will Reid to get video footage of both Mills and Robinson.  Dr. Warren was shocked at what she saw.  The facilities at Mills were obviously inferior to that of Robinson Middle, and the facilities at Mills were not complete, whereas the facilities at Robinson were complete.  Dr. Warren reported this to the board members and asked them to come and view the video; six of the board members did.  Remele was the first to see the video. Contrary to board policy, Remele asked Dr. Warren not to allow the other board members to view the video until she visited the two (2) campuses.  However, consistent with board policy, Dr. Warren had contacted the other board members and invited them to view the video at the same time she invited Remele.  Dr. Warren did not rescind their invitation.

Dr. Warren also contacted Sam Jones, who was the new attorney hired to represent the district in the desegregation case.  Sam Jones had filed a status report with the court about two (2) weeks prior.  However, when Mr. Jones saw the video, he knew that there was a problem, and he needed to file a supplemental report with the Court.   Dr. Warren along with Sam Jones worked on the supplemental report, which was filed on September 5, 2017.  The status hearing was held on September 8, 2017.  The Court directed Margie Powell, the Court's expert to go and view the two construction projects.  Margie Powell prepared a report that pointed out in detail the disparities that existed between Mills High School and Robinson Middle.  The facilities disparities were reported in the *Arkansas Democrat/Gazette*, which demonstrated that the district was not fully complying with *Plan 2000*.

During a September 12, 2017 board meeting, Remele and Gillen attacked Dr. Warren about the supplemental filing that was made by Sam Jones.  After the meeting, Dr. Remele got into Dr. Warren's face, and angrily told her that "we do not air our dirty laundry in public."  Also, during the board meeting, Remele and Gillen criticized Dr. Warren for making changes to her office, and told her that she was only to "keep the ship afloat."  It was also at the September 12th board meeting that the majority of the board decided to conduct a national search for a superintendent.  After the September 12, 2017 board meeting, Dr. Remele started preparing a list of things that she did not like about Dr. Warren.  This paper trail went on until on or about November 14, 2017, when the Board announced that it was hiring a national search firm to look for a new superintendent. This caught Dr. Warren completely off guard, and she was devasted by this turn of events.

In December 2017, the Board hired *Ray and Associates* to conduct the national search. Through its network of associates, *Ray and Associates* contacted 1,197 potential applicants, but only got thirty-six (36) people to apply.  *Ray and Associates* developed a standardized rubric of

ten qualities, based on its survey of 30 general characteristics that it uses throughout the nation regardless of the local demographics. *Ray and Associates* identified Ten Top Themes or the specific needs and qualities desired by stakeholders and staff. These themes met PCSSD's specific needs for selecting a new superintendent. The board chose to use the general characteristics as its rubric rather than one designed to meet its specific needs and would point to Dr. Warren's qualifications.

*Ray and Associates* looked at the thirty-six (36) applicants, and narrowed the selection down to its ten (10) top candidates; nine (9) candidates were presented to the board on March 27, 2018.   There were six (6) African American applicants included in the nine, with three (3) Caucasian applicants; Dr. Warren was in the top nine.   The nine (9) candidates prepared video presentations, answering three (3) subjective questions.   The board reviewed the nine (9) video presentations, and selected three (3) males as their top candidates to interview.   Dr. Warren did not make the final cut based on the board's scoring, which again was based on subjective questions as answered by the nine (9) candidates.[1]   It is not known how the scoring was done, due to the fact that the PCSSD allowed *Ray and Associates* to destroy their scoring sheets, which is in violation of both state and federal laws.

The top three (3) candidates were two African American males and one Caucasian male – Dr. Charles McNulty.   The candidates were scheduled for interviews in April 2018.   However, the day before the interview, Mr. Harris withdrew.   Mr. Harris could not meet the superintendent's certification, because he lacked teaching experience. This left two (2) candidates to interview – McNulty and Pruitt.   Pruitt had the required teaching experience but did not have Central Office experience and had only served as an Area Superintendent for 18 months.   McNulty was the

---

[1] The nine (9) candidates had to answer three (3) subjective questions that flashed across the screen.

superior candidate to that of Harris and Pruitt, but Warren was the superior candidate to all of the eight (8) other candidates.  The board voted to hire Dr. McNulty.

