**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**JANICE HARGROVE WARREN**                                 **PLAINTIFF**

**v.**                        **Case No. 4:19-cv-00655-BSM**

**KEMP, et al.**                                                      **DEFENDANTS**

**PLAINTIFF'S BRIEF IN OPPOSITION TO THE DEFENDANTS'**
**RENEWED RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION TO ALTER OR AMEND THE JUDGMENT**

Plaintiff, Dr. Janice Warren, by and through her attorneys, Sarah Howard Jenkins, PLLC, and Austin Porter Jr., d/b/a Porter Law, submits her Brief in Opposition to the Defendants' Rule 50(b) Motion for Judgment as a Matter of Law or, in the alternative, a Rule 59(e) Motion to Alter or Amend the Judgment. As demonstrated herein, Defendants' Motion must be denied.

**INTRODUCTION**

This is a civil rights action brought pursuant to 42 U.S.C.A. § 2000e, Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C.A. § 1981, as amended by the Civil Rights Act of 1991; 42 U.S.C.A. § 1983, and pursuant to the Fourteenth Amendment to the United States Constitution. This matter was tried to a jury of eight (8) citizens from February 14, 2022 to February 25, 2022, and resulted in a jury verdict in the Plaintiff's favor on her claims of Retaliation.

**STATEMENT OF THE FACTS**

Dr. Jerry Guess was appointed as Superintendent of PCSSD after the State of Arkansas removed PCSSD's Board in June 2011.  Commissioner Johnny Key testified that Dr. Guess was

1

delegated final authority both as Superintendent and Board regarding all matters pertaining to the desegregation lawsuit. See also Brief in Support of Commissioner's Key's Motion to Quash, Dkt. No. 103 & 104. During this period, Derek Scott, with Dr. Guess' knowledge and approval, directed the reduction in the Mills High School ("Mills") construction project and diverted funds from Mills to the Robinson Middle School ("Robinson") construction project. On March 10, 2016, PCSSD was released from State control subject to the election of a new Board. The new Board assumed its seat in December of 2016. Six months in its infancy, the Board terminated Dr. Guess as Superintendent and appointed Dr. Janice Warren, a Black female, Interim Superintendent. She was PCSSD's first female to lead PCSSD in its 34-year history.

Less than 40 days into her tenure as Interim Superintendent, an irate Mills parent called Dr. Warren and complained about the inequitable construction of Mills athletic facility in the predominately black community as compared with the Robinson athletic facility in a predominately white community. Dr. Warren viewed video footage and toured Mills with its black Principal, black Athletic Director, and white Head Football Coach. As reported by Margie Powell, Dr. Warren learned that Mills' black Athletic Director, unlike his Robinson counterpart, was denied access to the building plans, denied the right to provide input by Derek Scott, and did not have an office in the newly constructed Mills facility. Although the academic facilities were not at a stage to evaluate the resulting inequities from the substantially reduced project, there was a concern about the adverse impact of the discriminatory construction on the academic facilities. Plaintiff's Trial Exhibit 6, p. 2, Supplemental Status Report. With Attorney Sam Jones help, Dr. Warren took a proactive process of notifying, correcting, and minimizing as much as possible the twenty-million-dollar discriminatory act. She notified the Board; commenced monthly construction meetings with the PCSSD personnel overseeing construction, the architects, and the

general contractor. Sam Jones notified the attorney for the Intervenors and made a supplement status report filing to inform the Court in the desegregation case.

The plans for Mills that Scott presented to the PCSSD cabinet of District leaders were not followed and, as the former CFO Denise Palmer testified, could not be achieved with the budgeted funds. Hallways were shrunk in width and three feet in height. Overall capacity was reduced from seven hundred fifty students to seven hundred. The walls at Mills were gypsum board unlike Robinson's concrete block walls; the classrooms at Robinson are larger; *every teacher has a classroom*, while at Mills High five teachers rotate with other teachers for classroom. The Robinson entrance atrium is grander; the halls are wider with higher ceilings; its sports practice building is better. *Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist.,* No. 4:82-CV-866-DPM, 2021 WL 1823137 (E.D. Ark. May 6, 2021); Plaintiff's Trial Exhibit 3; pp. 27 & 29.  Margie Powell, the Federal Court Expert, testified that the female athletes did not have a separate locker room or toilets in the new sports complex. Mills High boys and girls shared a trailer with a unisex bathroom with two stalls each on the practice field. Plaintiff's Trial Exhibit 35, p. 4.

The jury viewed the video comparing the athletic facilities. The video revealed that the work environment for Mills' administrators, teachers, and staff, as well as the learning atmosphere for students, were markedly distinguishable, from lavish for Robinson to sparse Mills. Theater styled, raked monogrammed leather seats in Robinson's team room versus a flat concrete floor without chairs in Mills' team room that was one-third the size of Robinson's.

## THE RETALIATION

On September 9, 2017, the Arkansas Democrat/Gazette reported on the September 8, 2017, status hearing and the construction inequities, embarrassing the district. During a

September 12, 2017, Board meeting, Remele and Gillen attacked Dr. Warren about the supplemental filing made by Sam Jones and criticized Dr. Warren for approving the painting of her office as recommended by Derek Scott. Dr. Guess testified that Derek Scott encouraged Guess to permit the repainting of the office well before Guess was terminated; Guess declined. Remele and Gillen told Warren that she was only to "keep the ship afloat." The Board also decided to conduct a national search for a superintendent.  After the meeting, Dr. Remele got into Dr. Warren's face and angrily told her, "We don't air our dirty laundry in public."  Dr. Remele began preparing a list of "concerns" about Dr. Warren.  This paper trail continued until on or about November 14, 2017, when the Board received its first presentation by a national superintendent search firm. Dr. Warren was encouraged to apply without any expectation of thoughtful consideration.

In December 2017, the Board hired Ray and Associates to conduct the national search. Ray and Associates used its network of associates to contact 1,177 potential applicants. Thirty-six (36) people applied. The thirty-six (36) applicants were winnowed to ten top candidates. Nine of these top ten, five men and two women, were presented to the Board on March 27, 2018, six (6) blacks and three (3) whites. Dr. Warren was among the top nine.  Each of the candidates submitted video presentations, answering three (3) subjective questions. The Board selected three (3) males, two blacks, James Harris and Eric Pruitt, and one white, Charles McNulty, as their finalists for interviews.  Dr. Warren was not selected; the voting matrix and other records of the Board's deliberations were destroyed by Ray and Associates as authorized by Dr. Remele. The finalists were scheduled for interviews on April 3, 2018. The day before the interview, Mr. Harris, one of the black males, withdrew. He could not qualify for the superintendent's certification; he lacked teaching experience. Only two left (2) candidates remained for interviews

– McNulty and Pruitt. McNulty was the superior candidate of the three finalists, McNulty, Harris and Pruitt; but Warren was the superior candidate of the nine candidates. The Board voted to hire Dr. McNulty.

