```
 1            IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF ARKANSAS
 2                     CENTRAL DIVISION

 3   JANICE HARGROVE WARREN

 4            Plaintiff
          Vs.                      No.  4:19-cv-00655-BSM
 5                                 February 17,2022
     MIKE KEMP, et al             Little Rock, Arkansas
 6                                 2:33 p.m.
              Defendants
 7
 8       TRANSCRIPT OF TESTIMONY OF EARNEST DUCKERY

 9       BEFORE THE HONORABLE BRIAN S. MILLER

10            UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   On Behalf of the Plaintiffs:

13       SARAH HOWARD JENKINS
         Sarah Howard Jenkins, PLLC
14       Post Office Box 242694
         Little Rock, Arkansas 72223
15       (501) 406-0905
         Sarah@shjenkinslaw.com
16
         AUSTIN PORTER, JR.
17       Porter Law Firm
         323 Center Street, Suite 1300
18       Little Rock, Arkansas 72201
         (501) 244-8200
19       aporte5640@aol.com

20   On Behalf of the Defendants:

21       GEORGE JAY BEQUETTE, JR.
         WILLIAM CODY KEES
22       Bequette, Billingsley & Kees, PA
         425 West Capitol Avenue, Suite 3200
23       Little Rock, Arkansas 72201
         (501) 374-5092
24       jbequette@bbpalaw.com

25       Proceedings reported by machine stenography and
     displayed in realtime; transcript prepared utilizing
26   computer-aided transcription.
```

```
1                        INDEX
2  WITNESS FOR THE PLAINTIFF:  Direct    Cross     Redirect
3  EARNEST DUCKERY              3         44        45
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

DIRECT EXAMINATION

```
 1          (The jury entered the courtroom.)
 2              THE COURT:  You can be seated.
 3      Mr. Porter, call your next witness.
 4              MR. PORTER:  Yes, Your Honor.  Earnest Duckery.
 5              THE COURT:  Mr. Duckery, come on down.  If you
 6  would raise your right hand and I'll swear you in.
 7      Have a seat on the witness stand.
 8              MR. PORTER:  May I begin, Your Honor?
 9              THE COURT:  You may.
10          EARNEST DUCKERY, PLAINTIFF'S WITNESS DULY SWORN
11                      DIRECT EXAMINATION
12  BY MR. PORTER:
13  Q.   Good afternoon, Mr. Duckery.  How are you doing, sir?
14  A.   I'm doing fine.
15  Q.   Would you please remove your mask for us?  Thank you.
16      Would you please state your name for the ladies and
17  gentlemen of the jury?
18  A.   Earnest Duckery.
19  Q.   Mr. Duckery, where are you employed?
20  A.   Wittenberg Delony & Davidson.
21  Q.   Wittenberg Delony & Davidson Architects?
22  A.   Yes.
23  Q.   Is that correct?
24      How long have you been employed by Wittenberg -- is
25  it Wittenberg?
```

DIRECT EXAMINATION

1  A.   Yes, Wittenberg.  Fourteen years.

2  Q.   And what is your position -- can we just call it

3  WD&D?

4  A.   Sure.

5  Q.   That's what most people call it anyway.  Is that

6  correct?

7  A.   Yes.

8  Q.   How long have you been employed by WD&D?

9  A.   Fourteen years.

10 Q.   Fourteen years.  In what capacity?

11 A.   Project manager.

12 Q.   And, Mr. Duckery, for purposes of the record, I'm

13 going to ask you to identify your race and also your sex

14 for us, please.

15 A.   African-American male.

16 Q.   And so you're the project manager.  Can you explain

17 to the ladies and gentlemen of the jury what a project

18 manager does?

19 A.   Basically, my duties are -- is once a schematic

20 design has been done for a building and the owner's okay

21 with it, then to actually produce that building from

22 schematic design, design the building, make construction

23 documents, and get it ready for bid, and from time to time

24 go to the owner, architect, and contractor's meetings

25 throughout the project and visit the project from time to

DIRECT EXAMINATION

1  time.

2  Q.    You and I, we've met before.  Have we not?

3  A.    Yes, we have.

4  Q.    And I believe you gave testimony during the summer of

5  2020 in the school desegregation case.  Is that correct?

6  A.    If that was the time that it was, then, yeah.  It's

7  been --

8  Q.    All right.  Of course, you're here by subpoena.  Is

9  that correct?

10  A.    That's correct.

11  Q.    Didn't come -- not by your choice?

12  A.    No.

13  Q.    All right.  Okay.  Just kind of give a little

14  background information about you, sir.  It's my

15  understanding you grew up in North Little Rock.  Is that

16  correct?

17  A.    That's correct.

18  Q.    Where did you go to high school?

19  A.    It was old main at the time, but it's North Little

20  Rock High again.

21  Q.    Old main high school.

22        And then, of course, you went to college.  Where did

23  you go to college?

24  A.    Started off at Louisiana Tech and then transferred

25  and went to U of A Fayetteville.

DIRECT EXAMINATION

1  Q.    It's my understanding DW&D, is that an architectural
2  firm.  Is that correct?
3  A.    That's correct.
4  Q.    Are you an architect?
5  A.    No.
6  Q.    So you serve as a project manager.
7        You mentioned the terminology schematic design.
8  Would you explain to the ladies and gentlemen of the jury
9  what a schematic design is?
10 A.    Sure.  Basically, once -- once we sit down with the
11 owner and we do concept diagrams and relation of spaces
12 and things like that, once we -- we can either go by the
13 State standard and come up with the square footages.  And
14 we have a chief architect designer at the firm, and he
15 comes up with the design which is basically the schematic
16 floor plan or elevation.  And then I will put that into
17 the computer, and that's basically how you get your
18 drawings or 3D drawings and things like that.
19 Q.    And in looking at your deposition, I believe you had
20 indicated that you had worked -- before you went to work
21 for WD&D, did you work for -- I know them.
22 A.    Woods & Carradine.
23 Q.    Woods & Carradine, correct.
24        Of course, they were an African-American
25 architectural firm.  Is that correct?

DIRECT EXAMINATION

1  A.    Yes.   That's correct.

2  Q.    You know a good friend of mine by the name of Dexter

3  Doyne?

4  A.    Yes.

5  Q.    Doyne Construction?

6  A.    Yes.

7  Q.    He and I are church members together.

8  A.    Saw Dexter last Monday.

9  Q.    Okay.  Very good.  I'm going to try to treat you well

10  so you can have some good things to say about me to

11  Mr. Doyne.  Okay?

12      Now -- and, of course, you grew up in the Pulaski

13  county area.  Is that correct, sir?

