1          IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF ARKANSAS
2                    CENTRAL DIVISION

3

4    JANICE HARGROVE WARREN

5                    Plaintiff,        No. 4:19-cv-00655-BSM

6          vs.                         February 15, 2022

7    MIKE KEMP, et al.,
                                       Little Rock, Arkansas
8                    Defendants.       1:11 p.m.

9

10        **TRANSCRIPT OF TESTIMONY OF MARGIE POWELL**
           BEFORE THE HONORABLE BRIAN S. MILLER,
          UNITED STATES DISTRICT JUDGE, and a jury

11

12   APPEARANCES:

13   On Behalf of the Plaintiff:

14        SARAH HOWARD JENKINS, Attorney at Law
            Post Office Box 242694
15          Little Rock, Arkansas  72223

16

17   On Behalf of the Defendants:

18        MR. W. CODY KEES, Attorney at Law
            JAY BEQUETTE, Attorney at Law
19          424 West Capitol Avenue
            Suite 3200
20          Little Rock, Arkansas  72201-3469

21        Proceedings reported by machine stenography ^ and displayed
     in realtime; transcript prepared utilizing computer-aided
22   transcription.

23

24

25

1

2                          I N D E X

3                            EXCERPT

4

5   PLAINTIFF'S WITNESS

6                     Direct  Cross  Redirect Recross Redirect

7   MARGIE POWELL          5     26     28      28      30

8

9   Court Reporter's Certificate............................ 30

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                         * * * * *
 3            THE COURT:  Ms. Jenkins, call your next witness.
 4            MS. JENKINS:  Your Honor, Plaintiffs call Margie
 5   Powell.
 6            THE COURT:  Ms. Powell.  We call Margie Powell,
 7   please.
 8            Ms. Powell, if you would come on down.  Ms. Powell, if
 9   you would raise your right hand?
10         MARGIE POWELL, PLAINTIFF'S WITNESS, DULY SWORN
11            THE COURT:  Ms. Powell, it's probably been what twelve
12   years since you have testified in this courtroom?
13            THE WITNESS:  You missed out on Judge Marshall.
14            THE COURT:  No, you have been testifying in another
15   courtroom, not this courtroom.
16            THE WITNESS:  I don't even think this courtroom was
17   here, was it?
18            THE COURT:  It was here.  This is where I have been
19   all along.
20            THE WITNESS:  I'm kind of senile now.
21            THE COURT:  All right.
22            MR. PORTER:  She probably thought, Your Honor, she was
23   testifying in court.
24            THE COURT:  She probably did.
25         All right.  Ms. Powell, if you feel comfortable removing
```

1    your mask to speak you can, but you don't have to.

2              THE WITNESS:  I want to.

3              THE COURT:  Okay.  I think you're far enough away.

4    We're spread out enough.

5              THE WITNESS:  This is going to get caught in my

6    earring, you know that, don't you?

7         Hang on.  Don't let me forget I have got one earring.

8              THE COURT:  Okay.  Ms. Jenkins, you can inquire of the

9    witness.

10             MS. JENKINS:  Yes.

11                       DIRECT EXAMINATION

12   BY MS. JENKINS:

13   Q.   Would you state your -- first of all, thank you for coming.

14        Would you state your name, current occupation, if any, your

15   gender and your race?

16   A.   My waist?

17   Q.   No, race.

18   A.   Okay.  Margie Powell.  I am currently retired for now.  I

19   am African-American.  And then what else did you tell me?

20   Q.   Gender.

21   A.   Female last time I looked.

22   Q.   Tell us a little bit about your work history, your work

23   experience?

24   A.   In my last capacity, because I have had 5,000 jobs almost?

25   Q.   Yes.  Your last capacity, please.

1    A.    Thanks to Judge Miller, I was appointed the director of the

2    then Office of Desegregation Monitoring.  Prior to that, I was

3    called an associates monitor.  We all had -- all of the monitors

4    had different areas that they monitored.  Mine was basically

5    discipline, technical education, counseling, and something else.

6    It's been a minute.

7    Q.    So when were you appointed as a monitor?

8    A.    In July of 1991.

9    Q.    And where?

10   A.    In Little Rock.

11   Q.    All right.  Here in Little Rock?

12   A.    Yes.  Uh-huh.

13   Q.    And so what kind of activities did you engage in?

14   A.    Well, we were -- I need to give you a little background

15   about that, so it will make sense to you.  Our office was the

16   first of its kind in the nation.  Most other cases similar to

17   these did not have a consent decree, and this case did.  So we

