## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**JANICE HARGROVE WARREN**                                      **PLAINTIFF**

**v.**                              **Case No. 4:19-cv-00655-BSM**

**KEMP, et al.**                                              **DEFENDANTS**

### PLAINTIFF'S BRIEF IN SUPPORT OF HER MOTION FOR RECONSIDERATION

### PROCEDURAL POSTURE

This action is a civil rights action brought by Dr. Janice Warren against Pulaski County Special School District ("PCSSD") and the members of its Board in both their official and individual capacities pursuant to 42 U.S.C.A. § 2000e, Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C.A. § 1981, as amended by the Civil Rights Act of 1991; 42 U.S.C.A. § 1983, and pursuant to the Fourteenth Amendment to the United States Constitution. This matter was tried to a jury of eight (8) citizens from February 14, 2022, to February 25, 2022, and resulted in a jury verdict in the Plaintiff's favor on her claims of Retaliation. On April 21, 2022, this Court issued its order denying Plaintiff's Motion for Equitable Relief in part on the question of her equitable right to additional back pay and front pay. Dr. Warren seeks this Court's reconsideration of its order to avoid manifest errors of fact and law.

### RELEVANT FACTS

Dr. Janice Warren, a black female, served as Superintendent of Crossett School District for ten years. When she commenced her tenure as Superintendent, the district was in fiscal

1

distress, and the district's high school and middle schools were in academic distress. During her service, she led the district out of fiscal distress within two years and reduced the achievement gap between white and black students in a district with a racial composition that shifted from 60% white, 40% black to 56% white, 42% black, 2% other. She retired from her position as Superintendent of Crossett School District in May of 2011 and moved to North Little Rock to be close to her grandchildren. After her move, Dr. Warren worked as an auditor for the Arkansas Department of Education, evaluating failing schools and recommending corrective action. While evaluating one of PCSSD's elementary schools, she was approached by PCSSD's Assistant Superintendent for Human Resources about joining PCSSD's staff. In the summer of 2012, Dr. Warren commenced her services at PCSSD as Director of Elementary Education. Later, in 2013, the responsibilities of Interim Assistant Superintendent for Equity and Pupil Services ("Asst. Super. for Equity") were added to her plate.

On July 18, 2017, the PCSSD Board of Education ("Board") terminated Dr. Guess as Superintendent of PCSSD and promoted Dr. Janice Warren from her position of Asst. Super. for Equity to Interim Superintendent. She was the first female to lead PCSSD. Less than 40 days into her tenure as Interim Superintendent, an irate Mills parent called Dr. Warren and complained about the inequitable construction of Mills athletic facility in the predominately black community as compared with the Robinson athletic facility in a predominately white community. Dr. Warren viewed video footage and, as required by the terms and conditions of her employment, notified the Board, PCSSD's attorney, and thereby the Federal Court of PCSSD's discriminatory conduct. After the September 8, 2017, status hearing, Board members commenced their continuing retaliatory conduct against Dr. Warren.

In December 2017, the Board hired Ray and Associates to conduct a national search for a Superintendent. Ray and Associates used its network of associates to contact 1,177 potential applicants. Thirty-six (36) people applied. The thirty-six (36) applicants were winnowed to ten top candidates.  Nine of these top ten, five men and two women, were presented to the Board on March 27, 2018, six (6) blacks and three (3) whites. Dr. Warren was among the top nine. The Board selected three (3) males, two blacks, James Harris and Eric Pruitt, and one white, Charles McNulty, as finalists for interviews. Dr. Warren was not selected; Ray and Associates destroyed the voting matrix and other records of the Board's deliberations as directed Board President Dr. Remele. The interviews of the finalists were scheduled for April 3, 2018. The day before the interview, Mr. Harris, one of the black males, withdrew. He could not qualify for the superintendent's certification; he lacked teaching experience. Only two (2) candidates remained for interviews – McNulty and Pruitt. McNulty was the superior candidate of the three finalists, McNulty, Harris, and Pruitt, but Warren was the superior candidate of the nine candidates. On April 3, 2018, the Board offered Dr. McNulty the position a couple of hours after his interview.

Shortly thereafter, Ray and Associates approached Dr. Warren about remaining in the Ray and Associates database so that she could be considered for other positions. She agreed. When her appointment as Interim Superintendent expired on June 30, 2018, Dr. Warren returned to her position as Asst. Super. for Equity as permitted by her Interim Superintendent contract (Plaintiff's Trial Exhibit 28). In July of 2018, PCSSD posted its opening for Deputy Superintendent of Learning Services. The position would have been a promotion for Dr. Warren with a salary increase. Dr. Warren applied (Plaintiff's Trial Exhibit 33). As part of the Board's continuing retaliation, Dr. Remele opposed Dr. Warren's selection as Deputy Superintendent. Dr. McNulty offered the position to Alesia Smith, an external applicant without a doctorate, the

preferred level of professional training for the position. Ms. Smith had building level but not district level experience with implementing learning protocols.