Dr. Warren filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) contending that she was discriminated against due to her race, sex, and in retaliation for having reported the racial disparity that existed between the construction of Mills High School and Robinson Middle School.  This matter was tried to a jury of eight (8), which consisted of seven (7) Caucasian jurors and one African American juror. A further breakdown of the jury was four females and four males.  On February 25, 2022, the jury returned a verdict in under three (3) hours for the plaintiff on her claim of retaliation for the superintendent's position, but in favor of the defendants on the plaintiff's claims of race, sex, and the breach of contract claim.  The jury also found in favor of the defendants on the plaintiff's claim of retaliation for the PCSSD's hiring of a lesser qualified, external candidate for the position of deputy superintendent in 2018. The jury award as modified by the court, on the plaintiff's retaliation claim for the superintendent's position is as follows:

1.  Lost Wages - $208,025.40

2.  Compensatory Damages - $125,000.00

3.  Punitive damages – Linda Remele - $25,000.00

4.  Punitive damages – Alicia Gillen - $25,000.00

**Total ……………………………… $ 383,025.40**

<u>Statement of Law</u>

As the United States Supreme Court stated, the purpose of Title VII is:

'[t]o make persons whole for injuries suffered on account of unlawful employment discrimination.' *Id* at 418. In determining the specific remedies to be afforded, a

district court is 'to fashion such relief as the particular circumstances of a case may require to effect restitution.' <u>Franks</u>, 424 U.S at 764.[2]

.   .   .

Thus, the Court has held that the purpose of Congress in vesting broad equitable powers in Title VII courts was 'to make possible the 'fashion[ing] [of] the most complete relief possible,' and that the district courts have' 'not merely the power but the duty to render a decree that will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.' <u>Albemarle</u>, *supra*, at 421, 418.  More specifically, in *Franks* we decided that a court must ordinarily award a seniority remedy unless there exist reasons for denying relief' 'which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination . . . and making persons whole for injuries suffered.' 424 U.S. at 771, *quoting* <u>Albemarle</u>, *supra*. at 421.

<u>Teamsters v. United States</u>, 431 U.S. 324, 364, 52 L.Ed.2d 396, 97 S.Ct. 1843 (1977), *quoting*,

<u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 418, 421, 45 L.Ed.2d 280, 95 S.Ct. 2362. "Once a

plaintiff proves that an unlawful motive played some part in the employment decision, see 42

U.S.C. § 2000e-(2)(m), the plaintiff is entitled to relief, including compensatory damages,

declaratory judgment, and injunctive relief." <u>Doane v. City of Omaha</u>, 115 F.3d 624, 629 (8th Cir.

1997), citing 42 U.S.C. § 2000e-5(g)(2)(B); <u>Pedigo v. P.A.M. Transport, Inc</u>., 60 F.3d 1300, 1301

(8th Cir. 1995).  The Court went on to say that, "[a] person who has been discriminated against is

entitled to the most complete relief possible, and there is a strong presumption that persons who

have been discriminated against are entitled to back pay.  <u>King v. Staley</u>, 849 F.2d 1143, 1144 (8th

Cir. 1988).  *As always, the goal is to make the victim whole*."   115 F.3d at 629 (emphasis added).

*See also*, <u>Harper v. General Grocers Co</u>., 590 F.2d 713, 717 (8th Cir. 1979).

---

[2]<u>Franks, et al. v. Bowman Transportation Co., Inc</u>., 424 U.S. 747 (1976)

A.    <u>Back Pay</u>

The jury awarded Dr. Warren $208,025.40 in back pay based on the difference that she would have made had she been promoted to the position of superintendent, versus the amount that she made as the interim superintendent.  Unfortunately, the jury did not fully award Dr. Warren the back pay that she lost.  "Back pay is awarded to put victims of unlawful discrimination in the position in which they would have been but for the discrimination."  <u>Floca v. Homcare Health Services, Inc.</u>, 845 F.2d 108, 111 (5th Cir. 1988), *citing* <u>Sellers v. Delgado Community College</u>, 839 F.2d 1132, 1136 (5th Cir. 1988).