Later, Dr. Warren filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) contending that as an applicant for the position of Superintendent she was discriminated against due to her race, sex, and in retaliation for having reported the racial disparity that existed between the construction of Mills and Robinson. After receiving her right to sue letter, this lawsuit was commenced and tried to a jury of eight (8). The jury consisted of seven (7) whites and one black juror, four females and four males. On February 25, 2022, the jury returned a verdict in under three (3) hours for the plaintiff on her claim of retaliation for the Superintendent's position, but in favor of the defendants on the plaintiff's claims of race, sex, and the breach of contract claims. The jury assessed the following damages on the plaintiff's retaliation claim for the Superintendent's position: Lost Wages - $208,025.40; Compensatory Damages - $125,000.00; Punitive damages – PCSSD - $273,000.00; Punitive damages – Linda Remele - $25,000.00; Punitive damages – Alicia Gillen - $25,000.00. In response to the defendants' Motion for Directed Verdict, this Court ordered the negation of the punitive damage award against PCSSD.

## THE APPLICABLE STANDARDS

Defendants have asserted alternative bases for their motion: Rule 50 Renewed Motion for Judgment as a Matter of Law or Rule 59 Motion to Alter or Amend the Judgment. Plaintiff will address the applicable standards in turn.

A.    Rule 50 Motion for Judgment as a Matter of Law

"The law places a high standard on overturning a jury verdict because of the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused." *Hunt v. Nebraska Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002). Judgment as a matter of law is proper "'[o]nly when there is a complete absence of probative facts to support the conclusion reached' so that no reasonable juror could have found for the nonmoving party." *Hathaway v. Runyon, 132 F.3d 1214, 1220 (8th Cir. 1997)*. The court must draw all reasonable inferences in favor of the nonmoving party without making credibility assessments or weighing the evidence. *Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000). "Although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from *disinterested* witnesses." *Phillips v. Collings*, 256 F.3d 843, 847 (8th Cir. 2001) (internal citations omitted) (emphasis added).

A jury's verdict must be affirmed "unless, viewing the evidence in the light most favorable to the prevailing party, we conclude that a reasonable jury could not have found for that party." *Cross v. Cleaver*, 142 F.3d 1059, 1066 (8th Cir. 1998).  When reasonable persons could differ as to the conclusion to be drawn from the evidence, the motion must be denied. *E.E.O.C. v. Kohler Co*., 335 F.3d 766, 772 (8th Cir. 2003); *Smith v. Riceland Foods, Inc*., 151 F.3d 813, 818 (8th Cir. 1998); *Ryther v. KARE* 11, 108 F.3d 832, 844 (8th Cir. 1997) (en banc). In this case, the jury's verdict must be confirmed. Viewing the evidence in this case in the light most favorable to the prevailing plaintiff, the only conclusion is a reasonable jury could find for Dr. Warren.

> [I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. . . .In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt."

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 2108, 147 L. Ed. 2d 105 (2000), *quoting*, Wright v. West, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992).

The defendants filed this motion as a Rule 50(b) motion but have not identified or asserted a single issue as the basis for its motion that Dr. Warren's proof was insufficient. Pursuant to Fed. R. Civ. Pro.: 50(b): "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. Pro. 50(b). In ruling on this renewed motion, this Court must deny the motion and allow the judgment on the verdict. The Plaintiff presented sufficient evidence that allowed a reasonable jury to find in her favor on the issue of retaliation regarding her application for the superintendent's position. Pursuant to the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), framework, Dr. Warren had the initial burden of establishing a *prima facie* case of retaliation by showing that (1) she engaged in protected conduct, (2) she suffered a materially adverse employment action, and (3) the adverse action was causally linked to the protected conduct. *Pye v. Nu Aire, Inc*., 641 F.3d 1011, 1021 (8th Cir. 2011).  The trial was held in this matter February 14, 2022, through February 25, 2022. The jury returned a verdict for Dr. Warren on her claim of retaliation by PCSSD. Therefore, the relevant question is whether Dr.

Warren's evidence permits a reasonable inference of retaliation. When the parties have developed a full trial record, the concern isn't with plaintiff's prima facie case. "Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). What is relevant, at this point, is simply whether the plaintiff's evidence permits a reasonable inference of retaliation. *Id.*; *Cardenas v. AT & T Corp.*, 245 F.3d 994, 998 (8th Cir. 2001). "Where a court has fully tried a case on the merits, it *is inappropriate* to return to the question of whether the plaintiff established a prima facie case." *Cardenas v. AT & T Corp.*, 245 F.3d 994, 998 (8th Cir. 2001). Whether Dr. Warren's reporting the discriminatory construction was a "protected activity" is no longer relevant. The only issue is whether Dr. Warren's evidence permits a reasonable inference of retaliation! Her evidence satisfies that question.

The status of this case requires a presumption that Dr. Warren met her burden of establishing a *prima facie* case.  Once a *prima facie* case is established, a presumption of retaliation arises and the burden shifts to the Defendants to establish a legitimate nondiscriminatory reason for the Board's failure to interview or hire Dr. Warren as Superintendent. Despite the number of purported "legitimate" reasons trotted before the jury, the Defendants failed to persuade the jury that they had a legitimate nondiscriminatory reason for failing to interview or hire Dr. Warren as Superintendent.

Defendants' alleged reasons included:

### 1.    Dr. Remele's list of 25 concerns (Defs.Trial Exhibit 1) & Gillen's list of 9 concerns (Plaintiff's Trial Exhibit 54).

Plaintiff's evidence demonstrated that both lists contained circumstances and conditions that predated Warren's interim superintendency. Remele and Gillen sought to blame Warren for

circumstances with which Dr. Warren had no involvement or knowledge. Both lists included allegations that the Plaintiff demonstrated with credible evidence were false or were inconsistent with Board Policy, including Dr. Remele's intrusions into the day-to-day administration of the district. For example, Remele's list: allegations regarding the handling of the gun incident at Robinson (item #22 -- false, testimony by Asst. Principal Bratcher), the purported incident that necessitated the lockdown of Sylvan Hills-Freshman Academy (item #14 -- false, testimony by Principal Yvone West), allegation that Board not given opportunity to provide input on the September 5th Supplemental Status Report (items #4 & 6 -- false, Exhibit 5 & testimony by Dr. Warren), Remele's request that notice of the discriminatory construction be withheld from the other Board members (item #3 -- inconsistent with Board Policy, Exhibit 22), handling of testing and testing coordinators not working (items # 10, 11 -- false and intrusion into day-to-day administration, testimony by Director of Counseling LaJuana Green), purchase of umbrellas an audit finding (item #15 – false, testimony of Dr. Warren), and approving the painting of the Superintendent's office and purchase of furniture (items #2, 7, 8, 9 – intrusion into day-to-day administration of the district; providing of a clean, habitable, and functional work environment, testimony of Dr. Warren).