14  A.    That's correct.

15  Q.    And, of course, you're quite familiar with areas such

16  as Sweet Home, College Station, Wrightsville, those areas

17  in Pulaski county.  Is that correct?

18  A.    That's correct.

19  Q.    And, of course, as you know, those are predominantly

20  African-American communities?

21  A.    Correct.

22  Q.    Of course, Mills High School -- at some point in time

23  when you started working with WD&D, of course, this

24  architectural firm, you guys tried to, obviously, get

25  jobs, bid for jobs in order to deal with construction

DIRECT EXAMINATION

1  projects.  Is that correct?

2  A.    That's correct.

3  Q.    Other than the Mills High School project, can you

4  tell me whether or not WD&D was involved in any other high

5  school construction within Pulaski county?

6  A.    Yes.  They've done Maumelle High, I think Maumelle

7  Middle School.

8  Q.    Were you employed with WD&D when Maumelle went up?

9  A.    I had gotten there, but I hadn't worked on that

10  project.

11  Q.    Have you had an occasion to go out to Maumelle High

12  School and visit those projects?

13  A.    Yes.

14  Q.    All right.  I'm sorry.  You had -- you were

15  mentioning some other projects you were working on.

16  A.    They've done Don Roberts, done some eStem editions.

17  So they've done -- they've done a lot of Pulaski county

18  and some Little Rock schools.

19  Q.    Of course, Roberts Elementary School, that's located

20  out in the Chenal community.  Is that correct?

21  A.    That's correct.

22  Q.    And the Roberts Elementary School is an elementary

23  school within Pulaski County School District.  Is that

24  correct?

25  A.    Little Rock School District I believe, but within

DIRECT EXAMINATION

1  Pulaski county.  Yes.

2  Q.   Yes.

3  A.   Yes, sir.

4  Q.   All right.  Thank you.

5       Now, when you were -- and I believe you indicated

6  that -- once you get these schematic designs I guess from

7  the architect, what is your role at that point?

8  A.   Basically, develop the -- to develop the project.

9  Q.   Okay.  All right.  And during the course of the --

10  the development and construction of the Mills High School

11  -- I just kind of want to limit our talk about that --

12  would there -- would there have been occasions that you

13  would meet with representatives of the Pulaski County

14  Special School District?  And I'm talking about before the

15  construction actually begun.

16  A.   Yes, I did.

17  Q.   Okay.  And who did you meet with -- with

18  representatives as -- a representatives of Pulaski County

19  Special School District?

20  A.   Dr. Guess and Derek Scott.

21  Q.   Derek Scott.  Of course, Derek Scott is a Caucasian

22  male.  Is that correct?

23  A.   That's correct.

24  Q.   Of course Johnny -- Jerry Guess testified here

25  earlier, correct?  Well, you probably don't know he

DIRECT EXAMINATION

1  testified earlier.

2       But you're meeting of Dr. Jerry Guess, he's also a

3  Caucasian male.  Is that correct?

4  A.    That's correct.

5  Q.    And so what was the purpose of these meetings that

6  you -- would there -- would there have been other people

7  from WD&D who would have met with Dr. Guess and Derek

8  Scott?

9  A.    Yes.

10 Q.    Who?

11 A.    Brad Chilcote.  And I believe in one meeting there

12 was Jay Clark.

13 Q.    Jay Clark?

14 A.    Yes.

15 Q.    Who is Jay Clark?

16 A.    Jay Clark is an architect at WD&D and --

17 Q.    And Brad Chilcote is --

18 A.    He's a principal.

19 Q.    He's a principal?

20 A.    Yes.  Basically, the way WD&D is structured, we

21 always have a principal -- one of the principals that's

22 over all of the projects.

23 Q.    I see.  So would it be fair to say that Brad

24 Chilcote, I guess, was the -- one of the principal owners

25 of WD&D or was he --

DIRECT EXAMINATION

1   A.   Yes.   He's the principal owner.   And the way our

2   projects are structured, we have a -- we have a principal

3   in charge, architect, and project manager.

4   Q.   Okay.   So Brad Chilcote -- and I believe it's spelled

5   C-h-i-l-c-o-t-e.   Does that sound about right?

6   A.   That's correct.

7   Q.   And you had mentioned Jay Clark.   Is that correct?

8   A.   Yes.

9   Q.   And, of course, yourself?

10   A.   Yes.

11   Q.   And of course, Chilcote and Mr. Clark, are they both

12   Caucasian?

13   A.   Yes.

14   Q.   So the three of you as representatives of WD&D would

15   go -- did you go out to the Pulaski County Special School

16   District administrative office to meet with them?

17   A.   Yes, we did.   Jay Clark only went once though, and

18   then he got assigned to another project, so he was off

19   that project.

20   Q.   So were you, like, the main -- were you, like, the

21   designated person on behalf of WD&D to see the

22   construction of the Mills High School campus through?

23   A.   The main person at the time was Roy Sinclair.   And

24   Roy Sinclair is -- he did our contract administration.

25   Q.   Mr. Sinclair?

DIRECT EXAMINATION

1  A.   Yes.

2  Q.   All right.  So -- but whenever you had -- it's my

3  understanding you had various meetings with

4  representatives of the Pulaski County School District, and

5  that would consist of Derek Scott and the superintendent,

6  Dr. Jerry Guess.  Is that correct?

7  A.   I only went to -- I went to, basically, I guess we

8  kind of called it a presentation meeting to where we

9  showed them the proposed Mills High.

10 Q.   What did you have with you when you went there?

11 A.   We had floor plans and renderings.

12 Q.   Floor plans?

13 A.   Floor plans, elevations, and renderings.

14 Q.   These are like drawings that you presented.  Is that

15 correct?

16 A.   That's correct.

17 Q.   And did you have, I guess, a budget -- I guess, a

18 proposed budget of what it would cost to complete the

19 Mills -- Mills High School construction?

20 A.   For the high school, I believe we had budget of 55

21 million.

22 Q.   Okay.  And it is also my understanding that part of

23 the construction projects for the Mills High School

24 project, you were -- are you familiar with the old Mills

25 High School that was there on Dixon Road as well?

DIRECT EXAMINATION

1   A.   Yes.

2   Q.   And it's my understanding that the old Mills High

3   School was to be converted into a middle school.  Was that

4   your understanding?