18   had to develop what our monitoring office had to do.  We had no

19   one to go by, nothing to go by.  So studying all of the

20   obligations, that sort of thing, we worked together to determine

21   monitoring strategies, how we would look at it, how to make sure

22   we were fair, how to engage the school district personnel, as

23   well, at that time Joshua, to make sure we were all connecting

24   and speaking the same language.

25   Q.    When you said these cases, this is not a deseg case.  What

1    case are you referring to?

2    A.    Little Rock School District versus Pulaski County and

3    Department of Education.

4    Q.    All right.  Thank you.  And how long did you serve as a

5    monitor in the Office of Desegregation Monitoring?

6    A.    Until 2014.

7    Q.    And what sort of -- and in that role, would you tell us

8    again what you did and who you worked with?

9    A.    Well, I worked with -- are you talking about from the

10   beginning, or as the chief monitor at the time?  What time frame

11   are you referring?

12   Q.    When you began in 1991.

13   A.    Okay.

14   Q.    How long were you in that position, and when did you move

15   to chief monitor?

16   A.    Okay.  I was in that position, I started out as associate

17   monitor.  All of the monitors started out that way.  And at that

18   time Ann Brown was the director of the Office of Desegregation

19   Monitoring, and she hired all of us.  As I said before, rather

20   than being repetitious, we all had areas that we monitored and

21   we collaborated on, because we all came from different

22   backgrounds to form something that would be a whole and useful

23   district wide.  I served in that capacity as an associate

24   monitor until after Ann -- Judge Andree Roaf was assigned to

25   replace her, and Judge Roaf died in the office.  As a matter of

1    fact, she died in my arms.  So that left us without a leader at

2    the time.  By then several of the members of the original

3    monitoring team had moved on, but Judge Miller gave me the

4    assignment in --

5                 THE WITNESS:  Was it 2014?

6                 THE COURT:  I can't testify.

7                 THE WITNESS:  I get him and Marshall, I have been with

8    the two of them, but I think it was 2014.  So you guys won't

9    think I'm completely nuts, I wrote some of this down so I

10   wouldn't forget it and I forgot it already.

11        Okay.  I was appointed December 4, 2009, by Judge Miller as

12   the director.

13   BY MS. JENKINS:

14   Q.   As the director?

15   A.   That is what -- really, that was a technical name, but

16   monitor was fine.

17   Q.   All right.  And you served in that capacity until 2014?

18   A.   That's right.  On June 24th, Judge Marshall asked me to be

19   his court expert.

20   Q.   And what did you do as court expert?

21   A.   It was my job to monitor the district still in the areas

22   that they were still under court supervision, to write reports

23   as needed, or requested by the judge, or if I felt they were

24   needed and to report back to the court.  Also to work with the

25   districts to help them to implement their plans correctly, and

1   if I thought that they might need some help or going in the

2   wrong direction I could advise them and they could take it or

3   leave it, but they were pretty cooperative about that.

4   Q.    In that role, did you work with Dr. Janice Warren?

5   A.    Oh, yes.  Oh, yes.

6   Q.    And what was your assessment of her performance as

7   Assistant Superintendant of Equity and Pupil Services?

8   A.    Well, I have to say in all areas of my opinion that I

9   talked to her about, she was probably the best assistant

10  superintendant, certainly superintendent-worthy person I had

11  seen in all of the school districts since I had been in this

12  position.

13  Q.    Why do you say that?

14  A.    Because for one thing, in my opinion, educators tend to use

15  knowledge as weapons, so they hoard it.  She shared everything,

16  as far as I could tell, with her staff, with the teachers, and

17  with the administrators, so that everybody was on the same page.

18  And she got the district personnel to finally buy in to actually

19  honoring their plan.  And you could see the difference

20  immediately starting in the different areas that I looked at.

21  So I think she did a great job.

22  Q.    Did you inform the Court of your assessment of her

23  performance at any time?

24  A.    I did.  As a matter of fact, one of the things we did not

25  do as a rule in the Office of Desegregation Monitoring was to

1  single out any personnel in the district and put them in our