Ms. Smith was acquainted with Advancement Via Individual Determination ("AVID"), a learning services program designed to reduce the achievement gap between white and black children. After attaining her doctorate, Alesia Smith's salary and benefits exceed Dr. Warren's by $14,289 (Plaintiff's Exhibit 1, Summary of Plaintiff's Trial Exhibit 59). Despite hiring Alesia Smith, who had AVID experience as Deputy Superintendent of Learning Services, Superintendent McNulty asked Dr. Warren to oversee the implementation of AVID throughout PCSSD to reduce the achievement gaps among PCSSD's children. In addition to her regular duties with Plan 2000 and the desegregation lawsuit, Dr. Warren used the balance of 2018 for studying, training, and observing AVID classrooms with demographics similar to PCSSD's. Plaintiff's Exhibit 2, Trial Testimony of Dr. Janice Warren, p. 66, lines 11 through 21. AVID was launched district-wide under her oversight in 2019 and has been fully implemented in grades 3 through 11 for three years.  "AVID has recognized PCSSD as one of its showcase school districts, because nowhere in the nation has anyone done full implementation of the district." *Id*., at p. 68, lines 5 through 20.  Two hundred and fifty members of PCSSD staff will receive AVID training under Dr. Warren's supervision in June 2022. *Id*., at p. 67, lines 8-21. McNulty selected Dr. Warren for AVID because of her leadership and relationship with building administrators (*Id*., at p. 66, lines 11 through 22). Indeed, he was aware of her ability to execute district wide programming (*Id*., at p. 67, lines 8 through 11). Yet, Dr. McNulty did not hire her to fill the position responsible for learning services.

Ray and Associates reached out and sought Dr. Warren's application for superintendent positions in Wisconsin, Florida, and one other location. Plaintiff's Exhibit 2, p. 86, lines 17-21.

Dr. Warren chose not to apply for those openings. She wanted to remain close to her

grandchildren. Dr. Warren remains in Ray and Associates' database.

## ISSUES PRESENTED

Motions for Reconsideration raise tension between two competing strong public policies:

preserving the finality of judgment and the incessant command of the Court's conscience that

justice is done.  Here, the command of the Court's conscience that justice is done must prevail to

avoid manifest errors of fact and law. The issues raised in this Motion for Reconsideration are:

1.      Did the defendants fail to satisfy their burden of showing that the course of

conduct Dr. Warren actually followed was so deficient as to constitute an *unreasonable* failure to

seek employment in mitigation of her damages from the defendants' egregious retaliation;

a.      Prevailing law only requires an honest, good faith effort to mitigate by a

Title VII claimant.  Dr. Warren's conduct satisfied this standard.

2.      Did the jury hear evidence that supported a conclusion that Dr. Warren failed to

mitigate her damages by seeking comparable employment;

a.       Prevailing law does not impose a duty on the claimant to accept or seek

employment at an unreasonable distance from her home (Defs' Brief in Support of their

Response to Plaintiff's Amended and Substituted Motion for Equitable and Injunctive Relief,

Dkt 185, p. 2 ¶ 2);

b.      Prevailing law does not impose on a claimant an obligation to apply for or

accept a position if the job responsibilities are substantially dissimilar to the claimant's

experience and distinguishable from the job responsibilities of the position withheld by the

defendants in violation of Title VII or other applicable law;

      c.     Defendants failed to establish that 2021-2022 Conway Public School ("Conway") superintendency was substantially equivalent to the position withheld by PCSSD and its Board from Dr. Warren in retaliation for her notifying the Board, PCSSD's attorney, and the Federal Court of PCSSD's discriminatory conduct. The jury was left to speculate on the comparative obligations and benefits.

      3.     In a failure to promote case, prevailing law requires a claimant to maintain her position with her employer unless constructively discharged. A voluntary resignation or retirement bars back pay from the date of the claimant's voluntary action.

      4.     Front pay is within the discretion of the district court.

      a.     Although this Court may not disregard the jury's findings, it must consider all circumstances as it determines a claimant's right to front pay.

      5.     Public Policy mandates the award of additional back pay and front pay in this case.

## ARGUMENT

A.    The Defendants failed to satisfy their burden of showing that the course of conduct Dr. Warren actually followed was so deficient as to constitute an *unreasonable* failure to seek employment in mitigation of her damages from defendants' egregious retaliation.