The PCSSD hired Dr. McNulty effective July 1, 2018.  Despite the fact that Dr. Warren has suffered a total back pay loss in the amount of $437,453.64, it is obvious that the jury only awarded her back pay loss for the school years of 2018-2019, 2019-2020.  Dr. Warren's back pay loss is computed as follows:

| Name | 2018-2019 | 2019-2020 | 2020-2021 | 2021-2022 |
|---|---|---|---|---|
| Charles McNulty | $270,600.00 | $270,600.00 | $283,800.00 | $283,800.00 |
| Janice Warren | $166,587.30 | $166,587.30 | $169,085.88 | $169,085.88 |
| **Difference** | **$104,012.70** | **$104,012.70** | **$114,714.12** | **$114,714.12** |
|  | **Pl. Exh. A** | **Pl. Exh. B** | **Pl. Exh. C** | **Pl. Exh. D** |
| Total Amount of pay loss: | $104,012.70 | $208,025.40 | $322,739.52 | $437,453.64 |

**The total amount of backpay loss is $437,453.64**.

The only way that Dr. Warren can be made whole is to have the Court to award her the total amount of backpay that she has suffered, which $437,453.64.  The Court went on to say that, "[a] person who has been discriminated against is entitled to the most complete relief possible, and

there is a strong presumption that persons who have been discriminated against are entitled to back pay.  King v. Staley, 849 F.2d 1143, 1144 (8th Cir. 1988).  *As always, the goal is to make the victim whole*."   115 F.3d at 629 (emphasis added).  *See also*, Harper v. General Grocers Co., 590 F.2d 713, 717 (8th Cir. 1979).

The Court should also require the defendant to adjust Dr. Warren's salary to make it equal to that of Dr. McNulty.  The annual salary of $283,800.00 divided by 52 weeks equals $5,457.69, which when divided by five (5) equals $1,091,54 per day.  Again, Dr. Warren has an annual salary of $169,085.88, which when divided by 52 weeks equals $3,251.65, which when divided by five (5) equals $650.33 per day. As it stands right now, Dr. Warren is losing $2,206.04 per week and $441.21 per day in the difference of those salaries.

B.      Pre-Judgment Interest

The plaintiff should be awarded pre-judgment interest on her monetary award from the date of July 1, 2018[3] until February 25, 2022, which is the date of the jury verdict.  The plaintiff was awarded $208,025.40 in back pay and $125,000.00 in compensatory damages, $50,000.00 in punitive damages for a total award of $383,025.40.   This award should be subjected to both prejudgment and post-judgment interest.

> A decision granting prejudgment interest is reviewed on appeal under the abuse of discretion standard.  *See* Val-U Constr. Co. v. South Dakota v. Rosebud Sioux Tribe, 146 F.3d 573, 582 (8th Cir. 1998); Smith v. World Ins. Co. 38 F.3d 1456, 1467 (8th Cir. 1994).  Stroh Container Co. v. Delphi Indus., Inc., 783 F.2d 743, 752 (8th Cir. 1986) provides that:

>> [a]s a general rule, prejudgment interest is to be awarded when the amount of the underlying liability is reasonably capable of ascertainment and the relief granted would otherwise fall short of making the claimant whole because he or she has been denied the use of money which was legally due.

---

[3] Effective date of hire for Charles McNulty.

> Generally, prejudgment interest should be awarded 'unless exceptional or unusual circumstances exist making the award of interest inequitable.' *Id*. (citations omitted).

Frazier v. Iowa Beef Processors, Inc., 200 F.3d 1190, 1194 (8th Cir. 2000).

"The purpose of the award is to compensate the employees for the loss sustained because of the wrongful withholding of wages.  While the good faith of the employer is one of many factors to be considered, '[t]o make such employees whole, the provision for the payment of interest for the time the back pay was wrongfully withheld from them is only equitable."  Marshfield Steel Co. v. N.L.R.B., 324 F.2d 333, 338 (8th Cir. 1963).