Gillen's list: allegation that Warren lied about funding for painting and purchase of furniture (item 1 – false, Exhibit 9, p. 2, Dr. Warren's testimony), Board not provided a copy of the Supplemental Status report before it was filed (item 2 – false, Exhibit 5), Warren's responsibility for overseeing the budget for facilities as Assistant Superintendent for Equity and Pupil Services (item 3 – false, testimony of former CFO Denise Palmer), Warren was responsible for monitoring facilities – false (item 5, testimony of Dr. Guess and Margie Powell, Exhibits 31, 32m and 35), terminated coach without authority (item 6 – false, Gillen's testimony), failure to

9

fire Norma Dixon because Dixon sued the district (item 7 – inconsistent with Federal Law);
purchase of umbrellas with district funds (item 9 – false, Dr. Warren's testimony, Exhibits 48,
49). Plaintiff's evidence established that the concerns on these lists were not worthy of credence
and were a pretext to cover intentional discrimination.

> ### 2.      Dr. Warren was called a poor communicator and was accused of failing to work cooperatively with the Board.

Plaintiff's evidence established that those subject to Warren's authority, her peers, and
those who supervised her did not have problems with Warren's communication style and viewed
her as an excellent communicator. Testimony by Dr. Jerry Guess, Margie Powell, Pastor John
Tackett – former PCSSD Director of Secondary Education, Sherman Whitfield – PCSSD
Director of Pupil Services,  Denise Palmer – former PCSSD CFO, Jeff Harrison – former
Crossett Board member, Norman Hill – former Crossett Business Manager, Pam Fitzgiven –
former PCSSD teacher and Chair of the Certified Personnel Committee, Assistant Principal
Brady Bratcher, Principal Yvone West, Jeff Senn -- Superintendent Lonoke Schools and former
PCSSD principal.  Defendants' allegation that Dr. Warren failed to work cooperatively with the
Board involved an allegation that the Board was not permitted to assist with the drafting of the
updated September 2017 Status Report. The Board was provided with a copy of the draft thirty
minutes after Warren received it from Sam Jones. Neither Dr. Remele nor Gillen were licensed
to practice law; neither Remele nor Gillen communicate that they had material facts to add.
Neither responded to Dr. Warren's email before the Status Report was filed. Dr. Warren also
provided a draft of the planned press release two days before the hearing well in advance of the
release or the request for information by the press. Other than the false reports of Dr. Warren's
handling of the gun incident at Robinson and the misdescription of the Sylvan Hills knife matter,

there were no other allegations of poor communication after the end of October. Defendants' allegations of poor communicator and uncooperativeness with the Board were not worthy of credence.

### 3.  Poor fiscal judgment; Defendants asserted that Dr. Warren's purchase of office furniture and umbrellas was evidence of poor fiscal judgment.

Plaintiff's evidence established Dr. Warren's history of sound fiscal management of district funds at Crossett and the substantial improvement of Crossett's financial stability under her leadership despite a substantial loss of Crossett's student population and financial base. (Testimony by Norman Hill – former Crossett Business Manager and former Crossett board member Jeff Harrison) Plaintiff provided evidence of Dr. Warren consulting with an outside expert who reviewed and assessed PCSSD's budget and financial status to prevent PCSSD from sliding into fiscal distress as the Mills Problem was resolved (Testimony of Norman Hill); that replacing the desk resting on bricks was necessary to provide adequate work space (Testimony by Dr. Warren). After conferring with the State Auditor and following the auditor's directions, Dr. Warren purchased the umbrellas with personal fund and not PCSSD's. Dr. Warren used PCSSD's requisition to receive the district's discount on the 150 umbrellas purchased for the Central Office staff. The Defendants did not introduce one scintilla of evidence to support a conclusion that Dr. Warren mismanaged district fund or the day-to-day administration of PCSSD. On the contrary, Pam Fitzgiven, former PCSSD teacher and Chair of the Certified Personnel Committee, testified that the atmosphere changed when Dr. Warren began her tenure as Interim Superintendent. People were happy; the tone and atmosphere at PCSSD was positive. The Defendants' alleged poor fiscal judgment as a legitimate nondiscriminatory reason was not worthy of credence.

**4.    Dr. Warren was not selected as the best qualified applicant in a nondiscriminatory process.**

Dr. Remele and other Board members attended a board training conducted by the district's lawyers that provided instruction on creating a rubric that yielded the candidate of choice. Plaintiff's evidence demonstrated that the Board chose a vague, general rubric rather than one that included qualifications that fit the specific needs of the district as identified by the staff and other stakeholders (Testimony by Molly Schwarzhoff, Vice President of Ray and Associates, and Dr. Warren, and Plaintiff's Exhibits 56, 79). The Board chose a rubric that pointed away from Dr. Warren and her credentials. Furthermore, Plaintiff's evidence demonstrated that the Board chose two black males, the least qualified candidates in the pool of applicants recommended by Ray and Associates, as finalists, including Harris who had no teaching experience. Harris could not qualify for Superintendent's certification in Arkansas. The pool of finalist included one white male whose credentials exceed those of the two black male finalists (Plaintiff's Exhibits 12, 13, 75, 76, 77, 78). Defendants purported legitimate nondiscriminatory reason was not worthy of credence.

**5.    Dr. Warren's association with Dr. Guess – tainted association.**

As part of Defendants' opening statement, defense counsel Cody Kees asserted for the first time in this case that the Board did not vote to interview Dr. Warren or hire her as Superintendent because she was associated with Dr. Guess. This defense was not included in the Defendants' answer; was not asserted in the Defendants' Motion for Summary Judgment, was not mentioned in any response to the Plaintiff's interrogatories, and was not mentioned by any member of the Board who was deposed before trial. See Plaintiff's Motion to Strike Tainted Association Testimony and Request for Curative Instruction or Motion for a Mistrial, Dkt. # 157. Cody Kees used Def. Trial Exhibit 4, a letter regarding negotiations of the Staffing Stipulation

for unitary status between John Walker, attorney for the Intervenors in the desegregation case, and Allen Roberts, PCSSD's attorney, to justify the Board's decision regarding Dr. Warren's application for Superintendent. The letter recited the consideration sought by the Intervenors in exchange for their consent to the Staffing Stipulation. Included among the desired equitable adjustments was the recommendation of Dr. Warren for Deputy Superintendent. When questioned at trial the only Board member who testified that Warren's association Jerry Guess barred fair consideration of Warren's application was Alicia Gillen. The jury's verdict is evidence that Defendants' allegation of Dr. Warren's association with Dr. Guess was not worthy of credence as a legitimate nondiscriminatory reason for not interviewing or hiring Dr. Warren as Superintendent.