5   A.   Within that 55 million?

6   Q.   No.  I'm just saying just --

7   A.   At some point?  Yes.  At some point in time, yes.

8   Q.   Was WD&D also responsible for the schematic drawings

9   for the conversion of the Mills -- old Mills High School

10  to convert it into a middle school?

11  A.   Yes.

12  Q.   All right.  So but as it -- it was your understanding

13  that, as it relates to the construction of Mills High

14  School -- what did that construction consist of,

15  Mr. Duckery?

16  A.   I can't remember the square footage exactly, but --

17  Q.   No, no, no.  I'm just saying -- of course, we know

18  there was going to be a high school building, yes?

19  A.   Yes.

20  Q.   And a football stadium or a football field?

21  A.   Eventually, yes, that came within the project.  But

22  during the first initial meeting, the building itself was

23  a $55 million building.

24  Q.   So $55 million building just for the building itself

25  just for the high school.  Is that correct?

DIRECT EXAMINATION

1   A.   Yes.

2   Q.   And what did Mr. Scott say to you in reference to

3   that initial concept, a building -- a $55 million

4   building?

5   A.   The 55 million, once we presented, I believe it was

6   Dr. Guess, Derek Scott, Jay Clark, Brad Chilcote, myself,

7   and the late John Walker.

8   Q.   Mr. Walker was there as well?

9   A.   Yeah, Mr. Walker was there.

10  Q.   Okay.

11  A.   We presented the building, showed it to them, showed

12  them what we -- what we designed for 55 million.  We went

13  over the current location -- putting it in the current

14  location and alternate locations throughout Pulaski

15  county.

16  Q.   Okay.  All right.  And did you get any response or

17  any reaction from either Dr. Guess or Mr. Scott as it

18  related to that initial proposal?

19  A.   Everything went fine and we got the -- we got the

20  go-ahead.

21  Q.   You got the go-ahead.

22       So at some point in time, it's my understanding that

23  you, meaning WD&D -- you were told that you needed to

24  scale back this project.  Is that correct?

25  A.   That's correct.

DIRECT EXAMINATION

1   Q.   I'm going to direct your attention, Mr. Duckery, to

2   Plaintiff's Exhibit Number 55.  I'm sorry.  Plaintiff's

3   Exhibit Number 53 that's already been introduced into

4   evidence.  And I'm going to show you -- you see

5   Plaintiff's Exhibit 55, the sticker that's there?  I'm

6   sorry. 53.

7   A.   Yes.

8   Q.   53.  And of course this is an email that's dated

9   March 11, 2016.  Do you see that?

10  A.   Yes.

11  Q.   And it's an email from Mike Meadors.  Who is Mike

12  Meadors?

13  A.   Mike Meadors used to work for Baldwin & Shell. He was

14  an estimator.

15  Q.   Mike Meadors was the estimator for Baldwin & Shell?

16  A.   Yeah.

17  Q.   Of course, Baldwin & Shell was the construction

18  company that was hired to do the Mills project, yes?

19  A.   That's correct.

20  Q.   And, of course, this email is dated Friday, March 11,

21  2016, at 10:26 a.m.  Is that correct?

22  A.   That's correct.

23  Q.   And, of course, it's an email that's sent to Brad

24  Chilcote and to Jay Clark, the gentlemen you just

25  mentioned.  Is that right?

DIRECT EXAMINATION

1  A.    That's right.

2  Q.    And, of course, it's CC'd to yourself.  There is a

3  Tommy Rutherford.  Who is Mr. Rutherford?

4  A.    He works at Baldwin & Shell.

5  Q.    What about Chuck Hesselbein?  That's

6  H-e-s-s-e-l-b-e-i-n.

7  A.    Baldwin & Shell.

8  Q.    Baldwin & Shell.

9        And, of course, we have Ray Horsey --

10  A.    Roy.

11  Q.    I'm sorry.  Roy Horsey, H-o-r-s-e-y.

12  A.    Baldwin & Shell.

13  Q.    Baldwin & Shell.

14        And out of these individuals who are listed here, how

15  many of these persons are African-American?

16  A.    Only myself.

17  Q.    Only yourself.

18        Then, of course, it talks from yesterday's meeting,

19  meaning there was a meeting that took place on March 10,

20  2016.  Is that correct?

21  A.    That's correct.

22  Q.    And let me -- and do you know whether or not that

23  meeting was the meeting that you were talking about

24  earlier?  Was that an earlier meeting?

25  A.    I can't recall.

DIRECT EXAMINATION

1    Q.    Okay.   That's fine.

2          And let me show you a document -- another page of

3    Plaintiff's Exhibit Number 53, and ask you if you can

4    identify what this document is.   I think it's fairly

5    clear.

6    A.    Yes.   It's the schematic estimate for the high

7    school.

8    Q.    Okay.

9    A.    The field house, football renovation, baseball,

10   softball, practice field, site work, concession stand,

11   toilet, and modify the existing locker room and total at

12   the bottom.

13   Q.    All right.   And it looks like, as it relates to the

14   high school, the project had a program area of 177,170

15   square feet.   Did I read that correctly?

16   A.    That's correct.

17   Q.    And also let me ask you this, Mr. Duckery.   There is

18   a Arkansas -- the State of Arkansas has what's called

19   minimum standards as it relates to the construction of

20   high schools, elementary schools, and junior high.   Is

21   that correct?

22   A.    That's correct.

23   Q.    Can you explain to the ladies and gentlemen of the

24   jury as far as what those minimum standards consist of?

25   A.    Sure.   For example, if -- if you were going to do a

DIRECT EXAMINATION

1   classroom for a high school -- the standards are different

2   from high school, middle school, elementary school.

3       But, for instance, a high school, the minimum

4   classroom square footage might be 850 square feet, and

5   that's the minimum that you can have for a classroom and

6   you have to design to that minimum.  You can go over the

7   850, but you can't go under.

8   Q.   What about the hallways?  Are there minimum standards

9   for hallways in high schools?

10  A.   They're based on the -- based on the number of

11  students.  It's a common practice for us to try to keep

12  the hallways at least nine feet.

13  Q.   Nine feet in width?

14  A.   Yes.

15  Q.   Okay.  All right.  And, of course, the minimum

16  standards are the standards that the State of Arkansas set

17  saying, you can't below those standards but you can surely

18  exceed those standards.  Is that correct?

19  A.   That's correct.

20  Q.   Whenever you are designing -- let's say, WD&D, is it

21  WD&D's practice to -- to design above the minimum

22  standards?