2  report.  But I thought at that time, because Dr. Warren, at that

3  time, was doing two jobs and getting paid for one, but that is a

4  whole other issue, but I had to make a mention of her in one of

5  my last reports about what a wonderful job she has done, and how

6  far she had brought the District in getting unitary status.

7  Q.  Thank you.  What did you observe in terms of Dr. Warren's

8  approach to monitoring?

9  A.  She was very open.  That's where it helped the district,

10 quite frankly, especially with our office.  She didn't try to

11 hide anything.  If something went wrong, she would mention it.

12 She would ask for assistance, if necessary, from us.  She was

13 very, very candid and open about it.

14 Q.  Let's look at Plan 2000.

15 And that's Exhibit 4.  Let's look at the monitoring

16 requirements.

17 A.  Okay.

18 Q.  That's on Page 7, Category N.  Just take a look at that and

19 when you have read it look up.

20 A.  I'm ready.

21 Q.  All right.  What was required of the assistant

22 superintendant for desegregation under the category of

23 monitoring?

24 A.  Well, the super -- you mean at this time, when this was

25 written?

1    Q.    Yes.

2    A.    Okay.  As far as I can remember, to be honest with you,

3    it's been some time, was to provide guidance to her different,

4    or his or her different departments, and to coordinate with them

5    the activities that they were doing that met this particular

6    stipulation in their plan, and to suggest changes of course, or

7    to give advice or to get input from others to get this done.

8    But one of the things that you have to remember about monitoring

9    was that the State of Arkansas Department of Education required

10   it also.  So they had to monitor one way or the other.  The

11   difference is what was asked for monitoring from the Department

12   of Education versus what was asked by us.  We were looking at

13   the plan.  The Department of Education, of course, has their own

14   rules and things they want them to get them, but we didn't look

15   at that.

16   Q.    So what is monitoring?

17   A.    Monitoring is -- these are just regular terms.  Paying

18   attention to what is going on in specific areas that you are

19   working with, whether it's education or football.  But to see is

20   the job being done.  If it is being done, is it being done

21   properly.  If it's not being done properly, what do we need to

22   do to make it work basically.

23   Q.    So would you read for us Paragraph 1?

24   A.    The assistant superintendent?

25   Q.    Yes.

1    A.    The assistant superintendent for desegregation shall

2    develop a plan, so that he or she and his or her staff focus

3    their monitoring and compliance efforts on the specific elements

4    of this plan, and provide the Joshua Intervenors within the 30

5    days of the court's approval this plan, a list geared to the

6    sections of this plan, identifying the staff member or members

7    with particular responsibilities for its implementation and the

8    position held by each.

9    Q.    So if she accomplishes those tasks, she has successfully

10   accomplished monitoring?

11   A.    Yes.  But remember, this was written in 2000.  They didn't

12   have that position anymore by the time Dr. Warren got there.  So

13   in my monitoring, when I did my report I didn't really look at

14   this because this was something that was already accomplished

15   and done back in 2000.

16   Q.    All right.  So what did you look at?

17   A.    The main thing, I made sure that they had filed their

18   report that they were supposed to with the Department of

19   Education as well as the monitoring reports that they would

20   submit to the Department of Education.

21   Q.    All right.  Let's take a look at Exhibit 37.  Have you seen

22   this document before?

23   A.    Yes.

24   Q.    And what is this document, and what is your evaluation of

25   it?

1    A.   Well, this is one of the school district's monitoring

2    compliance reports that not only did they submit to us, but they

3    probably submitted to the Department of Education also.  And it

4    covered the areas in their plan that was still under court

5    supervision, as far as what I looked at, and what had been

6    accomplished or not accomplished and what they thought was

7    achieved or not achieved.  And if it wasn't achieved, what they

8    were going to do about it.

9    Q.   And what was your assessment of this report, this is --

10   A.   I thought it was fine.  It answered all of the aspects that

11   I was looking at.