      As a Title VII claimant seeking back pay and front pay damages, Dr. Warren had a duty to mitigate her damages by exercising reasonable diligence to locate other suitable employment and to maintain a suitable job once it is located. *Baker v. John Morrell & Co.*, 263 F. Supp.2d 1161, 1171 (N.D. Iowa 2003), *aff'd*, 382 F.3d 816 (8th Cir. 2004); *E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir.1992). The burden of proving that the employee did not make reasonable efforts is on the defendant. *Di Salvo v. Chamber of Commerce*, 568 F.2d 593, 598 (8th Cir.1978); *Excel Corp. v. Bosley*, 165 F.3d 635, 639 (8th Cir.1999).

[The] defendant must show more than "that there were steps towards finding comparable employment other than those [the claimant] took; it must 'show that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment.'

[T]he employer must show that *substantially equivalent* work was available and that the claimant did not exercise reasonable diligence to obtain the employment. . . . In general, a plaintiff fails to mitigate adequately and therefore is not entitled to [back] pay to the extent he or she fails to remain in the labor market, fails to accept substantially similar employment, fails diligently to search for alternative work, or voluntarily quits alternative employment without good reason.

*Baker, supra*, at 1179 (internal citations omitted); *Equal Emp. Opportunity Comm'n v. New Prime, Inc*., No. 6:11-CV-03367-MDH, 2015 WL 8757318, at *6 (W.D. Mo. Dec. 14, 2015), quoting, *Baker, supra*, at 1179.

However, the burden on the claimant to show she mitigated her damages is less demanding. Dr. Warren need only show reasonable efforts to mitigate her damages. *Baker*, citing, *Fiedler v. Indianhead Truck Line, Inc*., 670 F.2d 806, 809 (8th Cir.1982).

Here, the Defendants did not establish that substantially equivalent work was available or that Dr. Warren did not exercise reasonable diligence. In their response to Dr. Warren's request for additional back pay and for front pay, the Defendants assert 1) that Dr. Warren failed to mitigate her damages because she did not apply for the Conway Public School's 2021-2022 superintendent's position, and 2) she did not apply for positions in Wisconsin and Florida recommended by Ray and Associates.

1.   Dr. Warren is not required to apply for or seek positions at an unreasonable distance to mitigate her damages.

After Dr. McNulty was hired in April 2018, Dr. Warren authorized Ray and Associates to include her in its database. Dr. Warren testified that Ray and Associates notified her and recommended that she apply for several superintendent positions in *Wisconsin* and *Florida*. A Title VII claimant is not required to move from his home "in order to reduce damages caused by

the [defendant's] unlawful acts." *Coleman v. City of Omaha*, 714 F.2d 804, 808 (8th Cir. 1983). It is a long-standing rule of labor law that the duty to mitigate does not require a claimant to apply for or to seek positions located at an unreasonable distance from her home in order to mitigate her damages. *Id.* In *Coleman*, the Eighth Circuit held that defendant's evidence on two police chief positions that required the ADEA claimant to leave his lifetime home was inadequate for meeting the defendant's burden on the claimant's duty to mitigate. See also *Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114, 119 (4th Cir. 1983) (the long-settled rule in the labor area is that a wrongfully discharged employee need not accept, in mitigation of damages, employment that is located an unreasonable distance from his home); *E.E.O.C. v. Fin. Assur., Inc.*, 624 F. Supp. 686, 693 (W.D. Mo. 1985). The Defendants' reliance on the availability of positions in Wisconsin and Florida to establish a lack of reasonable diligence fails to satisfy their burden of proof that Dr. Warren did not mitigate her damages.

      2.    The Superintendency of Conway Public School was not substantially similar to the PCSSD Superintendency that PCSSD withheld from Dr. Warren.

If the employer proves that the claimant rejected or did not seek a position substantially similar to the discriminatorily withheld position, the claimant has failed to mitigate her damages. The claimant is not entitled to back pay to the extent she did not avoid loss. *Baker*, *supra*, at 1179-1180.

> Once a claimant establishes a prima facie case and presents evidence on the issue of damages, the burden of producing sufficient evidence to establish the amount of interim earnings or lack of diligence shifts to the defendant. The defendant must then "establish that: 1) there were *substantially equivalent positions* which were available; and 2) the claimant failed to use reasonable care and diligence in seeking such positions.

*Grace v. City of Detroit*, 341 F. Supp. 2d 709, 716 (E.D. Mich. 2004), aff'd, 216 F. App'x 485 (6th Cir. 2007). A claimant is not obligated to accept a position or pursue a position that "is not consonant with his particular skills, background and experience." *Reilly v. Cisneros*, 835 F.