C.      Pre-Judgment Interest Rate

The defendant must concede that the plaintiff is entitled to pre-judgment interest on the jury's award of $383,025.40, the question is the appropriate rate.  In deciding what was the appropriate rate of interest in a case involving ERISA, the Eighth Circuit stated:

> A subsidiary questioned is the rate at which the award of interest should be computed.  28 U.S.C. § 1961 (1976) allows post-judgment interest on all civil judgments in federal court at the rate provided under state law.  We believe that section 1961 provides useful guidance in the area of prejudgment interest.  In the interest of uniformity, we therefore hold that while federal law governs the issue of interest and its rate, state law should be incorporated in the determination of the proper rate to be allowed, once an independent finding is made concerning whether any prejudgment interest should be awarded.

Dependahl, et al v. Falstaff Brewing Corporation, et al., 653 F.2d 1208, 1219 (8th Cir. 1981).

The Eighth Circuit also stated that it was not an abuse of discretion for the district judge to compute prejudgment interest based on the law of Iowa, while basing post-judgment interest based on federal law.  "Accordingly, the district court's award of prejudgment interest as computed under Iowa Code § 535.3 and postjudgment interest as computed pursuant to 28 U.S.C. § 1961 was not an abuse of discretion."  Frazier v. Iowa Beef Processors, Inc., 200 F.3d 1190, 1194 (8th Cir. 2000).

Under Arkansas Law, the rate of interest for prejudgment and post-judgment should be based on the Federal Reserve primary credit rate in effect on the date of the judgment, plus two percentage points.  Ark. Code Ann. § 16-65-114 provides in pertinent part:

(a)

> (1)      Except as provided in subdivision (a)(2) of this section, a judgment entered by a court shall bear post-judgment interest and, if appropriate under the facts of the case, prejudgment interest:
>
> (A)      In an action on a contract at the rate provided by the contract or at a rate equal to the Federal Reserve primary credit rate in effect on the date on which the judgment is entered plus two percent (2%), whichever is greater; and
>
> (B)      In any other action at a rate equal to the Federal Reserve primary credit rate in effect on the date on which the judgment is entered plus two percent (2%).

The Federal Reserve primary credit rate is .25%.  *See* 12 U.S.C. § 501.51(a).  Therefore, in accordance with Ark. Code Ann. § 16-65-114(a)(1)(B), the appropriate prejudgment interest rate should be 2.25%.  The jury verdict was $383,025.40  x .0225 = $8,618.07 in interest per year, which gives a daily interest rate of $23.61.  Therefore, the amount of prejudgment interest from July 1, 2018 to February 25, 2022 (date of judgment) = $31,519.35.[4]

D.      <u>Modified Judgment</u>

The Court should modify the jury's verdict as follows:

1.      Lost Wages - $437,453.64

---

[4] From July 1, 2018 until February 25, 2022, there are 1,335 days.

2.      Compensatory Damages - $125,000.00

3.      Punitive damages – Linda Remele - $25,000.00

4.      Punitive damages – Alicia Gillen - $25,000.00

**Total ……………………………… $612,453.64**

With the judgment being modified to the amount of $612,453.64, the amount of interest is

$50,396.25 computed as follows:

$612,453.64 x .0225 = $13,780.21 – yearly interest

$13,780.21 ÷ 365 = $37.75 x 1,335 (days) = $50,396.25

E.      <u>Post Judgment Interest</u>

The total judgment amount of $662,849.89 is based on a rate of .28.  The yearly amount of

interest based on $662,849.89 is $1,855.98 ($662,849.89 x .0028 = $1,855.98); this gives a daily

rate of $5.08.

F.      <u>Front Pay and/or Reinstatement</u>

The jury in the case at bar found that the plaintiff was a victim of retaliation when she was

denied the opportunity to interview for the superintendent's position.  In her complaint, the

plaintiff sought front pay until her retirement [**Doc. # 65, ¶ 89**]."Front pay is a monetary substitute

to reinstatement, which the district court in its discretion may award under the Age Discrimination

in Employment Act to make the injured party whole. . . The front pay award should address the

equitable need of the employee, such as the ability to obtain employment with comparable

compensation." <u>Hartley v. Dillard's, Inc</u>., 310 F.3d 1054, 1063 (8th Cir. 2002).  <u>Pollard v. E.I. du

Pont de Nemours & Co</u>., 532 U.S. 843, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001) (front pay is a

remedy that is not subject to the limitations of 1981a(b)(3); <u>Kramer v. Logan County School</u>

District No. R-1, 157 F.3d 620 (8th Cir. 1998) (front pay is an equitable remedy excluded from the statutory limit on compensatory damages provided for in section 1981a(b)(3)).