Finally, in addition to inferring discriminatory intent from an employer's false allegations of purported legitimate nondiscriminatory reasons, the fact finder may infer discriminatory intent from shifting reasons for their actions. Here, the Defendants' shifting and changing of their reasons for not interviewing or hiring Dr. Warren only further substantiate their attempt to cover up their discriminatory intent. *Schmitz v. St. Regis Paper Co*., 811 F.2d 131, 132-33 (2nd Cir. 1987); *Twiggs v. Selig*, 679 F.3d 990, 994 (8th Cir. 2012) (a substantial change in an employer's legitimate, nondiscriminatory reason for firing an employee may be probative of pretext; *Edwards v. U.S. Postal Servic*e, 909 F.2d 320, 324 (8th Cir. 1990) (record revealed pretext, inconsistency, and contradictory explanations which change every time they are recorded).

For the foregoing reasons, Defendants' Motion for JNOV must be denied. The Defendants failed to establish a legitimate nondiscriminatory reason for their action.

### B.     Rule 59 (e) to Alter or Amend the Judgment

The standard for altering or amending the judgment is distinguishable from Fed. R. Civ. Pro. 50, Motion for Judgment as a Matter of Law. The "[v]erdict may be set aside and new trial granted, when the verdict is *contrary* to the clear weight of the evidence, or whenever in the exercise of a sound discretion the trial judge thinks this action necessary *to prevent a miscarriage of justice*." 9B Fed. Prac. & Proc. Civ., Standard Distinguished from Other Procedures—New Trial § 2531 (3d ed. April 2021). Motions for altering and amending a judgment raise a tension between two competing strong public policies:  preserving the finality of judgment and the incessant command of the Court's conscience that justice be done.  Here, preserving the finality of judgment must carry the day; justice has been done. No manifest errors of law exist in the judgment as it stands.  Indeed, defendants' allegations of manifest errors of law are, in fact, erroneous statements of the applicable law and lack the necessary foundation to pass muster under Fed. R. Civ. Pro. 11(b)(2). Defense counsel are seasoned employment law practitioners and are asserting positions contrary to the authority cited in their motion to support their arguments.

## 1.    THE APPLICABLE LAW

The applicable law in this case is well established Title VII, 42 U.S.C.A. §§ 2000e-2, 2000e-3 (Title VII), and 42 U.S.C.A. §§ 1981, 1983 jurisprudence. The substantive provision[1] and the retaliation provision[2] of Title VII are relevant to the matters *sub judice*. The

---

[1] (a) Employer practices:
It shall be an unlawful employment practice for an employer--
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C.A. § 2000e-2, former section 703 (a) (West).
[2] (a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings:
It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling

employment-related imitation on prohibited employer conduct in the substantive provision ensures that the workplace is free of discrimination. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 US 53, 126 S. Ct. 2405 (2006). "The objective of the anti-retaliation provision is to promote the achievement of such a workplace, an objective that requires a prohibition against any kind of conduct – employment related or not – that would deter an employee from opposing violations of the act or participating in enforcement proceedings. *Id.*

### a. Title VII Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) that she engaged in protected activity; (2) that adverse employment action occurred; and (3) a causal connection between the two. *Kobrin v. University of Minnesota*, 34 F.3d 698, 704 (8th Cir. 1994), citing, *Jackson v. Missouri Pac. R.R.*, 803 F.2d 401, 406-07 (8th Cir. 1986) and *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980), cert. denied, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). Defendants assert, here, that the plaintiff's alleged "protected activity" isn't a protected activity within 42 U.S.C.A. § 2000e-2. Defs. Brief in Support, Dkt. No. 182, p. 5. Defendants are not asserting that Plaintiff's proof was insufficient to withstand a Rule 50(b) challenge. As demonstrated below, Dr. Warren engaged in a protected activity; that her opposition was to an employment related practice, conduct by PCSSD that violated the substantive provision 42 U.S.C.A. § 2000e-2.  Moreover, satisfying 42 U.S.C.A. § 2000e-2 also satisfies the requirements of 42 U.S.C.A. § 1981 and § 1983.

### (1).    What is a protected activity?

---

apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C.A. § 2000e-3 (West), former Section 704 (a).

The Eighth Circuit has consistently held that the requirement of engaging in a protected activity is met "as long as the employee [the plaintiff] had a reasonable belief that what was being opposed constituted discrimination under Title VII, the claim of retaliation does not hinge upon a showing that the employer was in fact in violation of Title VII." *Sisco v. J. S. Alberici Const. Co.*, 655 F.2d 146, 150 (8th Cir. 1981); see also *Brannum v. Missouri Dep't of Corr.*, 518 F.3d 542, 547 (8th Cir. 2008); *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 714 (8th Cir. 2000).

A protected practice "ranges from filing a complaint *to expressing a belief that the employer has engaged in discriminatory practices.*" *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 713 (8th Cir. 2000) (plaintiff expressed a belief that her employer had engaged in discriminatory acts) (emphasis added); *Wentz v. Maryland Casualty Co.*, 869 F.2d 1153, 1154–55 (8th Cir.1989) (complaining to the office manager that his supervisors were disrespectful to him, harassed him, and treated him differently from younger employees a protected activity), abrogated on other grounds in *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 857 (8th Cir. 2012). "'When an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication' virtually always 'constitutes the employee's opposition to the activity.'" *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276, 129 S. Ct. 846, 851, 172 L. Ed. 2d 650 (2009), quoting, Brief for United States as Amicus Curiae 9 (citing 2 EEOC Compliance Manual §§ 8–II–B(1), (2), p. 614:0003 (Mar.2003)). Likewise, limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of the individual because of his/her protected status is prohibited by the Equal Employment statutes. 42 U.S.C. § 2000e-2(a). "An employer may not provide segregated or unequal facilities." EEOC Compliance Manual, ¶2,

§ 10 (May 12, 2000), *citing*, *Robinson v. City of Fairfield*, 750 F.2d 1507, 1509 (11th Cir. 1985) (the city's discriminatory practices included the maintenance of segregated dressing and lounge facilities for its black and white employees that differed drastically in the quality of amenities).

Dr. Warren reasonably believed that PCSSD's conduct was a violation of Title VII. See Dkt. No. 65, Dr. Warren's EEOC Charge, Exhibit 12, Amended Complaint, attached as Appendix 1.  Dr. Warren engaged in protected activity in reporting the discriminatory construction of Mills. First, Plaintiff's proof provided the jury with a basis for inferring her reasonable belief that PCSSD's discriminatory construction of Mills was a prohibited employment practice adversely affecting the employment conditions of Mills' predominately black administrators, teachers, and staff. Second, Dr. Warren's reporting the discriminatory construction was a protected activity because it was a term and condition of her employment as Interim Superintendent. Third, notifying the Board, PCSSD's attorney, or the court was opposition to discriminating against black students and female students as a term or condition of her employment. Opposing discrimination is a protected activity.