23  A.   Yes.

24  Q.   Okay.  Now, according to this page that's found in

25  Plaintiff's Exhibit Number 53, we see that the new high

DIRECT EXAMINATION

1  school had a proposed square foot footprint, shall I say,

2  of 177,170 square feet.  Is that correct?

3  A.   That's correct.

4  Q.   Then, of course, we had the new field house which was

5  -- had in the original design concept of 44,857 square

6  feet correct?

7  A.   Correct.

8  Q.   Then, of course, the football field renovations, that

9  was 90,142 square feet.  Is that correct?

10  A.   That's correct.

11  Q.   And site work.  What is -- what is site work,

12  Mr. Duckery?

13  A.   So the site work is basically to, like, prepare the

14  building pads.  For instance, take Mills High School.

15  Half it is on rock quarry.  The other half is on bad soil.

16  So, basically, you're going in and prepping the bad soil

17  so it can be sturdy enough to support the building.  And

18  also you might have to undercut the rock in order to get

19  the building to set in there.  So that's part of site

20  work.

21  Q.   Got you.  Okay.

22       Then, of course, we also have the concession stand

23  and toilet buildings, 5,008 square feet.  Is that correct?

24  A.   That's correct.

25  Q.   And modify existing locker room building, 6,575

DIRECT EXAMINATION

1  square feet, correct?

2  A.   That's correct.

3  Q.   And the total project square foot is 517,859 square

4  feet.  Is that correct?

5  A.   That is correct.

6  Q.   And the estimated cost that Baldwin & Shell came up

7  with was $57,000,864.82 for the total construction project

8  budget for Mills High School, correct?

9  A.   Yes.

10  Q.   I'm sorry?

11  A.   I was trying to make sure you said the number right.

12  Q.   Let me go back.  $557,864,082.

13  A.   Correct.

14  Q.   Okay.  I don't know what I said, but --

15  A.   You said cents.

16  Q.   I'm sorry.  There you go.

17      All right.  57,800,000 project.  And were you a part

18  of a meeting when this estimate was presented to Dr. Guess

19  and/or Derek Scott?

20  A.   Yes.

21  Q.   What response did you get?

22  A.   That we needed to reduce -- that we needed to reduce

23  the size of -- we needed reduce the project.  We need to

24  reduce the size of the building in order to get the

25  numbers down.  We didn't get a number, but to get the

DIRECT EXAMINATION

1   numbers down.  They couldn't move forward with the numbers

2   at this -- at this price.

3   Q.   Of course, that was mainly coming from Derek Scott.

4   Is that right?

5   A.   That's correct.

6   Q.   And I believe at this point in time, Derek Scott was

7   your primary point of contact on behalf of Pulaski County

8   Special School District, yes?

9   A.   That's correct.

10  Q.   Is that correct?

11  A.   Yes.

12  Q.   All right.  Did you have any meetings during these

13  initials phases with Dr. Janice Warren?

14  A.   No.

15  Q.   Okay.  So it was just Derek Scott?

16  A.   Yes.

17  Q.   Okay.  And so when you presented -- when Baldwin &

18  Shell and I guess yourself presented this plan to

19  Mr. Scott, he said, that's too much money, you need to

20  scale back.  Yes?

21  A.   That's correct.

22  Q.   Okay.  And what did you do after you were told that

23  by Mr. Scott?

24  A.   Revised the floor plan.

25  Q.   Okay.  I'm going to show you another document, a page

DIRECT EXAMINATION

1    of Exhibit 53.   First of all, the page that I initially

2    showed you that had 177,000 square feet, this is March, I

3    believe, 8 of 2016.   Does that sound about right to you?

4    A.    Yes.

5    Q.    And then, of course, I'm presenting you with another

6    document from Baldwin & Shell.   Do you recognize this?

7    A.    Yes.

8    Q.    And can you -- again, can you tell the ladies and

9    gentlemen of the jury what this represents?

10   A.    This is a design development estimate.

11   Q.    Who prepared this?

12   A.    Baldwin & Shell.

13   Q.    Did they prepare it in consultation with WD&D?

14   A.    They -- yes.   They asked us for the revised floor

15   plan.

16   Q.    Okay.   So after you had the initial meeting with

17   Derek Scott and told them it was going to cost $57 million

18   in order to construct Mills High School, then WD&D had to

19   revise the schematic drawings in order to reduce things.

20   Is that correct?

21   A.    That's correct.

22   Q.    Now, we see a new high school that has 155,908 square

23   feet.   Is that correct?

24   A.    That's correct.

25   Q.    So we went from 177,000 -- do you see that?

DIRECT EXAMINATION

1    A.    Yes.

2    Q.    To 155,908 square feet, yes?

3    A.    Yes.

4    Q.    Of course, that brings the cost down, yes?

5    A.    Yes.

6    Q.    Okay.  And also we see the field house at 44,759.  I

7    believe that may have actually gone up a little bit.  It

8    was 44,857.  Is that correct?

9    A.    That's correct.

10   Q.    And then, of course, it went up to 45,759, yes?

11   A.    Yes.

12   Q.    And, of course, the 177,170 square feet down to

13   155,908 square feet, that's roughly about 24,000 square

14   feet that you reduced or cut off?

15   A.    That's correct.

16   Q.    Correct?

17         All right.  And the football field renovation was

18   taken out.  Is that correct?  On this document that's

19   dated March 8, 2016 -- you see that?

20   A.    Yes.

21   Q.    We see a football field renovation, 90,142 square

22   feet.  Do you see that?

23   A.    Yes.

24   Q.    But I don't see it on the one -- the second estimate

25   that's dated August 12, 2016.  Was it eliminated for some

DIRECT EXAMINATION

1    reason?

2    A.    No.   Derek Scott had a way of moving money around and

3    under -- under different avenues to get that project done.

4    Q.    Okay.   You say that kind of with a smile.

5    A.    Well, I mean, he was clever at doing it, so.

6    Q.    Gotcha.   Okay.

7          So we now see a project that went from 517,859 square

8    feet brought all the way down to 210,255 square feet, yes?

9    A.    Yes.

10   Q.    That's a huge difference of roughly some 235,000

11   square feet that has been eliminated.

12   A.    Yes.

13   Q.    Correct?

14   A.    Correct.

15   Q.    So the building that was initially designed for

16   $57,864,082 was now brought and reduced down to

17   $41,653,790.   I'm sorry.   $41,653,790.   Yes?