12   Q.   All right.  Was there anything unique implemented by

13   Dr. Warren and her team?

14   A.   Well, probably several things.  You caught me off guard

15   with that.

16   Q.   I'm sorry.

17   A.   I'm not sure what you mean by that.

18   Q.   As compared to how monitoring happened before Dr. Warren

19   was in the position, how does this compare?

20   A.   Well, one of the things was that they actually looked at

21   what was supposed to be looked at, made notes on it, made a

22   report on it, and then evaluated where it was, as far as

23   compliance with the plan, so that you could see movement or non

24   movement, compliance or noncompliance.  Quite frankly, in the

25   years before this, she started doing this, and I'm just going to

1    say, the district would put out their monitoring reports and all

2    they did was change the dates.

3    Q.    All right.  All right.  Let's just scroll down to Page 7,

4    which deals with discipline.  Would you just kind of tell us

5    what this Table 9 refers to?

6    A.    Well, basically it is to show exactly what was being done

7    within the area of discipline.  So they had to put down all of

8    the records of disciplinary actions, totals and percentages in

9    each school district by race and gender, and then look at those

10   things and say, we are still having problems at this school or

11   we are having problems in this area, and what are we gonna do to

12   fix it.

13   Q.    All right.  In May of 2021, last summer, Judge Marshall

14   released PCSSD from several areas.  Do you recall which areas

15   that he released PCSSD in?

16   A.    It was my understanding, released them in all except for

17   facilities.

18   Q.    All right.  Let's look at Exhibit 35.  You mentioned that

19   as part of your role working with Judge Marshall that you

20   occasionally provided reports?

21   A.    Yes.

22   Q.    Did you do that on a recurring basis?

23   A.    Not in the last few years, no.  The reports I did mostly

24   under Judge Marshall were ones he requested.

25   Q.    All right.  Can you describe what the document is on the

1   screen, ma'am?

2   A.   That is a report that Judge Marshall asked me to do with

3   respect to the differences between Robinson Sports Complex and

4   the Mills Sport Complex and define or discuss or describe the

5   inequities, if any, that there were.

6   Q.   What did you find?

7   A.   I found inequities, and some of them were rather gross, as

8   I put in my report.

9   Q.   Can you describe those inequities?

10  A.   Well, particularly of quality and quantity if you want to

11  make it simple.  The Robinson Complex was, in my opinion, almost

12  like a college campus, better than some college campuses that I

13  have been on.  They had all of the bells and whistles and their

14  facilities were beautiful.  Mills was nice, and I'm not saying

15  there was anything bad about it, but it wasn't up to the same

16  standard as Robinson, particularly their sport complex.  The

17  coach had no office.  Their female athletes had no place to

18  change clothes or to -- a room of their own.  The location from

19  some spots were difficult to get to.  The furniture was

20  different.  The equipment room was smaller.  I'm trying to

21  think.  They didn't have nearly the space to work with that

22  Robinson had.  And I'm just thinking off the top of my head.  I

23  could look at this report and tell you, but I'm trying to

24  remember that.  That's basically what I remember it being.  And

25  it was very disappointing, to be honest.

1   Q.   As part of this report, you met with a Dr. Jerry Guess?

2   A.   I did.

3   Q.   Could you share with us what exactly -- what he shared with

4   you?

5   A.   Well, I was trying to find my notes on that, because I

6   remember he and I met speaking about the facilities, and he told

7   me that he was -- he would have to --

8             MR. BEQUETTE:  Objection to the hearsay, Your Honor.

9             THE COURT:  I'll sustain the objection.

10            MS. JENKINS:  Your Honor, do I get a chance to argue?

11            THE COURT:  You can.

12            MS. JENKINS:  Okay.

13            THE COURT:  She was testifying as to what somebody

14   told her.  What's the response?

15            MS. JENKINS:  The response is it is a statement

16   against a party.

17       At the time the statement was made that she reported, he

18   was superintendant.  And I believe that falls within 801.

19            THE COURT:  Hold on just a second.  The question was:

20   As part of the report, you met with Dr. Jerry Guess?

21       The answer was:  I did.