Supp. 96, 100 (W.D.N.Y. 1993), aff'd, 44 F.3d 140 (2d Cir. 1995), *quoting*, *N.L.R.B. v. Madison Courier, Inc.*, 153 U.S.App.D.C. 232, 245-246, 472 F.2d 1307, 1320-1321 (1972).

Defendants must demonstrate that the alleged position provided "virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status as the former position." *Grace*, *supra*, at 716. The Defendants failed to establish the 2021-2022 Conway Public School ("Conway") Superintendency position was a substantially similar employment opportunity to PCSSD's 2018 position. The evidence introduced during the Defendants' cross examination of Dr. Warren was limited to 1) the fact that Dr. Warren did not apply for the 2021-2022 Conway Superintendency and 2) that the salary was more than Dr. Warren's salary as PCSSD's Asst. Super. for Equity. Defendants did not offer evidence on 1) the promotional opportunities, 2) actual compensation, 3) working conditions, or 3), most importantly, the job responsibilities. Defendants did not offer evidence on the deadline for applying for the position. No evidence was offered on the correlation between Dr. Warren's experience and Conway's job responsibilities to substantiate that Conway's position was substantially similar to the one PCSSD and its Board withheld from Dr. Warren. None of the Defendants' pretrial disclosures or trial exhibits addressed Conway's search for a superintendent. More importantly, any finding "inferred" from the jury's limited award of back pay is based on speculation by the jury and not evidence.

> a.   The job responsibilities for Conway's superintendency are substantially different from those of PCSSD.

As the comparison chart of District Characteristics illustrates, the job responsibilities of Conway superintendency are substantially different from those of PCSSD (Plaintiff's Exhibit 3). The most striking difference is the educational achievement districts' schools for the 2018-2019 academic year as evaluated by the Arkansas Department of Education in its ESSA School Grade

Index.  Because of covid-19, ESSA ratings were suspended for 2019-2020 and 2020-2021.

PCSSD had 24 schools from 2018 to 2019. Seventy percent (70%) of its schools are graded C &

D; eleven received a grade of "C" and six were awarded a grade of "D." In contrast, Conway had

15 schools; only 1 or 6.7% of its schools received a grade of "C."  Of the remaining 14 schools,

seven received an "A" and seven received a "B" (Plaintiff's Exhibit 3, Comparison Chart of Job

Responsibilities).  A Superintendent at Conway functions as a "caretaker," merely maintaining

the excellence already achieved. PCSSD's Superintendent must focus on rehabilitating PCSSD's

academically distressed schools, 70% or 17 of PCSSD's 24 schools, a challenge that Dr.

Warren's experience and expertise have groomed her to tackle with ease.

Likewise, the certified teachers, certified staff, and student populations vary substantially

by race, creating substantially different work environments with significantly different relational

dynamics.

| DISTRICT CHARACTERISTICS CERTIFIED TEACHERS BY RACE 2020-2021 SUBSTANTIALLY DIFFERENT JOB RESPONSIBILITIES ||
|---|---|
| **PCSSD** | **CONWAY** |
| **White** 584     70.0% | **White** 569     90.2% |
| **Black** 240     28.7% | **Black**   52       8.2% |
| **Other**   10        1.2% | **Other**   11       1.7% |

| DISTRICT CHARACTERISTICS CERTIFIED STAFF BY RACE 2020-2021 SUBSTANTIALLY DIFFERENT JOB RESPONSIBILITIES ||
|---|---|
| **PCSSD** | **CONWAY** |
| **White** 142     57.0% | **White** 170     85.9% |
| **Black** 104     41.8% | **Black**   27     13.6% |
| **Other**     3        1.2% | **Other**     1       .51% |

| DISTRICT CHARACTERISTICS CLASSIFIED STAFF BY RACE 2020-2021 SUBSTANTIALLY DIFFERENT JOB RESPONSIBILITIES ||
|---|---|
| **PCSSD** | **CONWAY** |

| | | | | |
|---|---|---|---|---|
| **White** 456 | 40.3% | | **White** 313 | 68.3% |
| **Black** 636 | 56.2% | | **Black** 130 | 28.4% |
| **Other** 40 | 39% | | **Other** 15 | 3.3% |

Although the respective student populations of the two districts are substantially similar, the racial composition of their student populations is significantly different. Consequently, the Superintendent's qualifications and experience necessary for success are different because the job responsibilities are substantially different.