The position of superintendent is filled; therefore, reinstatement is impracticable and/or impossible. More importantly, the relationship between the board and Dr. Warren has been irreparably marred by the retaliatory conduct of its past president and Alicia Gillen and the reckless indifference demonstrated by the male members of the board to Dr. Warren's constitutional and contract rights. "The issue of front pay is not an issue for the jury to decide, rather it is a form of equitable relief which must be determined by the district court after considering all aspects of the case. *Newhouse v. McCormick & Co.*, 110 F.3d 635, 641 (8th Cir. 1997). Front pay may be granted in lieu of reinstatement in situations where reinstatement would be impracticable or impossible." Excel Corp. v. Bosley, 165 F.3d 635, 639 (8th Cir. 1999).

In the case at bar, had the plaintiff not been the victim of retaliation, she would have been interviewed and hired for the superintendent's position. Although the position is currently filled, this Court can order that the plaintiff's salary be put at the same level as Dr. McNulty's, the current superintendent. If the Court fails to set the plaintiff's salary to that of Dr. McNulty, she would not be made whole, and would continue to suffer a pay loss. The Court also has the power to grant injunctive relief, ordering the defendant to place the plaintiff in the superintendent's position the next time that it becomes vacant.

> We cannot find that the injunctive relief commanding the defendant to appoint the plaintiff to the first vacancy occurring in its work force in the salary range and responsibility level at which she applied is in any way inappropriate. 42 U.S.C. § 2000e is to achieve equality of employment opportunity and to make persons whole for injuries suffered on account of unlawful employment discrimination. Albemarle Paper Co. v. Moody[5], *supra.*, and the defendant's contention that the trial judge exceeded his authority in entering that injunction is without merit.

---

[5] Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

<u>Sherko v. State of Wisconsin, Department of Public Instruction</u>, 630 F.2d 498, 504 (4th Cir. 1980).

Dr. Sara Sherkow, a female applied for a promotion to the position of Education Administrator I on the date of January 29, 1974.  Dr. Sherkow holds a Doctor of Philosophy in educational administration.  Dr. Sherkow was employed by the University of Wisconsin, and help set up a program called the Special Education Needs Program (SEN).  When the position of Education Administrator for SEN opened up in September 1973, Dr. Sherkow applied for the position, but a male was selected – Dr. Donald Anderson. Dr. Anderson had served as the *de facto* head of the program, and Dr. Sherkow did not challenge his selection.  Dr. Sherkow served under Dr. Anderson, and was the second in command.  However, shortly after Dr. Anderson was selected for the position, he accepted a position with the United States Military.  While Dr. Anderson was getting his affairs in order to leave the University of Wisconsin, he was not around very much, and Dr. Sherkow was running the program.  On January 29, 1974, Dr. Sherkow again applied for the Education Administrator I position; there were three people who applied and tested for the position.  Dr. Pennington was ranked the highest, while Dr. Sherkow was ranked second, and a Dr. Lawrence was ranked third.

Dr. Pennington was offered the position, but he rejected the offer.  Rather than offering the position to Dr. Sherkow, the university offered the position to Dr. Lawrence, a male.  Dr. Sherkow then filed a complaint with the EEOC alleging discrimination based on sex. Dr. Sherkow then filed her complaint for discrimination.

The trial judge ruled in Dr. Sherkow's favor.  The trial judge found that Dr. Sherkow was better qualified than Lawrence, and found that Dr. Sherkow was not appointed for the position in addition to her sex, her public statements that she made about sex discrimination and women's rights.  The University appealed. The Fourth Circuit affirmed the judge's decision.  <u>Sherko v. State</u>

16

of Wisconsin, Department of Public Instruction, 630 F.2d 498 (4th Cir. 1980).  "Victims of discrimination are presumptively entitled to reinstatement or reinstatement in the usual case." Thurman v. Yellow Freight Systems, Inc., 90 F.3d 1160, 1171 (6th Cir. 1996), *citing* Fleming v. Ayers & Associates, 948 F.2d. 993, 998 (6th Cir. 1991).  "Title VII relief is designed to be 'make whole' relief, that is, it should put the plaintiff in as good a position as if the discrimination never occurred."  Ingram v. Missouri Pacific Railroad Company, 897 F.2d 1450, 1456 (8th Cir. 1990).