> **(2).    Evidence establishing Dr. Warren's reasonable belief that discriminatory construction was a discriminatory practice.**

PCSSD's discriminatory construction of Mills adversely impacted the benefits and conditions of employment of the administrators, teachers, and staff assigned to Mills. In 2017, sixty-seven percent of the administrators at Mills, including the principal and athletic director, were black; fifty-eight percent of the staff was black. Teachers at Mills share smaller classrooms without proper storage, thereby hindering their creation and management of the proper teaching and learning environment unlike a work assignment in predominately white communities with their lavished work conditions and stable work environments. Mills' teachers rotate in and out of

small classrooms moving their materials, causing stress and increasing the demands on their time. Coaches at Mills lacked the facilities and equipment to execute their programs, unlike their counterparts assigned to high schools in predominately white communities, adversely impacting the performance of Mills' athletic professionals. During construction, Mills' administrators were denied the opportunity to provide input on the construction of their facilities, a benefit and a privilege enjoyed by their white counterparts at Robinson (Plaintiff's Trial Exhibit 35, pp. 4-5). Mills' black Athletic Director, unlike his Robinson counterpart, was denied access to the building plans, denied the right to provide input by Derek Scott when the Athletic Director asked, and did not have an office in the newly constructed Mills facility. *Id.* Robinson's Athletic Director was invited, at least twice, to provide input on what he felt was important with respect to design and specific attributes, had an office with a private restroom. *Id.*

The former CFO Denise Palmer testified that the plans for the two schools as presented to the Board could not be achieved with the funds budgeted for both projects. The plans for Mills that Scott presented to the PCSSD cabinet of District leaders were not followed; Hallways were shrunk in width and three feet in height. Overall capacity was reduced from seven hundred fifty students to seven hundred. The walls at Mills were gypsum board unlike Robinson's concrete block walls; the classrooms at Robinson are larger; every teacher has a classroom, while at Mills High five teachers rotate with other teachers for classroom space. The Robinson entrance atrium is grander; the halls are wider with higher ceilings; its sports practice building is better. *Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist.*, No. 4:82-CV-866-DPM, 2021 WL 1823137 (E.D. Ark. May 6, 2021) (Plaintiff's Trial Exhibit 3; pp. 27-30).

Mills classrooms were set at the state minimum standard for high schools.  In constructing Robinson's classroom larger than Mills, Robinson's classrooms not only exceeded

the state minimum for a middle school but also the state minimum for a high school. See

Transcript of Earnest Duckery, February 17, 2022, Warren v. Kemp, 4:19-cv-00655, pp. 17, line

25-18, line 7. Judge Marshall called Robinson's sports practice building better; Earnest Duckery

agreed that Mills' indoor practice facility was akin to a metal building. *Id.*, at p. 42; lines 9-11.

The jury viewed the video comparing the athletic facilities. The video revealed a work

environment for Mills' administrators, teachers, staff, and students was markedly

distinguishable, from lavish for Robinson to sparse for Mills. The jury saw theater styled, raked

seating of monogrammed leather seats in Robinson Middle School's palatial team room versus a

flat concrete floor without chairs in Mills' High team room that was one-third the size of the

Middle school facility at Robinson. Folding metal chairs were later added to the Mills team room

(Plaintiff's Trial Exhibit 35, pp. 4). Court Expert, Margie Powell, testified about the gross

inequities and described them as:

> Well, particularly of quality and quantity if you want to make it simple. The
> Robinson Complex was, in my opinion, almost like a college campus, better than
> some college campuses that I have been on. They had all of the bells and whistles
> and their facilities were beautiful. Mills was nice, and I'm not saying there was
> anything bad about it, but it wasn't up to the same standard as Robinson,
> particularly their sport complex. The coach had no office. Their female athletes
> had no place to change clothes or to -- a room of their own. The location from
> some spots were difficult to get to. The furniture was different. The equipment
> room was smaller. I'm trying to think. They didn't have nearly the space to work
> with that Robinson had.

Transcript of Testimony of Margie Powell, February 15, 2022, *Warren v. Kemp*, 4:19-cv-655, p.

14, lines 10-20.

Unlike the plaintiff in *Evans v. Kansas City*, *Mo. Sch. Dist.*, 65 F.3d 98 (8th Cir. 1995),

Dr. Warren reasonably believed that the discriminatory construction of Mills adversely impacted

all stakeholders in the Mills community: the conditions and benefits of employment of the

administrators, the teachers, cafeteria workers and other staff, as well as the educational

experience and benefit of the students, and their parents.

> (3).     Reporting the discriminatory construction was a term and
> condition of Dr. Warren's employment as Interim Superintendent

Contrary to the Defendants' assertion, the "facilities piece" of Plan 2000 does relate to

employment practices protected under Title VII. Dr. Warren, as Interim Superintendent, was

required to oversee the day-to-day operations of the district consistent with State and Federal

Laws, including PCSSD's federal court supervision and reporting to the Board on the status of

the educational program and operations.

> **2.1P: DUTIES OF THE SUPERINTENDENT**
> The Superintendent, as the chief executive officer of the Board and the school
> system, shall be the administrative head of all departments in the District. The
> Superintendent shall be responsible to the Pulaski County Special School District
> Board of Education for administering the school system according to the
> mandates of the laws, Division of Elementary and Secondary Education, other
> agencies of jurisdiction, and policies governing school operations. While the
> Superintendent may delegate his/her duties when and where necessary and
> appropriate, he/she shall be responsible to the Board for the results of those duties
> delegated.
> . . . .
> The Superintendent's duties include:
> . . . .
> 2.  Being responsible for the planning and implementation of an educational
> program in accordance with State and Federal requirements and the needs of the
> District;
> 3.  Reporting to the Board concerning the status of the educational program,
> personnel, and operations, and making recommendations for improving
> instruction, activities, services, and facilities;

(Plaintiff's Trial Exhibit 22, Board Policies, Policy 2.1P, pg. 2). Reporting the discriminatory

construction to all members of the Board and to PCSSD's attorney, and the Court was related to

the terms and conditions of Dr. Warren's employment, and was, therefore, an employment

practice and protected activity.

Defendants addressed in their cross examination of Dr. Jerry Guess and Dr. Warren and in their closing argument the December 7, 2016, meeting minutes of the November 30, 2016, PCSSD-Joshua Monitoring Meeting (Plaintiff's Trial Exhibit 31). Defendants asserted that Dr. Warren, as Assistant Superintendent for Equity and Pupil Services, failed to notify unspecified individuals of the inequitable value in the proposed construction of Mills. This, they asserted, was a failure in her performance. The minutes recorded that Dr. Warren's supervisor, Dr. Guess, PCSSD's attorney, Whitney Moore, and the Federal Court's Expert, Margie Powell, were present at the November 30, 2016, meeting. Those to whom she owed a duty as Assistant Superintendent were present and no notice was required.