18   A.    Yes.

19   Q.    And there is something down here called a revised

20   budget, 36 million 757,58.   Do you know what that

21   represents?

22   A.    I can't recall at the moment.

23   Q.    Okay.   All right.   So, basically, you had to do a lot

24   of things in order to scale back this project, yes?

25   A.    Yes.

DIRECT EXAMINATION

1   Q.    Have you ever gone out to Robinson Middle School and

2   looked at that middle school?

3   A.    No.

4   Q.    You have not?

5   A.    No.

6   Q.    Of course, you've been out to Maumelle, yes?

7   A.    Yes.

8   Q.    Maumelle High School?

9   A.    Yes.

10  Q.    Even the middle school?

11  A.    Yes.

12  Q.    I mean, of course, those schools walls are masonry

13  brick walls.  Is that correct?

14  A.    That's correct.

15  Q.    And, of course, the walls that were built at Mills

16  were gypsum board walls.  Is that correct?

17  A.    That's correct.

18  Q.    Now, remember I asked this question to Mr. Johnson

19  back in the school desegregation case.  If the big, bad

20  wolf was coming, which building would you rather be in,

21  Robinson Middle versus Mills High School?

22          MR. KEES:  Objection, Your Honor.  He hasn't

23  even been to Robinson Middle.

24          MR. PORTER:  Maumelle.  I'm sorry.

25  BY MR. PORTER:

DIRECT EXAMINATION

1  Q.   If the big, bad wolf was coming, which school would

2  you rather be in, Maumelle High School or versus that of

3  Mills High School?

4  A.   Hard question to answer, but -- because there's

5  actually a safe room at Mills.  That's why I'm saying.  It

6  depends on where you're at, but overall, Maumelle.

7  Q.   Got you.  Now, of course, you had to do a lot of

8  things in order to cut corners, reduce cost, as it relates

9  to the Mills project.  Is that correct?

10 A.   That's correct.

11 Q.   And I'm looking at your deposition where you said

12 some things.  I believe in your deposition you said the

13 field house was changed as well.

14      How was the field house changed?

15 A.   Let's see.  I think we incorporated the concession

16 stand with the field house.

17 Q.   Were they supposed to be separate facility?

18 A.   They were separate at first.

19 Q.   Okay.  So what's the significance of having a

20 separate concession stand to the field house as opposed to

21 having it together?

22 A.   Having it together would actually reduce cost.

23 Q.   Reduce cost?

24 A.   Because of the plumbing and stuff like that.

25 Q.   What is the benefit, I guess, of having a concession

DIRECT EXAMINATION

1    stand separate from the -- from the field house?

2    A.    If you have -- if you have the space -- if you have

3    the space, then that keeps the public away from the

4    students, if the students are coming out of the field

5    house.   But with Mills, we had a site challenge because we

6    were confined by the rock quarry, by the state highway,

7    and the property that's adjacent to Mills.

8    Q.    Okay.   I believe you indicated in your testimony that

9    the separate facility had been cut by some 3,000 feet.

10        Do you recall that?

11   A.    I don't recall that, but if I said it, that's right.

12   Q.    Okay.   All right.

13        I also believe in your testimony you indicated that

14   you had to make smaller hallways at the Mills High School.

15   Is that correct?

16   A.    From the initial design?

17   Q.    Yes.

18   A.    Yes.   So the initial design, the hallways were wider.

19   It was a large building.   So the only way sometimes to get

20   that large amount of money out of buildings is to start --

21   if you go above the State standard, is to start to come

22   down to State standards, not to go below it.

23   Q.    Right.   So isn't it true, Mr. Duckery, that whenever

24   you have a high school, you got students traversing in the

25   hallway, you want to have enough wide space in order to

DIRECT EXAMINATION

1  give students their space.  Is that correct?

2  A.  That's correct.

3  Q.  When you make it narrow or smaller, you're going to

4  compact people in, yes?

5  A.  Yes.

6  Q.  And that can create some problems within itself.  Is

7  that correct?

8  A.  Yes.

9  Q.  Kind of makes it unsafe?

10  A.  Egress-wise?  Maybe, yes.

11  Q.  All right.  I believe in your testimony you indicated

12  that you deleted the practice field from the project.

13      First of all, can you tell the ladies and gentlemen

14  of the jury what a practice field is?  I know back in my

15  day --

16  A.  We only had one field.

17  Q.  That's right.  The field we played on, field we

18  practiced on.

19  A.  That was it.

20      Basically, your practice field is -- it's just --

21  it's not as fancy as the -- as the field that you play on,

22  but it's the practice field for the football team to

23  practice on in order not to mess up the field -- the game

24  field, basically.

25  Q.  Sort of an indoor type facility?

DIRECT EXAMINATION

1   A.   We actually had I think -- at one time I think we had
2   -- we had an indoor and an outdoor at one time.
3   Q.   Okay.  But Mr. Scott -- in order for you to cut cost,
4   you deleted the practice field from the project.  Is that
5   correct?
6   A.   That's correct.
7   Q.   And that was saving of some $84,000.  Do you recall?
8   85,000?
9   A.   I can't recall, but if I said that, then, yes.
10  Q.   I mean, I can show you in your deposition if you want
11  to.
12  A.   It was fresh on my mind back then.  If I said it in
13  deposition, then --
14  Q.   All right.  Very good.
15       Also, I believe you had to do other things, such as
16  change the lighting scheme at Mills High School.  Is that
17  correct?
18  A.   It wasn't quite the lights.  If I could kind of
19  explain for a second.
20  Q.   Go ahead.
21  A.   If you look up here, you kind of got some clouds
22  where that part of the ceiling kind of hangs a little bit
23  lower than the other part.  So we had to eliminate things
24  like that and kind of made the ceiling flush.  So those
25  are more expensive.  So it wasn't quite the lighting --

DIRECT EXAMINATION

1  the lights itself.  It was like the clouds.

2  Q.    The design of the lights?

3  A.    The design.

4  Q.    Okay.  So, of course, in the federal courthouse, we

5  have more expensive lighting design I guess than you would

6  have at a place like Mills High School, yes?

7  A.    Yeah.  Not quite.  Not with the can lights.  I think

8  we could probably do a little better.

9  Q.    Okay.  All right.  I believe --

10  A.    That's only because technology.

11  Q.    I believe you indicated that you said Derek Scott

12  initially wanted this to be a green building.  What do you

13  mean by that?  The Mills High School.