22       The question was:  Could you share with us what exactly he

23   shared with you?

24       And Dr. Guess was the superintendant for the school

25   district at the time he made the statement, so he -- that is a

1   statement by a party opponent, as he was.

2              MS. JENKINS:  Yes.

3              THE COURT:  A member of Pulaski County at the time.

4        Do you want to answer that, Mr. Kees, do you want to -- oh,

5   Mr. Bequette?

6              MR. BEQUETTE:  No, Your Honor.

7              THE COURT:  The objection is overruled.

8        You can testify as to what Dr. Guess told you.

9              THE WITNESS:  I found my report and my notes also.

10  And the statement I made in my report that was filed with the

11  Court were the words that Dr. Guess used with me when I

12  interviewed him about the facilities issue.  And he, as I said,

13  you can look on this -- your own exhibit here.  It said he was

14  trying to save some money, put the money in a rainy day account.

15  And that he -- it was -- the issue of the inequities were his

16  fault.

17  BY MS. JENKINS:

18  Q.   All right.

19  A.   He said -- and his words were, the buck stops with me.

20  Q.   Did you -- did he comment about who was in charge?

21  A.   Well, in that Derek Scott, I believe at the time, was the

22  person in charge of construction at that time.  And my

23  impression was that he left most of the decisions up to

24  Mr. Guess.  I mean Mr. Scott.  I'm sorry.

25  Q.   That it was your impression that Dr. Guess --

1    A.    Dr. Guess relied on Derek Scott to handle the facilities

2    and construction.

3    Q.    All right.  Let's look at -- go back to Plan 2000.  And as

4    we are going that direction, you mentioned you have been a

5    monitor since --

6    A.    1991.

7    Q.    Yes.  When you toured and assessed the inequities between

8    these two facilities, were you able to assess that yourself, or

9    did you have someone accompany you?

10   A.    I had coaches accompany me, and one of the heads of the

11   maintenance department at one time, I believe, with me, or in

12   that particular schools, but mostly I had the coaches and their

13   assistants showing me.

14   Q.    So why did you have them accompany you?

15   A.    Because they knew more about sport than I did as far as,

16   you know, equipment, what was appropriate as far as size.  I

17   would never have thought about changing rooms and those sorts of

18   things.

19   Q.    All right.  So your work as a monitor didn't prepare you to

20   assess physical facilities?

21   A.    Well, we -- part of our monitoring --

22         Is it okay for me to show her something, Judge, that we

23   used as a monitoring tool?

24         Because we all had to monitor facilities, but I was not the

25   expert in the office on facilities.  Mrs. Guzman (phonetic)

1  was -- she has since gone.  Facilities was my last choice for

2  anything to monitor.  I'll tell you that upfront, but what we

3  did was we developed a monitoring tool for facilities.

4           MS. JENKINS:  You want to share that with the judge?

5           THE COURT:  Come and take a look at it.  And if you

6  want to, Mr. Bequette, you can come and look at this document.

7           THE WITNESS:  Sorry.  I didn't think about that.  We

8  called these -- we called them slot visits, because most of the

9  time we get this at the beginning of the school year, and we did

10 this to make sure that the schools were ready for students and

11 teachers and for school.  And we got a lot of backlash sometimes

12 from the school.  They started calling us the -- what is the --

13 portable potty monitors or something, because we would get onto

14 everybody about unclean restrooms and that sort of thing, but we

15 all had specific areas.  So we had someone who looked at the

16 gyms and sports areas.  I didn't do that.  Mostly what I looked

17 at were like counseling centers and places like that.  The

18 library.

19 BY MS. JENKINS:

20 Q.    Let's take a look at Exhibit 72.  Do you recognize this

21 document?

22 A.    Yes.

23 Q.    And can you tell us what it is?

24 A.    It is the minutes of one of our -- we call status meetings

25 with the Department of Education and the parties in my office.

1   Q.    All right.  So, these status meetings were between the

2   schools, the Federal Court representative and the state of

3   Arkansas, ADE?

4   A.    Yes.

5   Q.    Now were these just quiet little luncheons where people

6   chitchatted about what was going on?  What was the character of

7   these meetings?

8   A.    No.  They were very seldom quiet little meetings.  Let me