| DISTRICT CHARACTERISTICS STUDENT POPULATION & STUDENT POPULATION BY RACE 2020-2021 SUBSTANTIALLY DIFFERENT JOB RESPONSIBILITIES | | | |
|---|---|---|---|
| **PCSSD STUDENT POPULATION 11,424** | | **CONWAY STUDENT POPULATION 9,849** | |
| **White** 4475 | 39.2% | **White** 5220 | 53.0% |
| **Black** 5075 | 44.4% | **Black** 2887 | 29.3% |
| **Other** 1874 | 16.4% | **Other** 1742 | 17.7% |

The Defendants failed to establish that Conway's superintendency was substantially similar to PCSSD's. Conway's position was not "virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status as the former position." *Baker*, *supra*, at 1180, quoting *Reilly v. Cisneros*, 835 F.Supp. 96, 99 (W.D.N.Y.1993), aff'd, 44 F.3d 140 (2d Cir.1995). Dr. Warren's decision not to apply for the Conway position was not a failure to act reasonably. Therefore, neither Dr. Warren's failure to apply for the position nor the salary available for Conway superintendency may be used to reduce Dr. Warren's request for additional back pay and front pay. Any finding from the jury's limited award of back pay was based solely on speculation by the jury and not evidence. Dr. Warren did not fail to mitigate her damages.

Even assuming the Conway Superintendency was substantially similar, Dr. Warren would be entitled to back pay until the application deadline for the Conway position in the Fall of 2020, approximately October 13, 2020, the date the Conway Board moved to the interviewing

stage of its search. Minutes of the October 13, 2020, meeting

(https://drive.google.com/file/d/1WAiZasej3QGAhhdM5wbBiscrVoEeShaq/view); or the date

the Conway Board selected its finalist for the position of Superintendent, December 8, 2020.

Minutes of the December 8, 2020, meeting

(https://drive.google.com/file/d/1s2qcUUCtfluoSwMnvk_0I812XYBaLTrH/view).

      3.      <u>Dr. Warren engaged in an honest, good faith effort to mitigate her damages</u>.

      Title VII requires a claimant to engage in an honest, good faith effort to mitigate her

damages. Dr. Warren's conduct satisfied this standard. "[T]he reasonableness of a Title VII

claimant's diligence 'should be evaluated in light of the individual characteristics of the claimant

and the job market.'" *Huber v. The Gazette Company*, No. C 98–50 MJM, *1999 WL 33656874*

(N.D. Iowa Oct. 26, 1999).

      In *Baker*, the claimant was constructively discharged. Once cleared by her doctors to

return to work, she immediately obtained employment in a different field. Baker did not attempt

to find work in the meat-packing production field. She chose to enter a new career field. The

employer did not prove that comparable employment was actually available in the production

field when Baker accepted her position as a CNA. In holding that Baker satisfied her duty to use

reasonable diligence in finding suitable employment, the court considered her education, the

reasons for her decision, the income generated by her new employment, the unlawful acts by her

employer, and stated:

> The court is loathe to hold that a claimant must choose between pursuing a new career or
> facing denial of prospective equitable relief, especially in a case such as this where the
> plaintiff's decision to change careers was a direct result of the discrimination she endured.

*Baker*, at 1179-81. The court also observed a mitigative motive in the business decisions Baker

made.

Similarly, in *Daines v. City of Mankato*, 754 F. Supp. 681, 702 (D. Minn. 1990), the court discerned a mitigative motive when the claimant had not refused any position substantially equivalent to the housing director position withheld by her employer. The employer did not present evidence that plaintiff had refused a substantially equivalent job. The employee voluntarily resigning her job and accepted one in another city that led to a job substantially equivalent to the one withheld by her employer. The court concluded that "the employment decisions made by plaintiff were part of a reasonable and good faith effort to achieve such a [a substantially equivalent] position and, therefore, were based on "mitigative motives." *Id.*

Likewise, the court in *E.E.O.C. v. Fin. Assur., Inc*., 624 F. Supp. 686, 693 (W.D. Mo. 1985) found that the claimant, a discharged executive secretary, satisfied her obligation of an honest, good faith effort when she visited the State Job Service Office on several occasions, sought job referrals, read and marked newspaper advertisements, contacted personnel agencies and placed her name with at least one personnel agency, followed up leads obtained to determine the nature and incidents of the job, submitted her application to multiple employers either directly or through the employment agency. She did not refuse any employment offers from any source and performed babysitting. *Id.*

As the foregoing cases illustrate, Dr. Warren satisfied her obligation of an honest, good faith effort to mitigate her damages. After suffering the humiliating exclusion from the pool of finalists and the hiring of a lesser qualified white male, she continued her performance of her Interim Superintendent contract. Dr. Warren consented to the inclusion of her name in Ray and Associates' database to receive notice of open superintendent positions being recruited by Ray and Associates. She returned to her position as Asst. Super. for Equity and did not resign or retire as required by prevailing law. *Jurgens v. Equal Emp't Opportunity Comm'n*, 903 F.2d 386, 389