G.     Declaratory Relief and Injunctive Relief

The courts have held that when the evidence establishes that the plaintiff has been a victim of discriminatory conduct, then they are entitled to have a declaration by the court.  Where the evidence clearly demonstrated that black teachers were being paid less than white teachers, for performing the same duties, and holding the same degrees and certificates, the court stated that the plaintiff "is also entitled to a declaratory decree to the effect that such unlawful discrimination exists."  Mills v. Board of Education of Anne Arundel County, 30 F.Supp. 245, 249 (D.C. Maryland, 1939).  Furthermore, the courts have held that "[u]nder the Declaratory Judgment Act, 28 U.S.C.A. § 400, the district court has jurisdiction, when a controversy exists, 'to declare rights and other legal relations of any interested party petitioning for such declaration, whether or not further relief is or could be prayed.'" Morris v. Williams, 149 F.2d 703, 709 (8th Cir. 1945); *see also*, Davis v. Cook, 55 F.Supp. 1004, 1007 (N.D. Georgia 1944).  The Courts have held that even when the after acquired evidence rule would defeat certain forms of relief, it would not prevent the plaintiff form getting declaratory relief.  Wallace v. Dunn Construction Company, Inc., 968 F.2d 1174, 1182 (11th Cir. 1992).  The plaintiff is also entitled to an injunction to prevent further acts of discrimination.  *See* Doane v. City of Omaha, 115 F.3d 624, 629 (8th Cir. 1997), *citing* 42 U.S.C. § 2000e-5(g)(2)(B); Pedigo v. P.A.M. Transport, Inc., 60 F.3d 1300, 1301 (8th Cir. 1995).

<u>Conclusion</u>

In conclusion, the plaintiff is entitled to the most complete relief possible as the victim of retaliation as found by the jury.  The plaintiff is entitled to a declaration from this court that the defendants have subjected her to unlawful employment practices when it refused to interview her for the superintendent's position in retaliation for her opposing and reporting race discrimination, as required by her position of Interim Superintendent and to prevent a material adverse effect on the benefits, privileges, and conditions of employment of the majority black administrators and black teachers assigned to Mills High School.   Such a declaration would be consistent with the findings of the jury, and the court can make no other findings.  The plaintiff should also be placed in the superintendent's position or in the alternative the Court should order the defendant to place the plaintiff in the superintendent's position the next time one becomes vacant and to adjust the plaintiff's pay to reflect Dr. McNulty's rate of pay until such vacancy materializes.   At the very least, the Court should order PCSSD to adjust the plaintiff's salary to make it equal to that of the superintendent's salary or to award her front pay for two years.   The plaintiff is also entitled to an award of pre-judgment and post-judgment interest.   Finally, the plaintiff is also entitled to injunctive relief, to prevent the defendant from committing further acts of unlawful employment practices.

Respectfully submitted,

Austin Porter Jr.
Bar Number 86145
PORTER LAW FIRM
The Tower Building
323 Center Street, Suite 1035
Little Rock, Arkansas 72201
Telephone: 501-244-8200
Facsimile: 501-372-5567
E-mail: Aporte5640@aol.com

18

Sarah Howard Jenkins
Attorney at Law
P. O. Box 242694
Little Rock, Arkansas 72223
Telephone: 501-406-0905
Facsimile:
Email: sarah@shjenkinslaw.com

**CERTIFICATE OF SERVICE**

I, Austin Porter Jr., do hereby certify that a copy of the foregoing pleading was electronically filed with the Clerk of the United States District Court for the Eastern District of Arkansas, on this 21[th] day of March 2022, by using the CM/ECF system, which is designed to send notification of such filing to the following person:

Jay Bequette
W. Cody Kees
BEQUETTE, BILLINGS & KEES, P.A.
425 W. Capitol Avenue, Suite 3200
Little Rock, Arkansas 72201

jbequette@bbpalaw.com
ckees@bbalaw.com