Now, Defendants take a contrary position and assert that as Interim Superintendent reporting the actual discriminatory construction was not a term or condition of her employment as required by Board Policy. The Defendants cannot take inconsistent positions in this case. Either reporting inequities was a term and condition of Dr. Warren's employment contract, and thereby a protected activity, in both positions or it wasn't. As Assistant Superintendent, reporting was unnecessary; those to whom Dr. Warren reported were on notice of a valuation concern given the goal of replicating the Maumelle facility built several years before the Mills-construction and for more money.  As Interim Superintendent, reporting to the Board, to legal counsel, and to the Court was required. Dr. Warren provided the notice, performed the terms and conditions of her employment, opposed the discriminatory policy, engaged in a protected activity, and the Board retaliated. Furthermore, failing to report and correct the discriminatory work environment would make race and sex discrimination a term or condition of her employment.  Volume II, EEOC Compliance Manual, Section 8 Retaliation.

### (4).     Opposing discrimination against students was opposition to discrimination as a condition or term of her employment and was a protected activity.

As final authority and policy maker on desegregation matters Dr. Guess, knowingly constructed a racially discriminatory facility for female and black students. Dr. Guess' decision and conduct established a policy of discriminating against female and black students and engaged in racially discriminatory conduct. *St. Louis v. Praprotnik*, 485 US 112, 108 S.Ct. 915 (1988) (only one with policy making authority causes the particular constitutional violation). When Dr. Warren gave notice of the discriminatory construction, she was opposing and refusing to engage to an unlawful employment practice of discriminating against female and black students. Permitting and continuing the discriminatory construction, the policy created by Dr. Guess, required as a condition of Dr. Warren's employment that she discriminate against female and black students. Requiring an employee to discriminate is an unlawful employment practice. *Foster v. Time Warner Entm't. Co.*, 250 F.3d 1189, 1994 (8th Cir. 2001) (holding that customer service manager engaged in protected opposition activity when she repeatedly questioned her new supervisor about the impact of a revised sick leave policy on previously granted ADA accommodations for an employee with epilepsy whom she supervised, and then refused to implement the new policy by continuing to allow the employee to work flexible hours); *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 554 (8th Cir. 1998); *Moyo v. Gomez*, 32 F.3d 1382, 1385 (9th Cir.), amended, 40 F.3d 982 (9th Cir. 1994) (employee's refusing to carry out or otherwise protesting the defendants' alleged policy of denying showers to black inmates after work shifts, stated a retaliation claim based on an unlawful employment practice, the alleged practice of requiring Moyo, as a condition of his employment, to discriminate against black inmates); *Womack v. Munson*, 619 F.2d 1292, 1297 (8th Cir. 1980) (filing a lawsuit alleging a former employer

violated Title VII by requiring black employees to abuse black suspects is protected activity). Dr. Warren engaged in protected activity and is entitled to her judgment against PCSSD pursuant to Title VII.

### b.     42 U.S.C.A. Section 1981

Section 1981 prohibits contract-based discrimination. Dr. Warren's employment relationship is a contractual one. Section 1981 prohibits racial discrimination in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[3] The section is construed to cover the same employment decisions and conduct addressed by Title VII. Although Section 1981 does not include a retaliation provision, the Eight Circuit and other courts hold that opposition to racial discrimination is within the protective provisions of Section 1981. *Sisco v. J. S. Alberici Const. Co*., 655 F.2d 146, 150 (8th Cir. 1981); *Setser v. Novack Inv. Co*., 638 F.2d 1137, 1139 (8th Cir. 1981), *opinion vacated in part on reh'g*, 657 F.2d 962 (8th Cir. 1981); *Choudhury v. Polytechnic Inst. of New York*, 735 F.2d 38, 42–43 (2d Cir. 1984).

Section 1981 protective provisions cover both a plaintiff's cause of action to vindicate his or her personal contract rights because of retaliation and a those of a plaintiff who suffers retaliation protecting the contract rights of a third party. *Sullivan v. Little Hunting Park, Inc.*, 396

---

[3]**(a) Statement of equal rights**
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
(b) "Make and enforce contracts" defined
For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
**(c) Protection against impairment**
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law. 42 U.S.C.A. § 1981 (West).

U.S. 229, 235, 90 S. Ct. 400, 403, 24 L. Ed. 2d 386 (1969). In *Sullivan*, the lessor, Sullivan, and his lessee, Freeman, both sued under 42 U.S.C. §§ 1981 and 1982 for injunctions and monetary damages. Since Freeman, the black lessee, no longer resided in the area served by the defendant Little Hunting Park, Inc., Freeman's claim was limited solely to damages. Sullivan sued to vindicate 3rd party contract rights and Freeman sued to protect his personal contract rights. Both recovered. In *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445, 128 S. Ct. 1951, 1954, 170 L. Ed. 2d 864 (2008), the focus of the opinion is whether Section 1981 encompasses a complaint of retaliation against a person who has complained about a violation of another person's contract-related "right").[4] That resolution was not a limitation of the use of Section 1981 by an individual to protect his or her own right to freedom from retaliation. More importantly, as discussed Dr. Warren's reporting the racially discriminatory construction of Mills was a protected activity because of the racial discrimination against the employment contract rights of black administrators, teachers, and staff.

However, the applicability of Section 1981 is *not* limited to the vindication of third-party rights. *Setser, supra* (the plaintiff sued to vindicate his personal contract right); *Sisco v. J. S. Alberici Const. Co*., 655 F.2d 146, 150 (8th Cir. 1981) (the plaintiff alleged retaliation pursuant to Title VII and Sec. 1981); *Choudhury v. Polytechnic Inst. of New York*, 735 F.2d 38, 42–43 (2d Cir. 1984) (recognizing both usages of § 1981 for retaliatory conduct); *DeMatteis v. Eastman Kodak Co*., 511 F.2d 306 (2d Cir.), *modified on other grounds*, 520 F.2d 409 (1975) (a white

---

[4] In *CBOCS W, supra,* the United States Supreme Court recognized the invalidation of *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), that significantly limited the scope of § 1981 to prohibiting racially discriminatory conduct in the making and enforcing of contracts. Congress passed the Civil Rights Act of 1991 with the goal of superseding *Patterson*, *supra*, and reinstating *Sullivan, supra*.

person who suffered reprisals vindicating the rights of non-whites has standing to sue under §

1981).

The burden of proof for showing a prima facie case of discrimination or retaliation is the

same under Title VII, Section 1981, and Section 1983. *Kim v. Nash Finch Co.*, 123 F.3d 1046,

1060 (8th Cir. 1997) (the same *McDonnell Douglas* analytical framework is applied to a

retaliation claim under § 1981 and Title VII); *Kobrin v. University of Minnesota*, 34 F.3d 698,

704 (8th Cir.1994) (Title VII retaliation claim); *Richmond v. Bd. of Regents of Univ. of*

*Minnesota*, 957 F.2d 595, 598 (8th Cir. 1992) (prima facie case of discrimination under Title VII,

section 1981, section 1983, or the ADEA are the same).  The elements of a retaliation claim

under § 1981 and Title VII are identical. The plaintiff must establish: (1) protected activity, (2)

subsequent adverse employment action, and (3) a causal relationship between the two. The

instructions directing deliberations in *Warren v. Kemp*, were substantively correct. A verdict on

Section 1981 addressed Dr. Warren's proof obligation on Title VII, Section 1981, and Section

1983.