14  A.    Yeah.

15  Q.    We're talking about Mills?

16  A.    Yes.  So a LEED certified building, energy efficient

17  building --

18  Q.    When I mean LEED, I'm talking about L-E-E-D.

19  A.    Yes.

20  Q.    Yes?

21  A.    So simple way to put it, it's an energy efficient

22  building.  You can get platinum.  You can get gold.  you

23  can get certified.  Mills High School is actually LEED

24  certified.  It's not LEED gold.  It's not LEED silver or

25  platinum, but it is LEED certified.

DIRECT EXAMINATION

1  Q.   Okay.  And so Mr. Scott asked you to cut some as it

2  related to LEED lightings.  Isn't it true that Mr. Scott

3  wanted you to rely more on skylights?

4  A.   Yes.  We did have more natural, but the -- that

5  skylighting adds toward your LEED points.  So we did have

6  skylighting in the initial concept and design, along with

7  light wells and everything else at that time.

8  Q.   I believe you indicated in your deposition, you say,

9  we took out skylights and we took out light wells.  Is

10 that correct?

11 A.   Yes.

12 Q.   And, again, that was for to -- to reduce cost, yes?

13 A.   Correct.

14 Q.   What is the benefit of having skylights and light

15 wells?

16 A.   To bring in more natural light so you don't have to

17 use as much electricity to light a room, basically.

18 Q.   Mm-hmm.  I believe once you did all of that,

19 eliminated some things, reduced some things, reduced

20 hallways -- and I think you even testified that you even

21 reduced the height of the building itself.  Is that

22 correct?

23 A.   That is correct.

24 Q.   What was the -- do you recall the -- how much you had

25 to cut from the initial height of the building that was

DIRECT EXAMINATION

1   initially planned versus what you went with?

2   A.   I can't quite recall that, but if I had to try to

3   recollect, I think I took two feet off of each floor.

4   Q.   Two feet off each floor?

5   A.   Yes.

6   Q.   And, again, that was all done to try to reduce the

7   cost, bring down the cost, yes?

8   A.   Yes.

9   Q.   And I also -- I believe you indicated that, once you

10  did that, did you go back to Derek Scott and say, well,

11  look, this is what we've come up with?

12  A.   Yes.

13  Q.   What did he say then?

14  A.   We still need to reduce the cost.

15  Q.   Still need to reduce some cost.  So you went from

16  177,000 to 154,000, you cut some things, and he said that

17  still wasn't good enough, yes?

18  A.   Right.

19  Q.   Mr. -- go ahead.

20  A.   So in between that, I didn't reduce the building

21  until after he said we need to cut more cost.  So get to a

22  point that, after you've reduced square footage, you only

23  have building height left, so you have to reduce the

24  building height.

25  Q.   Mr. Duckery, whenever you had these meetings with

DIRECT EXAMINATION

1  Mr. Scott, did they ever mention to you anything about
2  plan 2000?
3  A.    No.
4  Q.    That never came up?
5  A.    Not that I recall, no.
6  Q.    Did they ever mention to you that they were in the --
7  that Pulaski County Special School District was in federal
8  court litigation and that they had an obligation to ensure
9  that their buildings were equal?
10  A.    No.
11  Q.    Never came up?
12  A.    No.
13  Q.    And I believe you indicated that before Dr. Warren
14  became interim superintendent, again, you were meeting
15  primarily with Derek Scott and I believe you also -- did
16  you also have a meeting with Dr. Remele or at least have
17  some interaction with Dr. Remele?
18  A.    No.
19  Q.    You did not?
20  A.    Did not.
21  Q.    I thought you said on page -- one thing I like to do,
22  Mr. Duckery, when I have depositions -- like yours is 94
23  pages.  I like to do summaries.  Summarize them.  Makes it
24  much more easier.
25      Let me go to Page 74.  And do you remember that we

DIRECT EXAMINATION

1  took your deposition -- or at least Ms. Jenkins took your

2  deposition on May 18 of 2020?  Do you see that?

3  A.   I remember it was 2020.  I do remember that.

4  Q.   May 18, 2020?

5  A.   I believe that might have been the date.

6  Q.   Of course, this is a deposition of Earnest Lamont

7  Duckery.

8  A.   That's me.

9  Q.   That's you?

10  A.   Yes.

11  Q.   You have to speak a little bit louder.

12  A.   Yes.  That's me.

13  Q.   I want to go to Page 74 --

14  A.   Sure.

15  Q.   -- of your deposition.  Let me go to Page 73 first.

16  Page 73.

17       And the question at Line 20, again, talking about

18  Dr. Warren.

19       "So she didn't become interim superintendent until

20  July of 2017."

21       What is your answer?

22  A.   "I can't recall, but it was after construction

23  started."

24  Q.   Next question, "It was after construction had started

25  that" -- and then you said?

DIRECT EXAMINATION

1   A.   "Yes."

2   Q.   And then the next page on Page 74, the question, "And

3   she was interim superintendent that you began meeting with

4   her?"

5   A.   Yes.

6   Q.   Your answer?

7   A.   "Yes."

8   Q.   "Before that was, your contact with Pulaski County

9   Special School District?"  Who was you -- I'm sorry.  "Who

10  was your contact with Pulaski County Special School

11  District?"

12  A.   "Derek Scott."

13  Q.   "All right.  Did you interact with Dr. Remele, board

14  president, at any time?"

15       What's your answer?

16  A.   "Yes."

17  Q.   "And on what occasion?"

18  A.   "During one of the meetings she would speak."

19  Q.   "Was this" -- and you said?

20  A.   "Or she would ask a question and we would answer."

21  Q.   "Was this one of the meetings that Dr. Warren

22  hosted?"

23  A.   "Yes."

24  Q.   "And where was -- where were those meetings held?"

25  A.   "At the administration building."

DIRECT EXAMINATION

1    Q.    So you did -- you did have a meeting with Dr. Remele.

2    And, of course, Dr. Remele was engaged in the meeting,

3    asking various questions, yes?

4    A.    Yes.

5    Q.    Okay.  But prior to the actual construction starting,

6    you were having these construction meetings, and those

7    meetings, of course, with Derek Scott.  And that's when

8    Mr. Scott told you you needed to reduce the size of the

9    building.  Is that correct?

10   A.    Yes.

11   Q.    And do you know whether or not -- strike that.

12        And so you had a second round where you met with

13   Mr. Scott and you had a reduction in the project and

14   Mr. Scott then told you that wasn't good enough.  Is that

15   correct?