9   tell you that part.  Basically, each school district or --

10  depending on what the meeting was about.  It might be one if it

11  was a big issue.  We discussed a specific area of the plan, what

12  the district was doing, will do, and the areas that they thought

13  that, you know, they might want to exhibit and show off, or

14  those that they were having trouble with.  And if necessary, to

15  ask for help.

16  Q.    This is a December 5th, 2013.  The date of this particular

17  document is December 5th, 2013.

18  A.    Okay.

19  Q.    So these meetings began quite some time ago?

20  A.    Yes.  Yes.

21  Q.    And they continued on a monthly basis, where you all sat

22  and talked about facilities or monitoring or student

23  achievement, depending on what was on the schedule for that

24  time; is that correct?

25  A.    Right.  And it continued without the Department of

1    Education, when they were released from Court supervision up

2    until this past May when Judge Marshall issued his order.  We

3    had just met the night before that, as a matter of fact.

4    Q.    All right.  Let's look at another one of these.  Let's look

5    at Exhibit 31.  Would you tell us who was in attendance, and

6    their capacity, if you remember?

7    A.    Well, according to this, and I'm not going to lie and say I

8    remember it exactly, but it says, Dr. Guess, Willie Marshall, he

9    is Department of Education, myself, Attorney Walker.  At that

10   time regular Joy Springer, and now Representative Joy Springer.

11   Dr. Owoh, Scott Richardson.

12   Q.    Who was Scott Richardson?

13   A.    Scott worked for -- you ask me these names.  I forgot.  He

14   was.  I want to say he had something to do with facilities, but

15   don't get me wrong about that.

16   Q.    Okay.

17   A.    It's been a long time.  I tell you.

18   Q.    Let's turn over to -- first, let's look at Bullet Point 1.

19   A.    Okay.  Pull it up a little bit.  Okay.  Thank you.

20   Q.    Would you read that for us?

21   A.    I welcome everyone to the meeting, that part?

22   Q.    Excuse me?

23   A.    I welcome everyone to the meeting?

24   Q.    No, the second bullet point.

25   A.    Oh, the second bullet point.

1        Mr. Scott stated that the district was on time and on

2   budget with the current construction projects.  The replacement

3   of Mills High and Robinson Middle School.  He stated the Mills

4   project was proceeding, the building pad was ready for

5   foundation and the football field is ready.  Mr. Scott added

6   that students had been removed from the northeast section of the

7   site and the site turned over to construction, so that they

8   could begin.

9   Q.   All right.  The next bullet point, tell us what happened.

10  A.   Mr. Walker -- you want me to read that or just tell you

11  what happened?

12  Q.   If you remember what happened, just tell us.

13  A.   Well, Attorney Walker got upset about the disparity in the

14  amounts of money being spent on both projects, and the inequity

15  of it all.  He referred to the cost that it took to build

16  Maumelle, and then replacement for Mills, which was almost like

17  20 million dollars difference.  He then -- I remember he was

18  just flat out saying that they were unequal.

19  Q.   Dr. Warren was at that meeting.  As a monitor, what

20  responsibility did she saw have when Mr. Walker announced his

21  disappointment in the disparity?

22  A.   Well, Dr. Warren was not involved with facilities in any

23  authoritarian or authority wise, as far as I knew.  She had very

24  little to do with that.  She dealt with academics.  And it was

25  her main role to improve achievement and improve discipline and

1    that sort of thing.  I don't think she had very much, that I

2    could see, I never spoke to her really about facilities.

3    Q.   All right.  Thank you.

4         I want you to look at another document.  I'm going to

5    project it.  Can you see that on the -- do you recognize this

6    document at all?

7    A.   Well --

8              MR. BEQUETTE:  Your Honor, is there an exhibit number

9    for this document?

10             MS. JENKINS:  I'm sorry.  Yes, there is one.

11             THE WITNESS:  Specifically, do I recognize it, or do I

12   recognize the format?

13   BY MS. JENKINS:

14   Q.   The format of it.

15   A.   I recognize the format of it.

16   Q.   Give me one second and let me give them the exhibit number.

17   A.   Sure.

18             MS. JENKINS:  Exhibit 36.

19   BY MS. JENKINS:

20   Q.   Let me make sure I have got the right one.  Let's just use

21   36.  We don't have the correct one in front of me.  There.  It's