(5th Cir.1990); *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C.Cir.1981) (requiring a finding of

constructive discharge to justify post-departure back pay); *McCoy v. Oscar Mayer Foods*, 108

F.3d 1379 (7th Cir. 1997) (claimant was entitled to back pay limited to the difference in pay

between the two positions for the period between the denial and his resignation); *Lewis v. D.C.*,

791 F. Supp. 2d 136, 143–44 (D.D.C. 2011) (a plaintiff who resigns or retires from his or her

position is barred from recovering back pay for the period after his or her departure, absent a

viable claim of constructive discharge); see generally *Bowles v. Osmose Utilities Servs., Inc.*, No.

CIV. 04-4003, 2004 WL 4910143, at *7 (W.D. Ark. Dec. 21, 2004), *aff'd*, 443 F.3d 671 (8th Cir.

2006).

Dr. Warren worked diligently and in good faith to maintain her employment with PCSSD

as required by one seeking back pay and front pay.

> A Title VII claimant seeking either back pay or front pay damages has a duty to mitigate
> those damages by exercising reasonable diligence to locate other suitable employment
> and *maintain a suitable job* once it is located.

*Baker*, *supra*, at 1175, *quoting*, *E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664, 668 (8th Cir.

1992) (emphasis added). With a mitigative motive, Dr. Warren undertook the AVID assignment

to improve her knowledge and skill on eliminating achievement gaps. She undertook AVID

training and implemented AVID in 23 of PCSSD's schools. PCSSD relied upon Dr. Warren's

implementation of AVID in its October 24, 2019, Notice of Unitary Status, *Little Rock School

District v. PCSSD*, 4:82-cv-00866-DPM, Dkt. # 5533. Dr. Warren served as one of PCSSD's

primary witnesses during the trial of its July 2020 trial on Unitary Status. Janice Warren directed

and managed PCSSD's covid-19 protocols as Asst. Super. for Pupil Services 2020 to the present

date. Dr. Warren was among those acknowledged by Judge Price Marshall in his opinion

releasing PCSSD from Federal Court supervision in the four remaining areas that had not been previously declared unitary under Plan 2000. These were subject to Dr. Warren's authority (Plaintiff's Trial Exhibit 3).

Although Dr. Warren declined to apply for positions located at an unreasonable distance from her home and grandchildren, her decision was consistent with prevailing law. *Coleman v. City of Omaha*, 714 F.2d 804, 808 (8th Cir. 1983); *Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114, 119 (4th Cir. 1983); *E.E.O.C. v. Fin. Assur., Inc*., 624 F. Supp. 686, 693 (W.D. Mo. 1985).  Dr. Warren spoke of her commitment to PCCSD during her cross-examination; that is not the issue. The Defendants did not and have not established that the Dr. Warren refused to accept an offer of a substantially similar position and have not proven that the Conway position was substantially similar to the position withheld by PCSSD. Indeed, the Defendants did not establish at trial that *a* substantially similar position, within a reasonable distance from Dr. Warren's North Little Rock home was available. Consequently, the jury did not hear evidence consistent with Eighth Circuit jurisprudence that is required to support a conclusion that Dr. Warren failed to mitigate her damages fully. This Court must conclude that Dr. Warren met her obligation of engaging in an honest, good faith effort to mitigate her damages.

      4.    <u>Front pay is within the discretion of the district court</u>.

Reinstatement is impracticable or impossible in this case. Dr. McNulty, an innocent, non-culpable employee, currently holds the position of Superintendent. Front pay is an appropriate remedy. In its order, this Court denied Warren's request for front pay:

> because the jury found that Warren failed to mitigate her damages when it only awarded
> her half of the back pay she was seeking. The jury concluded that Warren was not

entitled to lost wages and benefits through the date of verdict, which is when front pay begins to be calculated.  A front pay award would contradict this finding by the jury. Order, Dkt. # 191, p.5, citing *Mathieu v. Gopher News Co.*, 273 F.3d 769 (8th Cir. 2001); *Excel Corp. v. Bosley*, 165 F.3d 635, 639 (8th Cir. 1999); *Miller v. Bd. of Regents of Univ. of Minnesota*, No. 15-CV-3740 (PJS/LIB), 2019 WL 586674, at *2 (D. Minn. Feb. 13, 2019), amended in part, 402 F. Supp. 3d 568 (D. Minn. 2019).  These cases establish that a jury's finding, even on evidence consistent with the defendant's burden of proof, is only one of several factors. *Excel Corp. v. Bosley*, *supra*; *Miller v. Bd. of Regents of Univ. of Minnesota*, *supra*. This Court's denial of  front pay when 1) the Defendants failed to satisfy their burden of proof as required by Eighth Circuit jurisprudences, 2) without considering Warren's acts in mitigation, and 3) without considering other factors as required by the Eighth Circuit errs in both fact and law. "The district court explained that if Bosley had offered evidence of her job search, it might have shown that she had mitigated her damages. But, that evidence was not in the record." *Excel Corp. v. Bosley*, 165 F.3d 635, 640 (8th Cir. 1999).