### c.    42 U.S.C.A. § 1983.

When Congress enacted the Civil Rights Act of 1991, subsection c was added to Section

1981. That enactment authorized the use of Section 1981 as the substantive basis for protecting

contract rights against impairment by racial discrimination and racial retaliation under the color

of state law. 42 USCA § 1981 (c). "The rights protected by this section are protected against

impairment by nongovernmental discrimination and impairment under color of State law." *Id.*

Section 1981 provides the substantive right and Section 1983 is the vehicle or civil remedy for

redressing the impairment of Section 1981 rights under color of State law. *Jett v. Dallas*

*Independent School Dist.*, 491 U.S. 701 (1989).

By its terms, 42 U.S.C.A. § 1983 is a remedial provision creating a cause of action against any person acting under color of state law who was responsible for a deprivation of Constitutional rights or laws. Section 1983 provides a federal forum and is designed to provide a civil remedy for its enforcement against state actors sued in their individual capacity.

> Every person who, under *color* of *any statute, ordinance, regulation, custom, or usage, of any State* or Territory or the District of Columbia*, subjects, or causes* to be subjected, any citizen of the United States or other person within the jurisdiction thereof *to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws*, *shall be liable* to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C.A. § 1983 (West).  Section 1983 is a vehicle for imposing liability against any person who deprives a citizen of a right or privilege secured by the Constitution and laws.  The Section does not provide a substantive basis for relief. *See*, e.g., *Ware v. Jackson Cty., Mo*., 150 F.3d 873, 880 (8th Cir. 1998) (county liable pursuant to § 1983 for violating prisoner's Eighth Amendment rights).

In the Eighth Circuit, Section 1981 claims against state actors must be asserted via Section 1983. *Flowers v. City of Minneapolis, Minn*., 558 F.3d 794, 800 (8th Cir. 2009) (Flowers may pursue a § 1981 claim against the City only through § 1983). After the commencement of this action, the Eighth Circuit restated its position, clarifying in *Onyiah v. St. Cloud State Univ*., 5 F.4th 926, 929–30 (8th Cir. 2021) that a "freestanding Section 1981 claims against state actors are prohibited. Dr. Warren's Complaint in this case does not assert a "freestanding" Section 1981 case against the members of PCSSD's Board. Indeed, her Section 1981 retaliation claims are

26

asserted on the basis of Section 1983, identifying both the substantive and procedural cause of her action.

Dr. Warren reasonably believed that PCSSD's conduct was a violation of Title VII. Dr. Warren engaged in a protected activity; her proof of the protected activity is substantial. From her proof, the jury could infer Dr. Warren's reasonable belief.

### 2.   ARGUMENT

Defendants allege six errors of law. Each will be addressed in turn.

> **a.   "Plaintiff did not submit or proffer a retaliation instruction under 42 U.S.C.A. § 1983;" Defs' Brief in Support of Motion, Dkt. No. 182, p. 3.**

This Court's Third Amended Final Scheduling Order directed the parties to use standard instructions from "AMI, Eighth Circuit or Federal Jury Practice and Instructions" and submit proposed instructions "to narrow areas of disagreement." The Eighth Circuit nor the Federal Jury Practice and Instructions provide a retaliation instruction under 42 U.S.C.A. § 1983.  See Eighth Circuit Model Rules, modified October 22, 2020 (Appendix 2). The substantive right impaired by racial retaliation is addressed via Section 1981, Model Rule 10.41, supplemented with instructions: 12.70 Damages:  Actual (42 U.S.C. § 1983); 12.71 Damages:  Nominal (42 U.S.C. § 1983); 12.72 Damages:  Punitive (42 U.S.C. § 1983). See Appendix 2, pp. 10-8, 12-9 – 12-17. Plaintiff's submitted and proffered instructions conform to the Eighth Circuit's Model Rules.

It is the District Court's responsibility to formulate, draft, or craft jury instructions that "fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case." *Linden v. CNH Am., LLC*, 673 F.3d 829, 836 (8th Cir. 2012); *Brown v. Sandals Resorts Int'l.*, 284 F.3d 949, 953 (8th Cir.2002). Instructing the jury is within the discretion of the Court. As required, the Court's instructions in this case address the

applicable law. Defendants have not pointed to an error in the instructions that affect their substantial rights.

The instructions submitted and proffered by the parties do not provide a basis for asserting an error of law. Defendants suggest that submitted and proffered instructions govern a party's right of recovery not those submitted to the jury by the Court. This isn't the law. Defendants submitted instructions for Title VII that included punitive damages. Applying the Defendants' analysis to punitive damages, we must conclude that having submitted instructions including punitive damages, Defendants' right to request a directed verdict on punitive damages awarded against PCSSD would be prohibited. Moreover, both parties requested punitive damage in this case; therefore, their instructions would govern recovery.  Plaintiff also observes that without leave of this Court and without notice to the Plaintiff, Defendants proffered substantially modified instructions from those submitted on February 4, 2022.

Even assuming the submission of erroneous instructions by a party, party authored instructions are not the basis for a JNOV. Defendants' Motion for JNOV must be denied.

**b.** **"[42 U.S.C.A.] § 1983 does not provide a private cause of action for retaliation on the basis of Plaintiff's conduct; § 1983 only provides a retaliation claim when the underlying activity arises under the First Amendment. At bottom, Plaintiff's retaliation claims stem from Title VII and 42 U.S.C. § 1981, and neither cause of action allows punitive damages against Remele or Gillen." Defs' Brief in Support of Motion, Dkt. No. 182, p. 4.**

Defendants are incorrect! A claim alleging a violation of § 1981 may not be brought directly against a state actor as a freestanding Section 1981 claim, but must be brought under § 1983. *Lockridge v. Bd. of Trs. of U. of Ark.*, 315 F.3d 1005, 1007 (8th Cir. 2003) (en banc); *see also Onyiah v. St. Cloud State Univ.,* 5 F.4th 926, 929–30 (8th Cir. 2021) (distinguishing a "freestanding" Section 1981 case and one brought pursuant to Section 1983). The

Eighth Circuit requires the *pleading* of the Plaintiff's cause of action against state actors to be based on Section 1983, the procedural basis, and Section 1981, the substantive right. The following citations provide ample authority for a Section 1981 retaliation claim against Remele and Gillen brought pursuant to Section 1983:

*Onyiah v. St. Cloud State Univ.*, 5 F.4th 926, 929–30 (8th Cir. 2021) (distinguishing a "freestanding" Section 1981 case and one brought pursuant to Section 1983);

*Ellis v. Houston*, 742 F.3d 307, 318–19 (8th Cir. 2014) (black officers sued five supervisors pursuant to 42 U.S.C. §§ 1981 and 1983, explaining § 1981 offers protection against racial harassment and also allows for retaliation claims);

*Jones v. McNeese*, 746 F.3d 887, 896 (8th Cir. 2014) (black business owner brought § 1981 and § 1983 claims against NDOC official who managed Department's voucher funding program, asserting due process and equal protection violations);

*Flowers v. City of Minneapolis, Minn.*, 558 F.3d 794, 800 (8th Cir. 2009) (black resident brought § 1983 action against city, city police lieutenant in his individual and official capacity alleging violations of several constitutional rights, including substantive due process under the Fourteenth Amendment);

*Lockridge v. Bd. of Trs. of U. of Ark.*, 315 F.3d 1005, 1007 (8th Cir. 2003) (en banc) (black professor brought race and sex discrimination claims under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e through 2000e–17), 42 U.S.C. § 1981, and 42 U.S.C. § 1983 based on the denial of equal protection, against the University of Arkansas's board of trustees, the university president in his official capacity, and the chancellor of Phillips Community College of the University of Arkansas (PCCUA), Dr. Steven Jones, in his official and individual capacities).