16   A.    That's correct.

17   Q.    Of course, Dr. Warren wasn't privy to that meeting or

18   that information to your knowledge.  Is that correct?

19   A.    That's correct.

20   Q.    And, again, whenever you were having these meetings

21   with Derek Scott, Mr. Scott never mentioned to you about

22   Plan 2000, correct?

23   A.    No.

24   Q.    I'm sorry?

25   A.    No.

DIRECT EXAMINATION

1  Q.    Now, I want to ask you about this -- there's a
2  concept called value engineering.  Can you tell the ladies
3  and gentlemen of the jury what is that?
4  A.    Value engineering is basically -- trying to find an
5  easy way to put it.  Value engineering is kind of finding
6  cost efficient products for which you have in the building
7  that can bring the cost down.
8  Q.    All right.  So rather than getting Bounty paper
9  towels, you want to value paper towels.  Is that correct?
10 A.    That's correct.
11 Q.    My wife was here earlier.  She loves bargains.  I
12 like the Bounty.
13       So value engineering is just kind of a sophisticated
14 way of saying, we want to do something, build something
15 with maybe lesser quality materials?
16 A.    Yes.
17 Q.    And so that's basically what Derek Scott asked you to
18 do as it related to the Mills High School project, yes?
19 A.    Yes.
20 Q.    Is that correct?
21 A.    That's correct.
22 Q.    So after you went back the second time around trying
23 to reduce the project again, again, would you explain to
24 the ladies and gentlemen of the jury what did you do in
25 order to get this project -- the project cost down for the

DIRECT EXAMINATION

1   Mills project?

2   A.   So basically -- basically, once we're asked to reduce

3   the plan or that it might be over budget, we'll reduce the

4   plan or reduce -- you know, we'll revise the drawings.   We

5   take it back to Derek Scott.   Derek Scott would have us to

6   send it -- send everything to Baldwin & Shell.   Baldwin &

7   Shell would do their estimate.   The estimates were too

8   high, then we have to revise it again.   So we did that --

9   we did that at least three times until we got down to a

10  number where it was a go for him.

11  Q.   And, of course, since the Mills High School has been

12  constructed, have you read about any newspaper articles

13  that talk about the inequality of the Mills High School as

14  compared to maybe Robinson or Maumelle High School?

15  A.   I think I read in the paper before the last trial.

16  Q.   So there were some issues that were raised, of

17  course, by the intervenors in the case that Mills was that

18  of an inferior product as it related to other high schools

19  such as Maumelle and Robinson Middle.   Is that correct?

20  A.   That's correct, because you can't build a high school

21  for the same price as a middle school.   Middle schools are

22  just cheaper.   If you have more money, you have a better

23  middle school.

24  Q.   As a matter of fact, I'm glad you brought that point

25  up, Mr. Duckery.   Typically, whenever you are

DIRECT EXAMINATION

1  constructing, designing a high school, typically the cost

2  of a high school should be more than that of a middle

3  school.  Is that correct?

4  A.    That's correct.

5  Q.    Because you have more complex things that go into a

6  high school than you would versus a middle school,

7  correct?

8  A.    That's correct.  I mean, middle school you don't have

9  to -- you don't have to have an auditorium.  High school,

10  you have to have an auditorium.  That can easily be a $5

11  million auditorium.  So, you know, you don't have to have

12  auxiliary gyms in middle schools all the time.  So those

13  are extra cost that you have at high schools that you

14  won't have at middle schools.

15  Q.    And did you become aware of the fact, sir, that at

16  the Mills High School, the Mills gymnasium was too small

17  to host AAA basketball tournaments?

18  A.    No.

19  Q.    You did not?  Okay.

20        Did you -- were you ever told, Mr. Duckery, that the

21  court, Judge Marshall, in the desegregation case had

22  required that the Mills High School project be a 50, $55

23  million project?

24  A.    I was aware.

25  Q.    I'm sorry?

DIRECT EXAMINATION

1    A.   I think I became aware, yes.

2    Q.   You became aware of that?

3    A.   Mm-hmm.

4    Q.   So even though it was required by the Court, you were

5    told by Mr. Scott to reduce that?

6    A.   Oh, no, no, no.  I'm sorry.  I didn't hear that until

7    like 2020, not back in 2015.

8    Q.   Okay.  You weren't told that by Mr. Scott back then,

9    correct?

10   A.   That's correct.

11   Q.   I believe you indicated that the score board was

12   eliminated as required by Derek Scott.  Is that correct?

13   A.   I can't recall, but if I said it in deposition, then

14   yes.

15   Q.   Do you know what score board, either basketball score

16   board or football score board?

17   A.   I can't recall which one.

18   Q.   I want to direct your attention to Page 56 of your

19   deposition.

20   A.   Sure.

21   Q.   Of course, I know it's been some time since you've

22   given a deposition.  I'm not trying to suggest you're

23   lying or anything.  I just kind of want to refresh your

24   memory.

25   A.   I've done 51 projects in between Mills and today.  If

DIRECT EXAMINATION

1    I have 51 kids, I wouldn't remember.

2    Q.   Congratulations on that, yeah.  Keep you quite busy.

3    That's good.

4        All right.   Page 56 of your deposition -- and see if

5    that refreshes your recollection.

6    A.   Okay.

7    Q.   I'm starting at Line 7.  I believe it says,

8    Now, I think -- this is a question that Ms. Jenkins is

9    asking you.  She said, "Now, I think the score board

10   allowance was even higher than that.  Let's see if we

11   can't -- there has got to be another" -- and then your

12   response.

13   A.   "Yes.  It was eliminated per instructions."

14   Q.   Question, "Okay.  So you had initially included in

15   your design?"  Answer?

16   A.   "Yes."

17   Q.   "All right.  And who gave the instruction to

18   eliminate?"

19   A.   If you can scoot up just a little bit.  I know the

20   answer, but -- "Derek Scott."

21   Q.   Derek Scott. Okay.

22       So Mr. Scott had instructed you that another thing in

23   order that you needed to do to eliminate cost was to

24   eliminate the score board.  Is that correct?

25   A.   That's correct.

DIRECT EXAMINATION

1   Q.   Do you know whether that was -- do you know whether

2   or not that was for the football field, the basketball

3   field, or -- I mean, floor?

4   A.   I can't recall.

5   Q.   Can't recall.  Okay.

6        Of course, I've been out to Mills indoor practice

7   facility.