22   a -- do you recognize that form?

23   A.   Yes.

24   Q.   All right.  And tell us the source of this document, the

25   authors of it and its function?

1  A.   Well, Mr. Morris was a part of the monitoring team for the

2  Department of Education, and he represented them at our status

3  meetings.  And he would give us information on what they were

4  doing or not doing and --

5  Q.   When you say they, is that the Department of Education?

6  A.   Department of Education, yes, I'm sorry.  Department of

7  Education.  And what they saw that the districts were doing.

8  Q.   Do you recall how frequently the Department of Education

9  did their monitoring of the school district?

10  A.   If I recall correctly, I would -- I think it was four times

11  a year, and I might be completely wrong, but it was -- I assume

12  it was quarterly.

13  Q.   All right.  So quarterly the Department of Education came

14  in and monitored, inspected.  All right?

15  A.   That's what they said.

16  Q.   Then PCSSD hosted the monthly monitoring meetings that you

17  discussed earlier?

18  A.   Right.  It was before Jacksonville became an entity to its

19  own, so they would only host -- of course Mr. Walker's office

20  would host it sometimes.

21  Q.   So they rotated who hosted those monitoring meetings?

22  A.   Yes.

23  Q.   And then you monitored as the judge asked you to?

24  A.   Well, yes.  And if there was something, for instance, that

25  that I picked up on as an issue, I would look at it anyway.  If

1    I felt like he needed a report, I would give him one, but I kept

2    those notes for myself.

3    Q.    Okay.  How were the inequities missed with all of that

4    monitoring from three different levels and directions?

5    A.    Well, I can't speak for them, but my feelings are that --

6    mind you, particularly when you are talking about construction,

7    if that is what you are talking about.  As far as I know, none

8    of us had any background in construction.  I couldn't tell you

9    an I-beam from a Z-beam if that was the case.  So I think that

10   we took it -- I know I took the words of the people who were

11   reporting, because I had no way of proving them wrong other than

12   visually looking at things when I was told that there was some

13   discrepancies in the building materials and that sort of thing.

14   So I had to learn at that time to recognize some things.

15   Q.    So once you had noticed, you learned what had to --

16   A.    Yeah.  What should be there and what didn't have to be

17   there and that sort of thing, because that's not my background

18   at all.

19   Q.    All right.

20            MS. JENKINS:  That's all I have.

21            THE COURT:  All right.  Cross-examination.

22            MS. JENKINS:  I do have one other question.  I'm

23   sorry.  May I ask it?

24            THE COURT:  Yes.

25            MS. JENKINS:  Thank you.  One last question.

1   BY MS. JENKINS:

2   Q.    Did you ever meet Derek Scott?

3   A.    Yes.

4   Q.    And what was his race?

5   A.    White.

6   Q.    Thank you.

7   A.    We would tease each other -- we were both in the military,

8   so we would kind of get at it.  Of course Navy, of course, being

9   the best.

10                      CROSS-EXAMINATION

11  BY MR. BEQUETTE:

12  Q.    I think I just have a few questions for you, Ms. Powell.

13  Good to see you again today.

14  A.    Yes.  How are you?  It's been a minute.

15  Q.    It has.  So you were testifying --

16        How do we get this switched over here, if we could?

17            Great.

18        So you remember this.  This is the recap of the meeting.

19  We have got it as Defendant's Exhibit 3, but this is the recap

20  of that meeting November 30, 2016.  And on the second page we

21  see here that Mr. Walker basically said hey, Robinson Middle is

22  nicer than the Mills Facility.  Walker said hey, the facilities

23  have to be equal.  There is a growth disparity.  So talking

24  about the disparities between Robinson Middle and the Mills High

25  School project, correct?

1  A.    Uh-huh.

2  Q.    Then moving several months later, I think you testified, or

3  it is in the record that in September of 2017, a few months

4  after this recap or this meeting, Judge Marshall asked you to do

5  a report about those disparities?

6  A.    Yes.

7  Q.    Correct?

8  A.    That's correct.

9  Q.    But those disparities that were talked about in court in

10  Judge Marshall's court in September of 2017, they were no

11  surprise and known to you and all of the participants in this

12  meeting back in late 2016, including Dr. Warren, correct?