Here, the record reflects that Warren not only returned to her position of Asst. Super. for Equity as required in mitigation of her damages but also applied for PCSSD's Deputy Superintendent position that was advertised in July of 2018. She consented to remaining in the Ray and Associates database and only declined to consider positions located at an unreasonable distance from her home. More importantly, the record *sub judice* does not support Defendants' contention that the Conway position was a substantially similar position, and the record does not establish that substantially similar positions were within a reasonable distance of Warren's home in North Little Rock. The record does not support the employer's contention that the claimant

efforts were deficit. *Arlington Hotel Co. v. NLRB*, 876 F.2d 678, 680 (8th Cir. 1989). The jury was left to speculate that all superintendencies are identical.

Although this Court is not free to reject or contradict the jury's findings, this Court retains the discretion to consider all the circumstances when it determines if equitable relief including front pay is appropriate. *Newhouse v. McCormick & Co*., 110 F.3d 635, 643 (8th Cir. 1997) (front pay is an equitable issue for the court). Here, the Court only considered the jury's findings. *Mathieu*, supra, at 778.

      a.   <u>Other circumstances this Court must consider when ruling on front pay.</u>

When considering the equitable award of front pay courts consider the following factors (1) the plaintiff's age; (2) the length of the plaintiff's employment with the defendant; (3) the likelihood that the plaintiff's employment would have continued absent the unlawful conduct; (4) the length of time it will take the plaintiff to secure comparable employment; (5) the plaintiff's work and life expectancy; (6) whether the plaintiff was an at-will employee; (7) the length of time other employees typically hold the position; and (8) the plaintiff's ability to work. *Miller v. Bd. of Regents, supra,* *3.

As to Dr. Warren,

(1) the plaintiff's age:  65 1/2 years old;

(2) the length of the plaintiff's employment with the defendant:   10 years;

(3) the likelihood that the plaintiff's employment would have continued absent the unlawful conduct: substantially likely; her employment has continued in good faith and with substantial benefit to PCSSD after PCSSD's illegal conduct;

(4) the length of time it will take the plaintiff to secure comparable employment: Dr. Warren's skills and expertise are specialized for academically and fiscally distressed

school districts. Given Dr. Warren's age, recommencing service with another district is significantly diminished;

(5) the plaintiff's work and life expectancy:   work expectancy: 4 years, life expectancy: 20 years;

(6) whether the plaintiff was an at-will employee:  Yes;

(7) the length of time other employees typically hold the position Superintendent:  6 – 10 years;

(8) the plaintiff's ability to work:  exceptional.

The determination of front pay is a question for this Court. *Newhouse*, *supra*. This Court must consider all the circumstances. *Miller v. Bd. of Regents*, *supra*, *3. In March 2018 when PCSSD and its Board engaged in retaliatory conduct, Dr. Warren was 62 ½.  The retaliatory behavior by Dr. Linda Remele continued in July 2018 when Remele opposed Warren's appointment as Deputy Superintendent. These acts of retaliation against Warren occurred after six years of faithful, dedicated service in two fulltime jobs that reignited PCSSD's progress towards unified status and PCSSD's ultimate release from Federal Court supervision in all areas subject to Dr. Warren's oversight.

Dr. Warren maintained her employment with PCSSD, as required by prevailing law to mitigate her damages, and with a mitigative motive, assumed responsibility for launching AVID district-wide. In approximately four years, 2026, PCSSD's middle school children who were part of Dr. Warren's launch of AVID in 2019 will be graduating from high school and beginning college. With only approximately four years remaining until she turns age 70, opportunities for recommencing service with a new district are significantly diminished. These circumstances coupled with the Defendants' failure to prove that the Conway Superintendency was

substantially similar to PCSSD's position and Defendants' inability to identify the availability of other substantially similar positions mandate the award of front pay.

Finally, Dr. Warren only requested this Court to order either the adjustment of salary to equal Dr. McNulty's salary or to award her front pay for two years. Plaintiff restates her request. The only other option is for PCSSD to pay Dr. Warren the salary equivalent of the Deputy Superintendent of Learning Services, the job she is performing. In view of all the circumstances, this request is neither outrageous nor unreasonable.