*Artis v. Francis Howell N. Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1181 (8th Cir. 1998) (Section 1983 "provides the exclusive federal damages *remedy* for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor).

Defendants cite *Burton v. Martin*, 737 F.3d 1219, 1236 (8th Cir. 2013) to support their argument that recovery against state actors for racial retaliation isn't recoverable under Section 1983 unless the substantive basis is the First Amendment. *Burton* is distinguishable from *Warren v. Kemp*. In Burton, a black officer with the State Capitol Police sued the Arkansas Secretary of State Mark Martin in his official capacity and the Chief of the Arkansas State Capitol Police in

his official and individual capacity and for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.; and 42 U.S.C. § 1983; and the Equal Protection Clause of the Fourteenth Amendment. Burton sued for retaliation under Title VII and 42 U.S.C. § 1983, and the Equal Protection Clause of the Fourteenth Amendment.

In *Burton*, the Eight Circuit ruled that recovery for retaliation was not cognizable under Title VII, or Section 1983, or the Equal Protection Clause. The court was not addressing retaliation pursuant to Sections 1981 and 1983. "'In complaining of retaliation, [Burton] proceeds under two theories: violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., *and* deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' under 42 U.S.C. § 1983." *Burton*, *supra*, at 1235-36 (emphasis added). Dr. Warren sued the individual Board members alleging claims pursuant to Sections 1981 and 1983. As an aside, the court mentions that "§ 1983 provides a vehicle for redressing claims of retaliation on the basis of the First Amendment." The court was not limiting § 1983 actions to those asserting retaliation pursuant to the First Amendment. *Ware v. Jackson Cty., Mo*., 150 F.3d 873, 880 (8th Cir. 1998) (county liable pursuant to § 1983 for violating prisoner's Eighth Amendment rights); *see also* the six cases listed above beginning with *Onyiah* through *Artis*.

Defendants' allegation is contrary to prevailing law. Asserting this allegation raises the question of defense counsel's duty of good faith pursuant to Fed. R. Civ. Pro. 11(b). Defendants' Motion for JNOV must be denied.

    c. **"Title VII does not provide for individual capacity claims; therefore, the punitive damages against Remele and Gillen could not have been assessed against them under Title VII." Defs' Brief in Support of Motion, Dkt. No. 182, p. 3.**

Plaintiff did not assert a Title VII claim against Remele and Gillen. All of Dr. Warren's

Title VII claims were asserted against PCSSD.  Second Amended Complaint, Dkt. No. 65, ¶¶ 40-

61. This allegation does not support the granting of Defendants' Motion for JNOV.

> **d.      "Section 1981 claims do provide a cause of action for retaliation, but not against state actors." Defs' Brief in Support of Motion, Dkt. No. 182, p. 3.**

Defendants fail to distinguish the substantive basis of Dr. Warren's claims from the

procedural method for bring a cause of action against a state actor.  For the reasons discussed in

¶ b, above, Defendants Motion for JNOV must be denied.

> **e.      "Even if Plaintiff had filed her § 1981 retaliation claim under § 1983 (see Artis, 161 F.3d at 1182, noting that "A federal action to enforce rights under § 1981 against a state actor may only be brought pursuant to § 1983"), that avenue would also fail because, as noted above, § 1983 does not provide a vehicle for bringing a retaliation claim based on the conduct at issue in this case." Defs' Brief in Support of Motion, Dkt. No. 182, pp. 3-4.**

Defendants' allegation lacks a basis in law. Asserting this allegation raises the

question of defense counsel's breach of their duty of good faith pursuant to Fed. R. Civ. Pro. 11.

The Eighth Circuit requires actions against state actors to be asserted pursuant to Sections 1983

and 1981. The Eighth Circuit reference to claims asserting retaliation pursuant to the First

Amendment was not a limitation on actions alleging retaliatory conduct by an employer.

Defendants' Motion for JNOV must be denied.

> **f.      "Plaintiff failed to establish she engaged in protected activity that gives rise to a retaliation claim under either Title VII or § 1983." Defs' Brief in Support of Motion, Dkt. No. 182, p. 4-8.**

As discussed at length, *infra, pp*.14-22, Dr. Warren established her good faith belief that

PCSSD's discriminatory construction of Mills violated Title VII. In point of fact, she introduced

sufficient evidence not only to establish her good faith belief that PCSSD's discriminatory

construction of Mills violated Title VII but also that her reporting the discriminatory construction was a term and condition of her employment contract.  Moreover, failing to report the discriminatory actions of PCSSD would subject her to discriminating against female and black students as a condition of her employment. Opposing that term or condition of her employment was a protected activity. Plaintiff satisfied her burden of proof with sufficient evidence. Defendants' motion must be denied.

## CONCLUSION

For the foregoing reasons, the Defendants' motion for JNOV must be denied. Defense counsel represented to the jury that they are legal counsel for the Arkansas School Board Association; records in Pacer indicate that defense counsel litigated employment discrimination cases for PCSSD from 2003. Given defense counsel's extensive experience in employment discrimination law, plaintiff's counsel believe that the matters asserted in the Defendants' motion were asserted to delay the resolution of this case and to harass the Plaintiff. Therefore, Plaintiff respectfully ask that the Defendants' motion be denied and that defense counsel be appropriately sanctioned.  Plaintiff requests that her expenses for responding to this motion, including attorney's fees, be reimbursed by the Defendants.

<div style="margin-left:40%">

Respectfully submitted this 5th day of April 2022,
Sarah Howard Jenkins
AR Bar No. 97046
Attorney for the Plaintiffs
SARAH HOWARD JENKINS, PLLC
P.O. BOX 242694
Little Rock, AR 72223
Telephone No. (501) 406-0905
Email:  sarah@shjenkinslaw.com

Austin Porter Jr., No. 86145
PORTER LAW FIRM
323 Center Street, Suite 1035
Little Rock, Arkansas 72201

</div>

Telephone: 501-244-8220
Facsimile: 501-372-5567
Email: Aporte5640@aol.com