8   A.   Yes.

9   Q.   And would it be fair to say that indoor practice

10  facility is almost akin to a metal building?

11  A.   Yes.

12  Q.   Okay.  And, of course, I've gone out to Robinson

13  Middle.  I don't think you've been out to Robinson Middle,

14  have you?

15  A.   No.

16  Q.   I would challenge you to do that.

17       Have you ever gone out to the Sylvan Hills High

18  School construction project?

19  A.   No.  Sylvan Hills?  The new high school?

20  Q.   Yes.

21  A.   Yes.

22  Q.   You have?

23  A.   Yes.

24  Q.   Very large complex -- project complex.  Is that

25  correct?

DIRECT EXAMINATION

1   A.   Yes.

2   Q.   Probably almost twice the size of that of Mills High

3   School?

4   A.   Yes.

5   Q.   Also, I believe you indicated in your testimony that

6   the concession/toilet building had an original price of

7   $1,420,918.  Do you recall that?

8   A.   I don't recall, but if I said it, then yes.

9   Q.   Okay.  Of course, that had to be eliminated, yes?

10  A.   Yes.

11  Q.   I'm sorry?

12  A.   I believe so.  If I said it in deposition, then yes.

13  Q.   I think what happened was, it was supposed to have

14  been a separate -- was that supposed to have been a

15  separate building and then it was conjoined --

16  A.   Yes.

17  Q.   -- to the practice field.

18  A.   Yes.

19  Q.   And I guess that would kind of create problems when

20  you're having your student athletes going in and out of

21  the field house and then, of course, you have the public

22  right there as well.  Is that correct?

23  A.   Yes.  And then you get into crowd control and gates

24  and things like that, yes.

25  Q.   Okay.  Just a second.

CROSS-EXAMINATION

1    MR. PORTER:  Your Honor, at this time, I'll pass
2  the witness.
3    THE COURT:  Cross-examination.
4    CROSS-EXAMINATION
5  BY MR. KEES:
6  Q.   Mr. Duckery, Cody Kees.  I was at your deposition two
7  years ago.
8  A.   Yes.
9  Q.   Mr. Porter questioned you pretty extensively at the
10  desegregation case in the summer of 2020.  Is that right?
11  A.   Yes.  Yes.  Yes.
12  Q.   You sat on the witness stand like this?
13  A.   Yes.  That's where I first met you.  Yes.
14  Q.   Judge Marshall was beside you?
15  A.   Yes.
16  Q.   And you went in -- and that's the litigation where
17  the lawyers fought over the Mills versus Robinson.  Do you
18  remember that?
19  A.   Yes.
20  Q.   And then the Judge ultimately issued an order and he
21  described Mills as an A-plus school.  Do you agree with
22  that?
23  A.   Yes.
24  Q.   And then we're here at this trial about an employment
25  decision by the board related to Dr. Warren.  You didn't

REDIRECT EXAMINATION

1  have anything to do with that decision, did you?

2  A.    No, I did not.

3  Q.    Thank you, sir.

4          MR. KEES: That's all I have, Your Honor.

5                  REDIRECT EXAMINATION

6  BY MR. PORTER:

7  Q.    Mr. Duckery, whenever buildings are built, you have

8  like placards on the building.  Is that correct?

9  A.    That's correct.

10          MR. KEES: Scope, Your Honor.

11          THE COURT:  Is this within the scope of his

12  cross-examination?

13          MR. PORTER:  Well, it kind of goes to the issue

14  involving Dr. Warren, Your Honor, as far as it relates to

15  her claim of discrimination.  So I think it's certainly

16  within that scope.

17          THE COURT:  I think his only question was, you

18  don't know anything about this.  Is this going to address

19  what he knows about that?

20          MR. PORTER:  Yes.  The placard.

21  BY MR. PORTER:

22  Q.    And, Mr. Duckery, was there some conversation that

23  you had with Dr. Remele about not wanting to have

24  Dr. Warren's name put on the placard for the Mills school?

25  A.    No.

REDIRECT EXAMINATION

1  Q.    Do you recall?

2  A.    No.

3  Q.    Hold on just a second.

4  A.    Not that I can recall.

5  Q.    Sir, WD&D hopes to do future business with the

6  Pulaski County Special School District.  Is that a fair

7  statement?

8  A.    I'm sorry?

9  Q.    I said certainly --

10         MR. KEES:  Scope, Your Honor.

11         MR. PORTER:  Never mind.  I'll strike that.  I'm

12  going back to my original question.  I'm sorry.

13  BY MR. PORTER:

14  Q.    Of course, you were asked a question about did Judge

15  Marshall say that the Mills High School was an A-plus

16  building.

17  A.    Yes.

18  Q.    And, of course, he gave a much higher score for that

19  of Robinson, correct?

20  A.    He said they were not equal, yes.

21  Q.    All right.  So just because it is an A-plus building,

22  the requirement had to be that the district had to make

23  those constructions equal, correct?

24  A.    Correct.

25  Q.    And you already testified, of course, the buildings

REDIRECT EXAMINATION

1   were not equal, yes?

2   A.   Correct.

3   Q.   Do you recall being asked the question, Mr. Duckery,

4   about cornerstone during your deposition?

5   A.   I believe so, but I think, when I was asked that, I

6   might have done a correction and said building plaque.

7   Q.   Okay.

8   A.   Maybe.  Can't quite recall, but I think it went -- I

9   think it went something like that.  I'm not for sure.

10  Q.   In other words, rather than having a cornerstone like

11  at our church --

12  A.   Right, because the cornerstone is on the outside of

13  the building.  It's concrete and it sits at the corner

14  versus a building plaque that's on the inside in the

15  vestibule just beyond the entry or something like that.

16  So I think I was just trying to -- I think I was just

17  trying to clarify the terminology.

18  Q.   Got you.  I recall that in your testimony.

19       All right.  Thank you.  Appreciate you.

20       THE COURT:  Mr. Duckery, you can stand down and

21  you're free to go.

22                    *  *  *  *  *

23              REPORTER'S CERTIFICATE

24      I, Valarie D., Flora, CCR, certify that the foregoing

25  is a correct transcript of proceedings in the

Valarie D. Flora, FCRR, TX-CSR, AR-CCR
United States Court Reporter
Valarie_Flora@ared.uscourts.gov  (501) 604-5105

REDIRECT EXAMINATION

1   above-entitled matter.

2        Dated this the 1st day of April, 2022.

3

4   /s/ Valarie D. Flora, CCR

5   -------------------------

6   United States Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25