13  A.    As far as I know.

14  Q.    Right.  Because everybody was -- I mean, people were

15  talking about them?

16  A.    They were talking about inequities, yes.

17  Q.    Right.  And Mr. Walker, you know, the attorney for the

18  intervenors, you didn't know Mr. Walker to have any particular

19  expertise in construction, did you?

20  A.    No.

21  Q.    He was just talking about what, you know, anyone could see

22  in plain sight, correct?

23  A.    Right.

24          MR. BEQUETTE:  Okay.  Nothing further.  Thank you.

25          THE COURT:  Any redirect?

 1            MS. JENKINS:  Yes.
 2                      REDIRECT EXAMINATION
 3   BY MS. JENKINS:
 4   Q.    At the meeting when Mr. Walker was complaining, was he
 5   complaining about specifics in the construction, or was he
 6   talking about the valuation, the amount of money that was being
 7   committed for the construction?
 8   A.    At that time, it was basically about the money.  Because he
 9   knew that there is no way that mills would have the same quality
10   and or quantity of things that Robinson already had.
11   Q.    So the construction inequities were not in plain sight, it
12   was his anticipated result from the amount of money invested?
13   A.    Right.  And they had drawings up there of -- but nothing
14   specific, you know, like all the little doodads that got
15   everybody in trouble.  It was just some architectural drawings.
16            MS. JENKINS:  All right.  Thank you.
17            MR. BEQUETTE:  Just one more question, Ms. Powell.
18                      RECROSS-EXAMINATION
19   BY MR. BEQUETTE:
20   Q.    So, I think I heard you just tell Ms. Jenkins that Mr.
21   Walker was talking exclusively about the disparity in money
22   being spent, correct?
23   A.    Yes.  We remembered something that happened some time ago.
24   That was the main argument for a while.
25   Q.    Right.  But you remember in this letter down here toward

1   the bottom?

2   A.   Okay.

3   Q.   Mr. Walker had obviously seen the facility, at least Mills,

4   because he compared Mills to the jail?

5   A.   But see the thing about Mills at that time, there was

6   hardly enough of it to really compare, because they had not

7   gotten to all of the extras, you know, what they call the more

8   decorative.  Size was more the problem with Mills, because it

9   didn't have like a coach's headquarters in there.  It didn't

10  have facilities for females.  And Robinson, of course, you know,

11  has that extra second floor.  So that makes a whole lot of

12  difference too.  So they can have parties.  And Mills didn't

13  have any of that.

14  Q.   You are not accusing Mr. Walker of misrepresenting the

15  facts, are you?

16  A.   No.

17  Q.   This was his statement, right?

18  A.   Where are you?

19  Q.   Down here at the bottom where it says, Mr. Walker compared

20  the replacement Mills facility to the Pulaski County Jail?

21  A.   Well, you know Mr. Walker could be a bit of a hyperbole

22  person.

23  Q.   You think?  Appreciated you.

24           THE COURT:  Anything further?

25           MS. JENKINS:  Yes, I do, Your Honor.  Give me one

1    second.

2                      REDIRECT EXAMINATION

3    BY MS. JENKINS:

4    Q.   I'm looking for the December 7th, 2016.

5             MR. KEES:  Exhibit 31.

6             MS. JENKINS:  Thank you.

7        Would you project it?

8             All right.  Scroll down to -- no.  No.  31.

9    BY MS. JENKINS:

10   Q.   Yes.  Scroll down to Bullet Point 2.  Would you read that

11   second bullet point?

12   A.   During the stuff with Mr. Scott?

13   Q.   Yes, please.

14   A.   Mr. Scott stated that the District was on time and on

15   budget with the current construction projects.  The replacement

16   of Mills High and Robinson Middle Schools.  He stated the Mills

17   project was proceeding, the building pad is ready for

18   foundation.

19   Q.   Stop.  The building pad?

20   A.   Right.

21   Q.   Was ready for foundation.  So the foundation hadn't been

22   laid yet?

23   A.   That's correct.

24   Q.   All right.

25             MS. JENKINS:  No further questions, Your Honor.

1         THE COURT:  All right.  Ms. Powell, you can stand

2    down.  Good so to see you again.

3         THE WITNESS:  Can I go home?

4         THE COURT:  Yes, you can go home.

5      (Testimony ended at 1:56 p.m.)

6                    REPORTER'S CERTIFICATE

7      I certify that the foregoing is a current transcript from
     the record of proceedings in the above-entitled matter.

8
     /s/Teresa Hollingsworth, CCR        Date:  March 31, 2022.
9    United States Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25