5.    Public Policy mandates the award of additional back pay and front pay in this case.

Title VII's back pay provisions are modeled on the back pay provisions of the National Labor Relations Act. *Di Salvo v. Chamber of Com. of Greater Kansas City*, 568 F.2d 593, 597 (8th Cir. 1978). Decisions by the National Labor Relations Board are instructive on back pay issues. *Id*. N.L.R.B. v. Madison Courier, Inc., 472 F.2d 1307 (D.C. Cir. 1972), provides insight on the issues before this Court.

The first goal of the back pay remedy is to reimburse the innocent employee for actual losses that resulted from her employer's improper, unlawful conduct. However,

> second, the [back pay] order furthers the public interest advanced by the deterrence of such illegal acts.  While the need for achievement of the private reimbursement objective is obvious, courts have generally placed greater stress on the less apparent goal of furthering public policy.

*Id*. at 1316. The duty to mitigate actual loss was added by the Supreme Court to further the vindication of the public policy goal of back pay and to thwart "willful idleness." *Id*. at 1317. Dr. Warren has not been willfully idle or malingering is a do-nothing position! "[I]n fashioning a proper back pay order, the N.L.R.B. 'may give appropriate weight to a clearly *unjustifiable* refusal [by the discriminatee] to take desirable new employment.'" *Id*., at 1318.  Dr. Warren has

not engaged in an unjustifiable refusal to take desirable new employment. Defendants have only

pointed to a single superintendency occurring in the two and a half years that have elapsed

between PCSSD'S retaliatory conduct and trial.

After the lapse of a reasonable time, the National Labor Relations Board encourages

wrongfully discharged discriminatees to lower their sights and accept employment with less

remunerative potential. Requiring a victim of unlawful failure to promote to remain with his or

her employer is a corollary of this principal.  However, both the discriminatee who is wrongfully

terminated and the victim of failure to promote are confronted with a Hobson's choice – loss of

back pay for accepting or remaining in a lower paying position or loss of back pay for not

generating increased income during an extensive back pay period.

> Although a discriminatee may be required by the Labor Board to 'lower his sights' by
> seeking less remunerative work after he was [sic] unsuccessfully attempted for a
> reasonable period of time to locate interim employment comparable with his improperly
> denied position, several considerations indicate that the N.L.R.B. and courts must be
> careful when applying such a requirement. If the discriminatee accepts significantly
> lower-paying work too soon after the discrimination in question, he may be subject to a
> reduction in back pay on the ground that he willfully incurred a loss by accepting an
> 'unsuitably' low-paying position. On the other hand, under the Southern Silk formulation,
> if he fails to 'lower his sights' after the passage of a 'reasonable period' of unsuccessful
> employment searching, he may be held to have forfeited his right to reimbursement on
> the ground that he failed to make the requisite effort to mitigate his losses. Under these
> circumstances, we believe that it would not be unreasonable for the N.L.R.B. to resolve
> doubts in this area in favor of the innocent discriminatee. '[T]he Board can hardly be said
> to be effectuating policies beyond the purposes of the Act by resolving the doubt against
> the party who violated the Act.'

*Id*., at 1321. Here, Dr. Warren mitigated her actual loss as required by law by maintaining her

employment with PCSSD.  After two and a half years, Defendants have only identified one

superintendency opening within a reasonable distance from Dr. Warren's home but have not

proven that the position was virtually the same as the PCSSD superintendency. Now, despite her

reasonable, good faith efforts to mitigate, PCSSD demands that Dr. Warren must forfeit two

20

years of back pay and front pay. Such an outcome does not effectuate the policy goals of Title VII and will discourage innocent employees who might otherwise resort to Title VII to correct employment discrimination.  All doubts regarding back pay and front pay in this case must be resolved against PCSSD.

## CONCLUSION

For the foregoing reasons, Plaintiff humbly requests this Honorable Court to reconsider its order denying in part her request for equitable relief for additional back pay and front pay. The policy goals of Title VII mandate a modification in the Court's order.

Respectfully submitted this 2nd day of May, 2022,

Sarah Howard Jenkins
Arkansas Bar #97046
SARAH HOWARD JENKINS, PLLC
P.O. Box 242694
Little Rock, Arkansas 72223
Telephone: 501-406-0905
Email:  sarah@shjenkinslaw.com

Austin Porter Jr., Ark. Bar No. 86145
PORTER LAW FIRM
Catlett-Prien Tower Building
323 Center Street, Suite 1035
Little Rock, Arkansas 72201
Telephone: 501-244-8200
Facsimile: 501-372-5567
Email:  Aporte5640@aol.com

Attorneys for Plaintiff